1   Tara Ford (State Bar No. 322049)
    tford@publiccounsel.org
2   PUBLIC COUNSEL
    610 South Ardmore Avenue
3   Los Angeles, California 90005
    Telephone:  (213) 385-2977
4   Facsimile:   (213) 385-9089

5   Grant A. Davis-Denny (State Bar No. 229335)
    grant.davis-denny@mto.com
6   MUNGER, TOLLES & OLSON LLP
    350 South Grand Avenue, Fiftieth Floor
7   Los Angeles, California 90071-3426
    Telephone:  (213) 683-9100
8   Facsimile:   (213) 687-3702

9   Leecia J. Welch (State Bar No. 208741)
    lwelch@childrensrights.org
10  CHILDREN'S RIGHTS
    2021 Fillmore Street
11  San Francisco, California  94115
    Telephone:  (415) 602-5202

12
    Sarah Manimalethu (State Bar No. 326441)
13  smanimalethu@alliancecr.org
    ALLIANCE FOR CHILDREN'S RIGHTS
14  3333 Wilshire Boulevard, Suite 550
    Los Angeles, California  90010
15  Telephone:  (213) 368-6010

16  *Attorneys for Plaintiffs*

17  * Additional counsel of record listed in
    signature line

18

19  **UNITED STATES DISTRICT COURT**

    **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

20

21  OCEAN S.; JACKSON K.; ROSIE S.;        Case No. 2:23-cv-06921
    ERYKAH B.; JUNIOR R.;  and ONYX
22  G. , by and through her next friend    **COMPLAINT FOR**
    Craig Schultz, individually and on     **DECLARATORY AND**
    behalf of others similarly situated,   **INJUNCTIVE RELIEF**

23

24          Plaintiffs,

25          vs.

26  LOS ANGELES COUNTY; LOS
    ANGELES COUNTY DEPARTMENT
27  OF CHILDREN AND FAMILY
    SERVICES; BRANDON NICHOLS,
28  Director of the Los Angeles County
    Department of Children and Family

1   Services; LOS ANGELES
    DEPARTMENT OF MENTAL
2   HEALTH; LISA WONG, Director of
    the Los Angeles County Department of
3   Mental Health; CALIFORNIA
    DEPARTMENT OF HEALTH CARE
4   SERVICES; MARK GHALY,
    Secretary of the California Health and
5   Human Services Agency;
    CALIFORNIA DEPARTMENT OF
6   SOCIAL SERVICES; and KIM
    JOHNSON, Director of the California
7   Department of Social Services,
    MICHELLE BAASS,
8
                Defendants.
9

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   JURISDICTION AND VENUE .......................................................... 5

III.  PARTIES ............................................................................................. 5

IV.   NAMED PLAINTIFFS' EXPERIENCES IN THE FOSTER CARE SYSTEM ............................................................................................. 9

    A.    Plaintiff Erykah B. ................................................................... 9

    B.    Plaintiff Onyx G. ................................................................... 11

    C.    Plaintiff Rosie S. ................................................................... 15

    D.    Plaintiff Jackson K. ............................................................... 19

    E.    Plaintiff Ocean S. .................................................................. 22

    F.    Plaintiff Junior R. .................................................................. 25

V.    DEFENDANTS FAIL TO MEET THEIR LEGAL OBLIGATIONS TO TRANSITION AGE FOSTER YOUTH .......................................... 29

    A.    Under State and Federal Law, Defendants Are Responsible for the Administration, Oversight, and Provision of Safe Stable and Appropriate Placement and Medicaid Services to Transition Age Foster Youth. ........................................................................... 29

    B.    Defendants Must Provide Safe and Stable Placement and Services that Are Appropriate for the Needs of Transition Age Foster Youth. ...................................................................................... 30

    C.    Defendants' Failure to Meet Their Obligations to Transition Age Foster Youth Results in a Foster Care to Homelessness Pipeline. ....... 31

VI.   DEFENDANTS' FAILURE TO DEVELOP A MINIMALLY ADEQUATE ARRAY OF SAFE AND STABLE PLACEMENTS PUSHES TRANSITION AGE FOSTER YOUTH INTO HOMELESSNESS ................................................................................ 33

    A.    DCFS and CDSS Supervise and License Placements for Transition Age Foster Youth. ............................................... 33

        1.    SILP and THPP-NMD Programs Are the Primary Placement Options for Transition Age Foster Youth Ages eighteen to twenty-one. .................................................. 33

        2.    Resource Family Homes Are the Primary Placement Option for Transition Age Foster Youth Ages Sixteen and Seventeen. .................................................................... 36

B.    DCFS's Placement Options for Transition Age Youth Are Scarce and Inadequate. ................................................................. 36

C.    When Transition Age Foster Youth Become Unhoused, DCFS Fails to Provide Safe, Emergency Housing and Support ..................... 38

D.    Defendants Have Deliberately Ignored the Need to Evaluate and Expand the Number of Safe, Stable, and Appropriate Placements. ................................................................................. 41

VII.   DEFENDANTS FAIL TO HAVE A SYSTEM TO ENSURE TRANSITION AGE FOSTER YOUTH RECEIVE INDIVIDUALIZED PLANNING FOR THEIR TRANSITION TO ADULTHOOD ................... 43

A.    Defendants Must Adequately Plan for Transition Age Foster Youth's Transition to Adulthood. .......................................... 43

B.    Defendants Have Failed to Create a Case Planning System that Ensures all Transition Age Foster Youth Receive Transition Planning. ......................................................................... 45

VIII.  DEFENDANTS' PROCEDURES DEPRIVE TRANSITION AGE FOSTER YOUTH OF DUE PROCESS WHEN DENIED OR PUSHED OUT OF PLACEMENT ............................................................... 47

A.    Application Procedures for Placement Benefits are Arbitrary and Opaque, and Youth Do Not Have Notice or Meaningful Opportunities to Contest a Denial. .......................................... 47

B.    Youth Losing Placement Benefits Receive Limited Notice and Lack Meaningful Opportunities to Contest the Discharge. ............... 51

IX.    DEFENDANTS VIOLATE TRANSITION AGE FOSTER YOUTH'S RIGHT TO FAMILIAL ASSOCIATION .......................................... 54

X.     DEFENDANTS DISCRIMINATE AGAINST YOUTH WITH MENTAL HEALTH DISABILITIES ............................................... 57

A.    Youth with Mental Health Conditions Which Substantially Limit One or More Major Life Activity are Protected from Discrimination on the Basis of Disability. ................................. 57

B.    DCFS's Placement Application Process Discriminates on the Basis of Disability. ........................................................... 59

C.    Youth with Mental Health Disabilities Are Pushed Out of DCFS Placement Because of Disability. ......................................... 65

D.    Defendants Unlawfully Institutionalize Youth with Mental Health Disabilities ................................................................... 67

XI.    TRANSITION AGE FOSTER YOUTH ARE BEING DENIED NECESSARY BEHAVIORAL HEALTH SERVICES. ............................ 70

    A.    Transition Age Foster Youth Are Entitled to Necessary EPSDT Services, Including Specialty Mental Health Services. ........................ 70

    B.    Defendants Fail to Provide Transition Age Foster Youth with Necessary Behavioral Health Services. ................................................ 73

    C.    Defendants Must Coordinate to Ensure Receipt of Behavioral Health Services. ................................................................................ 74

XII.   THIS ACTION CANNOT BE BROUGHT IN THE DEPENDENCY COURT AND IT DOES NOT INTERFERE WITH THE DEPENDENCY COURT'S JURISDICTION. ................................................ 74

CLASS ACTION ALLEGATIONS ...................................................................... 76

FIRST CAUSE OF ACTION ............................................................................... 80

SECOND CAUSE OF ACTION ........................................................................... 81

THIRD CAUSE OF ACTION ............................................................................... 83

FOURTH CAUSE OF ACTION ........................................................................... 84

FIFTH CAUSE OF ACTION ................................................................................ 88

SIXTH CAUSE OF ACTION ............................................................................... 92

SEVENTH CAUSE OF ACTION ......................................................................... 93

REQUEST FOR RELIEF ..................................................................................... 93

GLOSSARY OF TERMS ..................................................................................... 96

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**FEDERAL STATUTES**

4

28 U.S.C § 1331 ................................................................................................. 5

5

28 U.S.C § 1343(a) ............................................................................................ 5

6

28 U.S.C § 1391(b) ............................................................................................ 5

7

28 U.S.C § 1391(c) ............................................................................................ 5

8

28 U.S.C. § 1920 ............................................................................................... 95

9

28 U.S.C. § 2201 ................................................................................................ 5

10

28 U.S.C. § 2202 ................................................................................................ 5

11

29 U.S.C. § 794 ................................................................................................. 84

12

42 U.S.C. § 670 et seq. ............................................................................. 3, passim

13

42 U.S.C. § 671(1)(A)-(B) .............................................................................. 80

14

42 U.S.C. § 671(a)(2) ...................................................................................... 29

15

42 U.S.C. § 671(a)(16) ............................................................................... 44, 81

16

42 U.S.C. § 675(1) ........................................................................................... 44

17

42 U.S.C. § 675(1)(A) ..................................................................................... 44

18

42 U.S.C. § 675(1)(A)-(B) .............................................................................. 43

19

42 U.S.C. § 675(1)(B) ..................................................................................... 44

20

42 U.S.C. § 675(5)(I) ...................................................................................... 81

21

42 U.S.C. § 675(5)(A) ..................................................................................... 44

22

42 U.S.C. § 675(5)(H) ..................................................................................... 81

23

42 U.S.C. § 675(8)(B) ..................................................................................... 45

24

42 U.S.C. § 1396(a)(5) .................................................................................... 71

25

26

27

28

42 U.S.C. § 1396(r) ................................................................................... 93

42 U.S.C. § 1396a(43) ............................................................................. 93

42 U.S.C. § 1396a(43)(C) ................................................................... 4, 93

42 U.S.C. § 1396a(a)(5) ........................................................................... 71

42 U.S.C. § 1396a(a)(10)(A) .......................................................... 4, 71, 93

42 U.S.C. § 1396a(a)(43) ......................................................................... 71

42 U.S.C. § 1396a(a)(43)(C) .................................................................... 71

42 U.S.C. § 1396d(a)(4)(B) ........................................................... 4, 71, 93

42 U.S.C. § 1396d(r) ......................................................................... 4, 93

42 U.S.C. § 1396u-2 ................................................................................ 71

42 U.S.C. § 1983 ........................................................... 5, 81, 83, 93

42 U.S.C. § 1988 ..................................................................................... 95

42 U.S.C. § 12102(1)(A) ......................................................................... 59

42 U.S.C. § 12102(2)(A) ......................................................................... 59

42 U.S.C. § 12102(2)(B) .......................................................................... 59

42 U.S.C. § 12102 et seq. ......................................................................... 88

42 U.S.C. § 12131 .................................................................................... 88

42 U.S.C. § 12131(1)(A) ........................................................................... 9

42 U.S.C. § 12131(1)(B) ........................................................................... 9

42 U.S.C. § 12131(2) ............................................................................... 88

42 U.S.C. § 12132 .................................................................................... 88

42 U.S.C. § 12205 .................................................................................... 95

Rehabilitation Act of 1973 § 504 ................................................... 4, passim

Social Security Act § 475(8) .................................................................... 45

**STATE STATUTES**

Cal. Code Regs. Title 22 § 50004................................................................30

Cal. Health & Safety Code § 1502(18)........................................................12

Cal. Health & Safety Code § 1559.110(b)-(c)........................................10, 34

Cal. Health & Safety Code § 1559.110(d)(1)-(3)........................................34

Cal. Health & Safety Code § 1559.110(g)(2)(E)(iii)...................................92

Cal. Health & Safety Code § 1559.110(g)(2)(E)(iv)...................................92

Cal. Welf. & Inst. Code § 300.......................................................................7

Cal. Welf. & Inst. Code § 303(b)..................................................................1

Cal. Welf. & Inst. Code § 303(e)...................................................................1

Cal. Welf. & Inst. Code § 391.....................................................................45

Cal. Welf. & Inst. Code § 10605...................................................................8

Cal. Welf. & Inst. Code § 11400(v)............................................................45

Cal. Welf. & Inst. Code § 11400(x)............................................................33

Cal. Welf. & Inst. Code § 11400(x)(4)........................................................39

Cal. Welf. & Inst. Code § 11400(y)............................................................44

Cal. Welf. & Inst. Code § 11403.................................................................28

Cal. Welf. & Inst. Code § 16001(a)............................................................33

Cal. Welf. & Inst. Code § 16001(a)(2)........................................................39

Cal. Welf. & Inst. Code § 16001.9(a)(1).......................................................1

Cal. Welf. & Inst. Code § 16002.5..............................................................54

Cal. Welf. & Inst. Code § 16010.7(e)..........................................................51

Cal. Welf. & Inst. Code § 16500...................................................................7

Cal. Welf. & Inst. Code § 16501(a)...............................................................7

Cal. Welf. & Inst. Code § 16501(a)(5) ........................................................ 26

Cal. Welf. & Inst. Code § 16501.1 ............................................................. 44

Cal. Welf. & Inst. Code § 16501.1 (a)(1) ................................................... 43

Cal. Welf. & Inst. Code § 16501.1(a)(3) ..................................................... 12

Cal. Welf. & Inst. Code § 16501.1 (d)(1) .................................................... 43

Cal. Welf. & Inst. Code § 16501.1(d)(1) ..................................................... 44

Cal. Welf. & Inst. Code § 16501.1(g)(16) ................................................... 44

Cal. Welf. & Inst. Code § 16501.1(g)(16)(A)(ii) ........................................ 44

Cal. Welf. & Inst. Code § 16501.1(g)(16)(B) ............................................. 45

Cal. Welf. & Inst. Code § 16522.1(a)(1-2) ................................................. 10

Cal. Welf. & Inst. Code § 16522.1(a)(2) ..................................................... 34

Cal. Welf. & Inst. Code § 16522.1(c) .......................................................... 35

**FEDERAL RULES**

Fed. R. Civ. P. § 23(a) ................................................................................ 94

Fed. R. Civ. P. § 23(a) 23(b)(2) .................................................................. 76

Fed. R. Civ. P. § 23(b)(2) ........................................................................... 94

Fed. R. Civ. P. § 23(e) ................................................................................ 95

Fed. R. Civ. P. § 23(h) ................................................................................ 95

Fed. R. Civ. P. § 57 ................................................................................ 5, 94

Fed. R. Civ. P. § 65 ................................................................................ 5, 94

**FEDERAL REGULATIONS**

28 C.F.R. 35.130(b)(1)(i)(ii)(iii)(v)(vii) ...................................................... 88

28 C.F.R. § 35.104 ...................................................................................... 88

28 C.F.R. § 35.108 ...................................................................................... 88

28 C.F.R. § 35.130 ................................................................................ 88

28 C.F.R. § 35.130(b)(3) ...................................................................... 89

28 C.F.R. § 35.130(b)(7) ...................................................................... 91

28 C.F.R. § 35.130(d) ..................................................................... 90, 91

28 C.F.R. § 84.4(b)(2) .......................................................................... 86

29 C.F.R. § 1630.2(j)(3)(iii) ................................................................. 59

42 C.F.R. § 431.10 ............................................................................... 71

45 C.F.R. § 84.3(j) ............................................................................... 84

45 C.F.R. § 84.3(k) .............................................................................. 84

45 C.F.R. § 84.4(b) .............................................................................. 84

45 C.F.R. § 84.4(b)(4) .......................................................................... 86

**STATE REGULATIONS**

22 C.C.R. 85068.5(a) ........................................................................... 51

**CONSTITUTIONAL PROVISIONS**

U.S. Const., amend I ................................................................ 55, 92, 94

U.S. Const., amend I and XIV .............................................................. 79

U.S. Const., amend XIV .............................................................. 3, passim

**OTHER AUTHORITIES**

Los Angeles County Child Welfare Policy: *Transitional Housing Services* 0100-560.30 (Revision Date: 4/7/2017) ................................ 38

## I.    INTRODUCTION

1.    This civil rights action challenges the Los Angeles County foster care system's persistent failure to ensure that foster youth aged sixteen to twenty-one ("transition age foster youth"[1]) have meaningful access to the crucial housing, mental health, and other services to which they are legally entitled.  Six transition age foster youth[2] (collectively, "Plaintiffs" or "foster youth") seek redress from the State and County entities and officials responsible for administering and supervising Los Angeles County's child welfare system[3] and Medicaid program (collectively, "Defendants").  Plaintiffs bring this lawsuit on behalf of a putative class and specific subclasses of transition age foster youth who are now, or will be, in extended foster care[4] in Los Angeles County.

2.    Under federal and State law, Defendants are responsible for the administration, oversight, and provision of foster care and Medicaid services to foster youth. Pursuant to these responsibilities, Defendants must provide foster youth with safe, stable and appropriate placements at all times, free from physical, psychological, and emotional harm.[5]  As dependents in the California foster care system, transition age foster youth are legally entitled to supportive services—including transition planning, housing, and developmental, educational, and necessary health and mental

---

[1] Foster youth aged eighteen to twenty-one are also referred to as nonminor dependents ("NMDs").
[2] Plaintiffs are transition age foster youth and are referred to in this Complaint by pseudonyms; they are separately filing a Motion to Proceed With Fictitious Names.
[3] For clarity purposes, this brief uses the traditional terms "child welfare system" and "foster care system" to refer to the system of policies and supportive services meant to ensure the safety, well-being, and permanency of children, youth, and families.  We recognize that the term "family regulation system" more aptly describes this set of government structures, which far too often unjustly regulates marginalized families.
[4] California's extended foster care program allows eligible youth to remain in foster care until age twenty-one.  Youth between the ages of eighteen and twenty-one in foster care are considered "nonminor dependent[s]." Cal. Welf. & Inst. Code § 303(b).  Nonminor dependents have all the same rights as dependent minors, and county welfare departments have the same responsibilities to nonminor dependents as they do to other foster youth. *See* Cal. Welf. & Inst. Code § 303(e); Cal. Welf. & Inst. Code § 16001.9(a)(1).
[5] "Placement" refers to the approved living setting in which County welfare agencies place foster youth who are under the county's Care and supervision.

health services—to help them develop skills and cultivate relationships needed for independent living.

3.     Defendants are aware that the population of transition age foster youth in Los Angeles County have specific developmental needs that Defendants are legally required to accommodate.  Both before and after entering the foster care system, transition age foster youth[6] experience significant trauma.  This trauma includes separation from their families and loss of community and social ties, as well as interpersonal trauma, which often entails experiencing physical and/or sexual abuse and witnessing violence.  Far too often, the system designed to protect and safeguard youths' needs exacerbates their trauma as they are cycled through multiple unsuitable placements, lose contact with siblings and other loved ones, and experience abuse and neglect in foster placements.  A disproportionately high percentage of these youth have mental health conditions and other disabilities related to complex trauma, *i.e.*, chronic, ongoing interpersonal trauma.  Some are also young parents who, as they transition to adulthood, seek health, stability, and safety not only for themselves, but also for their families.  The overwhelming majority of foster youth in Los Angeles County come from low-income Black and Latino communities.  By failing to provide transition age foster youth meaningful access to the safe, stable and appropriate placements and support services to which they are legally entitled, Defendants exacerbate the harms experienced by Los Angeles County's most vulnerable young people, with profound consequences for their well-being and futures.

4.     Defendants' failures to meet their legal duties have created a pipeline from the foster care system to homelessness, heaping trauma on top of trauma and funneling these youth to the margins of society.  Transition age foster youth are forced into couch surfing, tents on city streets, dangerous adult temporary shelters, and

---

[6] For brevity's sake, this Complaint uses the term "transition age foster youth," but Plaintiffs recognize that person first language such as "transition age youth in foster care" is preferred to prioritize the personhood of youth over their foster care experience.

vehicular homelessness.  With no reliable places to sleep, shower, or keep their belongings, it is virtually impossible for these youth to pursue higher education or hold down a job.

5.   Defendants are engaged in six violations of foster youth's legal rights.

6.   **First,** Defendants have a constitutional duty under the Fourteenth Amendment Due Process Clause to ensure the safety and wellbeing of the transition age foster youth they take into custody.  Defendants are violating transition age foster youths' substantive due process rights by failing to develop a minimally adequate array of safe and stable placements, thus exposing them to an unreasonable risk of harm.

7.   **Second,** Defendants have failed to develop and implement a system for providing transition age foster youth with legally compliant case plans and transition plans under the Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), 42 U.S.C. §§ 670 et seq.  These plans are the guiding roadmap for the services and safe, stable, and appropriate placements to which transition age foster youth are entitled at all times.  The absence of such a system sets transition age foster youth up for failure and is a significant factor pushing them into homelessness and poverty.

8.   **Third**, Defendants' (i) opaque and arbitrary placement application processes and (ii) practice of forcing youth out of placements without adequate notice or opportunity to be heard violate transition age foster youths' procedural due process rights under the Fourteenth Amendment.

9.   **Fourth,** Defendants violate transition age foster youths' First and Fourteenth Amendment rights to freedom of familial association.  Because Defendants fail to provide a minimally adequate array of safe and stable placements appropriate for expecting and parenting youth, these youth often become unhoused, increasing the likelihood of family separation.  The lack of placements also creates barriers for transition age foster youth seeking to reunify with their children who have been removed from their care.  Defendants' practices directly and substantially

interfere with transition age foster youths' ability to parent their children while receiving extended foster care placement and services.

10. **Fifth,** Defendants violate transition age foster youth's rights under the Rehabilitation Act of 1973 ("Section 504") and the Americans with Disabilities Act ("ADA"), along with their implementing regulations, by discriminating against youth with mental health disabilities who would benefit from foster care services. Specifically, Defendants: (i) deny access to  placements on the basis of disability; (ii) fail to provide trauma-responsive services and supports necessary for these youth to access and benefit from foster care; (iii) terminate participation in transitional housing programs on the basis of disability; and (iv) unnecessarily segregate youth with mental health disabilities in institutional settings, contravening the legal requirement that they be placed in the least restrictive community-based setting appropriate to their needs.

11. **Sixth,** Defendants violate the Medicaid Act, 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(43)(C), 1396d(a)(4)(B) and 1396d(r), by failing to ensure transition age foster youth have access to medical assistance—including early and periodic screening, diagnostic, and treatment ("EPSDT") services.  Defendants deny transition age foster youth vital behavioral health services such as intensive care coordination ("ICC"), therapeutic foster care, intensive home-based services ("IHBS"), peer support specialists services, mobile crisis services, and other mental health services.  Without these critical and necessary services, transition age foster youth face tremendous odds coping with past traumas, building relationships, succeeding in academic and work environments, and maintaining stable housing.

12. Although long aware of these violations, Defendants have failed to redress them.  Plaintiffs file this action to seek solely declaratory and prospective injunctive relief compelling Defendants to remedy known harmful and unlawful practices and system deficiencies in the provision of placement and services to transition age foster youth.

## II.    JURISDICTION AND VENUE

13.    The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C §§ 1331 and 1343(a) because it arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.  This Court has personal jurisdiction over Defendants because Defendants' acts and omissions took place within this district.

14.    Plaintiffs' claims for declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

15.    Venue is proper in this judicial district pursuant to 28 U.S.C § 1391(b), (c).  All Defendants reside in California, the state in which this judicial district is located, and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## III.    PARTIES

### Named Plaintiffs

16.    *Plaintiff Erykah B.* is a nineteen-year-old Black young person who lives in Los Angeles County, California.  She is a nonminor dependent ("NMD") and she is in extended foster care in Los Angeles County.  Erykah B. is a member of the General Class, the ADA Subclass, and the Medicaid Subclass.

17.    *Plaintiff Onyx G.* is a seventeen-year-old, Black and Latina young person currently in foster care in Los Angeles County, California.  Because she is currently a minor, Onyx G. is now appearing through her next friend, Craig Schultz, who is familiar with Onyx G.'s history and is dedicated to her best interests.  Onyx G. turns eighteen imminently, when she will become a NMD by operation of law. She intends to enter extended foster care in Los Angeles County.  Onyx G. is a member of the General Class, the ADA Subclass, and the Medicaid Subclass.

18.    *Plaintiff Rosie S.* is a twenty-year-old Latina young person and an expecting mother from Los Angeles County, California.  She is a NMD and she is in extended foster care in Los Angeles County.  She has been temporarily living in Las

Vegas, Nevada for the last nine months because the Los Angeles County Department of Children and Family Services ("DCFS") has not yet moved her to a safe, stable and appropriate placement in Los Angeles. Rosie S. is a member of the General Class, the ADA Subclass, the Medicaid Subclass, and the Expecting and Parenting Subclass.

19.     *Plaintiff Jackson K.* is a nineteen-year-old Latino young person currently living in Riverside County, California in this judicial district. He is a NMD and he is in extended foster care in Los Angeles County. Jackson K. is a member of the General Class, the ADA Subclass, and the Medicaid Subclass.

20.     *Plaintiff Ocean S.* is a twenty-year-old Black young mother who lives in Los Angeles County, California. She is a NMD and she is in extended foster care in Los Angeles County. Ocean S. is a member of the General Class, the ADA Subclass, the Medicaid Subclass, and the Expecting and Parenting Subclass.

21.     *Plaintiff Junior R.* is a twenty-year-old mixed race young person who lives in Los Angeles County, California. He is a NMD and he is in extended foster care in Los Angeles County. Junior R. is a member of the General Class, the ADA Subclass, and the Medicaid Subclass.

**County Defendants**

22.     *Defendant Los Angeles County ("the County")* is a local governmental entity duly organized and existing under the laws of the State of California. The County oversees and monitors the Los Angeles County Department of Children and Family Services and the Los Angeles County Department of Mental Health.

23.     *Defendant Los Angeles County Department of Children and Family Services ("DCFS")* is a Los Angeles County governmental agency duly organized and existing under the laws of the State of California. DCFS is the agency responsible for administering foster care services in Los Angeles County, for providing placements for youth in the foster care system, and for ensuring the safety and well-

being of children under court supervision pursuant to California Welfare and Institutions Code § 300.[7]

24.    **Defendant Brandon Nichols ("Nichols")** is the Director of DCFS.  In this role, Defendant Nichols is responsible for administering foster care services in Los Angeles County, for providing placements for youth in the foster care system, and for ensuring the safety and well-being of children under court supervision pursuant to California Welfare and Institutions Code § 300.  Defendant Nichols is sued solely in his official capacity.

25.    **Defendant Los Angeles County Department of Mental Health ("DMH")** is a Los Angeles County governmental agency duly organized and existing under the laws of the State of California.  DMH is the agency responsible for providing behavioral health services to transition age foster youth in Los Angeles, including providing necessary Specialty Mental Health Services.

26.    **Defendant Lisa Wong ("Wong)"** is the Director of DMH.  In this role, Defendant Wong is responsible for overseeing the administration and provision of behavioral health services to transition age foster youth in Los Angeles, including providing Specialty Mental Health Services.  Defendant Wong is sued solely in her official capacity.  The County, DCFS, Nichols, DMH and Wong are referred to as the **"County Defendants"**

**State Defendants**

27.    **Defendant California Health and Human Services Agency ("CalHHS")** is a State agency duly organized and existing under the laws of the State of California.  CalHHS oversees departments and offices that provide a wide range of services in the areas of health care, mental health, public health, alcohol and drug treatment, income assistance, social services, and assistance to people with

---

[7] Cal. Welf. & Inst. Codes §§ 16500, 16501(a).

disabilities.  CalHHS oversees and monitors the California Department of Social Services and the California Department of Health Care Services.

28.    ***Defendant Mark Ghaly, MD, MPH ("Ghaly")*** is the Secretary of the California Health and Human Services Agency.  In this role, Defendant Ghaly is responsible for the administration and oversight of CalHHS and its departments and offices that provide a wide range of services in the areas of health care, mental health, public health, alcohol and drug treatment, income assistance, social services, and assistance to people with disabilities.  Defendant Ghaly is sued solely in his official capacity.

29.    ***Defendant California Department of Social Services ("CDSS")*** is a State agency duly organized and existing under the laws of the State of California. CDSS is the single state agency responsible for supervising and monitoring the administration of foster care services in California.

30.    ***Defendant Kim Johnson ("Johnson")*** is the Director of the California Department of Social Services.  In this role, Defendant Johnson is responsible for administering laws relating to foster care services; promulgating regulations and standards; supervising the administration of public social services, including foster care services; and investigating, examining, and making reports on public offices responsible for the administration of social services.[8]  Under California Welfare and Institutions Code § 10605, she has the authority to enforce state and federal law. Defendant Johnson is sued solely in her official capacity.

31.    ***Defendant California Department of Health Care Services ("DHCS")*** is a State agency duly organized and existing under the laws of the State of California. DHCS is the single state agency responsible under federal law for the administration of California's Medicaid program ("Medi-Cal").

---

[8] Cal. Welf. & Inst. Codes§§ 10553, 10554, 10600, 10602.

32.     ***Defendant Michelle Baass ("Baass")*** is the Director of the California Department of Human Care Services ("DHCS").  Defendant Baass' duties include supervision and control of the Medi-Cal program to secure full compliance with governing laws.  Defendant Baass is a public agency director responsible for operation of a public entity, pursuant to 42 U.S.C. §§ 12131(1)(A) and (B).  Defendant Baass is sued solely in her official capacity.  CalHHS, Ghaly, CDSS, Johnson, DHCS and Baass are referred to as the **"State Defendants"**.

## IV.     NAMED PLAINTIFFS' EXPERIENCES IN THE FOSTER CARE SYSTEM

### A.     Plaintiff Erykah B.

33.     Erykah B. is a nineteen-year-old Black young person from Los Angeles, California.  Born shortly after her siblings were removed from their parents' care, Erykah B. spent most of her childhood cycling between DCFS supervision and her mother's care.  Despite the trauma Erykah B. has experienced in foster care, she successfully graduated from high school and is currently enrolled at a trade college in cosmetology.  She is passionate about styling hair and dreams of finishing college and opening her own salon.

34.     Erykah B. is enrolled in Medicaid.

35.     Erykah B. first entered foster care when she was an infant.  Throughout the next eight years she was placed in at least five different foster homes interspersed with periods of living with her mother.  She was removed from her mother for the final time in 2012 and placed with the person who would become her legal guardian two years later, after her parents' family reunification services were terminated.  Only one of her seven siblings was placed with her and she has struggled to visit with the others since then.  Erykah B. told DCFS then that she did not want to be placed in this home, but DCFS failed to listen, telling her there was nowhere else for them to go.  Although her case remained open with DCFS' oversight, as Erykah B. predicted when

she was just eight years old, the placement proved traumatic and was marked by abuse and neglect.

36.    Erykah B. was finally removed from this home when she was seventeen-years-old.  By the time she turned eighteen, she had been placed in at least three additional foster homes.  Despite DCFS's obligation to provide her with a safe, stable and appropriate placement, her time in extended foster care has been marked by unstable placements and periods of homelessness.

37.    After experiencing an attempted sexual assault in her last foster home, Erykah B. experienced homelessness. She and her girlfriend slept outside for two weeks before securing a short-term hotel stay.  Although DCFS knew that Erykah B. was unhoused during this period, DCFS did not provide her with safe emergency housing options. Erykah B. also survived another attempted sexual assault on the streets, but she was unable to seek help or support from DCFS because she feared this information would impact her placement and service options.

38.    In August 2022, Erykah B. was forced to move into a sober living residence that did not meet her needs because DCFS had not offered her any safe, stable, and appropriate placement options. As a result of DCFS's procedure of sending delayed SILP checks, Erykah B. was ultimately discharged from this placement without a meaningful opportunity to challenge the decision.  DCFS then moved Erykah B. to a shelter.

39.    Around the same time, Erykah B. interviewed for a Transitional Housing Placement Program for Nonminor Dependents ("THPP-NMD") with little support from DCFS.  Erykah B. found out she had been accepted to the program roughly two months later, but DCFS failed to communicate Erykah B.'s interest in the placement to the provider for another several weeks, by which point her spot had been given away.

40.    Since March 2023, Erykah B. has lived in a THPP-NMD program.

41.    DCFS has failed in its obligation to assist Erykah B. in securing supportive services.   DCFS was delinquent in submitting Erykah B.'s THPP-NMD applications and in requesting Erykah B.'s Medicaid and public transit cards. ERYKAH B.  has had only brief meetings with DCFS and feels she has had almost no transition support over the last few years.

42.    Erykah B.'s traumatic childhood, marked by dangerous placements and instability, has led to diagnoses of depression and Post-Traumatic Stress Disorder ("PTSD"), as well as attempted suicide.   Erykah B.'s mental health conditions substantially limit one or more major life activities.

43.    The compounded trauma that Erykah B. experienced under, and as a consequence of Defendants' care, has made it difficult for her to succeed in school and created behavioral challenges and difficulties developing emotion management skills.  DCFS has failed to address Erykah B.'s trauma with appropriate mental health services, despite Erykah B.'s frequent requests.  Erykah B. has not had supportive adults in her life willing to recognize the behavioral challenges so often associated with early childhood instability and constant system involvement.  Instead, DCFS focuses on her behavior and seems to blame her for the challenges she is facing, demonstrating lack of training or interest in trauma-responsive techniques.

44.    Despite a difficult and unstable childhood, Erykah B. is eager to give back to other foster youth.  Erykah B. knows that she, and other foster youth, should not have to settle for less than that to which they are legally entitled.

**B.    Plaintiff Onyx G.**

45.    Onyx G. is a seventeen-year-old Black and Latina young person who has been involved in the foster care system since she was three years old.  Despite the trauma she has experienced while in foster care, Onyx G. is working hard to complete her high school diploma and begin higher education. She aims to pursue a career in fashion.

46.    Onyx G. is enrolled in Medicaid.

47.    Onyx G. has experienced multiple forms of trauma.  Between the ages of three and fourteen, Onyx G. was cycled by DCFS  between various family member placements.    During this period, she experienced abuse and neglect from her caregivers, including periods of homelessness.  When DCFS removed Onyx G. from her father's care in 2020, she had known mental health needs not uncommon for children and youth in the foster care system.  At just 14 years old, she was hospitalized for suicidal ideation and self-harming behavior.  She has received outpatient mental health services from multiple agencies, as well as inpatient psychiatric hospitalizations on approximately seventeen occasions.

48.    As a result of years of abuse, neglect, and instability, Onyx G. has been diagnosed with anxiety, Major Depressive Disorder, and Disruptive Mood Dysregulation Disorder.  These conditions substantially limit one or more major life activities.  She has difficulty regulating her emotions, concentrating, thinking and planning.  She needs special education services for her emotional needs in school. She also has extreme difficulty trusting others, especially adults.  She has had prolonged feelings of insecurity and fear for her safety.

49.    After Onyx G. left her first group home placement because the environment was restrictive and neglectful, she was placed at a Short Term Residential Therapeutic Program ("STRTP").[9]    At this placement, Onyx G. experienced verbal harassment and an attempted sexual assault from her peers.  Staff did not employ trauma-responsive techniques, but were instead inattentive, skeptical,

---

[9] STRTPs are residential facilities for foster youth that are licensed by the California Department of Social Services. See Cal. Health & Safety Code § 1502(18).  STRTPs are the most restrictive type of placement that Defendants provide, as they provide specialized and intensive treatment, and twenty-four-hour care and supervision in a congregate care setting.  Home-based placements like foster homes, on the other hand, are the least restrictive type of placement.  Recognizing that foster youth should be placed in the least restrictive family setting that promotes normal childhood experiences and meets the youth's individual needs, the legislature intended that STRTPs be used only as short term placements.  Youth age 13 and older who are under the supervision of the dependency court shall not remain in an STRTP more than six months, unless the Child Welfare Deputy Director or Director has approved the case plan consistent with Welf. & Inst. Code section 16501.1(a)(3) every six months thereafter. CDSS All County Letter No. 17-122 (1/9/18)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Case No. 2:23-cv-06921

and unwilling to remove the person who attempted to assault her.  The STRTP eventually discharged Onyx G. without adequate explanation or notice.

50.    At subsequent STRTP placements, Onyx G. experienced further harassment from peers and staff.  At one STRTP, Onyx G.'s roommate destroyed her electronics and soiled her bed.  At another, a staff member outed Onyx G.'s sexuality to the full group of residents and interrogated her about her father in front of her peers. The staff member would also stare at her for long periods of time, responding that he was "testing her limits" when she asked him to stop.  In addition, staff would walk in on residents as they were changing clothes.  These experiences aggravated Onyx G.'s trust issues as DCFS failed to provide a safe, stable and appropriate placement that responded to the nature of Onyx G.'s childhood and adolescent trauma.

51.    Onyx G. left her last STRTP in May 2023 after her roommate sexually assaulted her and the STRTP staff's inaction left her feeling unsafe and unsupported. Between May 2023 and August 2023, Onyx G. experienced homelessness, including a period at a homeless shelter for foster children.  In August 2023, DCFS placed Onyx G. at another STRTP, where she resides currently.  Due to the restrictive nature of this placement type, even though Onyx G. soon will become a legal adult, she will have to inform program staff any time she wishes to leave the facility to avoid being found in violation of program rules.

52.    Onyx G. was supposed to receive mental health treatment and trauma-responsive support; she instead was betrayed by the adults who were meant to protect her.  Defendants often misrepresent and dehumanize youth when youth feel like they need to leave unsafe placements, referring to youth as "A.W.O.L."  What Defendants characterize as "going A.W.O.L" is in reality a trauma response by a young person rightfully mistrustful of social service systems.  Here, Defendants stood idly by while programs with whom they contracted failed to meet Onyx G.'s basic needs.

53.    Onyx G. has effectively been left with no options but to remain in an STRTP until she turns eighteen, when she becomes eligible for THPP-NMDs.  Even

then, however, she faces dismal prospects of securing one of the scarce placements, particularly because Defendants' discriminatory policies weed out applicants with mental health needs and trauma symptoms.  Onyx G. also faces major obstacles to accessing a Supervised Independent Living Setting ("SILP"), the other primary placement option for foster youth aged eighteen to twenty-one, because she does not have friends or family whose homes could serve as an appropriate SILP and she does not have sufficient income or credit history to find a private landlord who would lease to her.  All of these obstacles should have been mitigated through appropriate case planning.

54.    DCFS was aware of Onyx G.'s disabilities and knows that Onyx G.'s experiences in STRTPs are tragically common, yet DCFS continued to cycle her through multiple inadequate and dangerous STRTP placements, demonstrating Defendants' indifference to her need for safe, stable and appropriate placement in the least restrictive environment.  Onyx G.'s early childhood instability, coupled with the sheer number of short-term placements have put Onyx G. at clear risk for homelessness, stunted her emotional development, exacerbated existing mental health conditions, and limited her ability to meet her educational and professional goals.  Yet her self-advocacy has been frequently dismissed by DCFS.

55.    DCFS has offered Onyx G. unstable and untenable placements that are miles from Los Angeles, where she attends school in person, or the option to return to prior placements that she knows do not meet her needs.

56.    While Onyx G. has been under DCFS's care, DCFS has failed to provide her with legally compliant case plans and transition plans and she has received inadequate independent living skills training—generic life skills worksheets, for instance, which often felt more like punishment than helpful instruction. Furthermore, Onyx G. has experienced bias while in foster care and her racial identity has not been supported.  For example, in various placements, Onyx G. was reprimanded to maintain better hygiene, but she was not given an opportunity to learn

how to take care of her Afro-textured hair until she was placed in an STRTP that happened to have several Black staff members.

57.    Onyx G. did not receive adequate mental health support while under DCFS's care, despite DCFS's knowledge that Onyx G. needed intensive, trauma-responsive, field-based mental health services with 24-hour crisis response, and her clear and specific request for cognitive behavioral therapy and anger management programs, which she never received. The limited therapy she has received has been inadequate, sporadic, and even harmful. Onyx G.'s STRTPs not only failed to appropriately support her in the development of a healthy identity in her adolescence and transition to adulthood; they actively harmed her. In addition, Onyx G.'s housing instability caused by DCFS have forced her to go prolonged periods without access to her medication, which only worsened her mental health conditions.

58.    Onyx G. has conveyed disappointment to DCFS that she never got the chance to live with a foster family, the least restrictive placement for transition age foster youth in out-of-home care. DCFS told Onyx G. that she was rejected from family-based placements because of her behavioral record, even though she has worked tirelessly to process her trauma, improve her mental health, and channel her behavior into positive outlets. Intensive, developmentally appropriate wraparound services, rooted in a trauma-responsive approach, would have made it more likely that Onyx G. could live safely, comfortably, and permanently in a least restrictive, family-based placement. Instead, she was never given a chance to learn and demonstrate improved coping and behavioral management skills in a family setting.

59.    Onyx G. is passionate about making sure that all young people have stable housing and that foster youth are empowered with real, relevant life skills needed to succeed in adult life.

60.    Onyx G. currently brings this action through her Next Friend, Craig Schultz.

**C.    Plaintiff Rosie S.**

61.    Rosie S. is a twenty-year-old Latina expecting mother.  She has been involved in the foster care system since she was eight years old.  She is expecting a child and is looking forward to bonding with her new baby in a safe, stable and appropriate placement.  Despite the trauma that she has experienced while in foster care, Rosie S. plans to pursue a career in youth advocacy.

62.    Rosie S. has been eligible for Medicaid since birth, though as a result of DCFS's failure to transfer her Medicaid with her SILP placement in Nevada, she was without Medicaid for six months during the time she was pregnant.  As of April 2023, she has been re-enrolled in Medicaid.

63.    Rosie S.'s childhood had the hallmarks of trauma and instability that DCFS is accustomed to seeing in children entering foster care, including early childhood abuse and neglect, family violence, frequent moves, and unstable placements.  She entered DCFS's care at eight-years-old and cycled between foster homes and family members, ending with a placement with her grandmother in Los Angeles.

64.    Although Rosie S. had a close bond with her grandmother, when Rosie S. turned eighteen, her relationship with her grandmother was disrupted and Rosie S. left the home.  Subsequently, Rosie S. experienced homelessness and "couch surfed" at friends' houses for over a year.  Structural difficulties in navigating re-entry prevented Rosie S. from entering extended foster care for over a year.

65.    Rosie S. entered extended foster care in September 2022, at the age of nineteen.  Instead of assisting Rosie S. in transitioning out of homelessness, DCFS failed to offer her a safe, stable and appropriate placement, in violation of its legal duties to Rosie S.[10]  DCFS only referred her to homeless shelters, which are not

---

[10] CDSS All County Letter 19-105 provides in relevant part: "If, at the time the [reentry] agreement is signed, a youth does not have safe, appropriate housing and presents with a need for placement, the placing agency is responsible for immediately offering a placement to the NMD prior to a re-entry hearing. [. . .] The placing agency may provide a list of available housing options to the NMD; however, the agency continues to be responsible for immediately offering an available placement."

placements.  DCFS also failed to provide her with developmentally attuned, trauma-responsive services and supports.  DCFS failed to let Rosie S.'s self-assessment of her needs guide their placement search; instead, they imposed ill-fitting options onto Rosie S., adopting a "take it or leave it" mentality.  All of these obstacles should have been mitigated through appropriate case planning.

66.    Around October 2022, Rosie S.'s grandmother allowed her to move back in temporarily.  Despite knowing that their relationship was strained at times, DCFS did not provide supportive services to stabilize the placement or find Rosie S. alternative placement.  Predictably, Rosie S.'s relationship with her grandmother deteriorated over the next few weeks until Rosie S. notified DCFS that she had found a family friend willing to house her in Nevada.  DCFS failed to recognize the trauma impacting Rosie S. and her placement with her grandmother; therapeutic supports, proactive intervention, and trauma-responsive practices may have made reunification with her grandmother a stable placement option.

67.    After effectively consigning Rosie S. to find *herself* a placement in a different state instead of providing a safe, stable and appropriate placement in Los Angeles County near her limited support systems, DCFS continued to delay fulfilling its legal responsibility to support her.  It took about a month for the Nevada residence to be approved as a SILP and another two months for Rosie S. to start receiving SILP benefits.  Since that time, she has had ongoing issues with receiving her SILP payments; to date, she has received four of the seven checks that she should have received.  Although Rosie S. has been eligible for an Expectant Parent Payment since July 2023 to assist her in preparing for the birth of her baby, she still has not received it.  Additionally, Rosie S. repeatedly told DCFS that she did not have health insurance; DCFS did nothing to help her secure it.

68.    Rosie S.'s SILP in Nevada was meant as a temporary situation to help Rosie S. avoid homelessness.  She has now been there for nine months.  Rosie S. laments how long she has been away from her support network in Los Angeles and

describes her placement as feeling impermanent. From the outset, she hoped to move back to Los Angeles to be closer to her support network. As a result of the delay, it has been difficult to re-enroll in school or keep a job. Additionally, Rosie S. has braces. Despite DCFS's obligation to provide for Rosie S.'s orthodontia treatment, she has not been able to obtain treatment since being forced to leave her grandmother's home and she cannot resume treatment until she is in a more permanent placement.

69.    Since re-entering DCFS's care, Rosie S. has continually expressed her desire to be placed at a THPP-NMD in Los Angeles. Rosie S. in fact completed applications for THPP-NMDs without any guidance or support from DCFS. Shortly after re-entering care in October 2022, she provided the applications to DCFS to submit to its contracted transitional housing providers per policy, but DCFS never informed her if she had been accepted into a THPP-NMD placement. Rosie S. later learned that DCFS had never submitted the applications she had diligently and independently prepared. Months later, DCFS finally submitted the THPP-NMD applications, but DCFS informed Rosie S. that none of their THPP-NMD providers had any openings for parenting youth. Rosie S. was not provided with written notice of the denials of her THPP-NMD applications, nor was she afforded an opportunity to contest those determinations. Due to DCFS's lack of safe and stable placements appropriate for expecting and parenting transition age foster youth, the THPP-NMD placement option was foreclosed to Rosie S., and DCFS failed to offer her an alternate placement that would have met Rosie S.'s needs.

70.    In July 2023, approximately nine months after Rosie S. re-entered foster care, Rosie S. finally was accepted into a THPP-NMD program in Los Angeles. DCFS plans to move Rosie S. into the new placement at the end of August 2023, which will be nearly a year after she re-entered foster care.

71.    Rosie S. has been diagnosed with major depressive disorder, anxiety, trichotillomania, and mood disorders. These conditions and her experience of trauma

substantially limit one or more major life activities. Despite this, DCFS has continuously failed to successfully connect Rosie S. with a therapist. Furthermore, failing to find Rosie S. a safe, stable and appropriate placement in Los Angeles and removing her from her, albeit limited, social support systems, especially while pregnant, risks aggravating existing trauma, prolonging instability, and potentially augmenting multigenerational trauma.

72.    Despite a traumatic childhood and ongoing housing instability, Rosie S. is an optimistic young person eager to secure safe, stable and appropriate placement and advocate for similarly positioned youth. She is reflective on her life experiences and is adamant that there should be emergency placement options besides shelters for transition-aged foster youth. She believes deeply that all young people are entitled to safe, stable and appropriate placement, and that people can make their best decisions only when they are not worried about where they are going to sleep at night. She is passionate about foster care reform and wants no other young person to have to endure what she has.

### D.    Plaintiff Jackson K.

73.    Jackson K. is a nineteen-year-old Latino young person in foster care who resides in Riverside County, in this judicial district. His primary language is American Sign Language ("ASL"). Despite Jackson K.'s experience of trauma while in foster care, he successfully graduated from high school in June 2023 and aims to attend college in New York to pursue a degree in criminal justice.

74.    Jackson K. is enrolled in Medicaid.

75.    Jackson K. entered DCFS care in 2007 after his biological mother went to prison. He was adopted in 2009. During the twelve years spent with his adoptive family, his adoptive mother was the only person in the family who became fluent in ASL.

76.    Tragically, his sole lifeline, his adoptive mother, passed away when Jackson K. was nine years old. Jackson K. struggled to find support in the years after

her death, particularly because his adoptive family had not learned ASL. Following some conflicts, Jackson K.'s adoptive father kicked him out of the house in early 2022.

77.    After being forced to leave home, Jackson K. stayed in a hotel for two weeks until he moved into a youth shelter after he ran out of money or other options. He had to drop out of his last semester of high school because he no longer had a stable place to live. Jackson K. lived in shelters for nearly two months before a court granted his request to re-enter foster care.

78.    Despite DCFS's obligations to provide Jackson K. with supportive services and safe, stable and appropriate placement in extended foster care, DCFS continually failed to account for Jackson K.'s individual needs, particularly his need for ASL interpretation services.

79.    In May 2022, Jackson K. was moved from the shelter to a DCFS-contracted hotel after an incident left him feeling unsafe. Shortly thereafter, Jackson K. called the police to report that people were bullying him online. When the police arrived, Jackson K. attempted to describe the bullying and the impact it had on him. Due to a lack of police ASL interpreters, he was mistakenly sent to a psychiatric hospital without any explanation as to why he was being transported to a hospital. After his hospitalization, he agreed to attend therapy, but his appointment was canceled because the provider could not secure an ASL interpreter.

80.    In addition, DCFS forced Jackson K. to complete his THPP-NMD applications alone and follow up with each provider independently. DCFS gave Jackson K. links to applications in English but failed to provide him with an interpreter or other support to complete the application process. Even when DCFS finally provided Jackson K. with an ASL interpreter for his THPP-NMD orientation and interviews in July 2022, the language barrier proved exceedingly difficult. Jackson K. received denial after denial from THPP-NMDs in Los Angeles County

because of the lack of available safe, stable and appropriate placements and DCFS's indictment of Jackson K. as behaviorally challenged.

81.    DCFS similarly failed to identify  resource family placements for Jackson K.  For example, one resource parent declined to take Jackson K. due to concerns about possible behavioral problems.  Jackson K. did not have an opportunity to present his side of the story or otherwise challenge the denial of placement.  The other placements DCFS identified for Jackson K. were inappropriate for a variety of reasons, including age limitations, insufficient ASL services, and a requirement that he close his dependency case, despite having just opened it to obtain additional support.

82.    Jackson K. was ultimately accepted into a THPP-NMD program in Riverside County.  After moving in, however, Jackson K. was once again a victim of an internet prank where someone called a fake welfare check on him, which led to Jackson K. being tackled by a police officer due to a miscommunication with the police, who were not using an ASL interpreter.

83.    The THPP-NMD provider gave Jackson K. a three-day notice to vacate that did not cite any program rules that Jackson K. had violated and noted that it was his responsibility to find housing once he was discharged.  Although the THPP-NMD knew that Jackson K. required ASL interpretation, the notice to vacate referred to verbal warnings without specifying whether an interpreter was present or whether any communications about program rules were also provided in ASL.

84.    Ultimately, the THPP-NMD provider reluctantly withdrew its unlawful notice and worked with Jackson K. to support his needs.  Although Jackson K. has resided at the THPP-NMD for a year, his housing situation remains tenuous because of the lack of due process protections and inadequate supportive services to help him maintain his placement.

85.    Jackson K. has lived with the disability of deafness his entire life.  He experienced a devastating loss of a loved one during his childhood.  He has also

experienced the traumas of improper police interaction, which resulted in the further traumas of police violence and involuntary psychiatric restraint. Jackson K.'s experiences of trauma substantially limit one or more major life activities. He wants to be a class representative to ensure the hardships and dismissals he experienced do not happen to other young people.

**E.      Plaintiff Ocean S.**

86.      Ocean S. is a twenty-year-old Black mother in extended foster care. Despite her experience of trauma in foster care, Ocean S. is working towards becoming a phlebotomist and is passionate about nursing.

87.      Ocean S. is enrolled in Medicaid.

88.      Ocean S.'s early life was mired in instability - she experienced abuse and neglect from an early age. She lost a sister to gang violence. She attended six different elementary schools, two middle schools, and three high schools, all by age fifteen. She and her family experienced bouts of homelessness. She has a history of sexual trauma.

89.      In 2018, she was declared a dependent of the juvenile court due to abuse by her mother, and lack of care and supervision. She was declared a NMD in September 2020 and on information and belief, she received limited to no transition planning.

90.      Ocean S. has been diagnosed with mood disorders, insomnia, PTSD, and major depression. Her mental health conditions and her experience of trauma substantially limit one or more major life activities.

91.      Ocean S. has been in at least seven placements since her initial removal from her mother's care, including shelters and group homes. DCFS has moved her around indiscriminately, without considering her actual needs and goals. At one placement, she was discharged for pregnancy; at another, she was exited for inviting a guest whom the facility deemed problematic. These are not reasons youth should be left unhoused. Ocean S. has had to find many of her own placements, without help

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

from DCFS.  Her family instability, coupled with poorly tailored placements, and the feeling that no one has been looking out for her, have caused Ocean S. to question adults' motives.

92.    Many of Ocean S.'s placements were marked by violence.  For example, Ocean S. had to press charges against another resident in one of her transitional living programs because of the resident's violent behavior against her.  At other placement, she was exited with little notice and for unclear reasons.  These issues are especially troubling given that Ocean S. is parenting; she had a three-year-old daughter.

93.    Periodically, DCFS asked Ocean S. to complete THPP-NMD applications, but for an extended period, Ocean S. was not accepted to any of these programs.  DCFS encouraged Ocean S. to explore a SILP but she did not know anyone who could rent her a room, she was uncomfortable with the idea of her infant daughter sharing an apartment with a stranger, and she could not afford to rent an apartment on her own.

94.    Ocean S. was temporarily incarcerated while in care, and even after she was eligible for release, she had to remain incarcerated for a period of time due to the lack of safe, stable, and appropriate placements.

95.    Ocean S. was finally able to enter a THPP-NMD program after she learned that a peer's provider had openings in their program and requested that DCFS submit an application on her behalf to that specific program.  After moving in with her daughter, however, Ocean S.'s then-partner visited her at her unit and physically assaulted her.  Ocean S.'s strained relationship with her family has eroded her trust in others, caused severe isolation, and left her vulnerable to domestic violence.

96.    Due to the domestic violence and perceptions of how Ocean S. responded to the violence, and in close consultation with DCFS, the THPP-NMD ultimately terminated Ocean S.'s participation in the program.

97.    At the time Ocean S. was pushed out of the THPP-NMD, DCFS failed to offer Ocean S. an alternate placement and supportive services.  Instead, DCFS

offered Ocean S. only domestic violence shelters.  Consequently, Ocean S. was forced to live in a motel for several months.  She struggled to find a safe, stable and appropriate placement, particularly because her daughter had been removed from her care.  Although she was eagerly working to get her daughter back, Ocean S. was caught in a vicious cycle—she could not get her daughter back without stable housing, but she was ineligible for placements for herself and her child without having physical custody.

98.     In June 2023, Ocean S. moved into a SILP-funded apartment.

99.     DCFS has done little to support Ocean S.'s efforts to find safe, stable and appropriate placement or to plan for her aging out of extended foster care next month.  Ocean S. conducted extensive research to try to find a  placement.  On numerous occasions, DCFS suggested that her only option was to check into a domestic violence shelter, or that she needed to check into a shelter before she would be eligible to stay in a DCFS-contracted hotel.

100.    Ocean S. has suffered the effects of compounded trauma—unstable and violent parents and partners, the loss of a sibling, homelessness, domestic violence and separation from her child.  She has had few stable, positive adult figures in her life.  She has been blamed repeatedly for her predicament, demonstrating that DCFS is not utilizing trauma-responsive techniques.   Trauma-responsive social work recognizes that one's early life experiences can engender behavior that seems agitated, uncooperative, mistrustful, or even violent.  Social workers must be trained to engage youth and to work with DMH staff to connect youth to needed therapy and support.   Domestic violence is a complicated phenomenon requiring trauma-responsive care.  DCFS has failed to provide Ocean S. the care necessary to navigate these challenges and develop the tools necessary for future success and stability.

101.    Instead of providing Ocean S. with the support she needs, DCFS has treated her as defiant.  Although Ocean S has repeatedly requested that DCFS provide referrals for long-term therapeutic programs, Ocean S.'s lack of continuity of care due

to placement instability has interfered with her ability to benefit from services. Her therapy has been inconsistent and sporadic, often with long wait times. On the rare occasions when therapists have taken the time to develop rapport with Ocean S., her behavior has settled, and she has been able to invest comfortably in her treatment. All of these obstacles should have been mitigated through appropriate case planning.

102.   Ocean S. has chosen to participate in this lawsuit because she wants to ensure no other young people are treated the way she has been treated and to show her daughter that everyone is entitled to safe housing and supports that meet their needs.

### F.    Plaintiff Junior R.

103.   Junior R. is a twenty-year old, mixed race young person in extended foster care. Junior R. has lived through frequent moves, family instability, and a failure to have his basic needs met. Although Junior R.'s placement instability and his experiences of trauma while in foster care have made his continued education virtually impossible, Junior R. remains hopeful for the future, and he is aiming to finish school this fall.

104.   Junior R. is enrolled in Medicaid.

105.   Junior R.'s early life was marked by instability. At just eight years old, he was removed from his mother's care after witnessing and experiencing physical violence in the home. Over the next six years, he was placed with his father, and then his grandmother. In early 2018, he re-entered foster care after his grandmother's legal guardianship was terminated.

106.   Since then, Junior R. has cycled through various placements, including a THPP-NMD program that he identified without the aid of DCFS and several STRTPs. Junior R. was forced to leave the THPP-NMD program in November 2022 for alleged marijuana use and the use of profanity. DCFS and the transitional housing provider did not provide Junior R. with a meaningful opportunity to be heard or to otherwise challenge the discharge decision, and he was left without recourse.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

107.   Junior R. juggled homelessness and a brief hotel placement before moving into a housing program for youth in Los Angeles with SILP funding.  This program imposed onerous conditions, including a no guest policy.  Junior R. was forced to leave this program in February 2023 largely due to the cleanliness of his unit.  Prior to his discharge, he did not receive any stabilization meetings or Child and Family Team meetings ("CFTs"), which are the cornerstone of California's integrated core practice model.[11]  He was discharged without adequate notice or any opportunity to contest the loss of placement.

108.   As a result, Junior R. again experienced homelessness and lived in various short-term hotels across Los Angeles County, some contracted with DCFS and some not.  In violation of its legal duties, DCFS failed to offer Junior R. a safe, stable and appropriate placement upon learning that he was unhoused, instead offering only shelters.  The few non-shelter placement options that DCFS identified for Junior R. were inappropriate or unworkable.  For example, despite knowing that Junior R. is not Christian, DCFS offered him an unlicensed housing program that required its residents to attend Christian church on a weekly basis.  DCFS identified another unlicensed housing program for Junior R. that he could not afford because rent was one thousand dollars ($1,000 U.S.D.) per month and the monthly SILP payment available at the time, meant to help pay for both housing and all other living expenses, was only one thousand one hundred and twenty-nine dollars ($1,129 U.S.D.).

109.   Eventually, DCFS reluctantly agreed that Junior R. would be permitted to interview with one of DCFS's THPP-NMD providers.  After the interview, Junior R. learned that his application had been rejected due to comments he made during the interview, including him questioning why the program was run like a group home.  Junior R. was not permitted any opportunity to challenge the denial of placement.  After Junior R.'s THPP-NMD application was rejected, DCFS urged that he consider

---

[11] Cal. Welf. & Inst. Code § 16501(a)(5)

the reality of DCFS's limited placement capacity in Los Angeles County. DCFS also threatened to seek closure of Junior R.'s dependency case if he did not resume work or school soon, despite his homelessness.

110.    Instead of continuing to look for a safe, stable and appropriate placement or extending emergency hotel aid for Junior R., DCFS moved him back to his grandmother's care in April 2023, despite her legal guardianship having been terminated years earlier. This was not a trauma-responsive plan attuned to Junior R.'s needs and experiences. Junior R. was wary of the placement and anticipated potential tension because he knew he and his grandmother did not share the same religious beliefs. Junior R. asked to visit the home and to negotiate an expectations list with his grandmother before moving back in. However, move-in was rushed and DCFS did not fulfill either of these requests. Predictably, conflict escalated between Junior R. and his grandmother, and he experienced threats of physical harm. Within a few months, Junior R. left his grandmother's home and DCFS agreed to transport him to a friend's home in a town over an hour from Los Angeles. Junior R. has been able to receive SILP benefits through this placement.

111.    Junior R. has been diagnosed with depression, anxiety, and attention deficit hyperactivity disorder. His placement instability has caused him to experience panic attacks and suicidal ideation. Junior R.'s mental health conditions and experiences of trauma substantially limit one or more major life activities. Yet, DCFS has failed to help him adequately access the supports and services he needs. Junior R. had to ask DCFS to make referrals for therapy for months before he was finally able to connect with the services he needs.

112.    Throughout Junior R.'s time in care, DCFS failed to provide him with adequate transition planning support. DCFS failed to ensure Junior R. had a safe, stable and appropriate placement at all times. DCFS placed unrealistic educational and work expectations on Junior R. despite knowing of his tremendous placement instability. In April 2023, after repeated threats, DCFS asked the court to close Junior

R.'s case due to alleged noncompliance with extended foster care participation criteria[12] because he was not in school or employed. It is unreasonable to expect Junior R. to have been able to maintain full-time school attendance or employment when he was being shuttled between shelters and motels. Junior R. has experienced bias in his interactions with DCFS and his racial identity has not been affirmed and supported.

113.    Junior R. has been rejected from placements for asking questions to determine if the placement would be a good fit and because DCFS informed its prospective placement providers of Junior R.'s prior discharges and loss of placement. For example, one THPP-NMD rejected Junior R. because of its perception of his reputation from prior placements. DCFS has failed to communicate Junior R.'s specific, individual needs to each prospective placement, coordinate with DMH, or serve as a champion and advocate for him. DCFS's systematic practice of informing prospective placement providers about a transition age foster youth's previous placement discharges, without providing the youth the opportunity to explain their version of those events or to ask for any needed accommodations, predictably results in youth like Junior R. being denied placement opportunities.

114.    Junior R.'s history of instability and neglect has made him wary and untrusting of adults. His time in foster care has been defined by placements that do not meet his needs. When Junior R. has advocated for himself and his needs, DCFS has dismissed him as stubborn and problematic. For example, DCFS has repeatedly expressed frustration when Junior R. turned down placements, even though he had legitimate reasons for doing so, such as concerns about religious intolerance, lack of privacy, or unaffordability given his limited resources. Instead of situating Junior

---

[12] Foster youth must meet one of five Participation Requirements to maintain eligibility for the Extended Foster Care program: 1. Work toward completion of secondary education or an equivalency program; 2. Enroll in an institution that provides postsecondary or vocational education; 3. Participate in a program or activity designed to promote or remove barriers to employment; 4. Be employed at least 80 hours per month; or 5. Be unable to do any of the above due to a verified medical condition. Cal. Welf. & Inst. Code § 11403.

R.'s behavior as emergent from his needs and experiences, DCFS has routinely blamed Junior R. for his situation and provided poor alternatives.

115.    Junior R. wants the foster care system to provide needed placements and services to youth.

## V.    DEFENDANTS FAIL TO MEET THEIR LEGAL OBLIGATIONS TO TRANSITION AGE FOSTER YOUTH

### A.    Under State and Federal Law, Defendants Are Responsible for the Administration, Oversight, and Provision of Safe Stable and Appropriate Placement and Medicaid Services to Transition Age Foster Youth.

116.    California has a complex foster care system that regulates when the government removes children and youth from their families for abandonment, abuse, or neglect.  The purpose of California's foster care system is to provide for the care, placement, and protection of the children and youth entrusted to the State's care. Federal and State law places responsibilities on government agencies to ensure safe, stable and appropriate placements and care for transition age foster youth at all times.

117.    The federal government provides the largest single source of funding for California's foster care system through Title IV-E of the Social Security Act.  Long established federal legal frameworks mandate specific responsibilities to states that accept federal dollars to administer foster care programs, including the obligation to comply with federal requirements under AACWA.

118.    To comply with the federal funding requirements, California designated CDSS, a department of CalHHS, to be the single state agency responsible for administering the State foster care system.[13]  CDSS is responsible for licensing and overseeing placement programs and services in California for youth in foster care,

---

[13] 42 U.S.C. § 671(a)(2).

including establishing and maintaining standards for foster family homes and childcare institutions. DCFS administers those programs at the County level.

119. CDSS and DCFS, together with DHCS and DMH, are public agencies that all accept federal dollars[14] and are responsible for ensuring that youth in the foster care system with mental health conditions are served in accordance with federal law, including the ADA and Section 504. Medicaid is the primary payer for a wide range of medical, behavioral health, and supportive services health care for foster children. The importance of coordination between the agencies responsible for the foster care system and the Medicaid program cannot be overstated, as both programs have duties to identify and meet the health and mental health needs of transition age foster youth, as well as to coordinate and oversee the delivery of these services.

**B.    Defendants Must Provide Safe and Stable Placement and Services that Are Appropriate for the Needs of Transition Age Foster Youth.**

120. Defendants' programs for transition age foster youth must account for the developmental and psychological realities of adolescence, especially when a youth has compounded experiences of trauma. Both before and during their time in foster care, transition age foster youth are highly likely to have experienced complex trauma, a term that describes children's exposure to multiple traumatic events, often interpersonal in nature, as well as the impact of this exposure. When unaddressed, the neurobiological effects of trauma exposure often substantially impact activities such as emotional self-regulation, concentration, sleep, verbal processing and communication, and cognition. The impact of trauma often delays the development of coping skills necessary for independence. The wounds inflicted by disruption and trauma caused by Defendants may be invisible, but they are unmistakably revealed by brain imagining of children exposed to traumatic experiences such as abuse, abandonment, and neglect.

---

[14] Cal. Code Regs. tit. 22 § 50004.

121.  Fundamental brain development takes place during adolescence, including the development of brain functions that govern reasoning, decision-making, judgment, and impulse control.  The vital need for sustained support during this period of "emerging adulthood" is even more pronounced for transition age foster youth, who generally cannot rely on traditional familial structures.  Transition age foster youth sorely lack necessary life skills. They often struggle with long term planning.

122.  These manifestations of adolescence and trauma are well-known.  Due to transition age foster youth's developmental needs, Defendants must ensure such youth can access the safe, stable, and appropriate placement, supports, and services they need for their safety and well-being at all times.

**C.    Defendants' Failure to Meet Their Obligations to Transition Age Foster Youth Results in a Foster Care to Homelessness Pipeline.**

123.  Roughly one in every five transition age foster youth in California reports experiencing homelessness while in extended foster care.  In 2022, more than 4,200 youth aged sixteen to twenty-one years old were in foster care in Los Angeles County.  Based on the best available data, more than 1,000 of these young people will become unhoused at least once while in Defendants' care.

124.  The harmful impacts of Defendants' failures to meet their legal duties to transition age foster youth are pronounced and concrete, including harms from being cycled through multiple unsuitable placements, loss of important relationships, abuse and neglect while in care, and homelessness.  The longer young people endure homelessness, the more they are exposed to numerous adversities, traumas, and survival risk behaviors, and the greater their risk for re-entering homelessness once they do get housed.  Nationally, almost two-thirds of transition age foster youth who experienced homelessness also reported being physically assaulted, robbed, sexually assaulted or raped, or threatened with a weapon while unhoused.  Without the support of an effective extended foster care program, youth are also more likely to drop out

of school, struggle with mental health conditions and substance abuse disorders, experience unemployment, and enter the criminal justice system.

125.   In addition, the harms of Defendants' failures disproportionately fall on already marginalized youth—youth of color, queer youth, pregnant and parenting youth, and youth with disabilities—as these youth are vastly over-represented in the Los Angeles County foster care population.  Out of the 2,460 youth ages eighteen to twenty-one in extended foster care in Los Angeles County in 2022, eighty-six percent (86%) were Black or Latino (32% Black and 54% Latino).  Roughly one in five foster youth in transitional placements for nonminor dependents in 2021 identified as LBGTQ+.  That same year, there were over 250 youth, ages 10 to 20, who were themselves parents and in foster care in Los Angeles County.

126.   Defendants' failures are numerous and interrelated.  As a threshold matter, Defendants do not have a minimally adequate array of safe and stable placements for all the transition age foster youth in their care, resulting in major placement instability for those youth.  Defendants exacerbate placement instability by maintaining arbitrary application and termination procedures that deny youth their right to contest denial of placement.  Placement instability is also exacerbated by DCFS's failure to assist transition age foster youth with case planning and transition planning for safe, stable and appropriate placement and a variety of other services, including healthcare and mental health services.

127.   Treacherous for all transition age foster youth, Defendants' policies and practices are particularly egregious for pregnant and parenting youth, who are denied access to placement where they can live with their children.  Outcomes are even worse for transition age foster youth with mental health disabilities.  Defendants' policies and practices erect barriers that make it difficult for youth with mental health disabilities to access placement, remain in placement, and avoid placement in unduly restrictive settings.

128.    Finally, placement instability is compounded by Defendants' failure to provide necessary mental and behavioral health services to transition age foster youth, which also contributes to youth's unnecessary placement challenges.

## VI.    DEFENDANTS' FAILURE TO DEVELOP A MINIMALLY ADEQUATE ARRAY OF SAFE AND STABLE PLACEMENTS PUSHES TRANSITION AGE FOSTER YOUTH INTO HOMELESSNESS

129.    Defendants have failed to develop even a minimally adequate array of safe and stable placements in violation of transition age foster youth's substantive due process rights.  DCFS's failure to develop such an array of placements results in long placement delays and exposes transition age foster youth to a grave risk of homelessness and other harms.  In further violation of Defendants' duty to transition age foster youth, Defendants fail even to evaluate the adequacy of their placement resources or to assess whether they have an adequate number of safe and stable placements to meet the needs of all of the transition age foster youth in care.[15] Defendants also fail to maintain sufficient emergency placements for youth who unexpectedly lose their placement. Defendants have been aware of the need to increase the number of safe and stable placements for transition age foster youth since 2018, if not earlier, and have failed to ameliorate these structural systemic failures.

### A.    DCFS and CDSS Supervise and License Placements for Transition Age Foster Youth.

#### 1.    *SILP and THPP-NMD Programs Are the Primary Placement Options for Transition Age Foster Youth Ages eighteen to twenty-one.*

130.    Transition age foster youth ages eighteen to twenty-one have two primary placement programs available to them under California law: SILPs  and THPP-NMDs.[16]

---

[15] Cal. Welf. & Inst. Code § 16001(a).
[16] Cal. Welf. & Inst. Code § 11400(x).

131.    Youth in SILP settings are provided a monthly stipend that they use to pay for the rent of their living arrangement once it is approved by DCFS.  That stipend is set and does not change even if the cost of room and board exceeds the stipend amount.  The youth must find a person or landlord who is willing to rent them a space to serve as their SILP, which can include an apartment, a rented room, or a college dorm.[17]  Once a youth identifies a SILP, DCFS is responsible for inspecting and approving the SILP in a timely manner and for documenting the SILP in the youth's case plan.[18]

132.    For California's fiscal year 2022-23, NMDs could receive a monthly SILP payment of one thousand one hundred and twenty-nine dollars ($1,129 U.S.D.).[19]  Youth in SILPs must rely on the SILP payment to cover all their basic living expenses, not just placement costs.

133.    Transitional housing programs offer supervised transitional housing services to youth in foster care between ages sixteen and twenty-one.[20]  Transitional Housing Placement Programs for transition age foster youth eighteen and over are known as THPP-NMDs, and Transitional Housing Placement Programs for sixteen and seventeen-year-olds are known as THPPs.[21]

134.    Depending on the provider, youth in THPPs may live with certified host families, at sites staffed with THPP employees, or in independent apartments paid for by the THPP.[22]  DCFS has delegated the essential government function of providing safe and stable placements for many of the transition age foster youth under DCFS's care and supervision to DCFS's contracted THPP-NMD providers.  Because THPP-NMDs are one of only two primary placement options available to transition age foster youth between eighteen and twenty-one, and because DCFS does not operate

---

[17] All-County Letter 11-77, p. 6.
[18] *Id.* at 6-7, 10.
[19] All-County Letter 22-59, p. 5.
[20] Cal. Health & Safety Codes §§ 1559.110(b)-(c).
[21] *See* Cal. Welf. & Inst. Code § 16522.1(a)(2).
[22] Cal. Health & Safety Code § 1559.110(d)(1)-(3).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Case No. 2:23-cv-06921

its own THPP-NMD programs, the contracted providers' operation of the THPP-NMD programs is indispensable to DCFS's ability to meet its duty to provide out-of-home care to transition age foster youth.

135.   To become a THPP-NMD, a provider must be certified by the county and meet statutory requirements before being licensed by CDSS.[23]   In particular, DCFS must certify that the prospective provider would be able to "effectively and efficiently" operate the program and that the plan of operation is suitable to meet the needs of transition age foster youth and maintain case-manager-to-youth participant ratios of one to twelve.

136.   THPP-NMD providers' policies, procedures, and day-to-day operations are heavily regulated at the State and County level.  To obtain and maintain licensure, providers must adhere to CDSS's Interim Licensing Standards.[24]   The Interim Licensing Standards govern all aspects of providers' operations, including record maintenance, procedures against assessment, selection , removal and discharge of program participants, safeguarding program participants' valuables, transportation of program participants, food services; occupancy limits for bedrooms, and even the provision of bed linens to program participants.

137.   In addition to the requirements of the Interim Licensing Standards, THPP-NMD providers' operations are regulated through the providers' contract with Los Angeles County and the requirements of DCFS's certification process for providers.  DCFS and its providers have undertaken a deeply intertwined process of selecting youth whom DCFS and its providers deem appropriate for THPP-NMD placements, providing placement to those youth, and, in many cases, refusing placements for other youth deemed non-suitable or involuntarily discharging youth

---

[23] Cal. Welf. Inst. Code § 16522.1(c).
[24] CDSS Interim Licensing Standards for Nonminor Dependents in Foster Care (AB 12), Transitional Housing Placement Programs, Ver. 2, /https://www.cdss.ca.gov/Portals/9/CCL/Childrens-Residential-Licensing/ILS/AB12-THPP-ILSVer2.pdf?ver=2021-11-04-122728-973 (retrieved 8/19/23).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

from their placement.  For example, DCFS pre-selects which transition age foster youth apply for the THPP-NMD program and helps prepare and submit their applications to the providers.  DCFS convenes regular meetings with its contracted THPP-NMD providers to discuss operational issues and challenges that arise in the context of providing placement to transition age foster youth.  Prior to discharging a program participant, the providers inform DCFS staff of the decision, and DCFS and the provider work together to decide on the discharge plan and timeline.

   *2.* *Resource Family Homes Are the Primary Placement Option for Transition Age Foster Youth Ages Sixteen and Seventeen.*

138. Transition age foster youth ages sixteen and seventeen are not eligible for SILP and THPP-NMD programs.  Although CDSS has created a Transitional Housing Placement Program ("THPP") for foster youth ages sixteen and seventeen, DCFS does not presently contract with any THPP providers or offer any county-run THPP placements.  Therefore, this placement option is foreclosed to sixteen and seventeen year old transition age foster youth in Los Angeles County.

139. Like NMDs, sixteen and seventeen-year-olds who have mental health disabilities do not have access to a minimally adequate array of safe and stable placements.  If they need more support than what can be provided by a resource parent and outpatient services, their only real placement option is STRTP, which may be overly restrictive for many youth and which is not meant to be a long-term placement option.

140. The primary placement options available to sixteen and seventeen-year-old foster youth in Los Angeles County is the Resource Family Home (formerly referred to as "foster homes").  Resource Families include relatives, non-related extended family members, and foster families licensed by both DCFS and foster family agencies.

**B.** **DCFS's Placement Options for Transition Age Youth Are Scarce and Inadequate.**

141.    Despite DCFS's duty to provide a minimally adequate array of safe and stable placements for all transition age foster youth at all times, on information and belief, many languish waiting for placement, forcing them into homelessness for weeks—in some cases months—at a time.

142.    Transition age foster youth encounter a number of barriers in accessing SILP as a placement option.  First, transition age foster youth find it challenging to cover the cost of rent, food, transportation, utilities, and other basic expenses relying solely on the SILP rate.  Further, transition age foster youth do not have adequate credit or income for most landlords to be willing to rent to them.    In addition, the SILP process is slow and cumbersome.  DCFS generally takes at least sixty days to approve a SILP and  to issue funding to a transition age foster youth. [25]  Given this lengthy process, transition age foster youth cannot access SILP funds in time to pay a security deposit or their first month's rent, as would be required for most leased apartments.  Therefore, unless transition age foster youth are able to identify a friend or relative who is willing to forego a security deposit, accept below-market rent, and wait two months to receive the first payment, the SILP option is foreclosed to them.  Moreover, even when a youth finds a willing friend or relative, it is often not a safe and stable placement and merely a stopgap solution with little security and no services or support.

143.    The other primary placement option is the THPP-NMD program.  As with SILP, however, Defendants' actions and omissions have made THPP-NMDs inaccessible to many transition age foster youth.  On information and belief, the total number of available placements is far smaller than the number of foster youth for whom a THPP-NMD placement would be a safe and stable placement.  Youth who cannot find a SILP, or youth who can find a SILP but for whom a SILP is not appropriate because they need a greater level of support in their placement, must wait

---

[25] Supervised Independent Living Placement 0100-560.40 (rev.10/27/22), 10, 13.

indefinitely for a transitional housing program placement to become available.  Due to DCFS's failure to develop a minimally adequate array of safe and stable THPP placements, Plaintiffs have struggled with homelessness, living in shelters, in cars, and on friends' couches for weeks at a time.  They have experienced harm while living in unsafe and unsuitable settings while awaiting a safe and stable placement.  Erykah B.'s experience as a victim of attempted sexual assault while left to live on the streets evidences the gravity of harms facing unhoused foster youth.

144.  CDSS also has created a placement option for foster youth with significant needs known as the Intensive Services Foster Care ("ISFC") program.  However, on information and belief, DCFS has identified only a small number of ISFC providers, and therefore ISFC is unavailable to most of the transition age foster youth whose individual needs would be met by this placement option.

145.  DCFS further violates its duty to provide safe and stable placements to transition age foster youth by actively encouraging youth to access housing programs through the Los Angeles Homeless Services Authority ("LAHSA"), pushing youth out of extended foster care and into the already overburdened adult homelessness services system.  Youth have to exit extended foster care in order to access these programs and lose other benefits available to them in the foster care program. DCFS policy encourages social workers to direct youth to these settings,[26]  which require youth to close their foster care cases, foregoing the support and oversight of the court, their lawyers, their CASAs, and their DCFS social workers.

**C.    When Transition Age Foster Youth Become Unhoused, DCFS Fails to Provide Safe, Emergency Housing and Support**

---

[26] Los Angeles County Child Welfare Policy: *Transitional Housing Services* 0100-560.30 (Revision Date: 4/7/2017.

146.   When a youth in foster care, including any transition age foster youth, loses their placement unexpectedly, DCFS must provide them with safe emergency housing to ensure that they do not experience homelessness while in care.[27]

147.   The California Legislature authorized counties to approve "transitional living setting[s]" for transition age foster youth who are entering or reentering foster care or transitioning between placements.[28]

148.   **A Transitional Living Setting ("TLS")** is an emergency, non-shelter setting for youth who have recently re-entered extended foster care or have experienced a placement disruption and need an alternative to homelessness.[29] Transition age foster youth who are placed in a TLS can receive a monthly payment equivalent to the SILP rate, which was one thousand one hundred and twenty-nine dollars ($1,129 U.S.D.) for fiscal year 2022/2023.[30]   However, DCFS has been slow to implement this program.  According to data released by DCFS, between January 2021 and July 2023, DCFS provided direct TLS funding to only eleven transition age foster youth, and DCFS issued TLS funding for a hotel on behalf of one hundred and eight youth.

149.   In addition, DCFS arbitrarily pays for a TLS placement for only seven days at a time although that timeline is not found in statute, undermining the stability of the TLS.  At the seven-day mark, DCFS often fails to reauthorize the funding or to find an alternative safe and stable placement for the youth. Moreover, emergency housing is largely ad hoc, and the process takes too long to prevent homelessness when placement is disrupted.

150.   DCFS's failure to gather meaningful data related to homelessness among transition age foster youth has served as another barrier to creating sufficient emergency housing.  DCFS has reported that it does not know how many nonminor

---

[27] Cal. Welf. & Inst. Code § 16001(a)(2).
[28] Cal. Welf. & Inst. Code § 11400(x)(4).
[29] Id. .
[30] All-County Letter 22-59, p. 5.

dependents need emergency housing at a given time or whether DCFS has the capacity to meet those emergency housing needs. As a result, transition age foster youth and their families have had to resort to couch-surfing, vehicular homelessness, and sleeping in homeless shelters for weeks at a time. For youth like Junior R., the lack of safe emergency housing results in more trauma, worsening mental health, and disruption of their ability to obtain employment or attend school.

151. Rather than implementing the TLS program in a trauma-responsive manner, DCFS created a policy that unnecessarily places transition age foster youth at risk of physical and emotional harm. DCFS forces transition age foster youth and their social workers to prove that they have made exhaustive efforts to find a non-hotel emergency housing option before agreeing to pay for a hotel. In addition, DCFS's practice is to wait until the evening that a young person is to become unhoused before it will agree to place the youth at a hotel.[31] DCFS follows this practice even in situations where DCFS has had months of advance notice that a young person would lose their placement by a specific deadline. If all TLS contracted hotel spaces are occupied, the DCFS social worker generally will instruct the youth to go to a shelter. This practice unnecessarily causes transition age youth emotional harm and increases the likelihood that they will experience homelessness and its attendant health and safety risks.

152. If youth in foster care are not in an approved placement, they are deprived of foster care benefits. For example, youth who are unhoused cannot receive monthly SILP payments or infant supplement payments, even if the youth are otherwise eligible for these benefits. The destabilizing effects of these acute periods of homelessness often follow youth even after they have found a new placement. For example, because the only placement Rosie S. could find as a SILP is out of state and she is still waiting to be moved to a THPP-NMD placement in Los Angeles County,

---

[31] DCFS For Your Information No. 22-06 (REV), dated 3/11/22.

she is unable to obtain stable employment.  Because DCFS delayed helping her transfer her Medicaid, she was unable to obtain vital health care services, like prenatal care.  For Onyx G. and Junior R. their placement instability disrupted their ability to finish high school.  For all Named Plaintiffs, placement instability has harmed their ability to create and sustain the supportive connections with others that are vital for their long-term wellbeing.

### D.    Defendants Have Deliberately Ignored the Need to Evaluate and Expand the Number of Safe, Stable, and Appropriate Placements.

153.    On November 20, 2018, the Los Angeles County Board of Supervisors ("Board") unanimously passed a motion recognizing an "acute need for youth in extended foster care and youth exiting foster care to have access to housing programs."  In pertinent part, the motion required DCFS to report back within 90 days on available funding to increase the capacity of THPP-NMD by "at least 33%."[32]

154.    When DCFS finally reported on available funding to increase placements in April 2019, it claimed that contracted providers "would be able to support a capacity increase" and "accommodate more youth."  On information and belief, DCFS has failed to implement these needed capacity increases.

155.    In December 2019, DCFS reported that it was adding ten beds to the existing five hundred and thirty-three (533) beds in the THPP-NMD program, a meager two percent (2%) increase.  On March 3, 2020, DCFS reported that "THPP-NMD inventory remains unchanged since our last report" and admitted that "capacity building challenges" are a "standing agenda item."

156.    Since March 3, 2020, DCFS has failed to report any further progress to the Board.  On information and belief, the capacity of the THPP-NMD program has actually decreased during that period.

---

[32] THPP-NMD was formerly known as Transitional Housing Program plus Foster Care, or "THP+FC"

157.   DCFS's failure to expand the capacity of the THPP-NMD program to the levels deemed necessary by the Board, despite the stated availability of both the funds and the contractor capacity to do so, shows a deliberate indifference to the reasonable safety and minimally adequate care to which the transition age foster youth in its care are entitled.

158.   DCFS has also failed to collect the most basic data about whether they are meeting their obligations to provide safe and stable placements for transition age foster youth at all times.  For instance, to this day, DCFS claims not to know or track how many transition age foster youth are waiting for a safe and stable placement.

159.   Recognizing the need for data to ensure accountability and effective management, on November 20, 2018, the Board required DCFS to "report back within 180 days on implementing enhanced data collection and reporting for transition age foster youth housing programs, including establishing universal data elements and semi-annually reporting key variables including the length of waitlists and time on waitlists," among other data.  DCFS did not provide any of the requested waitlist data to the Board.

160.   On information and belief, as of the date of this Complaint, nearly five years after the Board recognized the acute shortage of placements for transition age foster youth and requested basic data about waitlists, DCFS still does not effectively track the transition age youth who applied for and are waiting to be placed with THPP-NMD providers.

161.   As the Board recognized, without tracking basic information about waitlists, it is not possible to effectively manage placement programs for transition age foster youth and ensure that those programs are not a pipeline to homelessness. DCFS's failure to collect and report this data, and its failure to provide for a minimally adequate array of safe and stable placements for transition age foster youth, shows its deliberate indifference to their right to reasonable safety and minimally adequate care.

## VII. DEFENDANTS FAIL TO HAVE A SYSTEM TO ENSURE TRANSITION AGE FOSTER YOUTH RECEIVE INDIVIDUALIZED PLANNING FOR THEIR TRANSITION TO ADULTHOOD

162.   State and federal law require DCFS to provide transition age foster youth ages sixteen through twenty-one with individualized case plans that address their need for safe, stable and appropriate placements and other critical services.  Recognizing that many dependent youth become homeless shortly after aging out of the foster care system at age twenty-one, state and federal law also require DCFS to assist transition age foster youth in planning their eventual transition out of state care.  DCFS is systematically failing to meet this obligation, resulting in increased placement instability among transition age foster youth.

### A.   Defendants Must Adequately Plan for Transition Age Foster Youth's Transition to Adulthood.

163.   When a child or transition age youth enters foster care, DCFS must develop a "case plan," a single written document that includes a discussion of the safety and appropriateness of the child's placement and a plan for assuring that the child receives safe and proper care and services to address the child's needs.[33]  A case plan is not a pro forma document; rather, the California Legislature declared the case plan "the foundation and central unifying tool in child welfare services" and specified that case plans must meet a child's individual needs.[34] The case plan is the roadmap for the remainder of the child's time in foster care, and agency decisions and actions should be driven by the case plan and its components.

164.   AACWA requires that a written case plan shall also include (1) a "discussion of the safety and appropriateness of the placement;"[35] and (2) assurance that the "child receives safe and proper care and that services are provided…and

---

[33] 42 U.S.C. § 675(1)(A)-(B).
[34] Cal. Welf. & Inst. Codes §§ 16501.1 (a)(1), (d)(1).
[35] 42 U.S.C. §§ 671(a)(16), 675(1)(A).

address the needs of the child while in foster care."[36]  California also requires that a case plan to include the reasoning behind the choice of placement, which must be based on selecting a "safe setting that is the least restrictive family setting that promotes normal childhood experiences and the most appropriate setting that meets the child's individual needs and is available, in proximity to the parent's home, in proximity to the child's school, and consistent with the selection of the environment best suited to meet the child's special needs and best interests."[37]

165.    State and federal law, as well as the California Title IV-E State plan, also impose duties related to transition planning.[38]  Transition planning is intended to help youth transition successfully into adulthood and live independently outside of foster care.

166.    California's IV-E plan incorporates AACWA's requirements related to case planning and transition planning for transition age foster youth in the care of the State and all of its political subdivisions, including Los Angeles County.[39]

167.    When a child in foster care turns sixteen years old, their case plan must include a "transitional independent living plan" ("TILP"), which is "a written description of the programs and services that will help the child, consistent with the child's best interests, to prepare for the transition from foster care to successful adulthood."[40]

168.    In the 90-day period before the youth turns eighteen, DCFS staff "shall provide the youth or nonminor dependent with assistance and support in developing the written 90-day transition plan, that is *personalized* at the direction of the child, information as detailed as the participant elects that shall include, but not be limited to, options regarding housing, health insurance, education, local opportunities for

---

[36] 42 U.S.C. §§ 671(a)(16), 675(1)(B).
[37] Cal. Welf & Inst. Code § 16501.1(d)(1) (emphasis added); 42 U.S.C. § 675(5)(A).
[38] 42 U.S.C. § 675(1); Cal. Welf. & Inst. Code § 11400(y), 16501.1(g)(16).
[39] *See* California IV-E State Plan, pp. 22-26 (citing Cal. Welf. & Inst. Code § 16501.1).
[40] Cal. Welf & Inst. Code § 16501.1(g)(16)(A)(ii).

mentors and continuing support services, and workforce supports and employment services, a power of attorney for health care, and information regarding the advance health care directive form."[41]

169.   Nonminor dependents are also entitled to a "transitional independent living case plan pursuant to Section 475(8) of the federal Social Security Act."[42] California requires that safe and appropriate placement planning for nonminor dependents shall be based upon the young adult's developmental needs by providing opportunities to have incremental responsibilities that prepare them to transition to successful adulthood.[43]

## B.    Defendants Have Failed to Create a Case Planning System that Ensures all Transition Age Foster Youth Receive Transition Planning.

170.   On information and belief, DCFS uses TILPs in lieu of case plans when engaging in transition planning for transition age foster youth.  TILPs generally do not contain information that is required under AACWA for transition planning.  Most significantly, DCFS's TILPs routinely fail to discuss the safety or stability of the foster youth's current placement, the reasoning behind the choice of placement, or even the type of placement in which the youth is residing.  Even when the foster youth placement is referenced, the plan does not account for whether the placement is in proximity to services, family, school, or other needs.  Nor are the plans regularly updated to reflect new placements, circumstances, or the goals of the individual youth. DCFS's failure to include this information in their case plans undermines its transition planning efforts and contributes to placement instability and homelessness among transition age foster youth.

---

[41] Cal. Welf & Inst. Code § 16501.1(g)(16)(B) (emphasis added).
[42] *See* Cal. Welf. & Inst. Code §11400(v) (defining a "nonminor dependent" as a "foster child" as described in 42 U.S.C. § Section 675(8)(B)) .
[43] Cal. Welf. & Inst. Code § 391.

171.   In violation of federally mandated case planning requirements, when DCFS develops case plans, the plans are formulaic, merely checking boxes on the forms.  Youth plans often do not identify where the youth is living or wants to live.  The plans lack description of individualized trauma-responsive supports and treatments needed by the youth.  When the need for mental health services is raised with transition age foster youth, DCFS resorts to vague recommendations for counseling or anger management, and Defendants fail to include specific trauma treatments or other mental health services responsive to the specific needs identified by the individual youth in their case plans and transition plans.  In short, the plans are not specific to the individual transition age foster youth's care needs.  As a result, youth are provided with generic, cookie-cutter services, like Onyx G.'s life skills worksheets.

172.   This violation of duties under AACWA has devastating consequences for transition age foster youth.  Rather than effectively engage youth in collaboratively learning about trauma-treatments to which they are entitled, DCFS wields mental health services as a condition of extended foster care.  Mental health services are presented to youth as one more way of blaming them for their circumstances and telling them that they need to be fixed, rather than serving as a resource for healing.

173.   DCFS, as the agency responsible for Plaintiffs' placement and care , has failed to develop a system for ensuring all youth receive legally compliant case plans and had abandoned the role of the case plan as a central unifying document in its provision of services.  CDSS, as the single state agency charged with complying with the case planning and transition planning provisions of AACWA, has failed to monitor and ensure that DCFS is meeting its legal obligations. As a result of Defendants' failures, youth in foster care between the ages of sixteen and twenty-one lack the supports and services they need to achieve their goals and often struggle in placements that do not meet their needs.

## VIII. DEFENDANTS' PROCEDURES DEPRIVE TRANSITION AGE FOSTER YOUTH OF DUE PROCESS WHEN DENIED OR PUSHED OUT OF PLACEMENT

174.   Defendants' procedures deny transition age foster youth the right to due process in applying for and maintaining their placement benefit.  When transition age foster youth experience an abrupt loss or denial of placement, the news often comes verbally, from a social worker or case manager.  Youth across the extended foster care program, including those in THPP-NMDs and SILPs, do not receive adequate notice of a decision that will jeopardize their placement stability, nor are they provided meaningful opportunities to contest the decision.  Instead, transition age foster youth are one arbitrary decision away from homelessness.

175.   Plaintiffs have a legitimate claim of entitlement to a placement benefit at all times.  Defendants have no discretion to deny this essential benefit to Plaintiffs. The deprivation of this benefit, including unwarranted delays in placements, constitutes a grievous loss.  Thus, Plaintiffs have a protectable property interest in their placement benefit and are entitled to due process when applying for, appealing the denial of, or contesting the termination of, that benefit.  Defendants violate these due process rights in multiple ways.

### A.   Application Procedures for Placement Benefits are Arbitrary and Opaque, and Youth Do Not Have Notice or Meaningful Opportunities to Contest a Denial.

176.  Even when DCFS identifies the THPP-NMD program as the most appropriate placement option for a transition age foster youth, the youth must first apply to and be accepted into a THPP-NMD program.  DCFS works in close consultation with their contracted THPP-NMD programs to select and evaluate candidates, such that any rejections are either actions of Defendants or so inextricably intertwined with Defendants as to effectively constitute the actions of Defendants. Rejected applicants, like Rosie S. and Junior R., rarely learn the reason their

application was denied, and they have no opportunity to contest these denials. Frequently, youth receive no response to their application at all. This uncertainty adds to feelings of helplessness and hopelessness, which contribute to worsening mental health for many transition age foster youth.

177.    On information and belief, during the THPP-NMD application process, social workers screen out youth whom they perceive as unmotivated, irresponsible, and/or struggling to manage their medical or mental health conditions, even when the youth is eligible for and entitled to a THPP-NMD placement. DCFS does not afford transition age foster youth a meaningful opportunity to challenge these determinations. Onyx G., for example, fears that these opaque and unfair processes will prevent her from finding a THPP-NMD placement when she turns eighteen.

178.    If the social worker determines that the transition age foster youth is eligible and appropriate for the THPP-NMD program, the social worker instructs the transition age foster youth to complete an application that asks them to disclose, *inter alia*, their health conditions, mental health diagnosis, any mental health issues (past or present), their therapist's name, and any medications they are currently taking. As part of the application materials, the social worker includes a summary of the transition age foster youth's medical history known as the "Health and Education Passport." The social worker then submits the transition age foster youth's application packet to DCFS's contracted THPP-NMD providers, and subsequently follows up with the providers to schedule an interview for the transition age foster youth.

179.    Neither DCFS policy nor the Interim Licensing Standards identify a process for informing transition age foster youth whether their THPP-NMD application was denied or the reason for the denial, and, on information and belief, no such process exists. Frequently, transition age foster youth who are denied entry to THPP-NMDs never receive any response at all to their application. Instead, the transition age foster youth is left to surmise that their application must have been

denied after significant time passes without any response. In addition, because DCFS does not maintain waitlists for THPP-NMD placements, DCFS is unable to inform transition age foster youth how long they must wait to be accepted into a THPP-NMD program. Ocean S. was able to successfully pursue an opening only when she learned of it through a peer, rather than through Defendants. The absence of any coherent waitlist or notification system also leads directly to tragic and unnecessary loss of benefits, such as when Defendants failed to notify Erykah B. that she had in fact received a placement.

180. In addition to the lack of process around applications and notices of denial, applicants have no opportunity to challenge a denial decision. Transition age foster youth who are denied THPP-NMD placement due to concerns about their medical/mental health condition have no opportunity to contest the provider's assessment of their needs or to seek a reasonable accommodation. The THPP-NMD provider's application denial is effectively a denial of the entire THPP-NMD placement option because of the limited THPP-NMD spots, leading to homelessness and/or housing instability. Transition age foster youth who are denied placement because of a perceived lack of compliance with the extended foster care participation criteria have no opportunity to show that they are in fact enrolled in school, employed, or otherwise meeting the requirements. Transition age foster youth who are denied placement due to a lack of openings have no means of assessing if an opportunity will become available in the near term, or at all.

181. For example, as discussed in Part VI below, Defendants illegally discriminate against Plaintiffs with mental health disabilities. Jackson K. learned of several denials by THPP-NMD programs, some due to concerns about possible behavioral problems. Jackson K. never had an opportunity to present his side of the story, let alone discuss reasonable accommodations that might have allowed him to succeed in the placement programs.

182.   Many transition age foster youth experience unreasonable delays in the SILP approval process.  If a transition age foster youth identifies a place to live that they want DCFS to approve as a SILP, their social worker must first assess the youth's readiness for a SILP.  If DCFS determines that a transition age foster youth is not ready for a SILP, the youth is entitled to a grievance procedure or to raise the issue with the Dependency Court.  On information and belief, youth often are informally counseled away from SILPs to which they are entitled without understanding their options to pursue a grievance process or request court review.

183.   If the social worker determines that a transition age foster youth is ready for the SILP option, the social worker must then conduct a physical inspection of the home before the issuance of any foster care funding.  Under the best case scenario, transition age foster youth have to wait several months after identifying a SILP for DCFS to conduct the physical inspection of the home, resulting in several additional months of funding delays.  But often it takes longer than several month for DCFS to conduct the inspection, and DCFS frequently fails to provide transition age foster youth with any explanation for the delay or notification of their appeal rights.  Once the social worker finally completes the physical inspection of the home and approves the SILP, DCFS routinely takes approximately 60 days from the time of the inspection until the issuance of foster care funding.

184.   In the case of Rosie S., the slow and opaque approval process delayed her SILP benefits for nearly three months, putting her placement stability at risk.  Although state law entitles transition age foster youth to written notice and an appeal through the CDSS State Hearings process for any adverse decision related to their SILP approval, transition age foster youth do not consistently receive notice or any information about their right to appeal delays or denials of SILP approval.  This lack of adequate process leaves them without an opportunity to challenge a SILP delay or SILP denial and jeopardizes their efforts to secure a stable placement.

### B.    Youth Losing Placement Benefits Receive Limited Notice and Lack Meaningful Opportunities to Contest the Discharge.

185.    Transition age foster youth who are able to obtain a THPP-NMD placement can lose it quickly, with little to no meaningful process to be heard before or after the discharge.  Because DCFS lacks sufficient emergency housing options for transition age foster youth, youth who are involuntarily discharged often face a grave risk of homelessness.  Despite the grievous harm at issue, Defendants deprive transition age foster youth of any meaningful opportunity to challenge the loss of their placement benefit.

186.    First, CDSS and DCFS policy do not provide youth with sufficient notice when a transition age foster youth is facing "push-out" from a THPP-NMD program.  CDSS's THPP-NMD Interim Licensing Standards require that in non-emergency circumstances, a written notice must be given to the youth seven days prior to discharge, with a copy sent to the county placing agency.[44]  The written notice must be based on a specific reason, including that the youth has reached the maximum age for THPP-NMD, that the THPP-NMD agency's license has changed, or (most commonly) that the THPP-NMD agency "is no longer able to meet the needs" of the nonminor dependent.[45]

187.    Comparatively, minors in any foster care placement are entitled to fourteen days notice of any placement change.[46]  Residents of licensed adult residential facilities receive up to thirty days' written notice.[47]  Seven days is insufficient notice for transition age foster youth to meaningfully contest their discharge or for DCFS to arrange for alternative, safe, stable and appropriate

---

[44] Interim Licensing Standards 86268.4(c)(1).
[45] Interim Licensing Standards 86268.4(c)(1)(B), (d)(4). For an emergency removal, no notice is required. Interim Licensing Standards 86268.4(b).
[46] Cal. Welf. & Inst. Code 16010.7(e).
[47] 22 C.C.R. 85068.5(a).

placement, particularly in light of the critical shortage of placements for transition age foster youth.

188.    Second, the procedures that the Defendants created do not provide youth in THPP-NMD programs with a meaningful opportunity to be heard.  The youth facing discharge may submit a complaint against the THPP-NMD program to CDSS's Community Care Licensing Division ("CCLD").  Upon receiving the complaint, CCLD must investigate the discharge.[48]  On information and belief, however, youth are not given notice of this procedure.  In Los Angeles County, youth discharged from THPP-NMD placement theoretically may submit a grievance or Advocacy Review to the THPP-NMD program or DCFS, respectively, but the written notices transition age foster youth receive, if any at all, do not explain that a grievance procedure is available.[49]  There is no opportunity for transition age foster youth to present their complaint in person or to have a neutral arbiter consider the evidence, nor is there any mechanism to ensure that transition age foster youth remain housed while the complaint is pending.

189.    Finally, once a transition age foster youth is discharged from a THPP-NMD, other THPP-NMD providers may rely on the prior discharge as a basis for denying the youth admission to their programs.  Defendants do not afford youth any privacy regarding the circumstances of their discharge, and once a discharged youth applies to a new THPP-NMD program, the prospective program is able to obtain information from the previous provider and from the youth's own social worker about the reason for the discharge.  Thus, Defendants' denial of due process rights is compounded into loss of future placement benefits as well.

190. CDSS's Interim Licensing Standards provide that THPP-NMD programs may conduct a removal without *any* notice or opportunity for youth to be

---

[48] Interim Licensing Standards 86268.4(e).
[49] THPP-NMD Statement of Work, section 10.4.6.1.

heard in "emergency" circumstances.[50]  Such circumstances include when the youth must receive emergency medical or psychiatric care, or "when the health and safety of the nonminor dependent or others in the THPP is endangered by the continued presence of the nonminor dependent in the THPP."[51]  Defendants have created a system that deprives transition age foster youth of any opportunity to contest whether the circumstances surrounding the discharge qualified as a true emergency or an otherwise valid basis for discharge.  Foreseeably, the complete lack of due process associated with emergency discharges, combined with the fact that Defendants do not afford transition age foster youth the right to maintain their  placement while DCFS attempts to locate an alternate placement for them, often results in homelessness for transition age foster youth.  Jackson K., for example, was given a three-day notice to vacate his THPP-NMD placement that did not cite any program rules violation and noted that it was his responsibility to find a  placement once he was discharged.

191.    On information and belief, in the absence of any meaningful procedural protections, many discharges are misclassified as "emergency" discharges in order to avoid even the minimal and inadequate notice and appeal procedures available for "ordinary" discharges.  No accountability mechanism exists to prevent this abuse of "emergency" discharges.  These misclassified "emergency" discharge decisions are inextricably intertwined with actions of Defendants.  For example, on information and belief, Defendants can and do reverse the discharge decisions of their contracted THPP-NMD providers when they disagree with those decisions.

192.    Youth in SILP placements also lack adequate procedural protections. DCFS may suspend or terminate funding to youth whose SILPs are approved but later determined not to meet the eligibility requirements for funding.   In these circumstances, transition age foster youth are entitled to request an administrative hearing with CDSS's State Hearings Division.  However, on information and belief,

---

[50] Interim Licensing Standards 86268.4(b)(1).
[51] Interim Licensing Standards 86268.4(b)(2)(B).

transition age foster youth lose their SILP funding without notice or explanation, and without being informed of the option to request an administrative hearing.

193.    Without the ability to timely request a hearing, transition age foster youth unexpectedly lose their SILP payments, often their primary financial means for paying rent.  Without this critical source of funding, transition age foster youth may be evicted or forced to move out of their SILPs and experience homelessness, couch-surfing and sleeping in shelters and cars until they can find another place to live. Junior R., for example, was forced to leave SILP with no written explanation or meaningful opportunity to be heard.  This exit resulted in homelessness.

## IX.    DEFENDANTS VIOLATE TRANSITION AGE FOSTER YOUTH'S RIGHT TO FAMILIAL ASSOCIATION

194.    There are nearly three hundred transition age youth in Los Angeles County's foster care system who are parenting their own young children.   On information and belief, DCFS does not track the number of expecting or parenting youth who are experiencing homelessness or on waitlists for safe, stable and appropriate placements.

195.    Navigating the foster care system is even more complex and burdensome if the foster youth is pregnant or is parenting their own child like Rosie S. and Ocean S.   Transition age foster youth who are parents need safe, stable and appropriate placements at all times for themselves and their children, support to develop positive and supportive relationships, and caregiving assistance.  To help preserve their family unit, parenting transition age foster youth should be provided with access to services for which they are eligible that are specifically targeted at supporting, maintaining, and developing both the parent-child bond and the parent's ability to provide a permanent and safe home for the child.[52]

---

[52] Cal. Welf. & Inst. Code § 16002.5.

196.   However, rather than implementing policies that promote family stability and wellbeing, Defendants deny pregnant and parenting youth and their children access to safe, stable and appropriate placement, which can be a contributing factor in family separation.  These practices interfere with transition age foster youth's right to familial association under the First and Fourteenth Amendments.

197.   In Los Angeles County, foster youth are regularly told that there are no available openings in THPP-NMD programs that accept pregnant or parenting youth, denying and/or delaying access to this placement option.  DCFS policy permits THPP-NMD programs to reserve most of their units for non-parenting youth and to accept only a limited number of parenting youth in the program.  Consequently, parenting youth are often forced into inappropriate and unstable placements in order to live with their children.

198.   DCFS also permits providers to discharge transition age foster youth who become pregnant after being accepted into a THPP-NMD program, if the provider designated that youth's apartment as a non-parenting unit.  Some programs restrict the number of children in the home or their ages, meaning that a participant could be discharged for a subsequent pregnancy or when their infant becomes a toddler.  And THPP-NMD programs frequently interpret CDSS's authorized grounds for emergency removal and discharge in a manner that discriminates against pregnant youth—for example, terminating a pregnant youth without adequate notice because the program claims it can no longer meet that youth's needs.

199.   Even if a pregnant or parenting transition age foster youth is able to secure a placement, Defendants allow their contractors to operate placements that are hostile to pregnant and parenting youth.  THPP-NMD programs are allowed to establish arbitrary rules such as limiting which rooms can be used to feed children. Other THPP-NMD programs have strict employment or educational requirements that force pregnant or parenting youth to return to work before they are physically or mentally ready, often much sooner than the federal standards for parental leave.

Violation of THPP-NMD rules often leads to involuntary discharges from THPP-NMD, which may result in homelessness and thereby contribute to the risk of family separation.

200.  Neither CDSS (the licensing agency) nor DCFS (the certifying and contracting agency) penalize THPP-NMD programs for discriminating against pregnant and parenting participants.  On information and belief, DCFS fails to directly monitor THPP-NMD programs to ensure that they are not discriminating against pregnant and parenting participants, and DCFS does not enforce any contract terms that prohibit such discrimination.  DCFS has declined opportunities to train THPP-NMD programs on nondiscrimination law and the rights of transition age parenting youth in transitional placements.

201.  DCFS's failure to provide a minimally adequate array of safe and stable placements appropriate to meet the needs of all transition age youth, including expecting and parenting youth, directly and significantly interferes with familial association in at least two ways.

202.  First, far too many parenting youth and their children often experience homelessness, which can contribute to the risk of family separation and intergenerational cycles of foster care system involvement.  DCFS has initiated dependency proceedings against over 20 percent of the parenting youth in its care, placing their children in foster care due to safety concerns that may be exacerbated, in part, by DCFS's own failure to provide safe, stable and appropriate placement and required services to the family.  For example, DCFS explicitly told Rosie S. that there were no openings for parenting youth at any contracted THPP-NMD providers.

203.  Second, for parenting transition age foster youth who have been separated from their children, DCFS often imposes housing as a condition of family reunification, meaning that DCFS' failure to provide a minimally adequate array of safe and stable placements serves as a known barrier to transition age foster youth regaining custody of their children.  For instance, although Ocean S. is eagerly

working to get her daughter back, Ocean S. was caught in a vicious cycle—she could not get her daughter back without stable housing, but she was ineligible for the limited THPP-NMD placements available for parenting youth without having physical custody of her daughter. DCFS's failure to immediately provide her with an alternate safe, stable and appropriate placement prolonged her homelessness and created an additional barrier to reunification, until Ocean S. eventually was able to find her own SILP.

## X.    DEFENDANTS DISCRIMINATE AGAINST YOUTH WITH MENTAL HEALTH DISABILITIES

204.   Defendants are well aware that many transition age foster youth have mental health disabilities, including impairments associated with complex trauma that substantially limit one or more major life activity. The Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504") impose affirmative duties on Defendants to provide meaningful access to their services and programs to transition age foster youth with mental health disabilities. Defendants have gone in the opposite direction: they have erected burdensome, arbitrary, and discriminatory barriers for transition age foster youth with mental health disabilities.

205.   All transition age foster youth with mental health disabilities, including complex trauma, are otherwise qualified to participate in California's foster care system and Medicaid program. Defendants' programs receive financial assistance, including federal funds, and are public entities. Members of the ADA Subclass have been subjected to unlawful disability discrimination.

### A.    Youth with Mental Health Conditions Which Substantially Limit One or More Major Life Activity are Protected from Discrimination on the Basis of Disability.

206.   Many transition age foster youth experience complex trauma that is related to their exposure to traumatic events; complex trauma that substantially limits one or more major life activity is a protected disability. It is all too common for

transition age foster youth to have experienced and continue to experience traumatic events that profoundly affect their psychological, emotional, and physical well-being. They may have experienced physical, emotional, or sexual abuse; emotional or physical neglect; homelessness; the death, incarceration, or deportation of a parent; domestic violence; parental substance abuse or mental illness; and/or maltreatment while in foster care. The trauma of abuse, abandonment, neglect, and instability is often compounded by unfair treatment and discrimination due to their race or ethnicity, sexual orientation, or gender identity, as well as extreme poverty and other socioeconomic hardship.

207. Although even a single traumatic event can impair a young person's mental health, for transition age foster youth these events often do not take place in isolation. Too often, transition age youth in foster care are subjected to multiple, repeated, and sustained traumatic experiences. The trauma they experienced with their families is compounded by their experiences in foster care, including unstable and unsafe placements, separation from their siblings or their own children, and lack of appropriate treatment and services.

208. Many transition age foster youth, including Plaintiffs, members of the ADA Subclass, experience complex trauma, a term that describes children's exposure to multiple traumatic events, often interpersonal in nature, as well as the wide-ranging and long-term impacts of this exposure. The effects of complex trauma cause impairment that limits an individual's ability to perform major life activities, including without limitation sleeping, concentrating, long-term planning, and emotional self-regulation. Not only can complex trauma induce changes in the brain and impair cognition, learning, and social skills, it can manifest in diagnoses like PTSD, depression, anxiety, and bipolar disorder.

209. The definition of "an individual with a disability" under the ADA and Section 504 includes someone who has "a physical or mental impairment that

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

substantially limits one or more major life activities."[53]   Under federal regulations, certain psychiatric diagnoses presumptively substantially limit major life activities.[54] Plaintiffs with other mental health conditions which substantially limit one or more major life activities, including those with complex trauma, have mental impairments that also meet the definition of "individuals with disabilities" under federal anti-discrimination laws.  Over sixty percent (60%) of transition age youth in foster care meet the criteria for at least one mental health disorder, and studies have observed PTSD in transition age foster youth at over twice the rate of transition age youth in the general population.  The ADA and Section 504 protect transition age foster youth with mental health disabilities from discrimination on the basis of disability.

**B.    DCFS's Placement Application Process Discriminates on the Basis of Disability.**

210.   ADA Subclass members struggle to navigate DCFS's byzantine application processes for gaining access to least restrictive placements available to their non-disabled peers such as THPP-NMDs and SILPs.  Already challenging for any youth, deciphering the intricacies of transition age foster youth placement options is particularly arduous for youth with mental health disabilities.   Defendants' application process erects barriers for transition age youth with disabilities to even apply to community-based placements that would allow them to live with their non-disabled peers.

211.   Instead of giving transition age foster youth with mental health disabilities the program-wide supports and trauma-responsive accommodations they require to complete transitional placement applications, Defendants leave class members to navigate the process on their own, whether that requires decoding the alphabet soup of placement programs and application procedures or accomplishing predicate steps for program participation, like obtaining a state-issued ID and other

---

[53] 42 U.S.C. §§ 12102(1)(A), (2)(A).
[54] 29 C.F.R. § 1630.2(j)(3)(iii); *see* 42 U.S.C. § 12102(2)(B).

vital documents. For any eighteen-year-old, this would be a tall order, but for one with a mental health disability, it may be insurmountable. The result is that transition age foster youth with mental health disabilities are systemically excluded from even applying to less restrictive programs like SILPs and THPP-NMD.

212. In addition, youth with mental health disabilities are often excluded from accessing THPP-NMD because intake policies adopted by Defendants allow, and even encourage, THPP-NMD programs to refuse to serve foster youth based on their disabilities.

213. First, DCFS train their staff considering eligibility for THPP-NMD programs to screen out transition age foster youth with mental health disabilities who report mental health diagnoses or display behaviors consistent with trauma. As a result, evidence of a mental health disability is functionally a basis for denial of less restrictive placement.

214. Second, Defendants have established policies that encourage disability discrimination by transitional placement providers. CDSS's THPP-NMD Interim Licensing Standards allow THPP-NMD programs substantial access to youth's medical and mental health history for use in a "Pre-Placement Appraisal." Yet after DCFS social workers have supplied THPP-NMD providers with medical information regarding the NMD applicant, Defendants place no legally-required guard rails on how the disability can be used to assess suitability for THPP-NMD. For example, based on CDSS's THPP-NMD Interim Licensing Standards, Defendants' providers are not prohibited from denying an application based on the fact that the youth has been prescribed psychotropic medication. Defendants all but encourage THPP-NMD providers to identify class members with actual or perceived disabilities and thereby exclude them from a less restrictive placement option.

215. For example, Onyx G. is at serious risk of being excluded from less restrictive placement options due to her mental health disability. Onyx G. has been diagnosed with anxiety, Major Depressive Disorder, and Disruptive Mood

Dysregulation Disorder, and she has struggled with self-harming behavior. While in DCFS custody, Onyx G. bounced through several group homes that did not meet her needs, including a lack of intensive, trauma-responsive mental health services. Under DCFS's current procedures, Onyx G.'s history of mental and behavioral health needs will be disclosed. Upon information and belief, providers have denied applications because the transition age foster youth disclosed a history of suicidal ideation, no matter how far in the distant past, which providers presume creates a per se safety risk for the applicant and other program residents, again in lieu of required assessment of reasonable accommodation. She will likely be labeled "higher need," and denied participation in a THPP-NMD program, rather than being provided with the legally-required, individualized assessment of whether she can participate with reasonable accommodations.

216. Additionally, Defendants' procedures do not allow transition age foster youth with mental health disabilities the opportunity to dispute a provider's interpretation of their needs or to request a reasonable accommodation that would allow them to fully access and benefit from the  placements available to their non-disabled peers despite their disability. Jackson K., for instance, learned of several denials by THPP-NMD programs but had no opportunity to present his application or respond, let alone discuss reasonable accommodations that would allow him to succeed in the placement programs.

217. DCFS does not provide, or require THPP-NMD programs to provide, reasonable accommodations or help the transition age foster youth with mental health disabilities access individualized and developmentally appropriate mental health services that would allow the youth to participate in THPP-NMD programs. For instance, DCFS approved the decision of Ocean S.'s THPP-NMD to terminate her placement after she survived a physical assault by her then-partner instead of supporting her with appropriate services that could have facilitated her healing and allowed her to remain in the program.

218. Additionally, Defendants' administration of the SILP program discriminates against transition age foster youth with mental health disabilities in much the same way. For example, due to Defendants' failure to assist with identifying and arranging SILPs, many ADA Subclass members are functionally foreclosed from SILPs because their mental health disabilities make it difficult to independently identify a potential SILP placement, let alone one that would meet DCFS and CDSS requirements. DMH does not have a functional process to provide needed Medicaid services that would help youth access the SILP program.

219. Moreover, even if a transition age foster youth with mental health disabilities is able to take the great initiative of identifying a SILP, those youth are at risk of significant placement instability because the SILP option does not include any supportive services. According to DCFS policy, a SILP is not appropriate for youth requiring "significant supportive services," or youth with high-risk mental/physical health needs. Yet nearly half of transition age foster youth ages 18-21 reside in SILP. On information and belief, many of the youth residing in SILP experience severe placement instability that could be mitigated if DMH provided needed Medicaid services to help youth maintain placement. Defendants Fail to Accommodate Youth with Mental Health Disabilities in Placements.

220. Even if transition age foster youth with mental health disabilities successfully obtain a THPP-NMD placement, Defendants' policies and practices prevent them from meaningfully accessing the benefits of Defendants' programs. Accommodating youth impacted by trauma requires trauma-responsive practice, including centering the youth's perspective and experiences, providing individualized treatment through a culturally-sensitive lens, and ensuring that program staff are trained in trauma-responsive care. Defendants' county-certified, State-licensed THPP-NMD providers routinely fail to accommodate the needs of youth impacted by trauma by putting youth in situations that exacerbate their trauma, establishing

policies that frustrate recovery, and punishing manifestations of mental health impairments.

221.  Transition age youth impacted by trauma need systems of support to develop positive relationships and support, yet most THPP-NMD programs certified by DCFS have restrictions that undermine youth's ability to develop and maintain connections to their support systems.  Even though THPP-NMD programs are designed for young adults, they often have restrictive visitor policies that interfere with their ability to socialize with friends and peers and to arrange frequent visitation with their co-parent.  And there is not a single licensed transitional housing program in Los Angeles County that allows the youth's non-participant partner or co-parent to reside in the placement.

222.  For transition age foster youth with mental health disabilities, including those impacted by complex trauma, it may often be difficult to plan their activities and socialization in a way that comports with these rules, or they may impulsively decide to engage in social activity that providers prohibit.  A placement system that fails to encourage relationships but promotes unjustified isolation, actively punishing youth when they take steps to meet their needs for connection, and fails to offer them reasonable accommodations as needed, does not provide transition age youth with mental health disabilities equal access to DCFS' foster care placements.

223.  In another example, most THPP-NMD programs house youth with roommates.  DCFS is fully aware that roommate conflict is a primary reason for placement disruption for transition age foster youth with mental health disabilities.  DCFS also knows that, for many transition age foster youth with mental health disabilities, their disabilities impair their ability to manage relationships with others and their trauma histories may include being harmed by people with whom they have lived.  For example, Ocean S. had to press charges against another resident at one of her placements.  Onyx G. was also physically assaulted by a roommate.  Because so many youth with mental health disabilities have been unsafe in prior placements, they

have good reason to fear that any roommate conflict can escalate. Many transition age foster youth with mental health disabilities do not have the skills they need to navigate roommate conflict and need supportive services to be able to navigate issues with peers, including roommates. Without trauma responsive supports, they are often unable to meet program expectations, or may feel they need to leave their placements in order to be safe.

224. In another example, THPP-NMD programs, under the direction and control of Defendants, also often refuse reasonable requests for emotional support animals. Programs also require transition age foster youth with mental health disabilities who have already obtained emotional support animals to give them up to maintain their placement, without engaging in the interactive process required for reasonable accommodation requests.

225. Additionally, youth, like Ocean S. and Erykah B. describe how program staff often enter their private spaces without notice. For most transition age foster youth with mental health disabilities, intrusion into their private space, especially an unannounced and unwanted entry, is an unsafe experience and underscores ways in which they lack control over their own environment. It would not fundamentally alter the Defendants' programs to modify methods of monitoring youth or entering youth's private spaces and to require that these activities be done in a trauma-responsive, developmentally appropriate manner that protects the safety, privacy and independent needs of transition age foster youth with mental health disabilities

226. When transition age foster youth with mental health disabilities are not able to obtain a placement in a THPP-NMD program, their other practical alternative is often to apply for a SILP, often with people they are related to or otherwise know. SILPs with family are often fragile because these relationships may be impacted not only by the needs of the transition age foster youth but also by intergenerational trauma impacting the entire family. SILPs with others may demand that youth with mental health disabilities interact regularly with persons who do not know or

understand their individual needs.  Transition age foster youth with mental health disabilities predictably need supports and services to manage these relationships.  Yet, DMH does not make available trauma treatments that would help them develop strategies to be successful in SILP placements.  DCFS routinely places youth in SILP placements without regard to the relationships in the living space and without implementing appropriate supports and services to stabilize the placement.  For example, Junior R. specifically asked for help setting up expectations with his grandmother, which DCFS never provided.  As Junior R. predicted, the result was conflict and threats of physical harm that forced Junior R. to leave the placement.

227.  Defendants' policies and practices have excluded ADA Subclass members from participating in or retaining placements.

228.  Defendants' policies and practices have excluded class members from participation in or retaining safe and stable placements.  There are effective and reasonable modifications to Defendants' policies and practices that could be made to ensure that transition age foster youth with mental health disabilities are offered and provided trauma-responsive approaches and other related services needed to stabilize their placements.  These modifications would not fundamentally alter Defendants' programs.

**C.    Youth with Mental Health Disabilities Are Pushed Out of DCFS Placement Because of Disability.**

229.  When transition age youth with mental health disabilities do not receive or are excluded from placements, services, and supports based on their disability-related needs, their placements are predictably unstable.  In transitional placement settings, for example, Defendants fail to ensure that THPP-NMD staff are able to properly respond to the disability-related needs of transition age foster youth with mental health disabilities.

230.  Because THPP-NMD staff often lack training in trauma-responsive techniques or de-escalation tactics, they are not well-equipped to mediate disputes

between youth with mental health disabilities living in group settings. These "roommate disputes" can lead to unlawful involuntary exits.

231. Staff are ill-equipped to manage and ameliorate behavioral issues that stem from the compounded trauma so many transition age foster youth with mental health disabilities have experienced. Any behavior that providers deem to be a violation of the program's rules may lead to an involuntary exit.

232. Relatedly, THPP-NMDs are often not equipped to properly manage the symptoms of mental health crises. Upon information and belief, rather than working with mobile crisis response services to help stabilize a dysregulated young person, THPP-NMD staff instead often call police unnecessarily to address mental health issues, resulting in youth with mental health disabilities being involuntarily committed and/or incarcerated.

233. Youth with mental health disabilities who successfully obtain a THPP-NMD placement are often evicted or "pushed out" of these programs for behaviors related to their disabilities, a practice which State policies explicitly allow.[55]

234. CDSS policy enumerates grounds for removal and discharge that discriminate against individuals with disabilities. For example, CDSS's Interim Licensing Standards for THPP-NMDs provide a "health and safety" basis for "emergency" removal when a youth participant is experiencing a behavioral or psychiatric crisis.

235. 220. Moreover, CDSS's Interim Licensing Standards for THPP-NMDs allows programs to push out youth if the provider "is no longer able to meet the needs of the nonminor dependent, youth" when the youth's disabilities require accommodations that do not align with the THPP-NMD's programming and staffing. Defendants' policies jeopardize any sense of safety or stability for youth with mental health disabilities in foster care and instead encourage disability-based discrimination.

---

[55] Interim Licensing Standards 86268.4(b)(2), (c)(1)(B).

Behavior that results from impaired emotional self-regulation and heightened sensitivities to stressors in the foster care environment—both symptoms of trauma—does not lead to trauma-responsive interventions or provision of needed Medicaid services, but rather involuntary and unlawful discharges from the placements that took the youth so long to obtain.  For example, Onyx G. and Junior R. were both denied placements because of perceptions of their behavioral records.  Erykah B. and Jackson K. have both been villainized as poorly behaved, with no recognition of the ways their behavioral problems are naturally emergent responses to the trauma and instability they've experienced.

236.   There are effective and reasonable modifications the Defendants could implement that would create appropriate supports for transition age foster youth with mental health disabilities across the foster care placement continuum and allow ADA Subclass members to enjoy the benefits of Defendants' placements and services. Examples include trauma-responsive training for Defendants' and their contractors' staff; trauma-responsive interventions and dispute resolution processes to enable youth with mental health disabilities to remain in placements at all times; individualized planning; mandatory convening of a CFT meeting prior to any discharge; and trauma-responsive methods of connecting youth to services; and provision of needed Medicaid services.

**D.    Defendants Unlawfully Institutionalize Youth with Mental Health Disabilities.**

237.   Defendants route many transition age foster youth with mental health disabilities into segregated overly-restrictive institutional settings even though they are eligible for less-restrictive and more integrated placement options, they could be served in these less restrictive and more integrated placement options, and they do not oppose being served in these community-based non-institutional settings.

238.   Upon information and belief, Defendants place transition age foster youth with mental health disabilities eligible for SILP and THPP-NMD into STRTPs,

which evolved from what formerly were known as "group homes."  These programs are far more restrictive environments than the apartments or other homes in which transition age foster youth with mental health disabilities could otherwise live. STRTPs impose strict rules on their residents, including 24/7 supervision; exclusion in an unlocked living, sleeping, or recreation area as a form of discipline; curfews; locked doors that prevent youth from leaving; visitor rules; and restrictions on telephone and internet-enabled device usage.

239.   Although youth are only supposed to stay in STRTPs for a limited period until they can be transitioned to a less restrictive environment, Defendants' denial of SILP and THPP-NMD placements forces transition age foster youth with mental health disabilities to stay far longer in these institutional and congregate care settings than they want or than is appropriate based on their needs.

240.   Defendants' failure to provide community-based behavioral and mental health services through Medicaid  is also a major contributor to institutionalization. *See* Section VII, *infra*.  In particular, Defendants' untimely and inadequate provision of services unique to the needs of the individual youth with mental health disabilities harms youth like Jackson K., who was subjected to psychiatric hospitalization rather than trauma-responsive crisis response, a crisis that was worsened because he was not provided with adequate ASL interpretation.  Defendants' inadequate case planning and failure to provide services based on the unique needs of the youth prevents youth with mental health disabilities from receiving the care they need to succeed in foster care, subjecting them to serious risk of segregation and often even effectively pushing them into more restrictive placement than necessary.

241.   By requiring transition age foster youth with mental health disabilities who are eligible for SILP and THPP-NMD placements to remain in STRTPs even after these youth stabilize and need a less restrictive placement, Defendants unjustifiably institutionalize, isolate, and segregate transition age foster youth with mental health disabilities from mainstream society because of their disabilities.

242.   Defendants' failure to provide an adequate array of placements results in transition age foster youth with mental health disabilities being in overly restrictive placements or pushed out of the foster care system altogether.  When class members with mental health disabilities go unhoused for an extended period of time, as with Junior R., DCFS often encourages these youth to close their dependency case, advising youth that they will have a better chance of finding supportive housing outside of the foster care system.  Los Angeles County's supportive housing program for young people ages eighteen through twenty-four is not available to foster youth.  Consequently, Defendants thereby force class members into a Hobson's choice between the benefits and support of the extended foster care program (including placement, case management support, foster care funding, representation by a court-appointed attorney, and dependency court oversight of their case) or the Los Angeles County homeless services program.

243.   Defendants' unlawful policies result in the institutionalization and confinement of transition age foster youth with mental health disabilities in overly-restrictive settings in another way: by pushing them to homelessness.

244.   Transition age youth who are homeless too often cycle between homelessness and incarceration.  Incarceration in the County's jails and juvenile halls, notorious for their deplorable treatment of the mentally ill, is a particularly pernicious form of institutionalization that retraumatizes those already suffering from complex trauma; blocks their integration into the County's economic, social, civic, political, educational, employment, and familial communities; and perpetuates unwarranted assumptions that disabled individuals are unable to and should not be permitted to participate in these essential aspects of community life.

245.   Once released from incarceration and cycled back out onto the County's sidewalks and into homeless encampments, transition age foster youth with mental health disabilities experience segregation and isolation, risking yet further trauma, amplified impairment, and a heightened risk of further institutionalization in the

County's jails.  As demonstrated by Ocean S.'s experience in seeking a placement after a period of incarceration, with the heightened stressors inherent in being unhoused, it is even more challenging for transition age foster youth with mental health disabilities to restart the obstacle-filled process of applying for a placement.

246.  Transition age foster youth with mental health disabilities who experience homelessness are also subjected to isolation from mainstream society.  On information and belief, class members experiencing homelessness would accept safe, stable, appropriate placements if Defendants offered them.

## XI.    TRANSITION AGE FOSTER YOUTH ARE BEING DENIED NECESSARY BEHAVIORAL HEALTH SERVICES.

247.  Developing a minimally adequate array of safe, stable, and appropriate placements for transition age foster youth is impossible without coordination with California's Medicaid program.  Transition age foster youth desperately need—and are legally entitled to—necessary behavioral health services that will enable them to maintain stable housing, accommodate for disabilities, and reduce their risk of institutionalization.  Yet, just as foster youth are transitioning to adulthood and need increased support, they face tremendous obstacles accessing the adult-serving mental health system.  All Defendants, including DHCS and DMH, share responsibility for the failure to provide these services to transition age foster youth.

### A.    Transition Age Foster Youth Are Entitled to Necessary EPSDT Services, Including Specialty Mental Health Services.

248.  Virtually all transition age foster youth receive their health services, including behavioral health services, through Medi-Cal, California's Medicaid program.  Medicaid is a cooperative federal and state funded program designed to provide medical and remedial services to low income people under Title XIX of the Social Security Act.[56]  States that choose to participate in the Medicaid program and

---

[56] 42 U.S.C. § 1396.

receive federal funding must adhere to the minimum federal requirements set forth in the Social Security Act and its implementing regulations.

249.   Federal law requires California, as a state participating in Medicaid, to cover certain mandatory services, including Early and Periodic Screening, Diagnostic, and Treatment (EPSDT) services for Medicaid eligible youth participants under the age of 21.[57]   Under the EPSDT provisions, states are required to provide screenings to identify transition age foster youth's mental and physical health needs, as well as arrange for treatment services  necessary to correct or ameliorate a youth's mental or physical health conditions.[58]

250.   DHCS, California's single state Medicaid agency, is responsible for administering Medicaid in California.[59]   DHCS administers the EPSDT behavioral health services entitlement to youth primarily through two complicated parallel systems.  County Mental Health Plans are responsible for providing Specialty Mental Health Services ("SMHS") under the authority of a section 1915(b) waiver approved by the Centers for Medicare & Medicaid Services.  Medi-Cal Managed Care Plans, or fee for service providers for youth not enrolled in managed care, are responsible for providing so-called non-Specialty Mental Health Services.  Although states may contract with organizations, including managed care entities, to oversee the delivery of services, and may arrange services through provider networks, states retain responsibility for ensuring compliance with Medicaid requirements, including the EPSDT mandates.[60]

251.   DMH is the Los Angeles County agency responsible for providing or arranging for the provision of Specialty Mental Health Services for Med-Cal

---

[57] 42 U.S.C. §§ 1396a(a)

[58]  42 U.S.C. §§ 1396a(a)(10)(A), 42 U.S.C. §§ 1396a(a)(43)(C); 1396d(a)(4)(B); 1396d(r)(1); 1396d(r)(5).

[59] See 42 U.S.C. § 1396(a)(5); 42 C.F.R. § 431.10.

[60] 42 U.S.C. §§ 1396a(a)(5), 1396a(a)(43), 1396u-2.

1  beneficiaries, including transition age foster youth.  These services are provided
2  through the Los Angeles County Mental Health Plan.

3      252.  Transition age foster youth are eligible for a variety of necessary
4  Specialty Mental Health Services, including intensive care coordination, therapeutic
5  foster care, IHBS , mental health services, peer support specialists services, and crisis
6  services.

7      253.  Intensive care coordination ("ICC") is a targeted and intensive case
8  management service that facilitates the assessment of, care planning for, and
9  coordination of mental health services and includes formal and informal supports and
10 team planning.

11     254.  Therapeutic foster care ("TFC") is a service model that allows for the
12 provision of short-term, intensive, trauma-informed, and individualized Specialty
13 Mental Health Services (SMHS) for children up to age 21 who have complex
14 emotional and behavioral needs.  Services include plan development and
15 rehabilitation and other needed supports.  In TFC, children are placed with trained,
16 intensely supervised, and supported TFC parents.

17     255.  IHBS include services that are designed to correct or ameliorate mental
18 health conditions that interfere with the youth's functioning and to build skills to help
19 the youth function in the home and community.  IHBS can be critical to stabilizing
20 placements.

21     256.  Mental health services include a variety of trauma treatments designed
22 to help an individual process a trauma or multiple traumas they have experienced and
23 learn how to cope with the feelings associated with the experience (e.g., fear,
24 posttraumatic stress, anxiety, depression, etc.).  Evidence-based trauma treatments
25 include: Eye Movement Desensitization and Reprocessing therapy (EMDR); Trauma-
26 focused Cognitive Behavioral Therapy (TF-CBT); Cue Centered Therapy (CCT);
27 Modular Approach to Therapy for Children with Anxiety, Depression, Trauma, or

28

Conduct Problems (MATCH-ADTC); Dialectical Behavior Therapy (DBT); and Multisystemic Therapy (MST).

257.   Peer support specialists services are an evidence-based model of care where certified support specialists provide recovery-oriented, culturally appropriate services that promote engagement, socialization, self-sufficiency, self-advocacy, natural supports and are trauma aware.

258.   Crisis services provide community-based rapid response, individual assessment and community-based stabilization.  These services are intended to reduce the immediate risk of danger and avoid unnecessary psychiatric hospitalization or law enforcement involvement.

**B.    Defendants Fail to Provide Transition Age Foster Youth with Necessary Behavioral Health Services.**

259.   Named plaintiffs' experiences and California's own data indicates that foster youth between the ages of eighteen to twenty are far less likely to receive Specialty Mental Health Services than foster youth under eighteen. Fiscal year 2021 State snapshot data measuring specialty mental health care visits indicates that in Los Angeles County, 60.67% of 12,200 eligible foster children between the ages of 12-17 accessed Specialty Mental Health Services.  In contrast, only 39.81% of 3,900 eligible foster youth between the ages of 18-20 accessed Specialty Mental Health Services.

260.   In Los Angeles County, the call-in line for youth with mental health needs is literally called the "gatekeeper."  Too often, the gate is closed.  Only a small fraction of foster youth are able to access supportive housing programs that offer mental health supports.

261.   At a minimum, failure to provide these necessary behavioral health services results in worsening symptoms, harming youth who are entrusted to the County's care.  But, over time, without access to these services, youth are cycled in and out of placements that do not meet their individual needs, funneled into overly restrictive settings, forced into dangerous situations while unhoused, and effectively

abandoned by the system.  Plaintiff Onyx G., for instance, was forced to leave her STRTP and enter a youth homeless shelter because she did not receive necessary psychological services after she reported she was sexually assaulted by her roommate. Similarly, Defendants failed to provide Plaintiff Junior R. with necessary crisis services when his placements destabilized, leading to homelessness.  DCFS's failure to find Junior R. an appropriate placement caused him to suffer from panic attacks and suicidal ideation, for which he also never received necessary treatment.  The system sets transition age foster youth up for adverse outcomes, including chronic homelessness and incarceration.

**C.**    **Defendants Must Coordinate to Ensure Receipt of Behavioral Health Services.**

262.    [61]Despite the fact that Defendants have known for decades that foster youth with mental health disabilities, including transition age foster youth, need access to Medicaid behavioral health services, their efforts have been woefully inadequate.  Meeting the State's affirmative duty to provide timely Medicaid services to foster youth with mental health disabilities requires intra- and inter-agency coordination, particularly the provision of intensive care coordination, IHBS , crisis services, and therapeutic foster care for transition age foster youth.

263.    At present, insufficient coordination between Defendants results in transition age foster youth with mental health disabilities falling through the cracks. Many transition age foster youth with mental health disabilities are still unable to access legally required and necessary Specialty Mental Health Services in the home and community.

**XII.  THIS ACTION CANNOT BE BROUGHT IN THE DEPENDENCY COURT AND IT DOES NOT INTERFERE WITH THE DEPENDENCY COURT'S JURISDICTION.**

---

[61] Cite to federal mandate on coordination between agencies.

Plaintiffs in this action do not challenge or seek to enjoin or otherwise interfere with the Dependency Court's determinations. Plaintiffs instead challenge the unlawful executive agency systemic practices of Defendants, practices that the Dependency Court is incapable of remedying.

The systemic issues alleged in this complaint are ones that cannot be remedied in the Dependency Court, because State law bars the interposition of Plaintiffs' claims in Dependency Court and/or because the systemic nature of the claims and remedies renders the Dependency Court an inadequate forum.

The Dependency Court does not have authority to:

(i)    correct systemic failures to ensure there is a minimally adequate placement array such that Class members have access to safe and stable placements;

(ii)    correct systematic failures resulting in Class members not receiving legally compliant case plans and transition plans;

(iii)    correct systemic failures to ensure that Class members receive adequate notice and due process after any denial of placement or pushout from placement;

(iv)    correct systemic failures to ensure Defendants do not discriminate against ADA Subclass members and instead provide them an adequate array of placements and services in the most integrated, least restrictive setting appropriate to their needs;

(v)    correct systemic failures to ensure that ADA Subclass members and Medicaid Subclass members have access to and receive the Medicaid services to which they are entitled; or

(vi)    correct systemic failures to ensure that Defendants do not violate the Expecting and Parenting Subclass members' right to familial association.

The remedies asserted herein will promote, not interfere with, the Dependency Court's ability to exercise its jurisdiction and ensure the safety and well-being of transition age foster youth.

### CLASS ACTION ALLEGATIONS

264.   This action is properly maintained as a class action under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

265.   This action consists of the General Class and three subclasses:

a.   The General Class includes all transition age foster youth who are or will be in extended foster care in Los Angeles County.

b.   The ADA Subclass includes all members of the General Class with mental impairments due to mental health conditions that substantially limit a major life activity.

c.   The Medicaid Subclass includes all members of the General Class who are eligible for Specialty Mental Health Services and for whom the service is needed to correct or ameliorate a mental health condition.

d.   The Expecting and Parenting Subclass includes all members of the General Class who are pregnant and/or parenting.

266.   Each class is sufficiently numerous to make joinder impracticable:

a.   Upon information and belief, the General Class includes at least four thousand two hundred (4,200) transition age foster youth, ages sixteen to twenty-one, who are or will be in extended foster care in Los Angeles County.  Joinder of thousands of these youth would be unduly burdensome and impractical in these circumstances.

b.   The ADA Subclass is sufficiently numerous to make joinder impracticable.  Over sixty percent (60%) of foster youth, ages seventeen to eighteen, have a mental health disability.  Using sixty percent (60%) as the baseline, over two thousand five hundred (2,500) transition age foster youth in Los Angeles County have mental health disabilities, and those disabilities substantially limit one or more major

life activities.  Moreover, youth who have not yet been diagnosed with a DSM-V diagnosis may still be members of the subclass as they have been subjected to the known trauma associated with removal from their home and communities, along with other trauma and instability they have experienced.  This complex trauma substantially limits their functioning.

c.    The Medicaid Subclass is sufficiently numerous to make joinder impracticable. Based on the most recent publicly available data, over 1,300 young people ages eighteen to twenty in Los Angeles received a Specialty Mental Health Service in 2021.  This number does not include subclass members ages sixteen to seventeen because their Specialty Mental Health Services usage is not disaggregated by age in publicly available data. Moreover, the actual number of youth in the subclass will be much larger because all transition age foster youth are eligible to receive Specialty Mental Health Services if they are needed to correct or ameliorate a mental health condition.

d.    The Expecting and Parenting Subclass is sufficiently numerous to make joinder impracticable.  In April 2023, there were over 250 youth, ages ten to twenty, who were parents in foster care in Los Angeles County.  Joinder is also impracticable because class members lack the knowledge and the financial means to maintain individual actions.

267.   The questions of fact and law raised by Named Plaintiffs' claims are common to and typical of those of the putative General Class and each Subclass.

268.   Each General Class and Subclass member relies on Defendants for their safety and well-being, both for necessities such as food and a safe and stable placement, but also for mental health, permanency, and other supportive services. Defendants' longstanding failures to oversee and support transition-related services and to ensure a minimally adequate array of  safe and stable extended foster care placements harm and/or place the entire General Class and each Subclass at risk of harm.

269.    Questions of fact common to the classes include:

a.    Whether Defendants have a policy, pattern, and/or practice of failing to provide timely and legally compliant case plans and transition plans to the General Class;

b.    Whether Defendants have a policy, pattern, and/or practice of failing to develop a minimally adequate array of safe and stable placements for transition age foster youth resulting in extreme housing instability and exposing the General Class to psychological, emotional, and physical harm and/or ongoing immediate risk of such harm;

c.    Whether Defendants have a policy, pattern, and/or practice of failing to ensure that the General Class are not subjected to arbitrary and opaque application procedures and not unlawfully rejected from or pushed out of such placements without adequate notice and an opportunity to be heard;

d.    Whether Defendants administer their placements and services in a manner that discriminates against the ADA Subclass and the Expecting and Parenting Subclass members, including the failure to develop a minimally adequate array of safe, stable and appropriate placements and supportive services tailored to their needs;

e.    Whether Defendants deprive the ADA Subclass members of necessary and appropriate services and reasonable modifications to give them equal access to integrated, least-restrictive, safe, and appropriate extended foster care placements and services; and

f.    Whether Defendants have failed to provide necessary behavioral health services to the Medicaid Subclass.

270.    Questions of law common to the General Class include:

a.    Whether Defendants' policies and practices violate the General Class's rights under AACWA to have timely and compliant case plans and a case review system that ensures Class members have a transition plan designed to meet their needs;

b.    Whether Defendants' policies and practices violate the General Class's substantive due process rights to be free from psychological, emotional, and physical harm and/or ongoing immediate risk of such harm while in State custody, as guaranteed by the Fourteenth Amendment to the United States Constitution;

c.    Whether Defendants' policies and practices violate the General Class's procedural due process rights to be free from unlawful denial of placement without adequate notice and an opportunity to be heard, and involuntary and unlawful pushouts without adequate notice and an opportunity to be heard, as guaranteed by the Fourteenth Amendment to the United States Constitution;

d.    Whether Defendants' policies and practices violate the ADA and Section 504 with respect to the ADA Subclass;

e.    Whether Defendants' policies and practices violate the Medicaid Act with respect to the Medicaid Subclass;

f.    Whether Defendants' policies and practices with respect to the Expecting and Parenting Subclass violate their rights to family association under the First and Fourteenth Amendments to the United States Constitution;

Whether the General Class and Subclass members are entitled to declaratory and injunctive relief to vindicate the rights they have been denied.

271.   The violations of law and resulting harms suffered by the Named Plaintiffs are typical of the legal violations and harms (or substantial risk of serious harm) that all General Class members experience.  Plaintiffs Erykah B., Onyx G., Rosie S., Jackson K., Ocean S., and Junior R. have claims that are typical of claims of the ADA and Medicaid Subclasses.  Named Plaintiffs Rosie S. and Ocean S. have claims that are typical of claims of the Expecting and Parenting Subclass.

272.   The Named Plaintiffs will fairly and adequately represent and protect the interests of the General Class and each Subclass.  There are no conflicts of interest

1  between the Named Plaintiffs and the classes they seek to represent.  The relief sought

2  by the Named Plaintiffs will benefit all members of the classes.

3      273.   Named Plaintiffs and the General Class are represented by attorneys with

4  extensive experience in complex civil and public interest litigation.  Plaintiffs'

5  Counsel include attorneys from Public Counsel, the Alliance for Children's Rights,

6  Children's Rights, and Munger, Tolles, & Olson LLP.  Plaintiffs' counsel have

7  committed sufficient resources to represent the classes.

8                     **FIRST CAUSE OF ACTION**

9  **(Against the County, DCFS, Nichols, CDSS, Johnson, CalHHS, and Ghaly for**

10     **Violation of the Case Planning and Transition Planning Provisions of the**

11        **Adoption Assistance and Child Welfare Act, 42 U.S.C. 670 et. seq.)**

12     274.  Plaintiffs hereby re-allege and incorporate by reference the foregoing

13  paragraphs of this Complaint as though fully set forth herein.

14     275.  Defendants, while acting under color of law, have developed and

15  maintained customs, policies, and practices that deprive Plaintiffs of their statutory

16  rights under the Adoption Assistance and Child Welfare Act of 1980 ("AACWA"),

17  42 U.S.C. § 670 et. seq, by:

18          a.    Failing to provide legally compliant case plans that includes a

19  description of the youth's placement, a discussion of the placement's safety and

20  appropriateness, and a plan that assures that the youth receives safe and proper care

21  that meets their needs while in a safe, stable and appropriate placement at all times,

22  42 U.S.C. § 671(1)(A)-(B); and

23          b.    Failing to ensure a case review system that includes a legally

24  compliant transition plan developed during the ninety-day period immediately prior

25  to each youth's exit from foster care, that is personalized at the direction of the youth

26  and includes specific options on safe, stable and appropriate placement, health,

27  insurance, mentorship, and education and employment support, as well as the youth's

28

birth certificate, Social Security card, and other vital documents that the youth must be provided before exiting foster care, 42 U.S.C. §§ 671(a)(16), 675(5)(H), (I).

276.   Plaintiffs and members of the Classes are entitled to appropriate relief.

## SECOND CAUSE OF ACTION

**(Against the County, DCFS, Nichols, CDSS, Johnson, CalHHS, and Ghaly for Violation of Substantive Due Process under the Fourteenth Amendment to the United States Constitution)**

277.   Plaintiffs hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

278.   Foster youth, including transition age foster youth, have a federal constitutional right to State protection while they remain in the care of the State. Because Defendants have restrained Plaintiffs' personal liberty by taking them into State custody and extending their foster care past age eighteen by operation of law, Defendants owe Plaintiffs reasonable safety, placement, and minimally adequate care and treatment appropriate to the Plaintiffs' age and circumstances.    Due to Defendants' special relationship with Plaintiffs, Defendants assumed an affirmative duty under the Fourteenth Amendment to the United States Constitution to protect Plaintiffs from harm, including but not limited to the harm caused by extreme housing instability and homelessness.

279.   Defendants, while acting under color of law, have developed and maintained customs, policies and practices that deprive Plaintiffs of their constitutional rights, in violation of 42 U.S.C. § 1983.  These practices include, but are not limited to, failing to provide a minimally adequate array of safe and stable placements; ; failing to identify sufficient emergency housing options for youth transitioning between placements or re-entering care; affirmatively issuing standards and policies that undermine placement stability for transition age foster youth; licensing and contracting with placement providers that do not respect and uphold the rights of foster youth; failing to ensure transition age foster youth's access to critical

EPSDT services; and deliberately ignoring the need to evaluate and expand safe and stable placement capacity for transition age foster youth.

280.   Defendants' practices have caused Plaintiffs' conditions to deteriorate and have subjected them to unsafe conditions and emotional, psychological and physical harm, in violation of the Fourteenth Amendment to the United States Constitution.

281.   Defendants have failed to provide for Plaintiffs' basic needs, including, without limitation, adequate safety; safe and stable placement; medical care, treatment, and required services; conditions of confinement that are reasonably related to the purpose of their custody; reasonable care; and freedom from unreasonable risk of harm.

282.   Defendants have acted under color of law with deliberate indifference towards Plaintiffs.  Defendants are aware that their failure to provide transition age foster youth with safe and stable placement and required services causes youth to experience homelessness and its attendant health and safety risks.  Defendants' own statements, and the various publications that have put them on notice, establish that Defendants have knowledge of the danger to Plaintiffs and have ignored this danger. In restricting Plaintiffs' access to safe and stable placement, services, and treatment, Defendants abdicated their duty to provide for Plaintiffs' basic needs and have thereby caused Plaintiffs' injuries.

283.   The foregoing actions and omissions of Defendants constitute a policy, pattern, practice, and/or custom that is inconsistent with the exercise of any accepted professional judgment and amounts to deliberate inference to the constitutionally protected liberty and privacy interests of Plaintiffs.

284.   Plaintiffs and members of the Classes are entitled to appropriate relief.

**THIRD CAUSE OF ACTION**

**(Against the County, DCFS, Nichols, CDSS, Johnson, CalHHS, and Ghaly for Violation of Procedural Due Process under the Fourteenth Amendment to the United States Constitution)**

285.  Plaintiffs hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

286.  Defendants, acting under color of law, have deprived Plaintiffs of their property without providing adequate procedural safeguards by failing to provide for sufficient notice or hearing before a neutral arbiter before a youth is denied admission to, or evicted from, programs like THPP-NMD and SILP.  The CDSS THPP-NMD Interim Licensing Standards and DCFS policies require Plaintiffs to apply and interview for admission to THPP-NMD, then allow THPP-NMD programs to deny admission without written notice or a meaningful opportunity to contest the reasons for denial.  Defendants' policies also allow inadequate notice and opportunity to be heard when youth are pushed out of a THPP-NMP placement, and allow THPP-NMD programs to misclassify as "emergencies" behaviors that could be addressed through trauma-responsive approaches; by misclassifying this conduct, programs may, under Defendants' policies, unlawfully and involuntarily exit Plaintiffs from their placements without any notice at all.  Similarly, Plaintiffs may be denied or delayed a placement in a SILP, or abruptly lose financial support for their SILP, without notice and an opportunity to appeal or grieve Defendants' actions.

287.  Defendants' actions, inactions, customs, policies, and practices deprive Plaintiffs of their property interest in extended foster care placement and services without due process, in violation of 42 U.S.C. § 1983.

288.  Defendants have denied Plaintiffs foster care placement and services, resulting in a grievous loss for Plaintiffs, without providing timely notice, a pre-termination hearing, and an impartial decision-maker as required by the Fourteenth Amendment.  In losing their placement without adequate procedural safeguards,

Plaintiffs lose not only a place to sleep, but other DCFS resources that are linked to Plaintiffs' placement status, including monthly stipends to help cover the cost of food and basic living expenses, clothing allowances and, for parenting youth, infant supplements.

289.   Plaintiffs and members of the Classes are entitled to appropriate relief.

## FOURTH CAUSE OF ACTION

### On behalf of the ADA Subclass

### (Against All Defendants for Violation of Section 504

### of the Rehabilitation Act)

290.   Plaintiffs hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

291.   Defendants are prohibited under Section 504 and its implementing regulations from discriminating against individuals with disabilities.[62]   Defendants are also prohibited from discriminating against individuals on the basis of disability through contractual, licensing or other arrangements.[63]

292.   Plaintiffs with mental health disabilities meet the definition of "individuals with disabilities" within the meaning of Section 504 and its implementing regulations, 45 C.F.R. § 84.3(j).

293.   Defendants conduct, operate, or administer the State foster care and Medicaid programs, which receive federal financial assistance and are therefore programs or activities within the meaning of the Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(b), and its implementing regulations, 45 C.F.R. § 84.3(k).

294.   Plaintiffs are under twenty-one years of age and otherwise eligible for the foster care placement and services for which Defendants receive federal funds at all times.

295.   Plaintiffs are otherwise eligible for Medicaid.

---

[62] 29 U.S.C. § 794; 45 C.F.R.§ 84.4(b).
[63] 45 C.F.R. § 84.4(b)

**General Discrimination**

296.   Defendants have denied transition age foster youth the benefits of the foster care system and Medicaid program solely on the basis of their disability. Defendants and their contractors exclude and unjustifiably terminate transition age foster youth with mental health disabilities foster care placements, including THPP-NMD and SILP, and other needed services.  This discrimination impairs Plaintiffs' and ADA Subclass members' ability to meaningfully access the benefits of foster care, denies them equal access to placements available to non-disabled transition age foster youth, denies them placement in the most integrated, least restrictive setting appropriate to their needs, and  denies other federally-funded Medicaid services to transition age foster youth with mental health disabilities, and substantially impairs accomplishment of these programs' objectives with respect to individuals with disabilities.

297.   There are effective and reasonable modifications the Defendants could implement that would allow Plaintiffs and ADA Subclass members to enjoy the benefits of the foster care system and Medicaid programs.  Providing these reasonable modifications would not fundamentally alter the nature of the placements and services that Defendants must provide at all times.

298.   Plaintiffs have suffered irreparable injury because of Defendants' discrimination on the basis of disability.  Plaintiffs are without adequate remedy at law.

**Methods of Administration**

299.   Pursuant to the regulations implementing the Rehabilitation Act, Defendants are prohibited from utilizing criteria or other methods of administration "(i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of [disability]; [or] (ii) that have the purpose or effect of defeating or

substantially impairing accomplishment of the objectives of the recipient's program or activity with respect to handicapped."[64]

300.   Defendants utilize methods of administration that subject Plaintiffs and ADA Subclass Members to discrimination on the basis of disability.  Defendants' policies exclude and unjustifiably terminate transition age foster youth with mental health disabilities from  foster care placements, including THPP-NMDs and SILPs, and other needed services.  This discrimination impairs Plaintiffs' and ADA Subclass Members' ability to meaningfully access the benefits of foster care, denies equal access to placements available to transition age youth without disabilities, denies placement in the most integrated, least restrictive setting appropriate to their needs, and denies federally-funded Medicaid services to transition age foster youth with mental health disabilities, and substantially impairs accomplishment of these programs' objectives with respect to youth with mental health disabilities.

301.   There are effective and reasonable modifications Defendants could implement that would create appropriate supports for placement and services and allow Plaintiffs and ADA Subclass members to enjoy the benefits of these foster care system and the Medicaid program.  Providing these reasonable modifications would not fundamentally alter the nature of the placement and services that Defendants provide.

302.   Plaintiffs have suffered irreparable injury because of Defendants' use of methods of administration that discriminate on the basis of disability.  Plaintiffs are without adequate remedy at law.

**Integration Mandate**

303.   Section 504 mandates that qualified individuals with disabilities are entitled to receive services in the most integrated setting appropriate to their needs.[65]

---

[64] 45 C.F.R. § 84.4(b)(4).
[65] 28 C.F.R. § 84.4(b)(2).

304.   Plaintiffs and ADA Subclass Members are capable of living in integrated settings, and they wish to receive services in the most integrated community-based settings that meet their needs, including their mental and behavioral health needs.

305.   Defendants' fail to provide a minimally adequate array of placements and needed services to meet the needs of transition age foster youth with mental health disabilities,, depriving Plaintiffs and ADA Subclass members of their right to receive placement and services in the most integrated, least restrictive setting appropriate to their needs.  Defendants have placed Plaintiffs and ADA Subclass Members in unduly restrictive and segregated settings despite their ability to benefit from placements and services in a less restrictive setting.

306.   Defendants' failure to provide Medicaid services in an integrated community-based setting restricts Plaintiffs' and ADA Subclass members' right to receive Medicaid services in the least restrictive environment appropriate to their needs.

307.   As a result of Defendants' acts and omissions, Plaintiffs and ADA Subclass Members are unnecessarily segregated or placed at risk of institutionalization and lack of community integration in violation of the Rehabilitation Act.

308.   Plaintiffs have suffered irreparable injury because of Defendants' failure to facilitate the receipt of services and least restrictive placement in the most integrated settings appropriate to their needs.  Plaintiffs are without adequate remedy at law.

309.   Plaintiffs and members of the ADA Subclass are entitled to appropriate relief.

**FIFTH CAUSE OF ACTION**

**On behalf of the ADA Subclass**

**(Against All Defendants for Violation of the**

**Americans with Disabilities Act of 1990)**

310.  Plaintiffs hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

311.  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[66]  Defendants are also prohibited under Title II of the ADA and its implementing regulations from discriminating against individuals with disabilities through contractual, licensing or other arrangements.[67]

312.  Plaintiffs and members of the ADA Subclass have mental health disabilities that substantially limit one or more major life activities, or have a record of such disabilities, and therefore have a disability as defined by the ADA, 42 U.S.C. §§ 12102 et seq., and its implementing regulations, 28 C.F.R. § 35.108.

313.  Plaintiffs and members of the ADA Subclass are "qualified individuals with disabilities" as defined by the ADA, 42 U.S.C. § 12131(2), and its implementing regulations, 28 C.F.R. § 35.104.

314.  Defendants are public entities as defined by the ADA, 42 U.S.C. § 12131, and its implementing regulations, 28 C.F.R. § 35.104.

**General Discrimination**

315.  Defendants have denied transition age foster youth the benefits of the foster care system and Medicaid program by reason of their disability.  Defendants

---

[66] 42 U.S.C. § 12132; 28 C.F.R. § 35.130.

[67] 28 C.F.R. 35.130(b)(1)(i)(ii)(iii)(v)(vii).

and their contractors exclude and unjustifiably terminate transition age foster youth with mental health disabilities foster care placements, including THPP-NMD and SILP, and other needed services.  This discrimination impairs Plaintiffs' and ADA Subclass members' ability to meaningfully access the benefits of foster care, denies them equal access to placements available to non-disabled transition age foster youth, denies them placement in the most integrated, least restrictive setting appropriate to their needs, and  denies other federally-funded Medicaid services to transition age foster youth with mental health disabilities, and substantially impairs accomplishment of these programs' objectives with respect to individuals with disabilities.

316.   There are effective and reasonable modifications the Defendants could implement that would allow Plaintiffs and members of the ADA Subclass to enjoy the benefits of Defendants' foster care system and Medicaid programs.  Providing these reasonable modifications would not fundamentally alter the nature of the placement, social services, and health services that Defendants provide.

317. Plaintiffs have suffered irreparable injury because of Defendants' discrimination on the basis of disability.  Plaintiffs are without adequate remedy at law.

**Methods of Administration**

318. Pursuant to the regulations implementing Title II of the ADA, Defendants are prohibited from utilizing criteria or other methods of administration: "(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities . . . ."[68]

319. Defendants utilize methods of administration that subject Plaintiffs and ADA Subclass Members to discrimination by reason of disability.  Defendants'

---

[68] 28 C.F.R. § 35.130(b)(3).

policies exclude and unjustifiably terminate transition age foster youth with mental health disabilities from foster care placements, including THPP-NMDs and SILPs, and other needed services. This discrimination impairs Plaintiffs' and ADA Subclass members' ability to meaningfully access the benefits of foster care; denies placement and federally funded Medicaid services to transition age foster youth with mental health disabilities; and substantially impairs accomplishment of these programs' objectives with respect to youth with mental health disabilities.

320. There are effective and reasonable modifications Defendants could implement that would create appropriate supports for placement and allow Plaintiffs and members of the ADA Subclass to enjoy the benefits of Defendants' foster care system and Medicaid program. Providing these reasonable modifications would not fundamentally alter the nature of the placements and social services that Defendants provide.

321. Plaintiffs have suffered irreparable injury because of Defendants' use of methods of administration that discriminate on the basis of disability. Plaintiffs are without adequate remedy at law.

**Integration Mandate**

322. Title II of the ADA requires that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."[69]

323. Plaintiffs and ADA Subclass members are capable of living in integrated settings, and they wish to receive services in the most integrated community-based settings that meet their needs, including their mental and behavioral health needs.

324. Defendants fail to provide a minimally adequate array of placements and services to meet the needs of transition age foster youth with mental health disabilities, depriving Plaintiffs and ADA Subclass members of their right to receive

---

[69] 28 C.F.R. § 35.130(d).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

placement and services in the most integrated, least restrictive setting appropriate to their needs.  Defendants have placed Plaintiffs and ADA Subclass Members in unduly restrictive and segregated settings despite their ability to benefit from placements and services in a less restrictive setting.

325.  Defendants' failure to provide mental and behavioral services in an integrated community-based setting restricts Plaintiffs' and ADA Subclass members' right to receive such services in the least restrictive environment appropriate to their needs.

326.  As a result of Defendants' acts and omissions, Plaintiffs and ADA Subclass members are unnecessarily segregated or placed at risk of institutionalization and lack of community integration in violation of Title II of the ADA.[70]

327.  Serving the Plaintiffs and the members of the ADA Subclass in the most integrated settings appropriate to their needs would not fundamentally alter the nature of the Defendants' services, programs, or activities.[71]

328.  Plaintiffs and members of the ADA subclass have suffered irreparable injury because of Defendants' failure to facilitate the receipt of services and safe and appropriate placement at all times in the most integrated settings appropriate to their needs.  Plaintiffs are without adequate remedy at law.

329.  Plaintiffs and members of the ADA Subclass are entitled to appropriate relief.

---

[70] 28 C.F.R. § 35.130(d).
[71] 28 C.F.R. § 35.130(b)(7).

## **SIXTH CAUSE OF ACTION**

**On Behalf of the Expecting and Parenting Subclass**

**(Against the County, DCFS, Nichols, CDSS, Johnson, CalHHS, and Ghaly for Violation of Freedom of Familial Association and Right to Privacy under the First and Fourteenth Amendments to the United States Constitution)**

330.   Plaintiffs hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

331.   Under the First and Fourteenth Amendment to the United States Constitution, state actors cannot infringe on the constitutional right to form and maintain certain intimate or private relationships free from unjustified governmental inference, including associational rights that attend the creation and sustenance of a family, including the upbringing of children.

332.   Defendants are state actors and thereby prohibited from infringing on freedom of association.

333.   Defendants, while acting under color of law and with deliberate indifference to the rights of Plaintiffs and Expecting and Parenting Subclass members, have developed and maintained customs, policies, and practices that have violated Plaintiffs' and subclass members' freedom of intimate association, by failing to provide safe and stable placements appropriate for pregnant and parenting youth to reside with their children.[72]  Because of Defendants' failures, Plaintiffs and Expecting and Parenting Subclass members have experienced homelessness, a contributing factor to family separation.  The lack of a minimally adequate array of safe and stable placements also creates barriers for Plaintiffs and subclass members seeking to reunify with detained children.  Defendants' practices directly and substantially interfere with the ability of Plaintiffs and members of the Expecting and Parenting Subclass to parent their children while participating in extended foster care .

---

[72] Cal. Health & Safety Code § 1559.110(g)(2)(E)(iii), (iv).

334.   Plaintiffs and members of the Expecting and Parenting Subclass have been harmed by Defendants' acts and omissions and are entitled to appropriate relief.

## SEVENTH CAUSE OF ACTION

### On Behalf of the Medicaid Subclass

**(Against the County, DMH, Wong, DHCS, and Baass for Violation of the Medicaid Act, Early and Periodic Screening, Diagnostic and Treatment (EPSDT) Services, 42 U.S.C. § 42 U.S.C. §§ 1396a(43), 1396d(a)(4)(B) and 1396(r))**

335.   Plaintiffs hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

336.   Defendants, while acting under color of law, have violated the EPSDT provisions of the Medicaid Act, by failing to provide or arrange for behavioral health services for the Medicaid Subclass that are necessary to correct or ameliorate their mental health conditions in violation of 42 U.S.C. §§ 1396a(a)(10)(A), 42 U.S.C. §§ 1396a(43)(C), 1396d(a)(4)(B) and 1396d(r).

337.   Plaintiffs in the Medicaid Subclass are otherwise eligible for Medicaid.

338.   Defendants' acts and omissions described above violate 42 U.S.C. § 1983 by depriving Plaintiffs and members of the Medicaid Subclass of their statutory rights.

339.   Plaintiffs and members of the Medicaid Subclass are entitled to appropriate relief.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a.      Assert subject matter jurisdiction over this action;

b.      Order that this action may be maintained as a class action pursuant to Fed. R. Civ. P. §§ 23(a) and 23(b)(2);

c.      Declare unlawful, pursuant to Fed. R. Civ. P. § 57, Defendants' conduct, as described above, in violation of: (i) Plaintiffs' substantive due process rights under

the Due Process Clause of the Fourteenth Amendment to the United States Constitution; (ii) Plaintiffs' procedural due process rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution; (iii) Title II of the ADA; (iv) Section 504 of the Rehabilitation Act; (v) the EPSDT provisions of the Medicaid Act; (vi) the case and transition planning provisions of the AACWA; and (vii) Plaintiffs' rights to privacy and familial association under the First and Fourteenth Amendments to the United States Constitution.

   d.     Grant preliminary and permanent injunctive relief, pursuant to Fed. R. Civ. P. § 65, requiring Defendants to: (i) correct systemic failures to ensure there is a minimally adequate placement array such that Class members have access to safe and stable placements at all times; (ii) correct systemic failures to ensure that Class members receive adequate notice and due process after any denial of placement or pushout from placement; (iii) correct systemic failures resulting in Class members not receiving mandated case plans and transition plans; (iv) correct systemic failures to ensure Defendants do not discriminate against ADA Subclass members and instead provide them an adequate array of placements and services in the most integrated, least restrictive setting appropriate to their needs; (v) correct systemic failures to ensure that Named Plaintiffs, ADA Subclass members, and Medicaid Subclass members have access to and receive the Medicaid services to which they are entitled; and (vi) correct systemic failures to ensure that Defendants do not violate the Expecting and Parenting Subclass members' right to familial association.

   e.     Retain jurisdiction over Defendants until such time as the Court is satisfied that Defendants have implemented and sustained this injunctive relief;

   f.     Award reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1920, 42 U.S.C. § 12205, 42 U.S.C. § 1988, and Fed. R. Civ. P. § 23(e) and (h); and

   g.     Grant such further relief as this Court may deem just, necessary, and proper.

DATED:  August 22, 2023

By: _____

Attorney for Plaintiffs

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# GLOSSARY OF TERMS[73]

**I.    Named Defendants Defined in the Complaint**

**CalHHS** ............................................. California Health and Human Services Agency

**CDSS** .........................................................California Department of Social Services

**County** ............................................................................Los Angeles County

**DCFS** .................Los Angeles County Department of Children and Family Services

**DHCS** ................................................. California Department of Health Care Services

**DMH** .......................................... Los Angeles County Department of Mental Health

**II.    Terms Defined in the Complaint**

**AACWA** ...................................Adoption Assistance and Child Welfare Act of 1980

**ADA** ......................................................................... Americans with Disabilities Act

**ASL** .................................................................................American Sign Language

**A.W.O.L.** ...................................................................................Absent Without Leave

**CCLD** .................................. Defendant CDSS Community Care Licensing Division

**CFT** ...................................................................Child and Family Team meeting

**EPSDT** ............................... Early and Periodic Screening, Diagnostic and Treatment

**IEP** .......................................................................... Individualized Education Plan

**IHBS** ...........................................................................Intensive Home-Based Services

**ISFC** ...............................................................Intensive Service Foster Care Program

**LAHSA** ...................................................Los Angeles Homeless Services Authority

**Medi-Cal** ...................................................................California's Medicaid Program

**NMD** .........................................................................................Nonminor Dependent

**PTSD** .........................................................................Post-Traumatic Stress Disorder

**Section 504** .......................................................................Rehabilitation Act of 1973

**SILP** .....................................................Supervised Independent Living Placement

**SMHS** ................................................................. Specialty Mental Health Services

---

[73] The defined terms are in alphabetical order in each section of this Glossary.

1   **STRTP** ................................................. Short-Term Residential Therapeutic Program

2   **TFC** ......................................................................... Therapeutic Foster Care

3   **THPP** ........................................................ Transitional Housing Placement Program

4   **THPP-NMD** ...Transitional Housing Placement Program for Non Minor Dependents

5   **TILP** ................................................................Transitional Independent Living Plan

6   **TLS** ................................................................................. Transitional Living Setting

7
8   DATED:  August 22, 2023            MUNGER, TOLLES & OLSON LLP

9

10                                              By:     */s/ Grant A. Davis-Denny*

11                                                        GRANT A. DAVIS-DENNY
                                                         Attorneys for Plaintiffs
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# *ADDITIONAL ATTORNEYS OF RECORD

Kathryn Eidmann (State Bar No. 268053)
keidmann@publiccounsel.org
Amanda Mangaser Savage (State Bar No. 325996)
asavage@publiccounsel.org
Rachel Stein (State Bar No. 257411) (C.D. Cal admission pending)
rstein@publiccounsel.org
Molly Mauck (State Bar No. 344278)
mmauck@publiccounsel.org
Natalie Garnica (State Bar No. 320230)
ngarnica@publiccounsel.org
Alero Egbe (State Bar No. 349753) (C.D. Cal admission pending)
aegbe@publiccounsel.org
Amelia Piazza (State Bar No. 342473)
apiazza@publiccounsel.org
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, California 90071-3426
Telephone:   (213) 385-2977
Facsimile:    (213) 385-9089

Jessica Zou (New York Bar No. 5922091) (pro hac vice application pending)
jzou@childrenrights.org
CHILDREN'S RIGHTS
2021 Fillmore Street
San Francisco, California  94115
Telephone:  (415) 602-5202

William D. Temko (State Bar No. 98858)
william.temko@mto.com
Peter Gratzinger (State Bar No. 228763)
peter.gratzinger@mto.com
Jimmy P. Biblarz (State Bar No. 341874)
jimmy.biblarz@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:   (213) 683-9100
Facsimile:    (213) 687-3702