Taylor Campion (State Bar No. 297664)
tcampion@fvaplaw.org
Family Violence Appellate Project
449 15th St., Suite 104
Oakland, CA 94612

Counsel for Amici Curiae Family Violence Appellate Project, et al.

Frank J. Broccolo (State Bar No. 210711)
frank@broccololaw.com
Law Office of Frank J. Broccolo
7249 Franklin Ave., Unit 401
Los Angeles, CA 90046
(310) 770-5878

Counsel solely for Amicus Curiae Family Violence Appellate Project

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION (LOS ANGELES)**

| | |
|---|---|
| OCEAN S., et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>LOS ANGELES COUNTY, et al.,<br><br>Defendants. | Case No.: 2:23-cv-06921-JAK-E<br>BRIEF OF AMICI CURIAE FAMILY VIOLENCE APPELLATE PROJECT, ET AL.<br><br>Before: Hon. John A. Kronstadt<br>Date: April 8, 2024<br>Time: 8:30 A.M.<br>Courtroom: 10B<br>Trail Date: None Set<br>Action Filed: August 22, 2023 |

# TABLE OF CONTENTS


I. INTRODUCTION. ....................................................................... 7

II. ARGUMENT. ............................................................................ 8

A. The Court Has Broad Discretion To Consider The Argument and Data Presented in the Amicus Brief ........................................................ 8

B. The Argument and Data Presented in the Amicus Brief Is Relevant To the Pending Motions To Dismiss and Other Issues in This Action. ...... 8

C. Defendants' Failure To Provide Plaintiffs Housing Security Exposes Them To Violence And Other Harms. ........................................ 11

1. Homelessness and Housing Insecurity Greatly Increase a Person's Exposure to Violence. ........................................ 12

2. Housing Insecurity Results in Transition Age Youth Remaining in Abusive Relationships, Where They Sustain Further Harm. ........................................................ 14

D. Defendants' Failure to Provide Housing Security For Parenting Plaintiffs Furthers Generational Abuse Cycles. ............................ 15

1. Exposure to Housing Insecurity Increases a Child's Risk of Developmental Delays and Poor Health. ............................ 16

2. Failure to Adequately Address the Housing Needs of IPV Survivors Also Increases the Risk That Survivors' Children Will Be Placed in Foster Care. ........................................ 17

3. Children in the Foster Care System Have an Increased Risk of Experiencing Harm. ................................................ 20

III. CONCLUSION. ......................................................................... 21

# TABLE OF AUTHORITIES

## Federal Cases

*California v. United States Dep't of Labor*, 2014 WL 12691095 (E.D. Cal. Jan. 14, 2014) ....8

*Duronslet v. County of Los Angeles*, 2017 WL 5643144 (C.D. Cal. Jan. 23, 2017) ....8

*Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982) ....8, 10

*In re Roxford Foods Litig.*, 790 F. Supp. 987 (E.D. Cal. 1991) ....8

*M.D. v. Abbott*, 907 F.3d 237 (5th Cir. 2018) ....12

*Neonatology Assocs.*, P.A. v. C.I.R., 293 F.3d 128 (3d Cir. 2002) ....8

*United States v. Louisiana*, 751 F. Supp. 608 (E.D. La. 1990) ....8

*WildEarth Guardians v. Haaland*, 561 F. Supp. 3d 890 (C.D. Cal. 2021) ....8

*Wyatt B. v. Brown*, 2021 WL 4434011 (D. Or. Sept. 27, 2021) ....12

## California Cases

*In re I.B.,* 53 Cal.App.5th 133 (2020) ....18

*In re J.M.*, 50 Cal.App.5th 833 (2020) ....18

*In re Ma.V.*, 64 Cal.App.5th 11 (2021) ....18

## Federal Statutes

34 U.S.C. § 12471 (7). ....14

**Other Authorities**

Andrew Khouri *et al.*, *Tracking Home and Rent Prices in Southern California*, L.A. Times (Sept. 21, 2023), https://www.latimes.com/california/story/2023-09-21/tracking-home-and-rent-prices-in-southern-california ....................................11

Brian Pittman et al., *Homelessness in Minnesota: Detailed Findings from the 2018 Minnesota Homeless Study*, Wilder Research (2020).........................................15

California Senate Office of Research, *What Percentage of the State's Polled Prison Inmates Were Once Foster Care Children?* POL'Y MATTERS (Dec. 2011). ....................................................................................................................19

Carmela J. DeCandia et al., *Evolving Our Understanding: Housing Instability as an ACE for Young Children*, 3 ADVERSITY & RESILIENCE SCI. 356 (2022) .........16

Charlene K. Baker et al., *Domestic Violence, Housing Instability, and Homelessness: A Review of Housing Policies and Program Practices for Meeting the Needs of Survivors,* 15 AGGRESSION & VIOLENT BEHAVIOR 430 (2010). ......14

Charles L. Witfield et al., *Violent Childhood Experiences and the Risk of Intimate Partner Violence in Adults*, 18 J. INTERPERSONAL VIOLENCE 166 (2003)...........17

Chrisanna Mink, *California Can Take Kids From Abused Moms. Why Separation Can Harm Both,* CalMatters (Dec. 7, 2023), https://calmatters.org/justice/2023/12/failure-to-protect/ .....................................18

Colleen C. Katz et al., *Prevalence and Predictors of Intimate Partner Violence Among Youth with Foster Care Histories*, 28 J. INTERPERSONAL VIOLENCE 10611 (2023). ........................................................................................................14

Huiling Feng et al., *Memo from CalYOUTH: Predictors of Homelessness at Age 21*, Chapin Hall at the University of Chicago (2018), https://www.chapinhall.org/wp-content/uploads/CY_PH_IB0520.pdf...............20

Jasmine Wali, "*I'd Rather Take A Beating Than Catch A CPS Case": Survivors Face Impossible Choice*, The Nation, (April 5, 2023)........................................18

Jennifer F. Culhane, et al., *Prevalence of Child Welfare Services Involvement among Homeless and Low Income Mothers*, 30 J. SOC. & SOC. WELFARE 79 (2003). ........................................................................................................17

Jessica A. Heerdea & Sheryl A. Hemphillc, *Associations Between Individual-Level Characteristics and Exposure to Physically Violent Behavior Among Young People Experiencing Homelessness: A Meta-Analysis*, 47 AGGRESSION & VIOLENT BEHAVIOR 46 (2019)....13

Joseph J. Doyle, *Child Protection and Child Outcomes: Measuring the Effects of Foster Care*, 97 AM. ECON. REV. 1583 (2007). ....20

Juliana Carlson et al., *Viewing Children's Exposure to Intimate Partner Violence Through a Developmental, Social-Ecological, and Survivor Lens: The Current State of the Field, Challenges, and Future Directions*, 25 VIOLENCE AGAINST WOMEN 6 (2019). .... 17, 18

Kipke, M., et al., *Homeless Youth and Their Exposure to and Involvement in Violence*, 20 J. OF ADOLESCENT HEALTH 360 (1997). ....13

Matthew Breiding et al., *Intimate Partner Violence in the United States — 2010*, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention., https://www.cdc.gov/violenceprevention/pdf/cdc_nisvs_ipv_report_2013_v17_single_a.pdf....14

Matthew D. Bramlett & Laura F. Radel, *Adverse Family Experiences Among Children in Nonparental Care, 2011–2012*, 74 NAT'L HEALTH STAT. REP. (2014). ....19

Michael A. Anderson et al., "*Why Doesn't She Just Leave?": A Descriptive Study of Victim Reported Impediments to Her Safety*, 18 J. FAM. VIOLENCE 151 (2003). ....15

Morgan E. PettyJohn et al., *Reproductive Coercion, Intimate Partner Violence, And Pregnancy Risk Among Adolescent Women with A History of Foster Care Involvement*, 120 CHILD. & YOUTH SERVIES REV. 1 (2020). ....19

National Conference of State Legislatures, *Mental Health and Foster Care* (Nov. 2019), https://www.ncsl.org/human-services/mental-health-and-foster-care.......20

*Student Homelessness in America: School Years 2018-19 to 2020-21*, National Center for Homeless Education (2022), https://nche.ed.gov/wp-content/uploads/2022/11/Student-Homelessness-in-America-2022.pdf. ....20

Vincent J. Felitti, et al., *Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults*, 14 AM. J. PREVENTATIVE MED. 245 (1998). ....................16

## I. INTRODUCTION.

Family Violence Appellate Project ("FVAP") is a non-profit organization dedicated to ensuring the safety of survivors of domestic violence and other forms of abuse by providing them legal assistance. FVAP has represented numerous clients experiencing homelessness and housing insecurity, including young persons between the ages of 18 to 21. Thus, FVAP has firsthand knowledge of the ways that homelessness and housing insecurity impact a person's safety and contribute to generational cycles of violence, as do the other amici curiae joining this brief.

FVAP and other amici curiae (collectively, the "Amici Curiae") submit this brief (the "Amicus Brief") to address contentions in the motions to dismiss filed by Defendants Los Angeles County (Dkt. No 52-1) and California Department of Social Services and Kim Johnson (Dkt. No. 50) (together with other Defendants, "Defendants") and to present information that is otherwise relevant to these proceedings. In their motions to dismiss, Defendants wrongly claim that, at most, they only have a duty to provide Plaintiffs and other putative class members (collectively, "Plaintiffs") "reasonable safety and minimally adequate care." (*See*, *e.g.*, Dkt. No. 52-1, at 8:19-10:9; Dkt. No. 50, at 11:11-12:22.) Defendants further incorrectly claim that Plaintiffs' First Amended Complaint (Dkt. No. 21) ("FAC") does not adequately allege that Defendants violate these standards. (*Id.*)

Defendants are wrong. The FAC explains in detail how Defendants' policies and practices cause Plaintiffs to experience homelessness, housing insecurity, and family separations. Moreover, the data described herein establish that, as a result of Defendants' failures, Plaintiffs are many times more likely to experience violence, remain in abusive relationships, witness violence, and/or subject to their children to the same cycles of abuse that they have endured.

Thus, the FAC's allegations, especially when considered with this data, plainly show that Plaintiffs are not "reasonably safe" in Defendants' systems.

**II. ARGUMENT.**

**A. The Court Has Broad Discretion To Consider the Argument and Data Presented in This Amicus Brief.**

Courts have "broad discretion" to accept submissions from amici curiae. *Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982) *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). Furthermore, District Courts in the Ninth Circuit "find it 'preferable to err on the side of' permitting [amicus] briefs." *Duronslet v. County of Los Angeles*, 2017 WL 5643144, at *1 (C.D. Cal. Jan. 23, 2017) (accepting non-profit's submission in connection with a defendant's pending motion to dismiss) *citing Neonatology Assocs.*, P.A. v. C.I.R., 293 F.3d 128, 133 (3d Cir. 2002). This is especially true where, as here, the matter addresses issues that have "potential ramifications beyond the parties directly involved." *California v. United States Dep't of Labor*, 2014 WL 12691095, at *1-2 (E.D. Cal. Jan. 14, 2014).

Moreover, "'[t]here are no strict prerequisites that must be established prior to qualifying for amicus status." *In re Roxford Foods Litig.*, 790 F. Supp. 987, 997 (E.D. Cal. 1991) *citing United States v. Louisiana*, 751 F. Supp. 608, 620 (E.D. La. 1990). For example, third parties need only demonstrate that "[their] participation is useful to or otherwise desirable to the court,'" or that they have "interests [that] may be affected by a decision." *WildEarth Guardians v. Haaland*, 561 F. Supp. 3d 890, 905-906 (C.D. Cal. 2021) *citing Roxford*, *supra.*, 790 F. Supp. at 997. Here, FVAP and the other Amici Curiae qualify on either ground.

### B. The Argument and Data Presented in the Amicus Brief Is Relevant To the Pending Motions To Dismiss and Other Issues in This Action.

As explained above, FVAP has provided legal services to numerous clients facing homelessness and housing insecurity, including youth between the ages of 18 to 21. Thus, FVAP understands how homelessness and housing insecurity undermine people's safety and contribute to generational cycles of abuse. Second, in 2023, FVAP assisted Youth Law Center provide comments to California's statewide regulations implementing the Transitional Housing Placement Program for Non-Minor Dependents. As such, FVAP is familiar with many of the issues presented by this matter for this additional reason. Third, FVAP has submitted thirty-six (36) amicus briefs in California's and Washington's Appellate and Supreme Courts, each of which bore some relationship to the issues presented here. Consequently, FVAP is qualified to serve as an amicus curiae in this action, as are the other Amici Curiae joining this brief, listed in the attached appendix.[1]

Moreover, the Amici Curiae respectfully submit that their brief might assist the Court in the following ways, among others:

First, the Amicus Brief contains legal argument explaining why contentions in Defendants' pending Motions to Dismiss are wrong. For example, Defendants incorrectly claim that Plaintiffs do not adequately allege that Defendants do not provide them "reasonable safety and minimally adequate care." (*See*, *e.g.*, Dkt. No. 52-1, at 8:19-10:9; Dkt. No. 50, at 11:11-12:22.) The Amicus Brief provides a

[1] FVAP further notes that its brief was solely drafted by FVAP and its pro bono counsel, and that no other persons provided money intended to fund preparing or submitting this brief.

summary of the FAC's allegations and explains why the out-of-state legal authority that Defendants cite is misplaced.

Second, even if Defendants were correct that the FAC requires more detail (which the Amici Curiae dispute) the data identified in the Amicus Brief provide Plaintiffs a good faith basis to amend their pleading and present more detail concerning the harms that Plaintiffs and putative class members are experiencing, and/or likely to experience, as well as how Defendants' policies and practices cause these harms.

Third, the data in the Amicus Brief vividly illustrate the significance of Plaintiffs' claims. As explained herein, the homelessness and housing insecurity that Plaintiffs and the putative classes face in Defendants' systems significantly increase their exposure to violence and other harm. Thus, it is no exaggeration to state that people's lives are at stake. As such, even if Defendants presented a potentially viable argument for the FAC's dismissal (which the Amici Curiae dispute), the information presented in the Amicus Brief establishes that any doubts should be resolved in favor of permitting this action to proceed without delay.

Fourth, the Court has "broad discretion" to accept amicus submissions, and the Court can appoint amici curiae to conduct factual investigations at the pleading stage. *Hoptowit*, 682 F.2d at 1260 (appointing an amicus curiae "shortly after the complaint was filed" to conduct a factual investigation was within the discretion of the District Court).

Consequently, even if the Court does not believe that the Amicus Brief is helpful to its resolution of Defendants' pending motions to dismiss, the Court can and should consider the Amicus Brief as a potential reference for the future.

### C. Defendants' Failure To Provide Plaintiffs Housing Security Exposes Them To Violence And Other Harms.

The FAC explains in detail how Defendants' policies and practices cause a staggering ***twenty percent (20%)*** of transitional age youth to experience homelessness in California's extended foster care system (FAC, ¶ 134), while the remainder suffer from housing insecurity.[2]

---

[2] Some of Defendants' policies and practices that cause homelessness and housing insecurity include: (a) Defendants' failure to maintain emergency placements (*id.*, ¶¶ 140, 157-162); (b) Defendants' failure to reasonably and timely approve payments for hotels when other emergency options are unavailable (*id.*, ¶ 162); (c) Defendants' failure to timely approve Supervised Independent Living Placement ("SILP") payments (*id.*, ¶¶ 153, 194-195); (d) Defendants' failure to account for security deposits required in most leases, further reducing placement options (*id.*, ¶ 153); (e) Defendants' refusal to make SILP payments to unhoused youth, even when they are otherwise entitled to them (*id.*, ¶ 163); (f) Defendants' failure to timely deliver authorized SILP payments (*id.*, ¶ 68); (g) Defendants' failure to authorize SILP payments over $1,129 per month, for ***all*** living expenses (*id.*, ¶ 143), when the average cost of a one-bedroom apartment in Los Angeles is $1,780, more than fifty percent (50%) higher (*see* Andrew Khouri *et al.*, *Tracking Home and Rent Prices in Southern California*, L.A. Times (Sept. 21, 2023, rev. Jan. 18, 2024), https://www.latimes.com/california/story/2023-09-21/tracking-home-and-rent-prices-in-southern-california); (h) Defendants' failure to provide reasons for denials of placements or benefits and/or a meaningful opportunity to challenge such denials (*id.*, ¶¶ 187-189, 191, 193-194); (i) Defendants' failure to provide a coherent waitlist or notification system concerning the status of applications with the Transitional Housing Placement Program for Nonminor Dependents ("THPP-NMD") program, resulting in further lost placements (*id.*, ¶ 190); (j) Defendants' failure to provide adequate notice and/or a meaningful opportunity to challenge the termination of placements (*id.*, ¶¶ 197-204); (k) Defendants' practice of discriminating against persons with mental health disabilities (*id.*, ¶ 192); and (l) Defendants' practice of improperly "pushing youth out of extended foster care" and into the already overburdened adult homelessness services system," where they forego significant benefits (*id.*, ¶ 156), among others.

Remarkably, Defendants nevertheless contend that the Court should ignore these allegations, citing two out-of-state cases that do not address youth who experienced and/or were at imminent risk of homelessness while in the foster care system. In *Wyatt B. v. Brown*, 2021 WL 4434011 (D. Or. Sept. 27, 2021), the Court held that youth were not entitled to "optimum" or an "array of placement options," but nevertheless acknowledged that "[t]he state ***must*** provide …shelter." *Id.*, *8-9 (emphasis added). Similarly, in *M.D. v. Abbott*, 907 F.3d 237 (5th Cir. 2018), plaintiffs challenged the "***ambulatory*** nature of children's placements" and sub-"optimal" placements. *Id.*, at 251 (emphasis added). Here, however, the FAC alleges that Plaintiffs face far more extreme circumstances, because often they do not have any placements at all. "Transition age foster youth [are] forced into couch surfing, tents on city streets, dangerous adult temporary shelters, and vehicular homelessness," "for weeks—[and] in some cases ***months***—at a time." (*See* FAC, ¶ 4, 152 (emphasis added).)

As the following data show, in addition to other harms, homelessness and housing insecurity cause people to experience abuse at significantly higher rates than securely housed persons. Moreover, children who experience homelessness, housing insecurity, or abuse are more likely to be removed from their parents and have an increased risk of negative health outcomes as adults. As a result, even if Defendants' sole responsibility to Plaintiffs is to provide them "reasonable safety" and "adequate care," they are unquestionably failing to meet this standard.

### 1. Homelessness and Housing Insecurity Greatly Increase a Person's Exposure to Violence.

All people, and especially youths, who are homeless or housing insecure are vulnerable to experiencing violence at rates much higher than housing secure

persons. For example, a meta-analysis of 26 studies involving participants ranging from 13 to 26 years of age concluded that youth experiencing homelessness are ***three times*** more likely to experience physical violence victimization than housed young people.[3] Moreover, a study of Los Angeles homeless youths (12-23 year olds) found that, after becoming homeless, 51% of youth experienced physical abuse (being "punched, hit, burned, or beaten up"), 50% were threatened with "serious physical harm," and 23% were "seriously hurt" (including from being stabbed, shot, or sexually assaulted).[4] Thus, Defendants cannot plausibly claim that youth experiencing or at risk of experiencing homelessness are "reasonably safe."

Indeed, even if transitional age foster youth are not homeless, the housing insecurity they face in Defendants' systems leaves them much more susceptible to abuse than their securely housed peers. For example, a study by the National Center for Injury Prevention and Control concluded that, over a 12-month period, individuals experiencing housing insecurity had a significantly higher prevalence of rape, physical violence, or stalking by an intimate partner (more than ***four times*** higher for women, and more than ***two times*** higher for men), compared to those who did not experience housing insecurity.[5]

---

[3] Jessica A. Heerde & Sheryl A. Hemphill, *Associations Between Individual-Level Characteristics and Exposure to Physically Violent Behavior Among Young People Experiencing Homelessness: A Meta-Analysis*, 47 AGGRESSION & VIOLENT BEHAVIOR 46, 50 (2019).

[4] Kipke, Michelle, et al., *Homeless Youth and Their Exposure to and Involvement in Violence*, 20 J. OF ADOLESCENT HEALTH 360, 363 (1997).

[5] The Center categorized people as housing insecure if they worry about having enough money to pay their rent or mortgage. Breiding, M.J., Chen J., & Black, M.C., *Intimate Partner Violence in the United States — 2010*, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention., https://www.cdc.gov/violenceprevention/pdf/cdc_nisvs_ipv_report_2013_v17_sin

**2. Housing Insecurity Results in Transition Age Youth Remaining in Abusive Relationships, Where They Sustain Further Harm.**

Furthermore, data show that Defendants' failure to provide transitional age foster youth housing security also undermines their safety by increasing the risk that they will not leave abusive relationships. Intimate partner violence (IPV) is abuse that occurs within an intimate relationship, and it can include physical, sexual, emotional, reproductive, and economic abuse.[6] Transitional age foster youth are at a heightened risk of experiencing IPV than the general population. *Id.* at 10611. One study of California foster youth found that 20.4% of foster youth were involved with some form of IPV by age 23. *Id.* at 10611-10612, 10627.

Moreover, many survivors of IPV struggle to leave abusive relationships, and stable housing may be one of the most important resources needed for people to escape IPV.[7] Indeed, IPV survivors often return to abusive partners because they cannot find long-term housing.[8] For example, a 2018 study found 53% of homeless

---

gle_a.pdf. Given the lack of placements in the THPP-NMD, and because the maximum SILP payment is $1,129 per month for ***all*** living expenses (FAC, ¶ 143), when the median cost of a one-bedroom apartment in Los Angeles is $1,780, the FAC's allegations plainly establish that Plaintiffs experience housing insecurity, as defined by this study. *See* Andrew Khouri *et al.*, *Tracking Home and Rent Prices in Southern California*, L.A. Times (Sept. 21, 2023, rev. Jan. 18, 2024), https://www.latimes.com/california/story/2023-09-21/tracking-home-and-rent-prices-in-southern-california.

[6] Colleen C. Katz et al., *Prevalence and Predictors of Intimate Partner Violence Among Youth with Foster Care Histories*, 28 J. INTERPERSONAL VIOLENCE 10611, 10612 (2023).

[7] Charlene K. Baker et al., *Domestic Violence, Housing Instability, and Homelessness: A Review of Housing Policies and Program Practices for Meeting the Needs of Survivors,* 15 AGGRESSION & VIOLENT BEHAVIOR 430, 431 (2010).

[8] 34 U.S.C. § 12471(7).

women reported that they had stayed in abusive relationships because they did not have other housing options.[9] Another study found 28.5% of women stayed in or returned to abusive relationships because they had no place else to go, and 18.2% stayed in or returned to abusive relationships because they became homeless.[10]

Foster youth's disproportionately high chance of experiencing IPV indicates that many members of the proposed classes are experiencing IPV. Because stable housing is often required for people to leave abusive relationships, Defendants' failure to provide housing security increases the likelihood that transitional age foster youth will remain in abusive relationships and suffer additional harm.

### D. Defendants' Failure to Provide Housing Security For Parenting Plaintiffs Furthers Generational Abuse Cycles.

Other data establish that Defendants' failure to provide housing security to parenting transitional age foster youth also increases the likelihood that foster youth's children will be unhoused or removed from their parents. When parenting foster youth are separated from their children, there is an increased risk that their children will enter the foster care system, experience IPV or witness other forms of abuse, and experience other negative health outcomes. This constitutes another harm that Plaintiffs and their families sustain, and undermines family stability and wellbeing, as alleged by the FAC. (*See*, *e.g.*, FAC, ¶¶ 207, 212-214.)

---

[9] Brian Pittman et al., *Homelessness in Minnesota: Detailed Findings from the 2018 Minnesota Homeless Study*, Wilder Research, 27 (2020).

[10] Michael A. Anderson et al., "*Why Doesn't She Just Leave?": A Descriptive Study of Victim Reported Impediments to Her Safety*, 18 J. FAM. VIOLENCE 151, 154 (2003).

**1. Exposure to Housing Insecurity Increases a Child's Risk of Developmental Delays and Poor Health.**

Defendants' failure to provide housing security to parenting transitional age foster youth significantly increases the risks that their children will experience negative outcomes. Children with adverse childhood experiences ("ACEs"), such as experiencing housing instability, involvement with child protective services, and witnessing IPV (which, as explained above, is frequent for persons experiencing housing instability), are at a higher risk of having developmental delays and poor health as an adult.[11] The effects of certain ACEs are cumulative; the more ACEs that a child has, and the more prolonged an adverse experience is, the higher the probability that the child will experience developmental delays and poor health outcomes.[12] For example, compared to a child with no ACEs, a child with four or more categories of ACEs has a "4- to 12-fold increased risk for alcoholism, drug abuse, depression, and suicide attempt," and an increased risk of adult diseases, including "cancer, chronic lung disease, skeletal fractures, and liver disease."[13]

Moreover, children exposed to IPV, a frequent consequence of housing insecurity, as explained above, have a higher risk than those not exposed to IPV of

---

[11] Carmela J. DeCandia et al., *Evolving Our Understanding: Housing Instability as an ACE for Young Children*, 3 ADVERSITY & RESILIENCE SCI. 356, 372-376 (2022); *see also* Vincent J. Felitti, et al., *Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults*, 14 AM. J. PREVENTATIVE MED. 245, 251 (1998).
[12] DeCandia, *supra*, at 368; Felitti, *supra*, at 245.
[13] Felitti, *supra*, at 245.

becoming victims or perpetrators of IPV.[14] Children with prolonged exposure to IPV also typically have more difficulty regulating behaviors and emotions in social settings and interpersonal relationships than those exposed to a single event.[15] Additionally, children exposed to IPV have a higher risk of developing emotional, behavioral, cognitive, health, and mental health problems. *Id.* at 8-13. As explained in Section II(C), by failing to provide transitional age foster youths housing security, Defendants place foster youth at increased risks of IPV, where they will have a corresponding increased risk of developmental delays and poor health.

**2. Failure to Adequately Address the Housing Needs of IPV Survivors Also Increases the Risk That Survivors' Children Will Be Placed in Foster Care.**

Defendants' failure to provide the putative classes housing security also greatly increases the risks that IPV survivors' children will be separated from them and placed in foster care. This is because unhoused women are more frequently investigated by child protective services, and their children are placed in foster care more often, than other low-income women.[16] Similarly, women are frequently investigated by child protective services and have their children removed from

---

[14] Charles L. Witfield et al., *Violent Childhood Experiences and the Risk of Intimate Partner Violence in Adults*, 18 J. INTERPERSONAL VIOLENCE 166, 176-181 (2003).

[15] Juliana Carlson et al., *Viewing Children's Exposure to Intimate Partner Violence Through a Developmental, Social-Ecological, and Survivor Lens: The Current State of the Field, Challenges, and Future Directions*, 25 VIOLENCE AGAINST WOMEN 6, 11 (2019).

[16] Jennifer F. Culhane, et al., *Prevalence of Child Welfare Services Involvement Among Homeless and Low Income Mothers*, 30 J. SOC. & SOC. WELFARE 79, 89-93 (2003).

their care because they experience IPV, which, as explained above, is more likely to occur when a person lacks housing security. (*See* Section II(C), *supra.*)

Parents that experience IPV regularly have their children taken away due to a belief that the parent failed protect their child from the IPV.[17] A recent report by the UCLA Pritzker Center indicates that more than half of Los Angeles County's 38,618 foster care cases in 2020 involved domestic violence.[18] When children are taken away from mothers experiencing IPV, it is often because the survivor is being faulted for minimizing abuse and failing to seek help. The link between IPV victimization and child removal are so well know that parents experiencing IPV often do not seek help because they fear losing custody of their children.[19] Thus, parenting foster youth who are unhoused, housing insecure, or experience IPV are more likely than other parenting foster youth to have their children removed from their care, undermining familial stability and wellbeing for both parent and child.

Although witnessing IPV increases a child's risk of poor health and of experiencing and perpetrating IPV, strong supportive relationships with their non-offending parent can mitigate such risks.[20] Indeed, children exposed to IPV are less likely to experience negative consequences associated with witnessing IPV if they have supportive relationships with the non-offending parent. *Id.* Alternatively, children removed from the supportive unoffending parent lose the protective

---

[17] *See, e.g., In re J.M.*, 50 Cal.App.5th 833, 846 (2020); *In re Ma.V.*, 64 Cal.App.5th 11, 22-23 (2021); *In re I.B.,* 53 Cal.App.5th 133, 154 (2020).

[18] Chrisanna Mink, *California Can Take Kids From Abused Moms. Why Separation Can Harm Both,* CalMatters (Dec. 7, 2023), https://calmatters.org/justice/2023/12/failure-to-protect/.

[19] Jasmine Wali, "*I'd Rather Take A Beating Than Catch A CPS Case": Survivors Face Impossible Choice*, The Nation, (April 5, 2023).

[20] Carlson, *supra*, at 14-15.

factors associated with that parental relationship and, thus, are more likely to suffer from the adverse effects of witnessing IPV. The latter result is much more likely to occur where, as here, an absence of housing options undermines non-offending parents' ability to find safe housing where their families can remain together.

**3. Children in the Foster Care System Have an Increased Risk of Experiencing Harm.**

Children in the foster care system have higher chances of facing a wide range of harms detrimental to their long-term health and wellbeing than children outside the foster care system.[21] For example, named Plaintiffs Erykah B. and Onyx G. both experienced abuse from people within the foster care system itself. (FAC, ¶¶ 36, 38, 48, 51, 52.) Moreover, women currently or previously involved in the foster care system disproportionately experience IPV associated with reproduction, including the destruction of contraceptives, violence or threats to decrease a woman's resistance to pregnancy, and condom manipulation (*e.g.*, the breaking or removing condoms on purpose).[22] Former foster care children are also disproportionately represented in California's prison centers.[23] Moreover, as previously explained, foster youth experience disproportionately higher rates of

[21] Matthew D. Bramlett & Laura F. Radel, *Adverse Family Experiences Among Children in Nonparental Care, 2011–2012*, 74 NAT'L HEALTH STAT. REP., 1 (2014).

[22] Morgan E. PettyJohn et al., *Reproductive Coercion, Intimate Partner Violence, And Pregnancy Risk Among Adolescent Women with A History of Foster Care Involvement*, 120 CHILD. & YOUTH SERVIES REV. 1, 5 (2020).

[23] California Senate Office of Research, *What Percentage of the State's Polled Prison Inmates Were Once Foster Care Children?* POL'Y MATTERS, 1-3 (Dec. 2011).

homelessness, at rates ranging from 11% to 38%.[24] Comparatively, during the 2018-2019, 2019-2020, and 2020- 2021 school years, respectively 4.3%, 4.0%, and 3.8% of public school children in California experienced homelessness.[25] Furthermore, foster youth also experience disproportionate rates of mental health issues (as high as 80%, compared to only approximately 18-22% of the general population).[26] Although Defendants will likely argue that youth in the foster care system had adverse experiences prior to entering the system, evidence suggests that when stakeholders disagree about children's placement in foster care, children tend to have better outcomes when they remain at home.[27]

Thus, Defendants' failure to provide housing security has harmed and continues to harm Plaintiffs and their children. Because parenting transitional age foster youth frequently lack housing security, they are more likely to experience IPV and homelessness. As such, their children have an increased risk of being placed in foster care, which increases the likelihood those children will experience IPV, have developmental delays, have mental health disabilities, and experience homelessness and incarceration.

---

[24] Huiling Feng et al., *Memo from CalYOUTH: Predictors of Homelessness at Age 21*, Chapin Hall at the University of Chicago (2018), https://www.chapinhall.org/wp-content/uploads/CY_PH_IB0520.pdf.

[25] *Student Homelessness in America: School Years 2018-19 to 2020-21*, National Center for Homeless Education, 4 (2022), https://nche.ed.gov/wp-content/uploads/2022/11/Student-Homelessness-in-America-2022.pdf.

[26] National Conference of State Legislatures, *Mental Health and Foster Care* (Nov. 2019), https://www.ncsl.org/human-services/mental-health-and-foster-care.

[27] Joseph J. Doyle, *Child Protection and Child Outcomes: Measuring the Effects of Foster Care*, 97 AM. ECON. REV. 1583, 1583 (2007).

The results of Defendants' failures are exemplified by Ocean S.'s experience. Ocean S. experienced IPV, and then became homeless and lost custody of her daughter. (FAC, ¶¶ 95-100.) Because Defendants did not provide Ocean S. safe and stable housing, she was unable to regain custody for months, which placed her daughter at increased risk of abuse and other harms. *Id.* This illustrates the way that Defendants' failure to provide parenting transitional age foster youth housing security can contribute to intergenerational cycles of violence and other harm.

## III. CONCLUSION.

The foregoing data establish that Defendants' ongoing failure to provide Plaintiffs housing security increases the likelihood that Plaintiffs and their children will experience violence and other harms. Thus, Defendants cannot credibly claim that Plaintiffs remain "reasonably safe" in their systems and/or that Defendants are otherwise complying with their duties to Plaintiffs.

February 8, 2024

/s/ Taylor Campion

Taylor Campion (SBN 297664)
Counsel for Amici Curiae Family Violence Appellate Project, et al.

# APPENDIX

## Additional Amici Curiae Joining This Brief

**Asian Americans Advancing Justice Southern California** (AJSOCAL) is the nation's largest legal and civil rights organization that empowers Asian American and Pacific Islander (AAPI) communities. Through community outreach, advocacy, and litigation, AJSOCAL works to advance civil and human rights for AAPI communities, and to promote a fair and equitable society for all. The Advancing Justice organizations AJSOCAL routinely files briefs as amici curiae on behalf of the communities they represent.

The mission of **Community Legal Aid SoCal** is to provide civil legal services to low-income individuals and to promote equal access to the justice system through advocacy, legal counseling, innovative self-help services, in-depth legal representation, economic development and community education.

**Disability Rights California** (DRC) is a California non-profit corporation and the largest disability rights firm in the nation. For nearly 50 years, DRC has worked to protect the legal and human rights of Californians with disabilities. DRC engages in individual and broad-based advocacy, representing clients in administrative hearings, impact and class litigation, and policy matters to enforce the right of people with disabilities to access appropriate and affordable housing and to receive necessary resources. Recent successful impact litigation includes the provision of trauma-informed mental health services and supports for young adults and children (including those involved in the state's foster care system) and the preservation of subsidized housing opportunities for low-income people with disabilities.

**Disability Rights Education and Defense Fund** (DREDF), based in California, is a national nonprofit disability civil rights law and policy organization dedicated to protecting and advancing the civil and human rights of people with disabilities. DREDF was founded in 1979 by a unique alliance of adults with disabilities, and parents of children with disabilities. We are board- and staff-led by members of the disability and parent communities for whom we advocate. DREDF pursues its mission through education, advocacy, and law reform efforts, and is recognized for its expertise in the interpretation of state and federal disability civil rights laws. A significant portion of DREDF's work is directed at securing and advancing the educational entitlements of children with disabilities under laws including the Americans with Disabilities Act (ADA), the Individuals with Disabilities Education Act (IDEA), and Section 504 of the Rehabilitation Act. DREDF leads a Parent Training and Information Center funded by the U.S. Department of Education that helps parents and guardians advocate for appropriate education and services for their disabled children, including families who are unhoused or covered by the McKinney-Vento Act. DREDF is a member of the California Foster Youth Education Task Force and supports transition-age youth through age 26 with training, technical assistance, and collaborations with other organizations. DREDF frequently represents the interests of foster and transition-age youth.

**Homeless Action Center** (HAC) is a nonprofit law office that provides Social Security representation at no cost to residents of Alameda County, California, many of whom are homeless. While representing clients in the process to obtain Social Security, HAC also assists clients in obtaining and retaining food stamps, Medicaid, and housing. HAC has been serving mentally ill clients experiencing

homelessness since 1990 and has a robust knowledge of the resources available to our clients. We currently represent over one thousand clients. Every person in California should have the right to participate fully and equally in society free from discrimination, but this right is denied to many residents simply because they are unhoused. Instead of ensuring that Californians without housing have universal access to a safe, permanent, and affordable place to live, many state and local governments continue to harass, displace, and segregate unhoused people. This disproportionately harms people of color – particularly Black communities who, because of historical and contemporary discrimination in all aspects of life, are unhoused at higher rates.

The **Legal Aid Association of California** is the membership association for over 100 legal aid nonprofits in our state. We train, coordinate, and advocate on behalf of legal aid. Our interest in this case stems from our mission, which revolves around supporting legal aid and the access-to-justice infrastructure in California. Many of our members provide domestic violence-related services and this case implicates those services and those who receive them. This case involves the failure of Los Angeles County to provide safe and stable housing placements for transition-age foster youth, which puts those youth at risk of domestic abuse. Our interest stems from the fact that our members provide domestic violence services to vulnerable Californians daily, and this case affects the interests of our members providing domestic violence and other legal and ancillary services as well as our particular interest in advocating on their behalf.

**Legal Services for Prisoners with Children** in Oakland offers specialized assistance focusing on maintaining family bonds and addressing family law issues for those affected by the carceral system. They help with child custody and

visitation rights, provide advice on divorce and child support, and advocate for the parental rights of incarcerated individuals. Additionally, they address civil rights violations in prisons, assist with parole and probation issues, and offer legal education. They also help ex-prisoners reintegrate into society, work on family law issues, and advocate for policy reforms to improve the justice system. This work is carried out by lawyers, legal aid groups, and volunteers, aiming to ensure fair justice and systemic changes.

**Los Angeles County Bar Association Counsel for Justice Domestic Violence Project (DVP)** provides legal information, forms preparation assistance, and referrals to litigants in domestic violence cases. With locations in the downtown Los Angeles courthouse and the LAPD Central Bureau Family Justice Center, DVP assists over 3,000 domestic violence litigants each year.

The mission of **Los Angeles Center for Law and Justice** (LACLJ) is to secure justice for survivors of domestic violence, sexual assault and human trafficking and empower them to create their own future. Located in East Los Angeles, LACLJ is a 33-person non-profit law firm serving survivors throughout Los Angeles County. LACLJ's primary practice areas are family law and immigration. However, LACLJ strives to provide clients with holistic legal services and has both a robust criminal justice advocacy and appellate practice. Through our integrated legal/social worker service model, LACLJ Community Care Advocates provide supportive services such as education, safety planning, accompaniment, and linkages to other service providers as part of the legal team. LACLJ is committed to a trauma-informed and culturally-responsive workplace and service provision.

The **National Housing Law Project** (NHLP), is a private, nonprofit, national housing and legal advocacy center established in 1968 and located in San Francisco, California, with NHLP attorneys based out of California, Illinois, Virginia, and Florida. NHLP's mission is to advance housing justice for poor people by increasing and preserving the supply of decent, affordable housing; improve existing housing conditions, including physical conditions and management practices; expand and enforce low-income tenants' and homeowners' rights; and increase housing opportunities for racial and ethnic minorities. NHLP is the lead legal organization that spearheaded efforts to pass the proposed housing title provisions of the 2022 Reauthorization of VAWA. NHLP also played a key role in drafting and passing the housing title sections of the 2013 Reauthorization of VAWA. NHLP frequently works with the U.S. Department of Housing and Urban Development and the U.S. Department of Agriculture's Rural Development on the agencies' implementation of VAWA and other policies to support survivors of gender-based violence. NHLP's Domestic Violence Project provides technical assistance and support on the housing rights of domestic violence, sexual assault, dating violence, and stalking survivors to hundreds of housing providers, domestic and sexual violence advocates, and legal aid attorneys across the country. Through litigation, policy advocacy, and training, NHLP supports local legal advocates in their efforts to enforce the housing protections of survivors under VAWA, the Fair Housing Act, as well as state and local laws. NHLP publications on domestic and sexual violence, including its nationally recognized Housing Rights of Domestic Violence Survivors: A State and Local Law Compendium, are widely used by housing providers and survivor advocates alike, and are cited by federal housing agencies.

**Neighborhood Legal Services of Los Angeles County** (NLSLA) is non-profit legal aid program providing free legal assistance to low-income families and individuals throughout Los Angeles County. NLSLA not only provides direct attorney representation to domestic violence survivors but operates several clinics at county courthouses that help domestic violence survivors seek restraining orders in pro per.

**Nancy K. D. Lemon,** has worked in the field of domestic violence law since 1981, representing survivors of abuse in many types of cases and testifying as an expert witness. Ms. Lemon wrote the first Domestic Violence Law textbook in 1996, and has updated it 6 times, using it in the first Domestic Violence Law class ever taught continuously starting in 1988 at Berkeley School of Law. Ms. Lemon co-founded FVAP in 2012 and served as Legal Director until 2022. Ms. Lemon worked on numerous successful pieces of California legislation affecting domestic violence survivors.