LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
JASON H. TOKORO (State Bar No. 252345)
jtokoro@millerbarondess.com
FARBOD S. MORIDANI (State Bar No. 251893)
fmoridani@millerbarondess.com
MILLER BARONDESS, LLP
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
Tel.: (310) 552-4400 | Fax: (310) 552-8400

DAWYN R. HARRISON (State Bar No. 173855)
dharrison@counsel.lacounty.gov
WILLIAM BIRNIE (State Bar No. 268742)
wbirnie@counsel.lacounty.gov
EMILY GROSPE (State Bar No. 290182)
egrospe@counsel.lacounty.gov
Kenneth Hahn Hall of Administration
500 West Temple Street, Suite 648
Los Angeles, California 90012
Tel.: (213) 974-1811 | Fax: (213) 626-7446

Attorneys for Defendants
COUNTY OF LOS ANGELES, THE DEPARTMENT OF CHILDREN AND FAMILY SERVICES, and THE DEPARTMENT OF MENTAL HEALTH

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

OCEAN S., *et al.*,

Plaintiffs,

v.

LOS ANGELES COUNTY, *et al.*,

Defendants.

**CASE NO. 2:23-cv-06921-JAK-E**

**NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF THE COUNTY DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

Assigned to Hon. John A. Kronstadt, Crtrm. 10B and Magistrate Judge Charles F. Eick. Crtrm. 255

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

**TO THE HONORABLE COURT:**

Defendants the County of Los Angeles, the Department of Children and Family Services, and the Department of Mental Health (together, the "County Defendants") respectfully request that the Court take notice of the following opinion that was decided after the hearing for, and is directly pertinent to, the County Defendants' pending Motion to Dismiss for Lack of Subject Matter Jurisdiction (Dkt. No. 51): *A.B. by Wilson v. Holcomb*, 2024 WL 2846363 (N.D. Ind. June 5, 2024) (*Younger* abstention in putative federal class action brought by children seeking foster care reform).

A true and correct copy of this opinion is attached hereto as Exhibit A.

DATED: June 10, 2024 MILLER BARONDESS, LLP

By: [signature]

FARBOD S. MORIDANI
Attorneys for Defendants
COUNTY OF LOS ANGELES, THE DEPARTMENT OF CHILDREN AND FAMILY SERVICES, and THE DEPARTMENT OF MENTAL HEALTH

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

**INDEX OF EXHIBITS**



| Exhibit No. | Description | Pg. No. |
|---|---|---|
| 1. | *A.B. by Wilson v. Holcomb*, 2024 WL 2486363 (N.D. Ind. June 5, 2024) | 4-11 |

# EXHIBIT A

2024 WL 2846363
Only the Westlaw citation is currently available.
United States District Court, N.D.
Indiana, South Bend Division.

A.B., a minor, by next friend
BRIAN WILSON et al., Plaintiffs,
v.
ERIC HOLCOMB et al., Defendants.

CAUSE NO. 3:23cv760 DRL-MGG
|
06/05/2024

Damon R. Leichty, Judge, United States District Court

OPINION AND ORDER

***1** For the second time in five years, Hoosier children pursue a putative federal class action to force changes to Indiana's foster care system. Federal law required the last district court to abstain in favor of the state courts supervising ongoing child-welfare proceedings. The law has not changed. Nor in truth has the nature of the claims materially changed to permit this second suit to continue.

Twelve children in Indiana's system—and really only ten who retain live claims because their state child-welfare matters still pend—say the system isn't what it should be. In a detailed amended complaint, they seek an injunction for perceived constitutional and statutory violations. They want changes. They want timely and focused treatment for children. They want new helplines for caseworkers and parents. They want lower caseloads. They want peer review. They want a new recordkeeping system. They want new policies. They want better and faster placement decisions. They want other things too, and all may be noble for consideration, but they have an ear for these requests already.

Today these children can present concerns about their placement, care, treatment, records, supervision, and the like to a state court designed specifically for them and their ongoing cases—a Child in Need of Services (CHINS) court. If not the Indiana General Assembly, a CHINS court can address these issues. And because that is so, federal law tells this court that it cannot. The court must dismiss this suit under a doctrine called *Younger* abstention.

BACKGROUND

Twelve children who are or were in the custody of Indiana's Department of Child Services (DCS), by their next friends, bring this putative class action on behalf of themselves and all children who are now or will be in DCS custody. The children sue DCS, DCS Director Eric Miller, and Indiana Governor Eric Holcomb for declaratory and injunctive relief.

The State of Indiana addresses allegations of child abuse and neglect primarily through CHINS proceedings. Ind. Code § 31-34-9-1. Once DCS substantiates an allegation, it may initiate a CHINS proceeding by filing a petition with a trial court, and the CHINS court normally must hold a hearing within ten days, Ind. Code § 31-34-10-2(a), or within two days when a child has been removed from the home, Ind. Code § 31-34-5-1(a). A CHINS court has the authority to control the conduct of "any person" in relation to a child. Ind. Code § 31-32-13-1(1).

If the court finds after a hearing that a child needs services, it will hold a dispositional hearing within thirty days thereafter to consider the child's care, placement, treatment, and rehabilitation, to be followed by its dispositional decree. Ind. Code §§ 31-34-19-1(a), 31-34-20-1. A CHINS case remains open until "the objectives of the dispositional decree have been met." Ind. Code § 31-34-21-11. The case does not end until the child achieves a permanent placement. Ind. Code § 31-19-11-6. This may mean reunification, adoption, or termination of parental rights.

***2** In the interim, the CHINS court reviews the case at least once every six months to ensure that a child's case plan, services, and placement continue to serve his or her best interests. Ind. Code §§ 31-34-21-2, 31-34-21-5(a). The court evaluates whether DCS has reasonably provided family services and complied with the child's case plan. Ind. Code §§ 31-34-21-5(a)(1), (b)(1). The court may modify its dispositional decree on its own or upon the motion of the child, the child's representative, the DCS attorney, or a service provider. Ind. Code § 31-34-23-1. During this process, most children are represented by a guardian ad litem or a court-appointed special advocate (CASA), or both.

For purposes of today's motion, the court takes the amended complaint's well-pleaded facts as true. Today's children, and what they hope will be more by way of a class, want to


© 2024 Thomson Reuters. No claim to original U.S. Government Works.

overhaul Indiana's foster care system. They allege statistics that give rise to their concerns. They say, since 2017, the average time that children remained in Indiana foster care rose from 490 days to 596 days. From 2015 to 2020, children stayed in the system 45 percent longer without a permanent placement. In 2020, a fifth of children who were discharged from foster care in Indiana reentered such care within two years. The year after, Indiana exceeded the national average for the number of days to reunification by 19.5 percent, and the number of days to adoption by 52.3 percent.

In 2021, according to the amended complaint, DCS lost a net 390 caseworkers and then another 339 the year after. Staffing matters because some DCS caseworkers report having as many as 35 active cases when the recommended average is 12-15 cases. The children advancing this case allege that the Indiana Inspector General's investigative reports revealed numerous instances of caseworkers falsifying entries to "buy time." The children also allege that DCS has used SafeACT—the Safe Assessment Closure Team created in 2021 to close out assessments when a child is deemed safe—to conclude cases in an effort to decrease caseloads that in reality pose serious safety concerns.

The United States Department of Health and Human Services, in a 2022 report entitled "Indiana Did Not Comply with Requirements for Documenting Psychotropic and Opioid Medications Prescribed for Children in Foster Care," found that in a random sample of healthcare records for children prescribed psychotropic or opioid medications, 95 percent lacked medical passports, 62 percent lacked documents from their providers, 58 percent omitted authorizations for these medications, and a majority of such medications had not been recorded in the Management Gateway for Indiana's Kids (MaGIK)—DCS's electronic records management system. Its director has since acknowledged that DCS's recordkeeping "requires updating." DCS has been developing a new system, I-KIDS, but it remains incomplete.

According to the amended complaint, in 2018, a study conducted by the Child Welfare Policy and Practice Group, a group that endeavors to improve outcomes for children and their families by designing and implementing system changes and improving frontline practices, found that 1,791 Indiana foster families withdrew their licenses over a 24-month period. This report also found a "gap in resources" for children who require a higher level of care than a foster home. After this report, and between March 2021 and March 2022, DCS lost nearly 500 licensed foster homes. The children allege that a culture of retaliation does not help—particularly when DCS responds by removing children from the foster home, removing providers from cases, threatening to rescind foster care licenses, and threatening allegations of abuse or neglect against those who participate. In one alleged instance, DCS filed to remove children from their grandparents after they wrote legislators and the governor for help when DCS reportedly provided no help for the children's needs.

***3** The amended complaint alleges other serious concerns. The children say deficiencies in Indiana's foster care system have had a direct impact on them. Extended stays in the foster care system and frequent placement disruptions exacerbated the mental health condition of certain children. Slow responses to reports of abuse led to more tragic abuse. Some foster parents received inaccurate medical information. Some foster parents were told that their foster children have no psychological conditions despite the children verbalizing and acting out on wanting to commit suicide. Some children who needed therapy never received it because their foster parents were not told how severe their trauma was. Another child remained in residential facilities despite DCS's knowledge that he was not receiving the treatment he needed there. Yet another child did not receive specialized treatment because of the limited supply of providers. Missing medical records and the seeming lack of help from DCS led some foster parents to relinquish their foster licenses altogether, according to the amended complaint.

Indiana's foster care system has evolved with the oversight of all branches of state government, and that oversight rests on the wisdom that most all things of human enterprise can be subject to neglect or can present opportunities for improvement, some more urgent than others. For instance, the General Assembly regularly reviews caseloads and the number of children serviced through DCS programs. *See* Ind. Code §§ 31-25-2-4, 31-25-2-6, 31-25-2-26. The executive branch, through a Department of Administration's ombudsman, "receive[s], investigate[s], and resolve[s] complaints that allege [DCS], by an action or omission, failed to protect the physical or mental health or safety of any child or failed to follow specific laws, rules, or written policies." Ind. Code § 31-25-5-1. The judiciary's Child Welfare Improvement Committee examines "ways to improve safety, timely permanency, and well-being outcomes for children and families involved in the child welfare system." Ind. Admin. R. 4(A)(5). Even the federal Children's Bureau, operating under the Department of Health and Human Services, investigates state child welfare matters

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

and publishes the results of these investigations. 42 U.S.C. § 192. With our children in need, it most often takes a village.

## STANDARD

A Rule 12(b)(1) motion "can take the form of a facial or a factual attack on the plaintiff's allegations." *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020). When evaluating a facial challenge to subject matter jurisdiction, the court must accept alleged factual matters as true and draw all reasonable inferences in favor of the plaintiff. *See id.*; *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). The defense raises a facial attack here, even for its abstention request that "fits more comfortably under Rule 12(b)(1)." *Ali Nadzhafaliyev v. Hardy*, 403 F. Supp.3d 663, 667 (N.D. Ill. 2019). The plaintiffs bear the burden of establishing the jurisdictional requirements. *Ctr. for Dermatology and Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588-89 (7th Cir. 2014).

## DISCUSSION

The children claim that Governor Holcomb and DCS Director Miller violated their Fourteenth Amendment due process rights while they were in Indiana's custody and subject to the foster care system's deficiencies, *see Lewis v. Anderson*, 308 F.3d 768, 773 (7th Cir. 2002), and their right to a case plan under the Adoption Assistance and Child Welfare Act (AACWA), 42 U.S.C. §§ 675(1)(C), (5)(D).[1] They say all three defendants, including DCS, violated the Americans with Disabilities Act (ADA) and the Rehabilitation Act by failing to give those children with disabilities the same access to foster care as non-disabled children. *See* 29 U.S.C. § 794; 42 U.S.C. § 12132. As relief, aside from a declaration, they seek an injunction to force the defendants to update DCS's recordkeeping system, to create a crisis helpline, and to implement new policies that will address caseloads and timely treatment, among other things.

***4** The state defendants ask the court to abstain and allow CHINS courts to address these concerns. "Since the beginning of this country's history[,] Congress has, subject to few exceptions, manifested a desire to permit state courts to try state cases free from interference by federal courts," *Younger v. Harris*, 401 U.S. 37, 43 (1971), including by way of injunction, *see* 28 U.S.C. § 2283. Equitable restraint and warranted respect for federalism undergird "a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Younger*, 401 U.S. at 44.

A federal court should abstain when "there is an ongoing state proceeding that is judicial in nature, involves important state interests, provides the plaintiff an adequate opportunity to raise the federal claims, and no exceptional circumstances exist." *Ewell v. Toney*, 853 F.3d 911, 916 (7th Cir. 2017). From this record, there is no doubting that the ten minors with live claims remain involved in judicial CHINS proceedings (absent a permanent placement), and that the State of Indiana has legitimate interests in the protection of children and the promotion of their health and welfare. As it turns out, today's claims can be redressed in a CHINS proceeding, and no exceptional circumstances exist to carve out an exception for raising them in federal court rather than in those ongoing CHINS proceedings. *See FreeEats.com, Inc. v. Indiana*, 502 F.3d 590, 596 (7th Cir. 2007) (exceptional circumstance means a showing of "such great, immediate, and irreparable injury as to warrant intervention in state [ ] proceedings").

At the start, the children devote a significant amount of ink to arguing that *Younger* should not apply. They contend that CHINS proceedings are not like criminal prosecutions and that they have not sued a state court or state judge. The law has answered their arguments already. The *Younger* abstention doctrine, as it has become known, "applies to state-initiated child-welfare litigation," *Ashley W. v. Holcomb*, 34 F.4th 588, 591 (7th Cir. 2022) (called *Ashley* here) (citing *Moore v. Sims*, 442 U.S. 415 (1979)), and applies equally to claims against the Indiana governor, DCS, and DCS director, *see id.* at 591.

The real question is whether these children seek relief that exceeds the scope or authority of a CHINS court, for otherwise "[d]isputes that can be resolved in a CHINS case must be resolved there." *Id.* at 593. This isn't a one-size-fits-all analysis. The "scope and complexity of CHINS proceedings makes a one-size-fits-all solution inapt," so the court must "figure out which, if any, of [the] requests should be submitted to the CHINS court under *Younger* and which remain for federal adjudication." *Id.* at 592-93. "For the same reason, however, the existence of some issues outside the ambit of a CHINS proceeding does not mean that *Younger* drops out of the picture." *Id.* at 593.

These minors can pursue due process claims in a CHINS proceeding. “State courts, as much as federal courts, have a solemn obligation to follow federal law.” *Arizona v. San Carlos Apache Tribe*, 463 U.S. 545, 571 (1983). The law never presumes that state courts will just ignore federal constitutional rights. *See Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982). “Principles of comity entitle the states to make their own decisions, on federal issues as well as state issues, unless there is some urgent need for federal intervention,” *Nicole K. v. Stigdon*, 990 F.3d 534, 537-38 (7th Cir. 2021), or Congress directs otherwise, *see Wilhelm v. Cnty. of Milawaukee*, 325 F.3d 843, 847 (7th Cir. 2003).

***5** There is no such need or directive here. Parties in Indiana may bring federal due process claims during a CHINS proceeding and may appeal an adverse decision on the same basis. *See N.L. v. Ind. Dep't of Child Servs.*, 919 N.E.2d 102, 108 (Ind. 2010) (vacating CHINS judgment for due process violation); *McBride v. Monroe Cnty. Off. of Fam. & Child.*, 798 N.E.2d 185, 194 (Ind. Ct. App. 2003) (parent waived due process challenge by not objecting in CHINS court); *see also Hatch v. Ind. Dep't of Child Servs.*, 2018 U.S. Dist. LEXIS 58082, 5 (N.D. Ind. Apr. 5, 2018). When “vital state interests are involved, a federal court should abstain unless state law clearly bars the interposition of the constitutional claims.” *Middlesex*, 457 U.S. at 432. No one today demonstrates that such claims would not find their ear in a CHINS court, and “[n]o more is required to invoke *Younger* abstention.” *Juidice v. Vail*, 430 U.S. 327, 337 (1977).

This case effectively involves relief similar to that sought in *Ashley*, even if in a measure expanded. There, children in DCS custody sued Governor Holcomb, the DCS director, and DCS—the same officers and agency here—for violations of the Fourteenth Amendment's due process clause as well as state and federal law. The children wanted “the court to issue a detailed regulatory injunction specifying better procedures for both [DCS's] operations and CHINS proceedings.” *Ashley*, 34 F.4th at 591. They wanted “an injunction requiring [DCS] to maintain caseloads and accepted professional standards for all workers providing direct supervision and planning for children as well as an order requiring [DCS] to periodically verify and report that it is meeting those standards.” *Id.* at 592-93.

Only two of the children in *Ashley* retained live claims, so it became “important to know just what relief [these two children] want[ed] that could not be provided by the judge in a CHINS proceeding.” *Id.* at 593. They argued that “many children could benefit from hearings at intervals shorter than six months, but [they] conceded that the judge hearing the CHINS case has authority to reduce the time between hearings if that seems appropriate.” *Id.* They also argued “that many placements are too slow—in part because there aren't enough people willing to serve as foster parents—or are made less than optimally,” or because “the bureaucracy moves sluggishly and makes too many mistakes,” but the court of appeals found that, short of ordering the state to come up with more money, a federal court had no more options than a CHINS court. *Id.* at 593-94. The children also argued that the federal court could order certain state law provisions to be fully enforced, but a federal court could not issue a mere “obey-the-law” injunction. *Id.* at 594. The court dismissed the case. *Id.*

So too here. For one, like *Ashley*, today's case involves children engaged in active CHINS cases. It features the same federal claims and against the same parties. *See Ashley W. v. Holcomb*, 467 F. Supp.3d 644, 648 (S.D. Ind. 2020), *rev'd*, 34 F.4th 588 (7th Cir. 2022). The plaintiffs in *Ashley* equally sought prospective relief designed to revamp Indiana's foster care system.

The children here raise a host of challenges to Indiana's foster care system. The prevailing question today is: “what can a federal court do about these things that a CHINS judge could not?” *Ashley*, 34 F.4th at 594. They argue that they cannot receive the relief they seek here in CHINS proceedings. They say the *Ashley* plaintiffs could not sufficiently articulate in 2022 what a CHINS court could not do when their case today presents enough differentiation that calls on a federal court to act. But their case is virtually the same as the one before—and even in its minor differences is met by the law's demand that the court abstain in favor of a CHINS court.

***6** First, they argue that a CHINS court cannot order Indiana to recruit and retain enough foster homes. Aside from ordering the state's provision of more money, either funding to the system as a whole or ultimately to foster parents—an unrealistic and troublesome idea that these children stop short of requesting—the court sees no options available solely here and not available in a CHINS court. *See Ashley*, 34 F.4th at 593. To increase the number of foster homes, these children say the court could require DCS to provide foster and adoptive parents accurate medical information, establish a sufficient recordkeeping system, establish a crisis response system, establish a crisis helpline, and implement a policy that

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

prohibits retaliation. They say this will help Indiana recruit and retain more foster parents. But they can seek this relief in a CHINS court. They say they can't, but they offer no authority for this view.

A CHINS court has the authority to control the conduct of "any person" in relation to a child. Ind. Code § 31-32-13-1(1). The court may do so on its own or upon the motion of a child's parent, guardian, custodian, or guardian ad litem, or a probation officer, caseworker, prosecuting attorney, DCS attorney, or any other person providing services to the child, parent, or guardian. Ind. Code § 31-32-13-1. A CHINS court also may decide in its periodic case review whether DCS has made reasonable efforts to provide family services or whether DCS has complied with a child's case plan. Ind. Code §§ 31-34-21-5(a)(2), (b)(1). This broad authority demands some deeper response from the plaintiffs—some answer as to why a CHINS court can't use its authority to craft relief that would require DCS to maintain accurate and available medical records, prohibit retaliation in any given case, or address crises all with the overall aim of encouraging the involvement of more foster parents. [2] The court doesn't operate under the presumption that state courts won't enforce federal rights or statutes. *See Middlesex*, 457 U.S. at 431.

Second, these children argue that a CHINS court cannot address caseworkers and caseloads. This too was addressed by *Ashley*, 34 F.4th at 594, which found no answer as to what a federal court could do about this issue that a CHINS court could not. The children here say the court could order peer counseling among caseworkers, establish regional non-caseload carrying units that could absorb cases when caseworkers quit, and establish an office that will ensure their physical safety, psychological well-being, and professional growth, and thereby reduce turnover.

But again, they cite no authority that would curtail a CHINS court's ability to address caseloads— say by addressing mistakes that arise from an overburdened caseload, requiring a new caseworker, or even requiring one with a lighter or capped load that can afford the desired attention to his or her slate of children. Nor do they explain why a so-called overburdened system of caseworkers would be served by adding the burden of counseling caseworkers peer-to-peer or, even if sense could be made of it, why this would not be within a CHINS court's power to order. Nor do they articulate this federal court's authority to establish new state government offices, much less to exercise supervisory authority over Indiana's coffers or to direct management of the state fisc to increase the agency's budget. Any such suggestion tends to erode rather than respect the very concerns of federalism that undergird *Younger* abstention. In short, they have not developed an argument outside the result of *Ashley*.

***7** Third, the children argue that a CHINS court cannot grant adequate systemic relief. They prefer to change the system rather than address constitutional issues on a case-by-case basis. Though they acknowledge that a CHINS court could address constitutional issues in each case, including the adequacy of children's placements and services, they say the reality is that a child will be thrown right back into a broken system after one issue is fixed. One circuit has declined to abstain under such a theory and thereby declined to follow *Ashley*. *See Jonathan R. v. Justice*, 41 F.4th 316, 336 (4th Cir. 2022) ("Reforming foster care case-by-case would be like patching up holes in a sinking ship by tearing off the floorboards."). Though another circuit might espouse a different view, this court has no such authority to ignore *Ashley*, nor have the plaintiffs here offered a salient reason for doing so today.

Lest one forget, *Ashley* featured a request for systemic relief as well. The court of appeals nonetheless held that "[d]isputes that can be resolved in a CHINS case must be resolved there." *Ashley*, 34 F.4th at 593. One might seriously debate, given the unique and individual circumstances of each child in Indiana's foster care system, whether a federal class action really is best suited to address constitutional deficiencies in any one child's case, but the fact of the matter is each concern today may be addressed by a CHINS court. For instance, if children in CHINS proceedings need faster placements or more detailed medical records, CHINS courts can resolve these issues, and thoughtfully so within the context of the needs and interests of these children. If children need care, if they need specific treatment, if they need monthly (or bimonthly) visits, if they need modified placements, or if they need other resources, either for them or their foster parents, a CHINS court has the power to see to it. And no one should presume that relief in CHINS proceedings has no effect on the overall system.

These plaintiffs exalt a preference for a federal forum to air their grievances, but not a need for one—not when CHINS courts stand authorized and ready to address these same concerns adequately. A preference for this venue doesn't alter the court's obligation to abstain. *See 31 Foster Children v. Bush*, 329 F.3d 1255, 1281 n.12 (11th Cir. 2003) (question is not "whether the broad relief the plaintiffs would prefer is available but instead whether the forum itself is adequate for

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

addressing the claims and providing a sufficient remedy to the individual plaintiffs"); *Joseph A. v. Ingram*, 275 F.3d 1253, 1274 (10th Cir. 2002) (plaintiffs cannot "avoid the effects of the *Younger* abstention doctrine in cases where relief is available to individual litigants in ongoing state proceedings but not to represented parties in a class action"). For those ten children yet with live claims, the court must abstain under *Younger* and *Ashley*.

The other two (of twelve) children lack standing today. A plaintiff must have standing—an injury, fairly traceable to the defendant's conduct, that the court's decision will likely redress. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 797 (2021); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Standing is individualized. It is not "dispensed in gross," so a plaintiff "must demonstrate standing for each claim [he presses] and for each form of relief [he seeks]." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). An injury "must affect the plaintiff in a personal and individual way," *Spokeo*, 578 U.S. at 339, *see also Matlin v. Spin Master Corp.*, 979 F.3d 1177, 1181 (7th Cir. 2020), and "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision," *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (quotations omitted).

***8** If the court's decision won't affect a litigant's rights, "the aggrieved party [is] unable to illustrate the redressability component of standing, rendering any judicial decision in the case an impermissible advisory opinion." *United States v. Brixen*, 908 F.3d 276, 280 (7th Cir. 2018). This case seeks prospective injunctive relief that pertains to Indiana's foster care system, so it follows that someone not in the system won't have their concerns redressed by the court. The other two plaintiffs (K.F. and N.M.) achieved permanency—the former's wardship ended on August 23, 2023 [21-3 at 41 (C-040)], and the other's CHINS case closed on February 7, 2023 [21-5 at 35 (E-034)]. They lack standing to proceed today.[3] *See also Ashley*, 34 F.4th at 592 ("hard to accept that standing should be resolved in the abstract [when] the question is whether [their] issues...matter to these plaintiffs in a way that a court could redress").

From here, the court need not address any other doctrine raised by the parties (including the *Rooker-Feldman* doctrine). *Younger* may take priority over another jurisdictional issue when "there is no practical difference in the outcome." *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996); *see also Ashley*, 34 F.4th at 594 (dismissing live claims under *Younger* without reaching the *Rooker-Feldman* question).

CONCLUSION

The children in DCS custody who retain live claims today have a ready and adequate ear for their complaints in ongoing CHINS proceedings before CHINS courts. The issues these children attempt to raise here must be raised there. The court must abstain under *Younger* and *Ashley*, so the court GRANTS the motion to dismiss [19], DISMISSES this case without prejudice, GRANTS the motion to seal [22], and DENIES AS MOOT the motion to eliminate class allegations [24]. This order terminates the case in this federal court.

SO ORDERED.

June 5, 2024 *s/ Damon R. Leichty*

Judge, United States District Court

**All Citations**

Slip Copy, 2024 WL 2846363

## Footnotes

1 In one paragraph of the amended complaint, the children allude to the First Amendment and Ninth Amendment as well, but they remain undeveloped as independent grounds for injunctive relief already pursued through the channel of 42 U.S.C. § 1983 under the guise of the Fourteenth Amendment. Mere mention of these other amendments ultimately has no effect on today's outcome.

2 The record presents instances of a CHINS court acting consistent with this interpretation of broad statutory authority. For instance, a CHINS court ordered DCS to provide a child's full psychological report to the

guardian ad litem and CASA [21-1 at 74 (A-073)], to ensure that children received sexually maladaptive counseling [21-1 at 82 (A-081)], and to provide trauma therapy and medication management services for children [21-5 at 112 (E- 111)], and ordered a medical provider to release the necessary paperwork to allow the children to begin taking prescribed medications [21-6 at 87 (F-086)]. Even as a facial attack, "it is a well-settled principle that the decision of another court or agency...is a proper subject of judicial notice." *Opoka v. INS*, 94 F.3d 392, 394 (7th Cir. 1996).

3 Their claims are likewise moot—lacking as these plaintiffs do a legally cognizable interest in the outcome of any live claim. *See Olson v. Brown*, 594 F.3d 577, 580 (7th Cir. 2010). That ten children retain live claims today also demonstrates the inherently transitory exception to mootness will not apply. *See id.* at 582.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.