Tara Ford (State Bar No. 322049)
tford@publiccounsel.org
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, California 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089

Grant A. Davis-Denny (State Bar No. 229335)
grant.davis-denny@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Leecia Welch (State Bar No. 208741)
lwelch@childrensrights.org
CHILDREN'S RIGHTS
2021 Fillmore Street
San Francisco, California 94115
Telephone: (415) 602-5202

Sarah Manimalethu (State Bar No. 326441)
smanimalethu@alliancecr.org
ALLIANCE FOR CHILDREN'S RIGHTS
3333 Wilshire Boulevard, Suite 550
Los Angeles, California 90010
Telephone: (213) 368-6010

*Attorneys for Plaintiffs*

* *Additional counsel of record listed in signature line*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION (LOS ANGELES)**

| | |
|---|---|
| OCEAN S.; JACKSON K.; ROSIE S.; ERYKAH B.; JUNIOR R.; ONYX G.; and MONAIE T., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs. | Case No. 2:23-cv-06921-JAK-E<br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Before: Hon. John A. Kronstadt |

LOS ANGELES COUNTY; LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES; LOS ANGELES DEPARTMENT OF MENTAL HEALTH; CALIFORNIA HEALTH AND HUMAN SERVICES AGENCY; MARK GHALY, Secretary of the California Health and Human Services Agency; CALIFORNIA DEPARTMENT OF SOCIAL SERVICES; KIM JOHNSON, Director of the California Department of Social Services; CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES; and MICHELLE BAASS, Director of the California Department of Health Care Services,

Defendants.

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 5

III. PARTIES ..... 5

IV. NAMED PLAINTIFFS' EXPERIENCES IN THE FOSTER CARE SYSTEM ..... 9

- A. Plaintiff Erykah B. ..... 9
  - 1. Placement History ..... 10
  - 2. Behavioral Health Services ..... 12
- B. Plaintiff Onyx G. ..... 14
  - 1. Placement History ..... 15
  - 2. Behavioral Health Services and Serious Risk of Institutionalization ..... 18
- C. Plaintiff Rosie S. ..... 19
  - 1. Placement History ..... 20
- D. Plaintiff Jackson K. ..... 23
  - 1. Placement History ..... 24
  - 2. Behavioral Health Services ..... 26
- E. Plaintiff Ocean S. ..... 28
  - 1. Placement History and Serious Risk of Institutionalization ..... 29
  - 2. Behavioral Health Services and Serious Risk of Institutionalization ..... 31
- F. Plaintiff Junior R. ..... 33
  - 1. Placement History ..... 34
  - 2. Behavioral Health Services and Serious Risk of Institutionalization ..... 37
- G. Plaintiff Monaie T. ..... 38
  - 1. Placement History ..... 39

2. Behavioral Health Services and Serious Risk of Institutionalization ... 41

V. DEFENDANTS FAIL TO MEET THEIR LEGAL OBLIGATIONS TO TRANSITION AGE FOSTER YOUTH WITH MENTAL HEALTH DISABILITIES. ... 42

A. Under State and Federal Law, Defendants Are Responsible for the Administration, Oversight, and Provision of Safe and Appropriate Placements and Medicaid Services to Transition Age Foster Youth. ... 42

B. Defendants Must Provide Safe and Appropriate Placements and Services that Are Appropriate for the Needs of All Transition Age Foster Youth. ... 43

C. Defendants' Failure to Meet Their Obligations to Transition Age Foster Youth Results in a Foster Care to Homelessness Pipeline. ... 44

VI. DEFENDANTS' FAILURE TO DEVELOP A MINIMALLY ADEQUATE ARRAY OF SAFE AND APPROPRIATE PLACEMENTS PUSHES TRANSITION AGE FOSTER YOUTH INTO HOMELESSNESS ... 46

A. DCFS and CDSS Supervise and License Placements for Transition Age Foster Youth. ... 47

1. SILP and THPP-NMD Programs Are the Primary Placement Options for Transition Age Foster Youth Ages Eighteen to Twenty-One, Including Youth with Mental Health Disabilities. ... 47

2. Resource Family Homes Are the Primary Placement Option for Transition Age Foster Youth Ages Sixteen and Seventeen, Including Youth with Mental Health Disabilities. ... 49

B. DCFS's Placement Options for Transition Age Youth with Mental Health Disabilities Are Scarce and Inadequate. ... 50

C. When Transition Age Foster Youth Become Unhoused, DCFS Fails to Provide Shelter, Including Emergency Housing. ... 52

D. Defendants Have Deliberately Ignored the Need to Evaluate and Expand the Number of Safe and Appropriate Placements and Emergency Housing Options. ... 55

VII. DEFENDANTS FAIL TO PROVIDE ADEQUATE NOTICE OF PLACEMENT DECISIONS OR THE PROCEDURES TO APPEAL A DENIAL OF OR DELAY IN PLACEMENT. ... 57

A. Plaintiffs Have a Protectable Property Interest in a Foster Care Placement, Which DCFS Has No Discretion to Deny. ... 57

B. The Deprivation of a Placement Constitutes a Grievous Loss for Transition Age Foster Youth with Mental Health Disabilities. ........... 60

C. DCFS Has Failed to Create Adequate Processes to Notify Foster Youth of Placement Decisions or Procedures to Appeal Denials or Delays ........... 61

D. Defendants Must Institute Procedures to Ensure that Youth Receive Adequate Notice of Placement Determinations and How to Appeal Them ........... 64

VIII. YOUTH LOSING THPP-NMD PLACEMENT BENEFITS RECEIVE LIMITED NOTICE AND LACK MEANINGFUL OPPORTUNITIES TO CONTEST THE DISCHARGE. ........... 66

IX. DEFENDANTS DISCRIMINATE AGAINST TRANSITION AGE FOSTER YOUTH WITH MENTAL HEALTH DISABILITIES. ........... 70

A. Youth with Mental Health Conditions Which Substantially Limit One or More Major Life Activity are Protected from Discrimination on the Basis of Disability. ........... 71

B. DCFS's Placement Application Process Discriminates Based on Disability. ........... 73

C. Defendants Fail to Accommodate Youth with Mental Health Disabilities in Placements. ........... 76

D. Youth with Mental Health Disabilities Are Pushed Out of DCFS Placement Because of Disability. ........... 80

E. Defendants Unlawfully Institutionalize and Segregate Youth with Mental Health Disabilities by Warehousing Them in STRTPs. ........... 82

X. TRANSITION AGE FOSTER YOUTH WITH MENTAL HEALTH DISABILITIES ARE BEING DENIED NECESSARY BEHAVIORAL HEALTH SERVICES. ........... 86

A. Transition Age Foster Youth with Mental Health Disabilities Are Entitled to Necessary EPSDT Services, Including Behavioral Health Services. ........... 87

B. Defendants Fail to Provide Transition Age Foster Youth with Mental Health Disabilities with Necessary Behavioral Health Services. ........... 90

C. Defendants Must Take Steps to Ensure Receipt of Behavioral Health Services. ........... 94

XI. THE INDIVIDUAL STATE DEFENDANTS HAVE PERSONAL KNOWLEDGE OF DEFENDANTS' FAILURE TO MEET THEIR LEGAL OBLIGATIONS TO TRANSITION AGE FOSTER YOUTH WITH MENTAL HEALTH DISABILITIES. ........... 95

XII. THIS ACTION CANNOT BE BROUGHT IN THE DEPENDENCY COURT AND IT DOES NOT INTERFERE WITH THE DEPENDENCY COURT'S JURISDICTION. ..... 97

XIII. CLASS ACTION ALLEGATIONS ..... 98

FIRST CAUSE OF ACTION ..... 103

SECOND CAUSE OF ACTION ..... 106

THIRD CAUSE OF ACTION ..... 109

FOURTH CAUSE OF ACTION ..... 111

FIFTH CAUSE OF ACTION ..... 112

SIXTH CAUSE OF ACTION ..... 114

SEVENTH CAUSE OF ACTION ..... 115

EIGHTH CAUSE OF ACTION ..... 117

REQUEST FOR RELIEF ..... 119

*ADDITIONAL ATTORNEYS OF RECORD ..... 121

GLOSSARY OF TERMS ..... 123

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL STATUTES**

28 U.S.C § 1331 .......... 5
28 U.S.C § 1343(a) .......... 5
28 U.S.C § 1391(b) .......... 5
28 U.S.C § 1391(c) .......... 5
28 U.S.C. § 1920 .......... 120
28 U.S.C. § 2201 .......... 5
28 U.S.C. § 2202 .......... 5
29 U.S.C. § 794 .......... 103, 104
29 U.S.C. § 794(b) .......... 4, passim
42 U.S.C. § 622 .......... 90
42 U.S.C. § 671 .......... 59
42 U.S.C. § 671(a)(2) .......... 43
42 U.S.C. § 671(a)(16) .......... 58
42 U.S.C. § 672(b) .......... 59
42 U.S.C. § 672(c) .......... 59
42 U.S.C. § 675(1)(A) .......... 58
42 U.S.C. § 675(1)(C) .......... 90
42 U.S.C. § 794 .......... 115
42 U.S.C. § 1396 .......... 42, 87
42 U.S.C. § 1396(a)(5) .......... 43, 88
42 U.S.C. § 1396(r) .......... 114

42 U.S.C. § 1396a ... 87

42 U.S.C. § 1396a(43) ... 114

42 U.S.C. § 1396a(43)(C) ... 4, 87, 114

42 U.S.C. § 1396a(a) ... 87

42 U.S.C. § 1396a(a)(5) ... 88

42 U.S.C. § 1396a(a)(10)(A) ... 4, 87, 114

42 U.S.C. § 1396a(a)(43) ... 88

42 U.S.C. § 1396d(a)(4)(B) ... 4, 87, 114

42 U.S.C. § 1396d(a)(13) ... 88, 90

42 U.S.C. § 1396d(a)(13)(C) ... 88

42 U.S.C. § 1396d(a)(19) ... 88, 90

42 U.S.C. § 1396d(r) ... 4, 114

42 U.S.C. § 1396d(r)(1) ... 87

42 U.S.C. § 1396d(r)(5) ... 87, 88

42 U.S.C. § 1396n(g) ... 88

42 U.S.C. § 1396n(g)(2) ... 90

42 U.S.C. § 1396u-2 ... 88

42 U.S.C. § 1983 ... 5, passim

42 U.S.C. § 1988 ... 120

42 U.S.C. § 12102(1)(A) ... 72

42 U.S.C. § 12102(2)(A) ... 72

42 U.S.C. § 12102(2)(B) ... 72

42 U.S.C. § 12102 *et seq.* ... 107, 117

42 U.S.C. § 12131 ... 107, 117

42 U.S.C. § 12131(1)(A) .......... 9

42 U.S.C. § 12131(1)(B) .......... 9

42 U.S.C. § 12131(2) .......... 107, 117

42 U.S.C. § 12132 .......... 106

42 U.S.C. § 12205 .......... 120

**STATE STATUTES**

Cal. Health & Safety Code § 1502 .......... 59

Cal. Health & Safety Code § 1502(18) .......... 15

Cal. Health & Safety Code § 1530.8 .......... 16

Cal. Health & Safety Code § 1559.110 .......... 59

Cal. Health & Safety Code § 1559.110(d)(1)-(3) .......... 48

Cal. Health & Safety Codes § 1559.110(b)-(c) .......... 48

Cal. Welf. & Inst. Code § 300 .......... 7, 16

Cal. Welf. & Inst. Code § 303(b) .......... 1

Cal. Welf. & Inst. Code § 303(e) .......... 2, 58

Cal. Welf. & Inst. Code § 8255 .......... 76

Cal. Welf. & Inst. Code § 8256 .......... 76

Cal. Welf. & Inst. Code § 10553 .......... 8

Cal. Welf. & Inst. Code § 10554 .......... 8

Cal. Welf. & Inst. Code § 10600 .......... 8

Cal. Welf. & Inst. Code § 10602 .......... 8

Cal. Welf. & Inst. Code § 10605 .......... 8

Cal. Welf. & Inst. Code § 11400 .......... 59

Cal. Welf. & Inst. Code § 11400(x) .......... 47

Cal. Welf. & Inst. Code § 11400(x)(4) ..... 53

Cal. Welf & Inst. Code § 11400(b) ..... 58

Cal. Welf. & Inst. Code § 11400(w) ..... 47

Cal. Welf. & Inst. Code § 11402 ..... 59

Cal. Welf. & Inst. Code § 11402.1 ..... 59

Cal. Welf. & Inst. Code § 11403(b) ..... 71

Cal. Welf. & Inst. Code § 14184.402(c) ..... 89

Cal. Welf. & Inst. Code § 16001(a) ..... 46

Cal. Welf. & Inst. Code § 16001(a)(2) ..... 52

Cal. Welf. & Inst. Code § 16001.9(a)(1) ..... 2, 58

Cal. Welf. & Inst. Code § 16001.9(a)(4) ..... 58

Cal. Welf. & Inst. Code § 16010.7(e) ..... 67

Cal. Welf. & Inst. Code § 16500 ..... 7

Cal. Welf. & Inst. Code § 16501(a) ..... 7

Cal. Welf. & Inst. Code § 16501(a)(5) ..... 35

Cal. Welf. & Inst. Code § 16501.1 ..... 58

Cal. Welf. & Inst. Code § 16522.1(a)(2) ..... 48, 59

Cal. Welf. & Inst. Code § 16522.1(c) ..... 48

**FEDERAL RULES**

Fed. R. Civ. P. § 23(a) ..... 98, 119

Fed. R. Civ. P. § 23(b)(2) ..... 98, 119

Fed. R. Civ. P. § 23(e) ..... 120

Fed. R. Civ. P. § 57 ..... 5, 119

Fed. R. Civ. P. § 65 ..... 5, 119

**FEDERAL REGULATIONS**


28 C.F.R. § 35.104 .......... 107, 117

28 C.F.R. § 35.108 .......... 107, 117

28 C.F.R. § 35.130 .......... 106

28 C.F.R. § 35.130(b)(1) .......... 107

28 C.F.R. § 35.130(b)(3) .......... 108, 118

28 C.F.R. § 35.130(b)(7) .......... 116, 118

28 C.F.R. § 35.130(d) .......... 117, 118

28 C.F.R. § 41.51 .......... 103, 104, 115

28 C.F.R. § 41.51(b)(1) .......... 103

28 C.F.R. § 41.51(b)(3) .......... 105

28 C.F.R. § 41.51(d) .......... 115, 116

29 C.F.R. § 1630.2(j)(3)(iii) .......... 72

42 C.F.R. § 431.10 .......... 88

42 C.F.R. § 440.130(d) .......... 90

42 C.F.R. § 440.169 .......... 90

42 C.F.R. § 441.18 .......... 90

42 C.F.R. § 441.56(c) .......... 88

45 C.F.R. § 84(d) .......... 116

45 C.F.R. § 84.1 .......... 103

45 C.F.R. § 84.2 .......... 104, 115

45 C.F.R. § 84.10 .......... 104, 115

45 C.F.R. § 84.60 .......... 103, 105, 115

45 C.F.R. § 84.68 .......... 103, 115

45 C.F.R. § 84.68(b)(3) .................... 105

89 Fed. Reg. 40066, 40106 (May 9, 2024).................... 82

**STATE REGULATIONS**

22 C.C.R. § 50004 .................... 43

22 C.C.R. § 85068.5(a).................... 67

CDSS All County Letter No. 11-77, p. 6.................... 47

CDSS All County Letter No. 19-105, p. 2.................... 58, 59

CDSS All County Letter No. 19-114 (12/13/19).................... 77

CDSS All County Letter No. 22-59, p. 5.................... 47, 53

CDSS Interim Licensing Standards § 86268.4(b) .................... 66

CDSS Interim Licensing Standards § 86268.4(b)(1) .................... 68

CDSS Interim Licensing Standards § 86268.4(b)(2) .................... 81

CDSS Interim Licensing Standards § 86268.4(b)(2)(B) .................... 68

CDSS Interim Licensing Standards § 86268.4(c)(1).................... 66

CDSS Interim Licensing Standards § 86268.4(c)(1)(B) .................... 66, 81

CDSS Interim Licensing Standards § 86268.4(d)(4) .................... 66

CDSS Interim Licensing Standards § 86268.4(e) .................... 67

**CONSTITUTIONAL PROVISIONS**

U.S. Const., amend. XIV .................... 3, passim

**OTHER AUTHORITIES**

2/12/24 Notice of Operation in Violation of Law, from Kevin Gaines and Angie Schwartz of California Department of Social Services to Brandon Nichols, Director of DCFS .................... 54

Cal. Dep't of Health Care Servs., Behavioral Health Information Notice No. 21-073 (Dec. 10, 2021), https://www.dhcs.ca.gov/Documents/BHIN-21-073-Criteria-for-Benefciary-to-Specialty-MHS-MedicalNecessity-and-Other-Coverage-Req.pdf ....... 89

CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES, FISCAL YEAR 2021/2022 MEDI-CAL SPECIALTY MENTAL HEALTH SERVICES TRIENNIAL REVIEW OF THE LOS ANGELES COUNTY MENTAL HEALTH PLAN - CHART REVIEW FINDINGS REPORT 21-23 (2022), https://www.dhcs.ca.gov/Documents/Los-Angeles-System-Review-Findings-Report-FY-21-22.pdf ....... 91

CDSS Interim Licensing Standards for Nonminor Dependents in Foster Care (AB 12), Transitional Housing Placement Programs, Ver. 2, /https://www.cdss.ca.gov/Portals/9/CCL/Childrens-Residential-Licensing/ILS/AB12-THPP-ILSVer2.pdf?ver=2021-11-04-122728-973 (retrieved 8/19/23). ....... 49

DCFS For Your Information No. 22-06 (REV), dated 3/11/22 ....... 54

DHCS, Children And Youth In Foster Care Specialty Mental Health Services (SMHS) Performance Dashboard, https://behavioralhealth-data.dhcs.ca.gov/pages/f953faa802cf40d5b4d9b5780183fca4 ....... 92

DHCS, Children And Youth In Foster Care Specialty Mental Health Services (SMHS) Performance Dashboard, https://behavioralhealth-data.dhcs.ca.gov/pages/f953faa802cf40d5b4d9b5780183fca4 (last accessed 7/31/2024) ....... 91

Kathryn Barger and Lindsey P. Horvath, "Stabilization Supports for Foster Youth" (May 21, 2024), https://file.lacounty.gov/SDSInter/bos/supdocs/191563.pdf ....... 86, 91

Lila Seidman, "L.A. promised mental health crisis response without cops. Why isn't it happening?" (April 13, 2023), https://www.latimes.com/california/story/2023-04-13/988-hotline-mental-health-crisis-system-police#:~:text=On%20July%2015%2C%202022%2C%20one,day%2C%20the%20county%20statement%20said.&text=More%20than%20eight%20months%20later,hours%20for%20an%20emergency%20response ....... 92

Los Angeles County Child Welfare Policy: *Supervised Independent Living Placement* 0100-560.40 (Revision Date: 10/27/22) .................................. 51

Los Angeles County Child Welfare Policy: *Transitional Housing Services* 0100-560.30 (Revision Date: 4/7/2017 .................................................. 52

Mary Dozier et al., *Consensus Statement on Group Care for Children and Adolescents: A Statement of Policy of the American Orthopsychiatric Association*, 84 A.M. J. of Orthopsychiatry 219, 223 (2014) ........................................................................................ 83

Medi-Cal Specialty Mental Health Services Waiver § 1915(b) ................................ 88

Richard P. Barth, *Institutions vs. Foster Homes: The Empirical Base for a Century of Action*, Jordan Inst. For Fams., Sch. Soc. Work, Univ. N.C. Chapel Hill 16 (June 17, 2002), https://ahum.assembly.ca.gov/sites/ahum.assembly.ca.gov/files/hearings/062811-BarthInstitutionsvFosterHomes.pdf ................................................ 83

Robert Garrova, "What You Should Know About LA's New Unarmed Teams Responding To Mental Health Crises" (April 3, 2024), https://laist.com/news/health/la-unarmed-teams-mental-health-crises ................ 93

THPP-NMD Statement of Work, section 10.4.6.1 ................................................... 67

U.S. Dep't of Justice Civil Rights Division, *Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C.* (June 22, 2011), http://www.ada.gov/olmstead/q&a_olmstead.htm .............................................. 82

# I. INTRODUCTION

1. This civil rights action challenges the Los Angeles County foster care system's persistent failure to ensure that foster youth aged sixteen to twenty-one ("transition age foster youth" [1]) with mental health disabilities have meaningful access to the crucial housing, behavioral health, and other services to which they are legally entitled. Seven transition age foster youth[2] (collectively, "Plaintiffs" or "foster youth") seek redress from the State and County entities and officials responsible for administering and supervising Los Angeles County's ("County") child welfare system[3] and Medicaid program (collectively, "Defendants"). Plaintiffs bring this lawsuit on behalf of a putative class and specific subclasses of transition age foster youth with mental health disabilities who are now, or will be, in extended foster care[4] in Los Angeles County.

---

[1] Foster youth aged eighteen to twenty-one are also referred to as nonminor dependents ("NMDs").

[2] Plaintiffs are transition age foster youth or were transition age foster youth at the filing of the Complaint. Plaintiffs are referred to in this Second Amended Complaint by pseudonyms. The Court granted Plaintiffs' Motion to Proceed With Fictitious Names.

[3] For clarity purposes, this brief uses the traditional terms "child welfare system" and "foster care system" to refer to the system of policies and supportive services meant to ensure the safety, well-being, and permanency of children, youth, and families. Plaintiffs recognize that the term "family regulation system" more aptly describes this set of government structures, which far too often unjustly regulates marginalized families, especially families of color. Plaintiffs recognize that it is imperative for our government to sufficiently invest in local communities so that families have the resources and support needed to thrive and remain together. Once child welfare agencies have taken action to separate a family, however, these agencies must meet their legal obligations to the youth now under their care and supervision.

[4] California's extended foster care program allows eligible youth to remain in foster care until age twenty-one. Youth between the ages of eighteen and twenty-one in foster care are considered "nonminor dependent[s]." Cal. Welf. & Inst. Code § 303(b). Nonminor dependents have all the same rights as dependent minors, and county welfare departments have the same responsibilities to nonminor dependents as they

2. Under federal and State law, Defendants are responsible for the administration, oversight, and provision of foster care and Medicaid services to foster youth. Pursuant to these responsibilities, Defendants must provide foster youth with safe and appropriate placements at all times, free from physical, psychological, and emotional harm.[5] In addition, as dependents in the California foster care system, transition age foster youth are legally entitled to necessary behavioral health services—to help them achieve and maintain appropriate housing and to develop the skills and cultivate relationships needed for independent living.

3. Defendants are aware that the population of transition age foster youth in Los Angeles County has specific developmental and behavioral health needs that Defendants are legally required to accommodate. Both before and after entering the foster care system, transition age foster youth[6] experience significant trauma. This trauma includes separation from their families and loss of community and social ties, as well as interpersonal trauma, which often entails experiencing physical, emotional and/or sexual abuse and witnessing violence. Far too often, the system whose purpose is to protect youth, exacerbates their trauma as they are needlessly separated from their families, cycled through multiple unsuitable placements, lose contact with siblings and other loved ones, and experience abuse and neglect in foster placements.

4. The majority of transition age foster youth have mental health disabilities related to complex trauma, *i.e.*, chronic, ongoing interpersonal trauma. Some are also

---

do to other foster youth. *See* Cal. Welf. & Inst. Code § 303(e); Cal. Welf. & Inst. Code § 16001.9(a)(1).

[5] "Placement" refers to licensed community care facilities, license-exempt facilities and settings, and Resource Family homes in which County welfare agencies place foster youth who are under the county's care and supervision.

[6] For brevity's sake, this Complaint uses the term "transition age foster youth," but Plaintiffs recognize that person first language such as "transition age youth in foster care" is preferred to prioritize the personhood of youth over their foster care experience.

young parents who, as they transition to adulthood, seek health, stability, and safety not only for themselves, but also for their families. The overwhelming majority of foster youth in Los Angeles County, including all of the Named Plaintiffs, come from low-income communities of color. By failing to provide transition age foster youth meaningful access to the safe and appropriate placements and support services to which they are legally entitled, Defendants exacerbate the harms experienced by Los Angeles County's most vulnerable young people, with profound consequences for their health, safety, wellbeing, and futures.

5. Defendants' failures to meet their legal duties have created a pipeline from the foster care system to homelessness, heaping trauma on top of trauma and funneling these youth to the margins of society. Transition age foster youth are forced into couch surfing, tents on city streets, dangerous adult temporary shelters, and vehicular homelessness. With no reliable places to sleep, shower, or keep their belongings, it is virtually impossible for these youth to pursue higher education or hold down a job.

6. Defendants are violating transition age foster youth's legal rights in at least four ways.

7. **First**, Defendants have a constitutional duty under the Fourteenth Amendment Due Process Clause to provide for the basic human needs of the transition age foster youth they take into custody. Defendants are violating transition age foster youths' substantive due process rights by failing to have a system that, at a minimum, ensures that youth are not without shelter, reasonable safety, and medical care, thus exposing them to a substantial risk of serious harm.

8. **Second**, Defendants violate transition age foster youths' procedural due process rights under the Fourteenth Amendment through two unlawful practices. Defendants fail to provide adequate notice of placement decisions or notice of procedures to appeal a denial of placement. Defendants also force youth out of Transitional Housing Placement Program for Non-Minor Dependents ("THPP-

NMD") placements without adequate notice or opportunity to be heard. These practices cause homelessness and extreme housing instability, subjecting youth to grievous harm.

9. **Third,** Defendants violate transition age foster youth's rights under the Rehabilitation Act of 1973 ("Section 504") and the Americans with Disabilities Act ("ADA"), along with their implementing regulations, by discriminating against youth with mental health disabilities who would benefit from foster care services. Specifically, Defendants: (i) deny access to placements on the basis of disability; (ii) fail to provide trauma-responsive services and supports necessary for these youth to access and benefit from foster care; (iii) terminate participation in transitional housing programs on the basis of disability; and (iv) unnecessarily segregate youth with mental health disabilities in institutional settings or abandon them to becoming unhoused, contravening the legal requirement that they be placed in the least restrictive community-based setting appropriate to their needs.

10. **Fourth,** Defendants violate the Medicaid Act, 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(43)(C), 1396d(a)(4)(B) and 1396d(r), by failing to ensure Medicaid-eligible transition age foster youth have access to medical assistance they are entitled to through early and periodic screening, diagnostic, and treatment ("EPSDT") services. Specifically, Defendants Los Angeles Department of Mental Health ("DMH") and California Department of Health Care Services ("DHCS") fail to provide Medicaid-eligible transition age foster youth with two medically necessary Specialty Mental Health Services: Intensive Care Coordination and mobile crisis services. Without these critical and necessary services, transition age foster youth face tremendous odds coping with past traumas, building relationships, succeeding in academic and work environments, and maintaining stable housing.

11. Although long aware of these violations, Defendants have failed to redress them. Plaintiffs file this action to seek solely declaratory and prospective injunctive relief compelling Defendants to remedy known harmful and unlawful

practices and system deficiencies in the provision of placement and services to transition age foster youth with mental health disabilities.

## II. JURISDICTION AND VENUE

12. The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C §§ 1331 and 1343(a) because it arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983. This Court has personal jurisdiction over Defendants because Defendants' acts and omissions took place within this district.

13. Plaintiffs' claims for declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

14. Venue is proper in this judicial district pursuant to 28 U.S.C § 1391(b), (c). All Defendants reside in California, the state in which this judicial district is located, and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## III. PARTIES

**Named Plaintiffs (as of date of Complaint filed August 22, 2023)**

15. ***Plaintiff Erykah B.*** is a nineteen-year-old Black young person who lives in Los Angeles County, California. She is a nonminor dependent ("NMD") and she is in extended foster care in Los Angeles County. Erykah B. is a member of the General Class, the THPP-NMD Subclass, the Medicaid Subclass, and the Unsheltered Subclass.

16. ***Plaintiff Onyx G.*** is a seventeen-year-old, Black and Latina young person currently in foster care in Los Angeles County, California. Onyx turns 18 imminently, when she will become an NMD by operation of law. She intends to enter extended foster care in Los Angeles County. Onyx G. is a member of the General Class, the STRTP Subclass, the THPP-NMD Subclass, and the Medicaid Subclass.

17. ***Plaintiff Rosie S.*** is a twenty-year-old Latina young person and an expectant mother from Los Angeles County, California. She is an NMD and she is in

extended foster care in Los Angeles County. She has been temporarily living in Las Vegas, Nevada for the last nine months because the Los Angeles County Department of Children and Family Services ("DCFS") has not yet moved her to a safe and appropriate placement in Los Angeles. Rosie S. is a member of the General Class, the THPP-NMD Subclass, and the Unsheltered Subclass.

18. ***Plaintiff Jackson K.*** is a nineteen-year-old Latino young person currently living in Riverside County, California in this judicial district. He is an NMD and he is in extended foster care in Los Angeles County. Jackson K. is a member of the General Class, the Medicaid Subclass, and the THPP-NMD Subclass.

19. ***Plaintiff Ocean S.*** is a twenty-year-old Black young person and parent who lives in Los Angeles County, California. She is an NMD in extended foster care in Los Angeles County. Ocean S. is a member of the General Class, the STRTP Subclass, the THPP-NMD Subclass, and the Medicaid Subclass.

20. ***Plaintiff Junior R.*** is a twenty-year-old mixed race young person who lives in Los Angeles County, California. He is an NMD and he is in extended foster care in Los Angeles County. Junior R. is a member of the General Class, the STRTP Subclass, the THPP-NMD Subclass, the Medicaid Subclass, and the Unsheltered Subclass.

21. ***Plaintiff Monaie T.*** is a twenty-year-old Black young person and parent who lives in Los Angeles County, California. She is an NMD and she is in extended foster care in Los Angeles County. Monaie T. is a member of the General Class, the STRTP Subclass, the Medicaid Subclass, and the Unsheltered Subclass.

**<u>County Defendants</u>**

22. ***Defendant Los Angeles County ("the County")*** is a local governmental entity duly organized and existing under the laws of the State of California. The County oversees and monitors the Los Angeles County Department of Children and Family Services and the Los Angeles County Department of Mental Health.

23. ***Defendant Los Angeles County Department of Children and Family Services ("DCFS")*** is a Los Angeles County governmental agency duly organized and existing under the laws of the State of California. DCFS is the agency responsible for administering foster care services in Los Angeles County, for providing placements for youth in the foster care system, and for ensuring the safety and well-being of children under court supervision pursuant to California Welfare and Institutions Code § 300.[7]

24. ***Defendant Los Angeles County Department of Mental Health ("DMH")*** is a Los Angeles County governmental agency duly organized and existing under the laws of the State of California. DMH is the agency responsible for providing behavioral health services to transition age foster youth in Los Angeles, including providing necessary Specialty Mental Health Services. The County, DCFS, and DMH are referred to as the **"County Defendants"**.

**<u>State Defendants</u>**

25. ***Defendant California Health and Human Services Agency ("CalHHS")*** is a State agency duly organized and existing under the laws of the State of California. CalHHS oversees departments and offices that provide a wide range of services in the areas of health care, mental health, public health, alcohol and drug treatment, income assistance, social services, and assistance to people with disabilities. CalHHS oversees and monitors the California Department of Social Services and the California Department of Health Care Services.

26. ***Defendant Mark Ghaly, MD, MPH ("Ghaly")*** is the Secretary of CalHHS, a role that he has held for over five years. In this role, Defendant Ghaly is responsible for the administration and oversight of CalHHS and its departments and offices that provide a wide range of services in the areas of health care, mental health, public health, alcohol and drug treatment, income assistance, social services, and

---

[7] Cal. Welf. & Inst. Codes §§ 16500, 16501(a).

assistance to people with disabilities. Defendant Ghaly is also the Co-Chair for the California Interagency Council on Homelessness. Defendant Ghaly is sued solely in his official capacity.

27. ***Defendant California Department of Social Services ("CDSS")*** is a State agency duly organized and existing under the laws of the State of California. CDSS is the single state agency responsible for supervising and monitoring the administration of foster care services in California.

28. ***Defendant Kim Johnson ("Johnson")*** is the Director of CDSS, a role that she has held for more than five years. In this role, Defendant Johnson is responsible for administering laws relating to foster care services; promulgating regulations and standards; supervising the administration of public social services, including foster care services; and investigating, examining, and making reports on public offices responsible for the administration of social services.[8] Defendant Johnson is also a council member of the California Interagency Council on Homelessness. Under California Welfare and Institutions Code § 10605, she has the authority to enforce state and federal law. Defendant Johnson is sued solely in her official capacity.

29. ***Defendant California Department of Health Care Services ("DHCS")*** is a State agency duly organized and existing under the laws of the State of California. DHCS is the single state agency responsible under federal law for the administration of California's Medicaid program ("Medi-Cal").

30. ***Defendant Michelle Baass ("Baass")*** is the Director of DHCS, a role that she has held for nearly three years. Defendant Baass' duties include supervision and control of the Medi-Cal program to secure full compliance with governing laws. Defendant Baass is also a council member of the California Interagency Council on Homelessness. Defendant Baass is a public agency director responsible for operation

---

[8] Cal. Welf. & Inst. Codes §§ 10553, 10554, 10600, 10602.

of a public entity, pursuant to 42 U.S.C. §§ 12131(1)(A) and (B). Defendant Baass is sued solely in her official capacity. CalHHS, Ghaly, CDSS, Johnson, DHCS and Baass are referred to as the **"State Defendants"**.

## IV. NAMED PLAINTIFFS' EXPERIENCES IN THE FOSTER CARE SYSTEM

### A. Plaintiff Erykah B.

31. Erykah B. is a Black young person from Los Angeles, California. Born shortly after her siblings were removed from their parents' care, Erykah B. spent most of her childhood cycling between DCFS supervision and her mother's care. Erykah B. has experienced a significant history of trauma, including both physical and sexual abuse. Despite the trauma Erykah B. has experienced, she successfully graduated from high school. She is passionate about styling hair and dreams of finishing college and opening her own salon.

32. Erykah B. has been diagnosed with Post-Traumatic Stress Disorder ("PTSD") and disruptive mood dysregulation.

33. Erykah B.'s mental health symptoms have substantially limited one or more major life activities. Her treating healthcare professionals have determined that she "experiences significant impairment in home and at school." For example, Erykah B.'s PTSD causes her to experience symptoms of depression, anxiety, and intrusive thoughts, including nightmares and flashbacks of the abuse she has suffered, which impair her ability to sleep. Sometimes she has panic attacks, during which she describes feeling like she "can't breathe."

34. Erykah B. is enrolled in Medicaid.

35. Erykah B. has not received the behavioral health services that she needs and to which she is statutorily entitled. Specifically, DMH has not provided Erykah B. the Intensive Care Coordination and mobile crisis services that she needs and that treating professionals have recommended for her.

36. During the periods when she was without a placement in July 2022 and January 2024, DCFS failed to provide Erykah B. with emergency housing, adequate notice of their placement decision, or sufficient notice apprising her of her right to contest the decision or the process for doing so.

37. Erykah B. has not had equal access to integrated, least restrictive, safe and appropriate extended foster care placements and services based on her needs. She wants and does not oppose placements and services in the least restrictive environment based on her needs.

*1. Placement History*

38. Erykah B. first entered foster care when she was an infant, in June 2004. Throughout the next eight years she was placed in at least five different foster homes interspersed with periods of living with her mother (she exited care in 2007, re-entered in 2008, and exited again in 2010). In early 2012, she was removed from her mother for the final time and placed with the person who would become her legal guardian. Only one of her seven siblings was placed with her and she has struggled to visit with the others since then. Erykah B. told DCFS then that she did not want to be placed in this home, but DCFS failed to listen, telling her there was nowhere else for them to go. Although her case remained open with DCFS's oversight, as Erykah B. predicted when she was just eight years old, the placement proved traumatic and was marked by abuse and neglect.

39. In January 2022, when Erykah B. was seventeen years old, she was finally removed from this home. By the time she turned eighteen, six months later, and became an NMD in extended foster care, she had been placed in at least three additional foster homes.

40. Despite DCFS's obligation to provide her with a safe and appropriate placement, her time in extended foster care has been marked by unstable placements and periods of homelessness.

41. In July 2022, Erykah B. fled her foster home because she survived an attempted sexual assault in the foster home. Foster parents are required to notify DCFS immediately when a placement disrupts, so DCFS should have been aware of her placement disruption. After fleeing the home, Erykah B. experienced homelessness, during which time she and her girlfriend slept outside for two weeks before securing a short-term hotel stay. During the time she was living on the streets, Erykah B. also survived another attempted sexual assault. DCFS did not provide any placement or emergency housing during this time.

42. In summer of 2022, Erykah B. interviewed for a Transitional Housing Placement Program for Nonminor Dependents ("THPP-NMD"), with little support from DCFS. Erykah B. found out she had been accepted to the program months later, but DCFS failed to communicate Erykah B.'s interest in the placement to the provider for another several weeks, by which point her spot had been given away. She then had to start the application process over again.

43. In late August 2022, Erykah B.'s sister helped her find an open room in a sober living program. Although the program was not appropriate for her because she did not have substance abuse issues, she moved in because DCFS failed to provide her with a placement and she had no other options. Erykah sought approval of the program as a Supervised Independent Living Placement ("SILP") to obtain foster care funding for rent charged by the program. Although DCFS eventually approved the residence as a SILP, DCFS' process for administering SILP funds resulted in payments arriving after the rent was due, preventing Erykah B. from being able to pay rent timely.

44. In February 2023, the program discharged Erykah B. largely due to late rent payments resulting from DCFS' timeline for issuing SILP checks. Rather than finding a new placement for Erykah B., DCFS moved her to a shelter, where she remained for about a month.

45. In March 2023, Erykah B. was finally accepted into a THPP-NMD program. She resided there until late October 2023, when she was discharged for minor violations of program rules. Upon information and belief, the provider did not provide her with adequate notice upon discharge of her right to contest this decision or the process for doing so.

46. Because DCFS failed to provide Erykah any new placement or emergency housing when she was discharged from the THPP-NMD program, she resorted to couch surfing. Although Erykah had a challenging relationship with her sister and did not wish to remain there, she sought SILP approval to live with her sister because DCFS had not provided her a placement. After periods living with one sister, living with a former caregiver, and being unhoused, DCFS eventually approved another sister's home as a SILP.

47. DCFS failed in its obligation to assist Erykah B. in securing supportive services. DCFS was delinquent in submitting Erykah B.'s THPP-NMD applications and in requesting Erykah B.'s Medicaid and public transit cards. Erykah B. has had only brief meetings with DCFS and feels she has had almost no transition support over the last few years.

*2. Behavioral Health Services*

48. As early as 2018, Erykah B.'s mental health providers recommended that she receive an array of intensive behavioral health services, including Intensive Care Coordination. Intensive Care Coordination is a specific form of case management that helps ensure eligible children receive needed assessment, planning, and coordination of services, and is particularly suited for individuals with intensive or complex needs such as children who have experienced complex trauma. However, despite her providers' recommendation, Erykah B. has not consistently received Intensive Care Coordination or the other services that were recommended.

49. Defendants' failures to provide Erykah B. with community-based behavioral health services have led to a number of mental health crises and

hospitalizations. For example, when she was sixteen and seventeen years old Erykah B. repeatedly experienced suicidal ideation and engaged in self-harm. No mobile crisis team responded to these incidents, and instead Erykah B. was hospitalized.

50. In November 2021, Erykah B. suffered a mental health crisis in which police were called to the home. In this instance, a mental health professional was called to the scene, who was able to successfully assist Erykah without further police involvement or institutionalization, demonstrating the benefit of such mobile crisis teams.

51. In December 2021, Erykah B. self-reported to be engaging in acts of self-harm and requested counseling. The juvenile court ordered that she be screened for behavioral health services. However, Erykah B. was not screened for services for another five months, until May 2022.

52. In February 2023, a mental health professional recommended that Erykah B. should receive additional behavioral health services, including individual psychotherapy, rehabilitation services, and case management to help develop treatment goals and help Erykah B. to access behavioral health services. However, it was not until September 2023, over six months later, that Erykah B. finally began to receive any of these services.

53. The compounded trauma that Erykah B. experienced has made it difficult for her to succeed in school and created behavioral challenges and difficulties developing emotion management skills. Intensive Care Coordination services could have helped connect Erykah B. to needed behavioral health services, but DMH did not consistently provide her with this service.

54. Despite a difficult and unstable childhood, Erykah B. is eager to give back to other foster youth. Erykah B. knows that she, and other foster youth, should not have to settle for less than that to which they are legally entitled.

**B. Plaintiff Onyx G.**

55. Onyx G. is a Black and Latina young person who has been involved in the foster care system since March 2008, when she was two years old. Despite the trauma she has experienced while in foster care, Onyx G. plans to complete her high school diploma and begin higher education.

56. Onyx G. has been diagnosed with anxiety, Major Depressive Disorder, and Disruptive Mood Dysregulation Disorder.

57. Onyx G.'s mental health symptoms have substantially limited one or more major life activities. She has difficulty regulating her emotions, concentrating, thinking and planning. She needs special education services for her emotional needs in school. She also has extreme difficulty trusting others, especially adults. She has had prolonged feelings of insecurity and fear for her safety.

58. Onyx G. is enrolled in Medicaid.

59. Onyx G. has not received the behavioral health services that she needs and to which she is statutorily entitled. Specifically, DMH has not consistently provided Onyx G. the Intensive Care Coordination and mobile crisis services that she needs and that treating professionals have recommended for her.

60. During periods when Onyx G. was without a placement, including in July 2022, June 2023, and July 2024, DCFS failed to provide her with adequate notice of their placement decision or sufficient notice appraising her of her right to contest the decision or the process for doing so.

61. Onyx G. has not had equal access to integrated, least restrictive, safe and appropriate extended foster care placements and services based on her needs. She wants and does not oppose placements and services in the least restrictive environment based on her needs. Onyx G.'s past STRTP institutionalization places her at serious risk of future institutionalization.

*1. Placement History*

62. Between the ages of two and seven, DCFS cycled Onyx G. among various family member placements; where she experienced abuse and neglect from her caregivers. In early 2013, she returned to her parents' care, but DCFS removed her again in March 2020.

63. In April 2020, DCFS placed Onyx G. in a Short Term Residential Therapeutic Program ("STRTP").[9] Although STRTPs are meant to be short-term and are highly restrictive and segregated congregate care settings, DCFS continued to place Onyx in a series of STRTPs for years, segregating her from her community.

64. Between 2020 and 2024, Onyx G. was placed in four different STRTP facilities. She was placed at the first STRTP in April 2020 when she was living in a homeless shelter with her father and removed from her father's care. In January 2022, she was moved to a second STRTP. In June 2022, Onyx G. left the STRTP because of concerns for her safety and became unhoused.

65. In July 2022, she couch surfed at the home of a former partner and spent time living on the street. During this period, DCFS failed to provide Onyx G. with adequate notice informing her that they were unable or unwilling to identify a foster care placement for her or apprising her of her right to contest the denial of placement.

[9] STRTPs are residential facilities for foster youth that are licensed by the California Department of Social Services. *See* Cal. Health & Safety Code § 1502(18). STRTPs are the most restrictive type of placement that Defendants provide, as they provide specialized and intensive treatment, and twenty-four-hour care and supervision in a congregate care setting. Home-based placements like foster homes, on the other hand, are the least restrictive type of placement. Recognizing that foster youth should be placed in the least restrictive family setting that promotes normal childhood experiences and meets the youth's individual needs, the legislature intended that STRTPs be used only as short term placements.

66. Later in July 2022, she was placed in Temporary Shelter Care,[10] a homeless shelter for children in foster care, and then moved to a third STRTP, where she experienced abuse from staff. In January 2023, she left because of the abuse from staff and had to resort to a period of couch surfing. By the end of January 2023, Onyx was again taken into Temporary Shelter Care. In February 2023, she was moved to a fourth STRTP.

67. In June 2023, Onyx G. left the fourth STRTP after her roommate sexually assaulted her and the STRTP staff's inaction left her feeling unsafe and unsupported. Staff did not employ trauma-responsive techniques, but were instead inattentive, skeptical, and unwilling to remove the person who attempted to assault her.

68. Between June 2023 and August 2023, Onyx G. resided in Temporary Shelter Care, a homeless shelter for foster children. During this time, DCFS offered her placements that were out of county, which she rejected because it would have jeopardized her right to stay in her school of origin and close to her social supports.

69. In August 2023, DCFS placed Onyx G. at the same STRTP, where she resided until November 2023. Due to the restrictive and institutional nature of this placement type, although Onyx G. is an adult, she was required to inform program staff any time she wished to leave the facility to avoid being found in violation of program rules.

70. At her various STRTP placements, Onyx G. experienced harassment from peers and staff, and significant restrictions. At one STRTP, Onyx G.'s roommate destroyed her electronics and soiled her bed. At another, a staff member

[10] Per Cal. Health & Safety Code § 1530.8, a "temporary shelter care facility" means "any residential facility that meets all of the following requirements: (1) It is owned and operated by the county or on behalf of a county by a private, nonprofit agency. (2) It is a 24-hour facility that provides no more than 10 calendar days of residential care and supervision for children who have been removed from their homes as a result of abuse or neglect, as defined in Section 300 of the Welfare and Institutions Code, or both."

outed Onyx G.'s sexuality to the full group of residents and interrogated her about her father in front of her peers. The staff member would also stare at her for long periods of time, responding that he was "testing her limits" when she asked him to stop. In addition, staff would walk in on residents as they were changing clothes. These experiences aggravated Onyx G.'s trust issues as DCFS failed to provide a safe, stable, community-based, and appropriate placement that responded to the nature of Onyx G.'s childhood and adolescent trauma.

71. DCFS was aware of Onyx G.'s disabilities and knows that Onyx G.'s experiences in STRTPs are tragically common, yet DCFS continued to cycle her through multiple inadequate and dangerous STRTP placements, demonstrating Defendants' indifference to her need for safe and appropriate placement in the least restrictive environment, in violation of the integration mandate. Onyx G.'s early childhood instability, coupled with the sheer number of short-term placements, have put Onyx G. at clear risk for homelessness, harmed her emotional development, exacerbated existing mental health disabilities, and limited her ability to meet her educational and professional goals. Yet, her self-advocacy has been frequently dismissed by DCFS.

72. In November 2023, Onyx G. was accepted into a transitional housing placement program for nonminor dependents. She resided in that program until April 2024, when she transferred to a different THPP-NMD program. She left the second program in July 2024 to move in with a friend who offered to share their apartment at a cheap monthly rate. Shortly after the new place was approved as a SILP, it flooded, becoming uninhabitable. She is now couch surfing.

73. Furthermore, Onyx G. has experienced bias while in foster care and her racial identity has not been supported. For example, in various placements, Onyx G. was reprimanded to maintain better hygiene, but she was not given an opportunity to learn how to take care of her Afro-textured hair until she was placed in an STRTP that happened to have several Black staff members.

### 2. *Behavioral Health Services and Serious Risk of Institutionalization*

74. In or around April 2020, while at her first STRTP, Onyx G. was assessed by a mental health professional as needing an array of intensive behavioral health services. However, each time Onyx G. was discharged from an STRTP facility, she stopped receiving such behavioral health services or received inconsistent services. Onyx G. did not receive any case management from DMH upon discharge, including specifically Intensive Care Coordination, that could have helped ensure Onyx G. continued to receive the critical behavioral health services she needed. Instead, Onyx G. was left to navigate access to services on her own.

75. Onyx G. has experienced approximately 20 hospitalizations due to suicidal ideation since the age of five. In all but one incident, Onyx G. was not responded to by a mobile crisis team. Instead Onyx G. was sent to the emergency room at the hospital. In March 2021, for example, Onyx G. was hospitalized due to experiencing suicidal ideation. Onyx G. received a mental health assessment in March 2023 that recommended largely the same services that had been recommended three years earlier while placed at her first STRTP facility. The mental health provider recommended an array of intensive behavioral health services, including specifically case management services. Although Onyx G. received some of these services sporadically, she has had difficulty maintaining consistency in her behavioral health services as she has bounced around between placements, including periods of homelessness. For example, it was not until in or around June 2024 that Onyx G. began receiving consistent therapy services. She is still not receiving case management such as Intensive Care Coordination services from DMH to facilitate access to behavioral health services.

76. Onyx G. could have succeeded in less restrictive noninstitutional settings if Defendants had provided appropriate behavioral health services. Because Defendants failed to provide her with these services and to find an appropriate,

community-based placement, Onyx G. spent years segregated from her community in so-called "short term" restrictive institutions, and remains at high risk of future institutionalization.

77. Onyx G. has conveyed disappointment to DCFS that she never got the chance to live with a foster family, the least restrictive placement for transition age foster youth in out-of-home care. DCFS told Onyx G. that she was rejected from family-based placements because of her behavioral record, even though she has worked tirelessly to process her trauma, improve her mental health, and channel her behavior into positive outlets. Intensive, developmentally appropriate wraparound services, rooted in a trauma-responsive approach, would have made it more likely that Onyx G. could live safely, comfortably, and permanently in a least restrictive, family-based placement. Instead, she was never given a chance to learn and demonstrate improved coping and behavioral management skills in a family setting.

78. Onyx G. is passionate about making sure that all young people have stable housing and that foster youth are empowered with real, relevant life skills needed to succeed in adult life.

**C. Plaintiff Rosie S.**

79. Rosie S. is a Latina young person and parent of a young child. She entered the foster care system in 2011, when she was only eight years old. Rosie S. has experienced significant trauma over the course of her life, including both witnessing and experiencing physical abuse at the hands of family members. Despite the trauma that she has experienced, Rosie S. plans to pursue a career in youth advocacy.

80. Rosie S. has been diagnosed with major depressive disorder, anxiety, trichotillomania, and mood disorders.

81. Rosie S.'s mental health symptoms have substantially limited one or more major life activities. For example, Rosie S. has experienced trouble communicating regarding her feelings and isolation from others due to her depression.

82. Rosie S. has been eligible for Medicaid since birth, though as a result of DCFS and DMH's failure to transfer her Medicaid with her SILP placement in Nevada, she was without Medicaid for six months which included time that she was pregnant. As of April 2023, she has been re-enrolled in Medicaid.

83. During the period upon reentry into care when she was without a placement, DCFS failed to provide Rosie S. with emergency housing, adequate notice of their placement decision, or sufficient notice appraising her of her right to contest the decision or the process for doing so.

84. Rosie S. has not had equal access to integrated, least restrictive, safe and appropriate extended foster care placements and services based on her needs. She wants and does not oppose placements and services in the least restrictive environment based on her needs.

*1. Placement History*

85. Rosie S.'s childhood was marked by trauma and instability, including early childhood abuse and neglect, family violence, frequent moves, and unstable placements while in foster care. She entered DCFS's care in 2011 and was cycled by DCFS between foster homes and family members until September 2014, when her case closed with her grandmother being granted legal guardianship of her in Los Angeles.

86. Although Rosie S. had a close bond with her grandmother, there were challenges in their relationship, and DCFS opened a case against the legal guardian, Rosie S.'s grandmother, in December 2020, which was closed in April 2021, when Rosie S. turned eighteen. Almost immediately, her relationship with her grandmother was disrupted and Rosie S. left the home. Subsequently, Rosie S. experienced homelessness and couch surfed at friends' houses for over a year. Structural difficulties in navigating re-entry prevented Rosie S. from entering extended foster care for over a year.

87. Rosie S. reached out to DCFS to re-enter extended foster care in September 2022, at the age of nineteen. Instead of assisting Rosie S. in transitioning out of homelessness and into a foster care placement as legally required, DCFS only referred Rosie S. to homeless shelters, which are not placements.

88. When she re-entered care in October 2022, DCFS failed to offer her a placement. Left without options, Rosie began couch surfing with her grandmother, who allowed her to move back in temporarily. Despite knowing that the disrupted relationship with her grandmother was the reason she needed to re-enter foster care, DCFS did not provide sufficient supportive services to stabilize the situation or provide Rosie S. with a placement or emergency housing. DCFS failed to let Rosie S.'s self-assessment of her needs guide their placement search. Predictably, Rosie S.'s relationship with her grandmother deteriorated over the next few weeks until Rosie S. notified DCFS that she had found a family friend willing to house her in Nevada. DCFS failed to recognize the trauma impacting Rosie S. and her grandmother; therapeutic supports, proactive intervention, and trauma-responsive practices may have made reunification with her grandmother a viable option.

89. After effectively consigning Rosie S. to find *herself* a placement in a different state instead of providing a safe and appropriate placement in Los Angeles County near her limited support systems, DCFS continued to delay fulfilling its legal responsibility to support her. It took about a month for the Nevada residence to be approved as a SILP and another two months for Rosie S. to start receiving SILP benefits. Even after SILP approval, she experienced delays in receiving her SILP payments and Expectant Parent Payment, which was needed to assist her in preparing for the birth of her baby. Additionally, Rosie S. repeatedly told DCFS that she did not have health insurance; DCFS did nothing to help her secure it.

90. Since re-entering DCFS's care, Rosie S. continually expressed her desire to be placed at a THPP-NMD in Los Angeles. Rosie S. in fact completed applications for THPP-NMDs without any guidance or support from DCFS. Shortly after re-

entering care in October 2022, she provided the applications to DCFS to submit to its contracted transitional housing providers per policy, but DCFS never informed her if she had been accepted into a THPP-NMD placement. Rosie S. later learned that DCFS had never submitted the applications she had diligently and independently prepared. Months later, DCFS finally submitted the THPP-NMD applications, but DCFS informed Rosie S. that none of their THPP-NMD providers had any openings for parenting youth. Rosie S. was not provided with written notice of the denials of her THPP-NMD applications, nor was she afforded an opportunity to contest those determinations. Due to DCFS's lack of placements appropriate for expecting and parenting transition age foster youth, the THPP-NMD placement option was foreclosed to Rosie S. for approximately nine months, and DCFS failed to provide her an alternate placement that would have met Rosie S.'s needs.

91. Rosie S.'s SILP in Nevada was meant as a temporary situation to help Rosie S. avoid homelessness. Due to the lack of safe and appropriate placements appropriate to her needs, however, she remained there for approximately nine months.

92. In July 2023, Rosie S. was finally accepted into a THPP-NMD program in Los Angeles. After she had moved into the program in August 2023, she traveled to Las Vegas to finish packing up her possessions to transport them to Los Angeles. While in Las Vegas packing her things, she went into labor. Because she had to remain in Las Vegas for a recovery period after giving birth, the THPP-NMD provider gave away her spot to another applicant. Upon information and belief, the provider failed to provide her with adequate notice of her right to contest the discharge decision or the process for doing so.

93. DCFS failed to provide her an alternate placement in Los Angeles, and she had to remain in Las Vegas until and even after she exited foster care at age 21.

94. Rosie S. laments how long she was away from her support network in Los Angeles and described her placement in Nevada as feeling 'impermanent.' From the outset of moving out of state, she hoped to move back to Los Angeles to be closer

to her support network. As a result of the delay, it has been difficult to re-enroll in school or keep a job.

95. Furthermore, failing to provide Rosie S. a safe and appropriate placement in Los Angeles and removing her from her, albeit limited, social support systems, especially while pregnant, aggravated her existing trauma and prolonged her isolation and instability.

96. Despite a traumatic childhood and a lengthy period of housing instability, Rosie S. is an optimistic young person eager to advocate for similarly positioned youth. She is reflective on her life experiences and is adamant that there should be emergency placement options besides shelters for transition-aged foster youth. She believes deeply that all young people are entitled to safe and appropriate placement, and that people can make their best decisions only when they are not worried about where they are going to sleep at night. She is passionate about foster care reform and wants no other young person to have to endure what she has.

**D. Plaintiff Jackson K.**

97. Jackson K. is a Latino young person who re-entered foster care in 2022 and who resides in Riverside County, in this judicial district. His primary language is American Sign Language ("ASL"). Despite Jackson K.'s experience of trauma, he successfully graduated from high school in June 2023 and aims to attend college.

98. Jackson K. has been diagnosed with depression. As a young child, mental health professionals diagnosed him with other conditions including anxiety and obsessive-compulsive disorder and determined that he meets the criteria for an emotional disturbance.

99. Jackson K.'s mental health symptoms have substantially limited one or more major life activities. For example, Jackson K. has struggled to communicate effectively with peers and DCFS workers due to his interconnected disabilities of Deafness and mental health issues, leading to misunderstandings, miscommunications, and unnecessary hospitalizations.

100. Jackson K. is enrolled in Medicaid.

101. Jackson K. has not received the behavioral health services that he needs and to which he is statutorily entitled. Specifically, DMH has not provided Jackson K. the Intensive Care Coordination and mobile crisis services he requires.

102. Between his re-entry to care in March 2022 and August 15, 2022, DCFS failed to provide Jackson K. with licensed emergency housing, adequate notice of their placement decision, or sufficient notice appraising him of his right to contest the decision or the process for doing so.

103. Jackson K. has not had equal access to integrated, least restrictive, safe and appropriate extended foster care placements and services based on his needs. He wants and does not oppose placements and services in the least restrictive environment based on his needs.

*1. Placement History*

104. Despite DCFS's obligations to provide Jackson K. with supportive services and safe and appropriate placement in extended foster care, DCFS continually failed to account for Jackson K.'s individual needs, particularly his need for ASL interpretation services.

105. Jackson K. entered DCFS care in 2007 after his biological mother went to prison. He was adopted in 2009. During the twelve years spent with his adoptive family, his adoptive mother was the only person in the family who became fluent in ASL.

106. Tragically, his sole lifeline, his adoptive mother, passed away when Jackson K. was nine years old. Jackson K. struggled to find support in the years after her death, particularly because his adoptive family had not learned ASL.

107. In January 2022, following some conflicts, Jackson K.'s adoptive father kicked him out of the house. After being forced to leave home, Jackson K. stayed in a hotel for two weeks until he moved into a youth shelter after he ran out of money and other options. He had to drop out of his last semester of high school because he

no longer had a stable place to live. Jackson K. filed a petition to re-enter foster care in January 2022 and it was granted in March 2022.

108. Between when he reentered care in March 2022, until May 2022, DCFS left Jackson K. in a shelter for unhoused adults. While residing at the shelter, he was threatened by other residents, observed physical altercations between residents in the bathroom, and observed drug transactions. During this period, someone broke his cellular telephone, depriving him of his only means of communicating (he used an ASL application on his cellular phone because none of the staff or residents spoke ASL). He also had his bicycle stolen. Because he was given no place to keep his official documents, he hid them under his mattress to try to protect them from being lost or stolen.

109. In May 2022, DCFS moved Jackson K. from the shelter to a DCFS-contracted hotel because of his well-founded concerns regarding his physical safety at the shelter. Throughout this period, DCFS failed to provide Jackson K. with a placement or with adequate written notice informing him of their placement determination, his right to appeal that decision, or the process for doing so. Although DCFS discussed with Jackson K. the possibility of moving into a resource home or SILP, DCFS never actually offered him an available placement. For example, one resource parent declined to take Jackson K. due to concerns about possible behavioral problems. Jackson K. did not have an opportunity to present his side of the story or otherwise challenge the denial of placement. The other placements DCFS identified for Jackson K. were unavailable and inappropriate for a variety of reasons, including age limitations, insufficient ASL services, and a requirement that he close his dependency case, despite having just opened it to obtain additional support.

110. DCFS forced Jackson K. to complete his THPP-NMD applications alone and follow up with each provider independently. DCFS gave Jackson K. links to applications in English but failed to provide him with an interpreter or other support to complete the application process. Even when DCFS finally provided Jackson K.

with an ASL interpreter for his THPP-NMD orientation and interviews in July 2022, the language barrier proved exceedingly difficult. Jackson K. received denial after denial from THPP-NMDs in Los Angeles County because of the lack of available safe and appropriate placements and because DCFS undermined his efforts to get into a THPP-NMD program.

111. In August 2022, Jackson K. was ultimately accepted into a THPP-NMD program. However, by September 2022, the THPP-NMD provider gave Jackson K. a three-day notice to vacate due to purported program rule violations. Although the THPP-NMD knew that Jackson K. required ASL interpretation, the notice to vacate referred to verbal warnings without specifying whether an interpreter was present or whether any communications about program rules were also provided in ASL. The notice also failed to inform Jackson K. of his right to contest the discharge decision or how to do so.

112. Ultimately, the THPP-NMD provider reluctantly withdrew its unlawful notice and worked with Jackson K. to support his needs. Although Jackson K. continues to reside at the THPP-NMD program, his housing situation remains tenuous because of the lack of due process protections and inadequate supportive services to help him maintain his placement.

113. In May 2023, upon learning of noise complaints against Jackson K., his DCFS social worker threatened him with eviction from his apartment and homelessness.

*2. Behavioral Health Services*

114. In May 2022, police responded to a call while Jackson K. was living at a shelter for what they believed was an incident of suicidal ideation. No mobile crisis response team responded to the incident. Instead, the police took Jackson K. to the hospital where he was placed on a 5150 psychiatric hold and diagnosed with depression. Hospital providers recommended that Jackson K. should receive

individual therapy. After his hospitalization, he agreed to attend therapy, but his appointment was canceled because the provider could not secure an ASL interpreter.

115. In September 2022, police again responded to an apparent mental health crisis, and Jackson K. was again hospitalized on a 5150 hold. Again, a mental health crisis team was not called, who could have helped to prevent psychiatric hospitalization. Instead the police were the sole responders and Jackson K. reported that they responded by tackling him.

116. Jackson K. did not begin receiving any therapy services until October 2022, five months after he was recommended to receive it. The therapy he finally did receive was through a counselor at his school. Jackson K. felt this therapy was helpful, and his school reported that he did well in the counseling sessions, however, this therapy ended upon his graduation in June 2023.

117. As of early March 2024, Jackson K. was not receiving any behavioral health services. He is also not receiving any case management, including specifically Intensive Care Coordination, which could help with coordinating the behavioral health services for which he was recommended and required.

118. Defendants' failure to provide Jackson K. with consistent, trauma-informed behavioral health services and safe and appropriate placements creates a risk that Jackson K. could become unnecessarily segregated from his community through a return to unstable and segregated housing in an adult shelter or hotel, homelessness, or another type of restrictive placement.

119. Jackson K.'s behavioral health disabilities are also impacted by his physical disability. Jackson K. has lived with the disability of deafness his entire life. While in care, Jackson K. was placed in adult shelters and hotels without necessary accommodations for his disability. For example, during one of his shelter stays, Jackson K. was not provided an ASL interpreter despite requesting one. The lack of an interpreter also caused Jackson K. severe hardship during his interactions with law enforcement and medical professionals. When Jackson K. was institutionalized after

allegedly threatening suicide, police officers and clinical doctors could not adequately communicate with him.

120. He wants to be a class representative to ensure the hardships and dismissals he experienced do not happen to other young people.

**E. Plaintiff Ocean S.**

121. Ocean S. is a Black young person and parent. Ocean S., who was twenty on August 22, 2023, exited extended foster care upon turning twenty-one. Ocean S. has experienced significant trauma over the course of her life, including physical and emotional abuse by her mother's boyfriend, the death of her sister due to gang violence, and sexual abuse. She and her family experienced bouts of homelessness. Despite her experiences of trauma, Ocean S. is working towards becoming a phlebotomist and is passionate about nursing.

122. Ocean S. has been diagnosed with unspecified mood disorder, dysthymic disorder, insomnia, PTSD, and major depression.

123. Ocean S.'s mental health symptoms have substantially limited one or more major life activities. Ocean S. has trouble sleeping and has insomnia because of her past trauma, anxiety, and depression.

124. Ocean S. is enrolled in Medicaid.

125. Ocean S. has not received the behavioral health services that she needs and to which she is statutorily entitled. Specifically, DMH has not provided Ocean S. the Intensive Care Coordination and mobile crisis services that she needs and that treating professionals have recommended for her.

126. During the period she was without a placement after her discharge from the THPP-NMD program, DCFS failed to provide Ocean S. with licensed emergency housing, adequate notice of their placement decision, or sufficient notice appraising her of her right to contest the decision or the process for doing so.

127. Ocean S. has not had equal access to integrated, least restrictive, safe and appropriate extended foster care placements and services based on her needs. She

wants and does not oppose placements and services in the least restrictive environment based on her needs. Ocean S.'s past STRTP institutionalization places her at serious risk of future institutionalization.

*1. Placement History and Serious Risk of Institutionalization*

128. Ocean S. entered foster care in May 2018. She briefly returned to her mother's care in April 2019 but was removed again in June 2019. Her time in foster care was marked by severe placement instability and periods of homelessness. She resided in a number of different placements, including STRTPs, and she was left in shelters and motels. DCFS moved her around indiscriminately, without considering her actual needs and goals.

129. From May 2018 through December 2020, Defendants placed Ocean S. in various restrictive, so-called "short term" STRTPs. As early as 2018, Ocean S. told DCFS that she wanted to be in a more intimate foster home with a family or in a home-like setting. DCFS ignored her wishes and instead found that Ocean S. should continue to linger in a group home setting. Ocean S. expressed that she felt trapped due to the STRTP's restrictive environment. And in 2019, Ocean S.'s CASA informed Defendants that she was greatly concerned about the "large institutional nature" of Ocean S.'s STRTP, and that immediate action was needed to help Ocean S. build healthy, supportive connections through therapy and a new, community-integrated placement.

130. During this extended period of placement in STRTPs, in September 2020, Ocean S. had a mental health crisis. However, Defendants failed to provide Ocean S. with appropriate mobile crisis intervention in response to this crisis.

131. Although Ocean S. applied for a number of THPP-NMD programs after becoming an NMD, due to the lack of placements, she was not able to move into a THPP-NMD program until December 2020. Therefore, she remained in an STRTP for approximately three months after she should have been transferred to a less restrictive placement. After she was accepted into the THPP-NMD, she experienced

issues with her transition, including lacking the necessary belongings and proper documentation from Defendants to leave the STRTP, unnecessarily extending her institutional stay.

132. In late 2021, Ocean S. learned that all youth in the program would need to exit their units because DCFS was ending its relationship with the provider. In early 2022, Ocean S. entered a THPP-NMD program after she learned that a peer's provider had openings in their program and requested that DCFS submit an application on her behalf to that specific program. After she moved in, however, the provider attempted to discharge her in 2022 for inviting a friend whom the facility deemed problematic. The discharge notice did not inform Ocean S. of her right to contest the termination decision or the process for doing so. Subsequently, Ocean S.'s then-partner visited her at her unit and physically assaulted her. Ocean S.'s strained relationship with her family has eroded her trust in others, caused severe isolation, and left her vulnerable to domestic violence.

133. Due to the above-described domestic violence and perceptions of how Ocean S. responded to the violence—and in close consultation with DCFS—the THPP-NMD provider ultimately terminated Ocean S.'s participation in the program in 2023. The discharge notice did not inform Ocean S. of her right to contest the termination decision or the process for doing so.

134. When Ocean S. was pushed out of the THPP-NMD in early 2023, the housing provider agreed to pay for one month in a motel. Despite having a month of advance notice, DCFS failed to provide an alternate placement or supportive services by the deadline for Ocean S. to leave the motel. Instead, DCFS offered Ocean S. only domestic violence shelters and other unlicensed living settings such a religious organization that required its residents to attend church weekly. After intensive advocacy by Ocean S.'s attorneys, DCFS agreed to cover the cost of motel while they worked to find Ocean S. a placement.

135. Ocean S. struggled to find a safe and appropriate placement where she could reside with her daughter, particularly because her daughter had been removed from her care. Although she was eagerly working to regain custody of her daughter, being unhoused was another barrier to reunification. Ocean S. was caught in a vicious cycle—she could not get her daughter back without stable housing, but she was ineligible for the limited THPP-NMD placements available for parenting transition age foster youth without having physical custody of her daughter. Her ability to locate an apartment that could be approved as a SILP was hindered by her limited credit history, her insufficient income as compared to the rental rate, and DCFS's failure to pay for start-up costs such as a security deposit or first and last month's rent.[11]

136. DCFS did little to support Ocean S.'s efforts to find a safe and appropriate placement or to plan for her aging out of extended foster care. In May 2023, after an extended period spent searching for an affordable apartment with a landlord who would accept her application despite her lack of credit and limited income, Ocean S. found and moved into a SILP-funded apartment.

137. During the period she was without a placement after her discharge from the THPP-NMD program, DCFS failed to provide Ocean S. with adequate notice of their placement decision or apprising her of her right to contest the denial of placement and the process for doing so.

*2. Behavioral Health Services and Serious Risk of Institutionalization*

138. In February 2020, while placed at an STRTP, Ocean S.'s treating providers determined that she needed an array of intensive behavioral health services, including specifically Intensive Care Coordination. Upon discharge from the STRTP

[11] DCFS' SILP Plus program provides up to $2500 for security deposit and other rental expenses, but the program is not accessible to many youth because it requires foster youth to pay these expenses up front and then seek reimbursement (which most cannot afford to do), or to identify a landlord who is willing to complete a W-9 tax form for DCFS before the issuance of funding (which many are not willing to do).

in December 2020, it was determined that Ocean S. would continue to need these services in the community. Although the STRTP provided some aftercare services, once these aftercare services ended DMH failed to ensure that Ocean S. continued to receive necessary behavioral health services, creating a gap in her care. As of the date she turned 21, Ocean S. was not receiving any behavioral health services.

139. In September 2020, while placed at the STRTP, Ocean S. experienced a mental health crisis. However, no mobile crisis team responded to the incident. Ocean S. has never received mobile crisis services, although she believes they would have been helpful to her.

140. Ocean S. has suffered the effects of compounded trauma—early instability and family violence, the loss of a sibling, homelessness, domestic violence and separation from her child. She has had few stable, positive adult figures in her life. Although Ocean S repeatedly requested referrals for therapeutic services, Ocean S.'s lack of continuity of care due to placement instability interfered with her ability to benefit from such services. What therapy she got was inconsistent and sporadic, often with long wait times. On the rare occasions when therapists took the time to develop rapport with Ocean S., her behavior settled, and she was able to invest comfortably in her treatment. All of these obstacles should have been mitigated through appropriate case planning.

141. Defendants' failure to provide Ocean S. with consistent, trauma-informed behavioral health services and safe and appropriate placements creates a serious risk that Ocean S. could become unnecessarily institutionalized or segregated from her community through homelessness, a return to an institutional setting, or another form of restrictive placement.

142. Ocean S. has chosen to participate in this lawsuit because she wants to ensure no other young people are treated the way she has been treated and to show her daughter that everyone is entitled to safe housing and supports that meet their needs.

**F. Plaintiff Junior R.**

143. Junior R. is a mixed-race young person. He was twenty on August 22, 2023, and exited extended foster care upon turning twenty-one. Junior R. has lived through frequent moves, family instability, and a failure to have his basic needs met. He has experienced significant trauma over the course of his life, including physical and emotional abuse at the hand of family members and witnessing multiple deaths resulting from gang violence. Junior R.'s placement instability and his experiences of trauma while in foster care have caused him to attend over eight different high schools, which undermined his educational progress. Despite this fact, Junior R. remains hopeful for the future and wants to finish high school.

144. Junior R. has been diagnosed with depression, anxiety, and attention deficit hyperactivity disorder. His placement instability has caused him to experience panic attacks and suicidal ideation.

145. Junior R.'s mental health symptoms have substantially limited one or more major life activities. For example, Junior R.'s treating medical professionals have found that he struggles with "excessive thinking," "thoughts of anger," and "inability to focus on completing tasks" that impact his daily functioning. Junior R.'s panic disorder causes him to have panic attacks where he experiences chest pain and light-headedness, impairing his ability to think and concentrate. He also has trouble sleeping due to his depression and anxiety.

146. Junior R. is enrolled in Medicaid.

147. Junior R. has not received the behavioral health services that he needs and to which he is statutorily entitled. Specifically, DMH has not provided Junior R. the Intensive Care Coordination and mobile crisis services that he needs and that treating professionals have recommended for him.

148. During periods he was without placement, DCFS failed to provide Junior R. with licensed emergency housing, adequate notice of their placement decision, or

sufficient notice appraising him of his right to contest the decision or the process for doing so.

149. Junior R. has not had equal access to integrated, least restrictive, safe and appropriate extended foster care placements and services based on his needs. He wants and does not oppose placements and services in the least restrictive environment based on his needs. Junior R.'s past STRTP institutionalization places him at serious risk of future institutionalization.

*1. Placement History*

150. Junior R.'s early life was marked by instability. In January 2012, at just eight years old, he was removed from his mother's care after witnessing and experiencing physical violence in the home. He was placed with his father only to be removed from him in May 2012. He then lived with his grandmother, who became his legal guardian when the case closed in April 2014. In October 2018, he re-entered foster care after a case was opened against his grandmother, who was his legal guardian.

151. Junior R.'s significant mental health needs have repeatedly resulted in his placement into institutional settings. Defendants have failed to address Junior R.'s mental health needs in community-based settings, instead cycling him through a series of restrictive STRTPs. Between December 2018 and July 2021, DCFS moved Junior R. between six different STRTP facilities, and failed to ensure that he was adequately connected with community-based behavioral health services so that he could leave such restrictive placements and transition back into community settings successfully.

152. In the spring of 2021, while Junior R. was residing in a STRTP, he became an NMD in extended foster care. In July 2021, he was discharged from his last STRTP and moved into a THPP-NMD program that he identified without the aid of DCFS. Junior R. was pushed out of the THPP-NMD program in November 2022. On information and belief, the discharge notice did not inform him of his right to appeal the decision or the process for doing so.

153. DCFS moved Junior R. to a hotel briefly before Junior R. found a housing program for youth that DCFS approved as a SILP. Junior R. was forced to leave this program in February 2023 largely due to minor infractions. Prior to his discharge, he did not receive any stabilization meetings or Child and Family Team meetings ("CFTs"), which are the cornerstone of California's integrated core practice model.[12] He was discharged without adequate notice or any opportunity to contest the loss of placement.

154. As a result, Junior R. again experienced homelessness and paid for a short stint in a hotel with his own funds, before he ran out of money. In violation of its legal duties, DCFS failed to provide Junior R. a foster care placement upon learning that he was unhoused, instead offering only shelters and other unlicensed settings that were inappropriate for his needs or unworkable. For example, despite knowing that Junior R. is not Christian, DCFS offered him an unlicensed housing program that required its residents to attend Christian church on a weekly basis. DCFS did not provide Junior R. with adequate notice of their placement decision or sufficient notice apprising him of his right to contest the decision or the process for doing so.

155. DCFS moved Junior R. between various motels for several weeks. Three weeks after Junior R. was discharged from his SILP, DCFS offered him a resource family home, which Junior R. declined because the foster care funding would have gone directly to the caregiver instead of to him, leaving him without sufficient autonomy. After advocacy from Junior R. attorneys, DCFS reluctantly agreed to facilitate an interview for Junior R. with one of their THPP-NMD providers. After interviewing, Junior R. learned that his application had been rejected due to comments he made to the provider, including him questioning why the program was run like a group home. Junior R. was not provided an adequate opportunity to challenge the

[12] Cal. Welf. & Inst. Code § 16501(a)(5).

denial of placement. After Junior R.'s THPP-NMD application was rejected, DCFS acknowledged DCFS's limited placement capacity in Los Angeles County and threatened to seek closure of Junior R.'s dependency case if he did not resume work or school soon, despite his homelessness and mental health disability.

156. DCFS failed to provide a placement or emergency housing for Junior R., and Junior R. was forced to couch surf with his grandmother in April 2023, despite the fact that her legal guardianship was terminated years earlier. This was not a trauma-responsive plan, and, as he had warned DCFS about, conflict escalated between Junior R. and his grandmother, and he experienced threats of physical harm by another family member in the home.

157. Within a few months, Junior R. left his grandmother's home and DCFS agreed to transport him to a friend's home in a town over an hour from Los Angeles. Junior R. eventually was able to receive SILP benefits through this placement.

158. Junior R. has been rejected from placements for asking questions to determine if the placement would be a good fit and because DCFS informed its prospective placement providers of Junior R.'s prior discharges and loss of placement. For example, one THPP-NMD rejected Junior R. because of its perception of his reputation from prior placements.

159. DCFS undermined Junior R. in the application process, failed to coordinate with DMH, and did not serve as a champion and advocate for him. Rather than explore how Junior R.'s traumatic experiences and unmet mental health needs contributed to his placement instability, DCFS facilitated these experiences being weaponized against him, undermining any efforts to locate a safe and appropriate placement. DCFS's systematic practice of informing prospective placement providers about a transition age foster youth's previous placement discharges, without providing the youth the opportunity to explain their version of those events or to ask for any needed accommodations, predictably results in youth like Junior R. being denied placement opportunities.

160. Junior R.'s history of instability and neglect has made him wary and untrusting of adults. His time in foster care has been defined by placements that do not meet his needs. When Junior R. has advocated for himself and his needs, DCFS has dismissed him as stubborn and problematic. For example, DCFS has repeatedly expressed frustration when Junior R. turned down unlicensed settings that did not meet his needs, even though he had legitimate reasons for doing so, such as concerns about religious intolerance, lack of privacy, or unaffordability given his limited resources. Instead of situating Junior R.'s behavior as emergent from his needs and experiences, DCFS has routinely blamed Junior R. for his situation and provided poor alternatives.

*2. Behavioral Health Services and Serious Risk of Institutionalization*

161. In 2018, while he was placed at a STRTP, mental health professionals determined that to treat his mental health needs, Junior R. needed to receive intensive behavioral health services, including case management services. Upon discharge from his last STRTP, however, Junior R. stopped receiving intensive behavioral health services. In particular, Junior R. did not receive any case management services such as Intensive Care Coordination services from DMH, that could have helped ensure Junior R. continued to receive the critical behavioral health services he needed. Instead, Junior R., who was only 18 years old at the time, was left to navigate access to services on his own.

162. Within months, Junior R. experienced repeated mental health crises. These mental health crises were not appropriately responded to by a mobile crisis team. Instead, in November 2021, Junior R was hospitalized after he experienced severe panic attacks. After spending three days in the hospital, Junior R. was discharged back to the community with no referrals to behavioral health services or follow-up. Four days later, Junior R. experienced suicidal ideation. Instead of a mobile crisis team, police were called to his home. Junior R. was then admitted to

the psychiatric unit at the hospital on a 72-hour psychiatric hold. Defendants' failures to adequately address Junior R.'s mental health needs directly led to this cycle of institutionalization.

163. In November 2021, after discharge from the hospital, Junior R. was again recommended to receive intensive behavioral health services including case management. Although Junior R. received some of these services sporadically, he has had difficulty maintaining consistency in his behavioral health services as he has bounced around between placements, including periods where he lived in hotels or temporary shelters. A care coordinator could help to navigate access to needed services. However, Junior R. was not receiving Intensive Care Coordination services as of the date he turned 21.

164. Defendants' failure to provide Junior R. with consistent, trauma-informed behavioral health services and safe and appropriate placements creates a serious risk that Junior R. could become unnecessarily institutionalized or segregated from his community through homelessness, return to institutionalization, or another restrictive placement as evidenced by his repeated placements into STRTPs and psychiatric hospitalization.

165. Junior R. wants the foster care system to provide needed placements and services to youth.

**G. Plaintiff Monaie T.**

166. Monaie T. is a Black young person and parent. She was twenty on August 22, 2023, and exited extended foster care upon turning twenty-one. She lives in Los Angeles, California. Monaie T. has experienced physical and sexual abuse by her caregivers.

167. Monaie T. has been diagnosed with PTSD and major depressive disorder.

168. Monaie T.'s mental health symptoms substantially limit one or more major life activities. Due to her PTSD, Monaie T. experiences disassociation and flashbacks, which impair her ability to concentrate, think, and communicate.

169. Monaie T. is enrolled in Medicaid.

170. Monaie T. has not received the behavioral health services that she needs and to which she is statutorily entitled. Specifically, DHCS and DMH have not provided Monaie T. the Intensive Care Coordination and mobile crisis services that she needs.

171. Between March 2021 and September 2021 and again in January 2024 when she was without a placement, DCFS failed to provide Monaie T. with emergency housing, adequate notice of their placement decision, or sufficient notice apprising her of her right to contest the decision or the process for doing so.

172. Monaie T. has not had equal access to integrated, least restrictive, safe and appropriate extended foster care placements and services based on her needs. She wants and does not oppose placements and services in the least restrictive environment based on her needs. Monaie T.'s past STRTP institutionalization places her at serious risk of future institutionalization.

*1. Placement History*

173. Monaie T. was removed from her father's care in June 2004. A year later, the case closed with custody granted to her mother. In June 2016, when Monaie T. was thirteen years old, she reentered foster care due to physical abuse by both her parents. She then began living with her godmother.

174. In 2017, at age fourteen, Monaie T. gave birth to a baby boy who spent his entire short life of nine months in the hospital before he passed away from a severe heart defect. Monaie T. tried to visit her son each day despite the hour and a half long bus ride each way. Unfortunately, she was forced to drop out of school to be with her son. To add trauma to trauma, DCFS largely ignored her needs, including failing to help pay for her son's burial services.

175. After her son's death in 2018, Monaie T. left her godmother's house, feeling a profound sense of instability compounded by grief. She spent the next year unhoused, which included couch surfing and living on the street. Even when Monaie T. became pregnant, she remained unstably housed for several months. Eventually, she returned to her godmother's house.

176. Just months after her daughter was born in 2019, however, DCFS opened an investigation against Monaie T.'s godmother, resulting in Monaie T. and her daughter first living with a foster family and then moving to an STRTP in Orange County.

177. Monaie T. was institutionalized for several months in 2020 at an STRTP. However, when Monaie T. was discharged from the STRTP, DMH did not continue to provide her with behavioral health services in the community. Defendants also failed to effectively plan for Monaie's discharge from the STRTP and to provide her with appropriate mental health supports and stable placement options, contributing to her placement instability.

178. In the spring of 2021, as Monaie T. transitioned into extended foster care, she and her daughter continued to struggle with homelessness, including periods of couch surfing and staying at different motels for which she or her friends paid. Despite the challenge of being a young parent who was unhoused, Monaie T. remained diligent and determined to secure a safe and happy living situation for herself and her daughter. Between March 2021 and September 2021, she remained unhoused, and DCFS did not provide emergency housing or any placements for Monaie T. and her daughter during this time. DCFS also failed to provide Monaie T. with adequate notice informing her of their placement decision or apprising her of her right to contest the denial of placement and the process for doing so.

179. In June 2021, Monaie T. began working with a housing and employment organization for transition age youth. In September 2021, that organization was able to help Monaie T. and her daughter move into a housing program with SILP funding.

However, Monaie T. was forced to leave in early December 2022 with no written explanation or meaningful opportunity to contest the loss of placement.

180. After being pushed out of her placement, Monaie T. became unhoused once again for approximately two months, during which DCFS did not provide her a placement. She resorted to sleeping on public buses and used a local gym to shower until late January 2023, when DCFS paid for three days of hotel, and then Monaie T. moved into a new SILP.

181. She resided in the new SILP until January 2024, when she was evicted and once again became unhoused. She resumed sleeping on the street and on buses. Although DCFS knew that she was unhoused, DCFS again failed to provide her placement or emergency housing between January 2024 and when she exited foster care in spring 2024.

*2. Behavioral Health Services and Serious Risk of Institutionalization*

182. Mental health professionals have repeatedly recommended that Monaie T. should receive intensive behavioral health services to treat her mental health needs. For example, in 2020 a mental health assessment determined that Monaie T. required wraparound intensive behavioral health services to correct or ameliorate the PTSD symptoms she experienced as a result of her extensive trauma and a history of being homeless. Such services should have included case management such as Intensive Care Coordination to help connect her to needed services. However, Monaie T. has only received behavioral health services sporadically.

183. DMH also failed to provide needed mobile crisis services for Monaie T. She has been hospitalized twice due to experiencing suicidal ideation. One such hospitalization occurred in 2016 after she disclosed that she had been physically abused. However, Monaie T. was not provided with mobile crisis services upon either hospitalization.

184. Defendants have unnecessarily segregated Monaie T. in restrictive settings. In 2020, Defendants placed Monaie T. in a restrictive STRTP in Orange County with her two-month-old daughter, rather than offering her a local, community-based placement with appropriate supports. Although the STRTP was supposed to be temporary, Monaie T. and her daughter remained there for at least four months. And it was only after Monaie T. entered an STRTP that she was connected with any intensive behavioral health services, when such services could have prevented institutionalization in the first instance.

185. Without access to necessary behavioral health services and stable housing supports, Monaie remains at serious risk of a return to institutionalization and segregation from her community.

## V. DEFENDANTS FAIL TO MEET THEIR LEGAL OBLIGATIONS TO TRANSITION AGE FOSTER YOUTH WITH MENTAL HEALTH DISABILITIES.

### A. Under State and Federal Law, Defendants Are Responsible for the Administration, Oversight, and Provision of Safe and Appropriate Placements and Medicaid Services to Transition Age Foster Youth.

186. California has a complex foster care system that regulates when the government removes children and youth from their families for abandonment, abuse, or neglect. The purpose of California's foster care system is to provide for the care, placement, and protection of the children and youth entrusted to the State's care, including children and youth with mental health disabilities. Federal and State law places responsibilities on government agencies to ensure safe and appropriate placements and care for transition age foster youth at all times.

187. The federal government provides the largest single source of funding for California's foster care system through Title IV-E of the Social Security Act. Long established federal legal frameworks mandate specific responsibilities to states that

accept federal dollars to administer foster care programs, including the obligation to comply with federal requirements under AACWA.

188. To comply with the federal funding requirements, California designated CDSS, a department of CalHHS, to be the single state agency responsible for administering the State foster care system.[13] CDSS is responsible for licensing and overseeing placement programs and services in California for youth in foster care, including establishing and maintaining standards for foster family homes and childcare institutions such as THPP-NMD programs. DCFS administers those programs at the County level.

189. California likewise designated DHCS, a department of CalHHS, to be the single state agency responsible for administering the Medicaid system in California.[14]

190. CDSS and DCFS, together with DHCS and DMH, are public agencies that all accept federal dollars[15] and are responsible for ensuring that youth in the foster care system with mental health disabilities are served in accordance with federal law, including the ADA and Section 504. Medicaid is the primary payer for a wide range of medical, behavioral health, and supportive services health care for foster children. The importance of coordination between the agencies responsible for the foster care system and the Medicaid program cannot be overstated, as both programs have duties to identify and meet the health and mental health needs of transition age foster youth, as well as to coordinate and oversee the delivery of these services.

### B. Defendants Must Provide Safe and Appropriate Placements and Services that Are Appropriate for the Needs of All Transition Age Foster Youth.

---

[13] 42 U.S.C. § 671(a)(2).

[14] 42 U.S.C. § 1396(a)(5).

[15] 22 C.C.R. § 50004.

191. Defendants' programs for transition age foster youth must account for the developmental and psychological realities of adolescence, especially when a youth has compounded experiences of trauma. Both before and during their time in foster care, transition age foster youth are highly likely to have experienced complex trauma, a term that describes children's exposure to multiple traumatic events, often interpersonal in nature, as well as the impact of this exposure. When unaddressed, the neurobiological effects of trauma exposure often substantially impact activities such as emotional self-regulation, concentration, sleep, verbal processing and communication, and cognition. The impact of trauma often delays the development of coping skills necessary for independence. The wounds inflicted by disruption and trauma caused by Defendants may be invisible, but they are unmistakably revealed by brain imaging of children exposed to traumatic experiences such as abuse, abandonment, and neglect.

192. Fundamental brain development takes place during adolescence, including the development of brain functions that govern reasoning, decision-making, judgment, and impulse control. The vital need for sustained support during this period of "emerging adulthood" is even more pronounced for transition age foster youth, who generally cannot rely on traditional familial structures. Transition age foster youth sorely lack necessary life skills. They often struggle with long-term planning.

193. These manifestations of adolescence and trauma are well-known. Due to transition age foster youths' developmental needs, Defendants must ensure such youth can access the safe and appropriate placements, supports, and services they need for their safety and well-being at all times.

**C. Defendants' Failure to Meet Their Obligations to Transition Age Foster Youth Results in a Foster Care to Homelessness Pipeline.**

194. Roughly one in every five transition age foster youth in California reports experiencing homelessness while in extended foster care. In 2022, more than 4,200 youth aged sixteen to twenty-one years old were in foster care in Los Angeles

County. Based on the best available data, more than 1,000 of these young people will become unhoused at least once while in Defendants' care.

195. The harmful impacts of Defendants' failures to meet their legal duties to transition age foster youth are pronounced and concrete, including harms from being separated from their families, cycled through multiple unsuitable placements, loss of important relationships, abuse and neglect while in care, and homelessness. The longer young people endure homelessness, the more they are exposed to numerous adversities, traumas, and survival risk behaviors, and the greater their risk for re-entering homelessness once they do get housed. Nationally, almost two-thirds of transition age foster youth who experienced homelessness also reported being physically assaulted, robbed, sexually assaulted or raped, or threatened with a weapon while unhoused. Without the support of an effective extended foster care program, youth are also more likely to drop out of school, struggle with mental health conditions and substance abuse disorders, experience unemployment, and enter the criminal justice system.

196. In addition, the harms of Defendants' failures disproportionately fall on already marginalized youth—youth of color, queer youth, pregnant and parenting youth, and youth with disabilities—as these youth are vastly over-represented in the Los Angeles County foster care population. Out of the 2,460 youth ages eighteen to twenty-one in extended foster care in Los Angeles County in 2022, eighty-six percent (86%) were Black or Latino (32% Black and 54% Latino). Roughly one in five foster youth in transitional placements for nonminor dependents in 2021 identified as LBGTQ+. That same year, there were over 250 youths, ages 10 to 20, who were themselves parents and in foster care in Los Angeles County.

197. Defendants' failures are numerous and interrelated. As a threshold matter, Defendants do not have a minimally adequate array of safe and appropriate placements for all the transition age foster youth with mental health disabilities in their care, resulting in major placement instability for those youth. Defendants

exacerbate placement instability by maintaining arbitrary application and termination procedures that deny youth their right to contest denial of placement. Placement instability is also exacerbated by DCFS's failure to assist transition age foster youth with mental health disabilities with case planning and transition planning for safe and appropriate placement and a variety of other services, including healthcare and behavioral health services.

198. Treacherous for all transition age foster youth, outcomes are even worse for transition age foster youth with mental health disabilities. Defendants' policies and practices erect barriers that make it difficult for youth with mental health disabilities to access placement, remain in placement, and avoid placement in unduly restrictive settings.

199. Finally, placement instability is compounded by Defendants' failure to provide necessary behavioral health services to transition age foster youth, which also contributes to youth's unnecessary placement challenges.

## VI. DEFENDANTS' FAILURE TO DEVELOP A MINIMALLY ADEQUATE ARRAY OF SAFE AND APPROPRIATE PLACEMENTS PUSHES TRANSITION AGE FOSTER YOUTH INTO HOMELESSNESS.

200. DCFS's failure to develop a minimally adequate array of placements for transition age foster youth with mental health disabilities violates their rights and results in long placement delays, exposes them to severe housing instability and homelessness, and results in other harms. Defendants also fail even to evaluate the adequacy of their placement resources or to assess whether they have an adequate number of safe and appropriate placements to meet the needs of all of the transition age foster youth with mental health disabilities in their care.[16] Additionally, Defendants fail to maintain sufficient emergency placements for youth who

[16] Cal. Welf. & Inst. Code § 16001(a).

unexpectedly lose their placement. Defendants have been aware of the need to increase the number of safe and appropriate placements for transition age foster youth since 2018, if not earlier, and have failed to ameliorate these structural systemic failures.

### A. DCFS and CDSS Supervise and License Placements for Transition Age Foster Youth.

#### *1. SILP and THPP-NMD Programs Are the Primary Placement Options for Transition Age Foster Youth Ages Eighteen to Twenty-One, Including Youth with Mental Health Disabilities.*

201. Transition age foster youth ages eighteen to twenty-one who have mental health disabilities have two primary community-based placement programs available to them under California law: SILPs and THPP-NMDs.[17]

202. Youth in SILP settings are provided a monthly stipend that they use to pay for the rent of their living arrangement once it is approved by DCFS. That stipend is set and does not change even if the cost of room and board exceeds the stipend amount. The youth must find a person or landlord who is willing to rent them a space to serve as their SILP, which can include an apartment, a rented room, or a college dorm.[18] Once a youth identifies a SILP, DCFS is responsible for inspecting and approving the SILP in a timely manner and for documenting the SILP in the youth's case plan.[19]

203. For California's fiscal year 2022-23, NMDs could receive a monthly SILP payment of one thousand one hundred and twenty-nine dollars ($1,129 U.S.D.).[20] Youth in SILPs must rely on the SILP payment to cover all their basic living expenses, not just placement costs.

---

[17] Cal. Welf. & Inst. Code § 11400(w), (x).

[18] All County Letter 11-77, p. 6.

[19] *Id.* at 6-7, 10.

[20] All County Letter 22-59, p. 5.

204. Transitional housing programs offer supervised transitional housing services to youth in foster care between ages sixteen and twenty-one.[21] Transitional Housing Placement Programs for transition age foster youth eighteen and over are known as THPP-NMDs, and Transitional Housing Placement Programs for sixteen and seventeen-year-olds are known as THPPs.[22]

205. Depending on the provider, youth in THPPs may live with certified host families, at sites staffed with THPP employees, or in independent apartments paid for by the THPP.[23] DCFS has delegated the essential government function of providing safe and appropriate placements for many of the transition age foster youth under DCFS's care and supervision to DCFS's contracted THPP-NMD providers. Because THPP-NMDs are one of only two primary placement options available to transition age foster youth between eighteen and twenty-one, and because DCFS does not operate its own THPP-NMD programs, the contracted providers' operation of the THPP-NMD programs is indispensable to DCFS's ability to meet its duty to provide out-of-home care to transition age foster youth.

206. To become a THPP-NMD, a provider must be certified by the county and meet statutory requirements before being licensed by CDSS.[24] In particular, DCFS must certify that the prospective provider would be able to "effectively and efficiently" operate the program and that the plan of operation is suitable to meet the needs of transition age foster youth and maintain case-manager-to-youth participant ratios of one to twelve.

207. THPP-NMD providers' policies, procedures, and day-to-day operations are heavily regulated at the State and County level. To obtain and maintain licensure,

---

[21] Cal. Health & Safety Codes § 1559.110(b)-(c).

[22] *See* Cal. Welf. & Inst. Code § 16522.1(a)(2).

[23] Cal. Health & Safety Code § 1559.110(d)(1)-(3).

[24] Cal. Welf. & Inst. Code § 16522.1(c).

providers must adhere to CDSS's Interim Licensing Standards.[25] The Interim Licensing Standards govern all aspects of providers' operations, including record maintenance; procedures for assessment, selection, removal and discharge of program participants; safeguarding program participants' valuables; transportation of program participants; food services; occupancy limits for bedrooms; and even the provision of bed linens to program participants.

208. In addition to the requirements of the Interim Licensing Standards, THPP-NMD providers' operations are regulated through the providers' contracts with Los Angeles County and the requirements of DCFS's certification process for providers. DCFS and its providers have undertaken a deeply intertwined process of selecting youth whom DCFS and its providers deem appropriate for THPP-NMD placements, providing placement to those youth, and, in many cases, refusing placements for other youth deemed unsuitable or involuntarily discharging youth from their placement. For example, DCFS pre-selects which transition age foster youth apply for the THPP-NMD program and helps prepare and submit their applications to the providers. DCFS convenes regular meetings with its contracted THPP-NMD providers to discuss operational issues and challenges that arise in the context of providing placement to transition age foster youth. Prior to discharging a program participant, the providers inform DCFS staff of the decision, and DCFS and the provider work together to decide on the discharge plan and timeline.

#### *2. Resource Family Homes Are the Primary Placement Option for Transition Age Foster Youth Ages Sixteen and Seventeen, Including Youth with Mental Health Disabilities.*

---

[25] CDSS Interim Licensing Standards for Nonminor Dependents in Foster Care (AB 12), Transitional Housing Placement Programs, Ver. 2, /https://www.cdss.ca.gov/Portals/9/CCL/Childrens-Residential-Licensing/ILS/AB12-THPP-ILSVer2.pdf?ver=2021-11-04-122728-973 (retrieved 8/19/23).

209. Transition age foster youth ages sixteen and seventeen are not eligible for SILP and THPP-NMD programs. Although CDSS has created a Transitional Housing Placement Program ("THPP") for foster youth ages sixteen and seventeen, DCFS does not presently contract with any THPP providers or offer any county-run THPP placements. Therefore, this placement option is foreclosed to sixteen- and seventeen-year-old transition age foster youth in Los Angeles County.

210. The primary placement options available to sixteen and seventeen-year-old foster youth in Los Angeles County is the Resource Family Home (formerly referred to as "foster homes"). Resource Families include relatives, non-related extended family members, and foster families licensed by both DCFS and foster family agencies.

211. Like NMDs, sixteen- and seventeen-year-olds who have mental health disabilities do not have access to a minimally adequate array of safe and appropriate placements. If they need more support than what can be provided by a resource parent and outpatient services, their only real placement option is STRTP, which may be overly restrictive for many youth and which is not meant to be a long-term placement option.

**B. DCFS's Placement Options for Transition Age Youth with Mental Health Disabilities Are Scarce and Inadequate.**

212. Despite DCFS's duty to provide a minimally adequate array of safe and appropriate placements for all transition age foster youth at all times, on information and belief, many youth with mental health disabilities languish waiting for placement, forcing them into homelessness for weeks—in some cases months—at a time.

213. Transition age foster youth encounter a number of barriers in accessing SILP as a placement option. First, transition age foster youth find it challenging to cover the cost of rent, food, transportation, utilities, and other basic expenses relying solely on the SILP rate. Further, transition age foster youth do not have adequate credit or income for most landlords to be willing to rent to them. In addition, the SILP

process is slow and cumbersome. DCFS generally takes at least sixty days to approve a SILP and to issue funding to a transition age foster youth.[26] Given this lengthy process, transition age foster youth cannot access SILP funds in time to pay a security deposit or their first month's rent, as would be required for most leased apartments. Therefore, unless transition age foster youth are able to identify a friend or relative who is willing to forego a security deposit, accept below-market rent, and wait two months to receive the first payment, the SILP option is foreclosed to them. Moreover, even when a youth finds a willing friend or relative, it is often not a safe and appropriate placement and merely a stopgap solution with little security and no services or support.

214. The other primary placement option is the THPP-NMD program. As with SILP, however, Defendants' actions and omissions have made THPP-NMDs inaccessible to many transition age foster youth, especially youth with mental health disabilities. On information and belief, the total number of available placements is far smaller than the number of foster youth for whom a THPP-NMD placement would be a safe and appropriate placement. Youth who cannot find a SILP, or youth who can find a SILP but for whom a SILP is not appropriate because they need a greater level of support in their placement, must wait indefinitely for a transitional housing program placement to become available. Due to DCFS's failure to develop a minimally adequate array of safe and appropriate THPP-NMD placements, Plaintiffs have struggled with homelessness, living in shelters, in cars, and on friends' couches for weeks at a time. They have experienced harm while living in unsafe and unsuitable settings while awaiting a safe and appropriate placement. Erykah B.'s experience as a victim of attempted sexual assault while left to live on the streets evidences the gravity of harms facing unhoused foster youth.

[26] Los Angeles County Child Welfare Policy: *Supervised Independent Living Placement* 0100-560.40 (Revision Date: 10/27/22).

215. CDSS also has created a placement option for foster youth with significant needs known as the Intensive Services Foster Care ("ISFC") program. However, on information and belief, DCFS has identified only a small number of ISFC providers, and therefore ISFC is unavailable to most of the transition age foster youth whose individual needs would be met by this placement option.

216. Although Los Angeles County has established a supportive housing program for young people with mental health disabilities ages eighteen through twenty-four, Los Angeles County has determined that foster youth with mental health disabilities are not eligible for this program. Defendants have not created a comparable placement option that would provide supportive housing for transition age foster youth with mental health disabilities. Consequently, Defendants thereby force class members into a Hobson's choice between the benefits and support of the extended foster care program (including placement, case management support from DCFS social workers, foster care funding, representation by a court-appointed attorney, and dependency court oversight of their case) or the Los Angeles County homeless services program. DCFS policy encourages social workers to direct youth to the supportive housing program for non-foster youth,[27] which require youth to close their foster care cases.

### C. When Transition Age Foster Youth Become Unhoused, DCFS Fails to Provide Shelter, Including Emergency Housing.

217. When a youth in foster care, including any transition age foster youth with mental health disabilities, loses their placement unexpectedly, DCFS must at minimum provide them with safe emergency housing to ensure that they do not experience homelessness while in care.[28]

---

[27] Los Angeles County Child Welfare Policy: *Transitional Housing Services* 0100-560.30 (Revision Date: 4/7/2017.

[28] Cal. Welf. & Inst. Code § 16001(a)(2).

218. The California Legislature authorized counties to approve "transitional living setting[s]" for transition age foster youth who are entering or reentering foster care or transitioning between placements.[29]

219. A Transitional Living Setting ("TLS") is an emergency, non-shelter setting for youth who have recently re-entered extended foster care or have experienced a placement disruption and need an alternative to homelessness.[30] Transition age foster youth who are placed in a TLS can receive a monthly payment equivalent to the SILP rate, which was one thousand one hundred and twenty-nine dollars ($1,129 U.S.D.) for fiscal year 2022/2023.[31] However, DCFS was slow to implement this program. According to data released by DCFS, between January 2021 and July 2023, DCFS provided direct TLS funding to only eleven transition age foster youth, and DCFS issued TLS funding for a hotel on behalf of one hundred and eight youth.

220. In addition, DCFS arbitrarily paid for hotel rooms for only seven days at a time although that timeline is not found in the statute. At the seven-day mark, DCFS often failed to reauthorize the funding or to find an alternative safe and appropriate placement for the youth. Moreover, this type of emergency housing is largely ad hoc, and the process takes too long to prevent homelessness when placement is disrupted.

221. DCFS's failure to gather meaningful data related to homelessness among transition age foster youth, including youth with mental health disabilities, has served as another barrier to creating sufficient emergency housing. DCFS has reported that it does not know how many nonminor dependents need emergency housing at a given time or whether DCFS has the capacity to meet those emergency housing needs. As a result, transition age foster youth with mental health disabilities and their families

---

[29] Cal. Welf. & Inst. Code § 11400(x)(4).

[30] *Id.*

[31] All County Letter 22-59, p. 5.

have had to resort to couch-surfing, vehicular homelessness, and sleeping in homeless shelters for weeks at a time. For youth like Junior R., the lack of safe emergency housing results in more trauma, worsening mental health, and disruption of their ability to obtain employment or attend school.

222. Rather than implementing the TLS program in a trauma-responsive manner, DCFS created a policy that unnecessarily places transition age foster youth at risk of physical and emotional harm. At the time the complaint was filed in August 2023, DCFS forced transition age foster youth and their social workers to prove that they had made exhaustive efforts to find a non-hotel emergency housing option before agreeing to pay for a hotel. In addition, DCFS's practice was to wait until the evening that a young person was to become unhoused before it agreed to place the youth at a hotel.[32] DCFS followed this practice even in situations where DCFS had had months of advance notice that a young person would lose their placement by a specific deadline. If all contracted hotel spaces were occupied, the DCFS social worker generally would instruct the youth to go to a shelter. For youth like Jackson K., this was an unreasonable, unsafe environment resulting in physical threats from other adult residents and property destruction. At one such shelter with no ASL interpreters on site, his only means of communication—his phone—was broken and his means of transportation—his bike—stolen. This practice unnecessarily caused transition age youth emotional harm and increased the likelihood that they will experience homelessness and its attendant health and safety risks.

223. In February 2024, after the original Complaint in this case challenged DCFS's emergency housing practices, CDSS found that DCFS was violating California law by using hotels as placements for foster youth in Los Angeles County. *See* 2/12/24 Notice of Operation in Violation of Law, from Kevin Gaines and Angie Schwartz of California Department of Social Services to Brandon Nichols, Director

[32] DCFS For Your Information No. 22-06 (REV), dated 3/11/22.

of DCFS. In June 2024, DCFS announced that it would no longer utilize hotels for NMDs. On information and belief, DCFS has not identified a substitute transitional living setting option to meet the emergency housing needs of pregnant and parenting youth, which disparately impacts pregnant and parenting youth with mental health disabilities. DCFS's policies and practices for meeting the emergency housing needs of transition age foster youth continue to be ad hoc, reactive, and inadequate.

224. If youth in foster care are not in an approved placement, they are deprived of foster care benefits. For example, youth who are unhoused cannot receive monthly SILP payments or infant supplement payments, even if the youth are otherwise eligible for these benefits. The destabilizing effects of these acute periods of homelessness often follow youth even after they have found a new placement. For example, because the only placement Rosie S. could find as a SILP was out of state, and because her Las Vegas placement was meant to be temporary while she waited for DCFS to find her a safe and appropriate placement appropriate to her needs in Los Angeles County, she was unable to obtain stable employment during the nine months she was in Las Vegas. Because DCFS delayed helping her transfer her Medicaid, she was unable to obtain vital health care services, like prenatal care. For Onyx G. and Junior R., their placement instability disrupted their ability to finish high school. For all Named Plaintiffs, placement instability has harmed their ability to create and sustain the supportive connections with others that are vital for their long-term wellbeing.

### D. Defendants Have Deliberately Ignored the Need to Evaluate and Expand the Number of Safe and Appropriate Placements and Emergency Housing Options.

225. On November 20, 2018, the Los Angeles County Board of Supervisors ("Board") unanimously passed a motion recognizing an "acute need for youth in extended foster care and youth exiting foster care to have access to housing

programs." In pertinent part, the motion required DCFS to report back within 90 days on available funding to increase the capacity of THPP-NMD by "at least 33%."[33]

226. When DCFS finally reported on available funding to increase placements in April 2019, it claimed that contracted providers "would be able to support a capacity increase" and "accommodate more youth." On information and belief, DCFS has failed to implement these needed capacity increases.

227. In December 2019, DCFS reported that it was adding ten beds to the existing five hundred and thirty-three (533) beds in the THPP-NMD program, a meager two percent (2%) increase. On March 3, 2020, DCFS reported that "THPP-NMD inventory remains unchanged since our last report" and admitted that "capacity building challenges" are a "standing agenda item."

228. Since March 3, 2020, DCFS has failed to report any further progress to the Board. On information and belief, the capacity of the THPP-NMD program has actually decreased during that period.

229. DCFS's failure to expand the capacity of the THPP-NMD program to the levels deemed necessary by the Board, despite the stated availability of both the funds and the contractor capacity to do so, shows a deliberate indifference to the reasonable safety and minimally adequate care to which the transition age foster youth in its care are entitled.

230. DCFS has also failed to collect the most basic data about whether it is meeting its obligations to provide safe and appropriate placements for transition age foster youth at all times. For instance, to this day, DCFS claims not to know or track how many transition age foster youth are waiting for a safe and appropriate placement.

231. Recognizing the need for data to ensure accountability and effective management, on November 20, 2018, the Board required DCFS to "report back within

[33] THPP-NMD was formerly known as Transitional Housing Program plus Foster Care, or "THP+FC".

180 days on implementing enhanced data collection and reporting for transition age foster youth housing programs, including establishing universal data elements and semi-annually reporting of key variables including the length of waitlists and time on waitlists," among other data. DCFS did not provide any of the requested waitlist data to the Board.

232. On information and belief, as of the date of this Second Amended Complaint, over five years after the Board recognized the acute shortage of placements for transition age foster youth and requested basic data about waitlists, DCFS still does not effectively track the transition age youth who applied for and are waiting to be placed with THPP-NMD providers.

233. As the Board recognized, without tracking basic information about waitlists, it is not possible to effectively manage placement programs for transition age foster youth and ensure that those programs are not a pipeline to homelessness. DCFS's failure to collect and report this data, along with its failure to provide for the basic human needs of transition age foster youth with disabilities, including shelter, medical care, and reasonable safety, shows its deliberate indifference to their constitutionally protected interests.

## VII. DEFENDANTS FAIL TO PROVIDE ADEQUATE NOTICE OF PLACEMENT DECISIONS OR THE PROCEDURES TO APPEAL A DENIAL OF OR DELAY IN PLACEMENT.

### A. Plaintiffs Have a Protectable Property Interest in a Foster Care Placement, Which DCFS Has No Discretion to Deny.

234. Transition age foster youth, including those with mental health disabilities, have a protectable property interest arising out of state law in a foster care placement benefit that includes housing and may include other supportive services. DCFS has no discretion to deny a foster care placement benefit to Plaintiffs.

235. All foster youth in California, including nonminor dependents, have enforceable rights including the right to live in a safe, healthy, and comfortable home.

WIC § 16001.9(a)(1); WIC § 303(e). Those rights further include the right "to be placed in the least restrictive setting possible" and "to have a placement that utilizes trauma-informed and evidence-based deescalation and intervention techniques." WIC §§ 16001.9(a)(4); 16501.1. *See also* CDSS All County Letter 19-105 at 2, 4 ("A placing agency has an obligation to offer the least-restrictive safe and appropriate available placement for an NMD, the same as is required for a minor in foster care."). Foster youth must have a case plan that, at a minimum, specifies the type of home in which the youth shall be placed, the safety of that home, and the appropriateness of that home to meet the youth's needs. WIC §11400(b). *See also* U.S.C. §§ 671(a)(16), 675(1)(A) ("case plan" must include a description of the type of home or institution in which a child is to be placed, including a discussion of the safety and appropriateness of the placement and how the state plans to carry out the placement of the child). Thus, while the least restrictive safe and appropriate placement will vary from youth to youth, foster youth have a right under state law to have a foster care placement at all times.[34]

236. Only licensed community care facilities, license-exempt facilities and settings, and Resource Family homes qualify as foster care placements under California law. That is why, for example, a hotel or motel does not qualify as a foster care placement, as CDSS has recently acknowledged. *See* 2/12/24 Notice of Operation in Violation of Law, from Kevin Gaines and Angie Schwartz of California Department of Social Services to Brandon Nichols, Director of DCFS (notifying DCFS of its violation of law through the use of hotels to house foster youth and stating that, "*Los Angeles County is required by law to place children only in licensed community care facilities, license-exempt facilities, and settings, or with resource families.*") (emphasis added.) Similarly, a shelter is not a foster care placement.

[34] *See also* statements of counsel for LA County, DCFS, and DMH during the hearing on their motion to dismiss the First Amended Complaint: "Plaintiffs have a right to a placement by statue [sic]." Tr. at 46: 3.

Transition aged foster youth who are, for example, housed in a hotel or referred to a shelter have been denied the foster care placement benefit to which they are legally entitled.

237. Placements that fall within the above categories of lawful foster care placements in California are Resource Family Homes, approved homes of relatives, licensed homes of nonrelative extended family members, Short Term Residential Therapeutic Programs, Intensive Services Foster Care, Supervised Independent Living Placements, Small Family Homes, licensed Transitional Housing Placement Programs for 16-8 year-olds, licensed Transitional Housing Placement Programs for Nonminor Dependents, Whole Family Foster homes, community care facilities licensed by Regional Center, and Tribally Approved homes. *See* Cal. Welf. & Inst. Code §§ 11400, 11402, 16522.1(a)(2); Cal. Health & Safety Code § 1502, 1559.110.

238. Child welfare agencies may only draw down foster care maintenance payments for licensed facilities, license-exempt facilities and settings, and Resource Family homes. California and federal law identify the types of placements and settings that may qualify for foster care funding. *See* WIC § 11402 (listing placement types eligible for foster care funding) § 11402.1 ("eligible for federal financial participation" means that the payment is consistent with an approved state plan under Sections 671 and following of Title 42 of the United States Code…"); 42 U.S.C. § 672 (b), (c) (federal foster care payments may be made only on behalf of a child or youth who is in a foster family home, a child-care institution, or removed pursuant to a voluntary placement agreement).

239. The right to a placement attaches immediately upon a nonminor dependent's entry or reentry into foster care and remains intact when a nonminor dependent loses or leaves placement. *See* CDSS All County Letter No. 19-105 ("Despite challenges that may arise when working with an NMD to meet their individual needs, *the placing agency must offer the NMD a safe and suitable placement that is immediately available to the NMD. The placing agency remains*

*responsible for ensuring that NMDs have access to a safe and suitable placement at all times*.") (emphasis added.)

240. At all times that Plaintiffs have been dependents of the Juvenile Court, DCFS was required to provide every Plaintiff at least one licensed facility, licensed-exempt facility or setting, or resource family home.

**B. The Deprivation of a Placement Constitutes a Grievous Loss for Transition Age Foster Youth with Mental Health Disabilities.**

241. In violation of its non-discretionary duties, DCFS denied Plaintiffs a foster care placement at various points while they were in foster care. The denial of placement constitutes a grievous loss for transition age foster youth with mental health disabilities because it causes homelessness and its attendant harms, or places them at grave risk of such harm.

242. For example, in July 2022, after surviving an attempted sexual assault in her foster home, Erykah B. fled the home to protect herself from further abuse and she became unhoused. She and her girlfriend slept outside for two weeks before securing a short term hotel stay. Although DCFS knew or should have known that Erykah B. was unhoused during this period, DCFS did not offer her an alternate placement. During the period she was unhoused, Erykah B. survived another attempted sexual assault.

243. In another example, Jackson K. was physically threatened, had his property stolen, and was exposed to violence and illicit drug use because DCFS left him in adult shelters rather than offering him a foster care placement when he reentered foster care at age 18.

244. Once DCFS fails to provide a placement, transition age foster youth are left in such volatile situations that even if they are not living on the street, they are at constant risk of ending up there. For example, after Ocean S. was discharged by a THPP-NMD provider in February 2023, DCFS failed to offer her a placement, and it took her three months to locate an apartment that could be approved as a SILP. During

that period, Ocean S. nearly lost her motel housing on several occasions because DCFS threatened to terminate the funding or failed to timely issue payments for the motel. Although Ocean S.'s attorneys successfully advocated for DCFS to continue the motel funding until she found an apartment, DCFS' inadequate transition planning and lack of placements placed Ocean S. at constant risk of homelessness.

245. Junior R. faced a similar situation after he was kicked out of his SILP placement and was residing in a motel. Although DCFS had several days of advance warning that Junior's motel vouchers were expiring soon, and even though DCFS represented to Junior R.'s attorneys that they would transport him from the motel to another appropriate housing option the morning his vouchers expired, no one from DCFS picked him up as promised. Instead, Junior R. waited outside of the motel with all of his belongings the entire day. That evening, and only after repeated requests from Junior R.'s attorneys to DCFS, DCFS transported Junior R. to a shelter, not to a placement. On information and belief, absent intervention by outside advocacy organizations, Junior R. would have ended up on the street.

### C. DCFS Has Failed to Create Adequate Processes to Notify Foster Youth of Placement Decisions or Procedures to Appeal Denials or Delays

246. Despite the gravity of the right at issue, Defendants have failed to create adequate procedures to notify foster youth with mental health disabilities of DCFS' placement decisions or the procedures to appeal a denial or delay of placement. In each situation in which DCFS failed to offer the Plaintiffs a placement after they became unhoused, DCFS also failed to provide adequate notice of this denial. Although DCFS social workers were aware that Ocean S., Erykah B., Junior R., Jackson K., Onyx G., Rosie S., and Monaie T. were in need of a placement, not a single Plaintiff received any adequate written notice from DCFS informing them what placement, if any, DCFS intended to offer them, when it would become available, or how to contest an unreasonable delay or a denial. Indeed, Defendants do not have

any processes in place for providing written notice to foster youth who are transitioning between placements or re-entering foster care of what placement DCFS intends to provide them. The only written notice that DCFS sometimes provides is when SILP funding has been approved.

247. If transition age foster youth seeking placement are notified that DCFS is not able to offer them a placement, it happens verbally through their social worker, without any explanation that the foster youth has been denied a benefit to which they are legally entitled, or any explanation regarding a process for contesting or appealing that denial. Because of the lack of safeguards relating to a denial of placement, foster youths' attorneys often do not learn that their clients have been denied placement until days or weeks after this occurs. Youth and their counsel are in the dark regarding whether they have been denied a placement and for how long they will need to remain without one.

248. This lack of due process deprives transition age foster youth, including those with mental health disabilities, of their opportunity to assert before a neutral arbiter that DCFS has wrongfully denied them a placement. It also prolongs transition age foster youth's homelessness, makes it more challenging to identify emergency housing options for them because it is unclear what services they qualify for or for how long they will need them, and places them at greater risk of harm. Defendants' failure to create adequate processes regarding their placement decisions and the denial of placement also unjustly shields Defendants from the consequences of their violations of law. And the lack of adequate process can also cause loss of benefits when a youth is not timely notified about placements that *are* available.

249. These due process violations have injured Plaintiffs. For example, over an approximately five-month period during which he was residing in shelters and motels, Jackson K. did not receive adequate notice that he was being denied the placement benefit to which he was entitled, or of his right to challenge whether DCFS had met its duty to provide him with a placement. After Rosie S. re-entered foster

care as a nonminor dependent and struggled to find a placement, she was not adequately informed of DCFS's placement decision and that she could contest DCFS's decision not to provide her a placement. Faced with a complete lack of information regarding if or when DCFS would offer her a placement, she had no choice but to start trying to find her own placement, even looking for placement in other states. Even after she moved to Las Vegas, Defendants' inadequate notice procedures deprived her of the opportunity to find a placement in Los Angeles. She prepared applications to THPP-NMD while she was unhoused, only to learn that DCFS never submitted them. They finally did so, but told her there were no openings for parenting youth. Rosie S. then spent months in limbo, with no waitlist procedures, no notices of denials, and no opportunity to contest any denials.

250. While Junior R. resided in motels and couch surfed with his grandmother, DCFS did not provide him or his attorneys with adequate notice of its placement decision, or inform him that he had the right to challenge whether DCFS had met its legal responsibility to provide him with a placement, prolonging his period of extreme housing instability and making it more difficult to connect to supportive services.

251. When Erykah B. was unhoused and seeking a placement in the summer of 2022, DCFS failed to adequately inform her what placement they were offering her, if any, or when it would become available. Faced with such uncertainty about whether DCFS would meet its legal obligation to place her, she felt that she had no choice but to move into a sober living facility her sister identified for her, although it did not meet her needs. As with Rosie S., DCFS' inadequate notice procedures resulted in the loss of a chance to move into a THPP-NMD placement and prolonged her housing instability.

252. When Ocean S. was pushed out of her THPP-NMD placement and was residing in a motel for months, DCFS failed to provide her and her attorney with adequate notice of their placement decision or adequately inform her of the right to

challenge whether DCFS had met its placement obligations to her. When Monaie T. was unhoused after being discharged from an STRTP in spring of 2021 and again after being discharged from her SILP in 2022, she did not receive adequate notice of how to challenge the denial of or delay in placement. When Onyx G. was unhoused after she left an STRTP based on her safety concerns, she was not adequately notified that she could challenge DCFS' failure to provide her with a new placement.

### D. Defendants Must Institute Procedures to Ensure that Youth Receive Adequate Notice of Placement Determinations and How to Appeal Them

253. Recipients of protected property benefits have a due process right to timely and adequate notice detailing an agency decision regarding their benefit, including the reasons for a proposed denial of benefits, and informing recipients of their right to contest the decision before an impartial decision maker. Because Defendants' current procedures do not provide this basic protection, transition age foster youth, including those with mental health disabilities, are regularly deprived of their right to placement benefits without due process.

254. To remedy these constitutional deficiencies, Defendants must implement a process by which they provide foster youth who are without a placement and their counsel adequate notice of whether and when DCFS will provide a placement and what placement is being offered. If DCFS is unable or unwilling to offer an immediate placement, it must inform youth of this determination and the procedures available to youth to challenge this decision.

255. To be adequate, the notice must be timely; DCFS must provide written notice within twenty-four hours of learning that a foster youth is without a placement. The notice must clearly inform the youth of the placement being offered and when it will become available to them. If a placement is not immediately available at the time the notice is issued, the notice must indicate what safe emergency housing options DCFS is providing in the interim and when a placement will be provided to the youth.

Furthermore, the notice must inform the youth of their right to contest the denial or unreasonable delay of placement and the procedure(s) for doing so.

256. If the placement being offered is administered through a third party provider such as a THPP-NMD provider with its own application process, DCFS also must provide timely written notice to the youth of the submission of any applications made on the youth's behalf and the results of those applications, including the reasons for denial.

257. These procedures will create transparency that will help youth, including youth with mental health disabilities, to better understand their rights and exercise them, mitigating or avoiding erroneous denials of placement. It will require DCFS to identify the processes for challenging the denial of placement. It will incentive DCFS to respond more rapidly to situations where youth are unhoused and to take prompt action to identify a placement. It will provide the opportunity for a measure of accountability in cases where DCFS fails to meet its legal obligations to provide placement and care to the youth they are entrusted with serving, including those with mental health disabilities.

258. The balance of interests weighs in favor of requiring these changes to the notice process because it would require minimal administrative burden on Defendants. Because DCFS is already required to maintain timely data in its CWS-CMS system regarding what placement it offers foster youth and any changes to their placement, this information is readily available to them. Furthermore, for over a decade, Defendants have issued written notices (referred to as a "Notice of Action") to inform caregivers and foster youth of denials of or changes to monthly foster care payments. There is no logical or legal reason that foster youth should not be afforded a similar notice process with respect to their essential and non-discretionary right to a foster care placement.

## VIII. YOUTH LOSING THPP-NMD PLACEMENT BENEFITS RECEIVE LIMITED NOTICE AND LACK MEANINGFUL OPPORTUNITIES TO CONTEST THE DISCHARGE.

259. Transition age foster youth who are able to obtain a THPP-NMD placement can lose it quickly, especially those with mental health disabilities, with little to no meaningful process to be heard before or after the discharge. Because DCFS lacks sufficient emergency housing options for transition age foster youth, youth who are involuntarily discharged often face a grave risk of homelessness. Despite the grievous harm at issue, Defendants deprive transition age foster youth of any meaningful opportunity to challenge the loss of their placement benefit.

260. First, CDSS and DCFS policy do not provide youth with sufficient notice when a transition age foster youth is facing "push-out" from a THPP-NMD program. CDSS's THPP-NMD Interim Licensing Standards require that in non-emergency circumstances, a written notice must be given to the youth seven days prior to discharge, with a copy sent to the county placing agency.[35] The written notice must be based on a specific reason, including that the youth has reached the maximum age for THPP-NMD, that the THPP-NMD agency's license has changed, or (most commonly) that the THPP-NMD agency "is no longer able to meet the needs" of the nonminor dependent.[36]

261. Seven days is insufficient notice for transition age foster youth to meaningfully contest their discharge or for DCFS to arrange for alternative placement, particularly in light of the critical shortage of placements for transition age foster youth. By comparison, minors in any foster care placement are entitled to fourteen

---

[35] Interim Licensing Standards 86268.4(c)(1).

[36] Interim Licensing Standards 86268.4(c)(1)(B), (d)(4). For an emergency removal, no notice is required. Interim Licensing Standards 86268.4(b).

days' notice of any placement change.[37] Residents of licensed adult residential facilities receive up to thirty days' written notice.[38]

262. Second, the procedures that the Defendants created do not provide youth in THPP-NMD programs with a meaningful opportunity to be heard. The youth facing discharge may submit a complaint against the THPP-NMD program to CDSS's Community Care Licensing Division ("CCLD"). Upon receiving the complaint, CCLD must investigate the discharge.[39] On information and belief, however, youth are not given notice of this procedure. In Los Angeles County, youth discharged from THPP-NMD placement theoretically may submit a grievance or Advocacy Review to the THPP-NMD program or DCFS, respectively, but the written notices transition age foster youth receive, if any at all, do not explain that a grievance procedure is available.[40] For example, the THPP-NMD discharge notices issued to Jackson K., Junior R., and Ocean S. did not include information about how to contest the decision using the grievance process. Jackson K.'s three-day notice to vacate his THPP-NMD placement did not cite any program rules violated and noted that it was his responsibility to find a placement once he was discharged.

263. In addition to receiving inadequate notice of the termination of their placement benefit, Junior R., Ocean S., Rosie S., and Erykah B. were not afforded an adequate pre-deprivation process to contest the termination decision. Neither the CCLD complaint process nor the grievance procedure provide an opportunity for transition age foster youth who are discharged from a THPP-NMD to present their complaint in person or to have a neutral arbiter consider the evidence. Nor is there any mechanism to ensure that transition age foster youth remain housed while the

---

[37] Cal. Welf. & Inst. Code § 16010.7(e).

[38] 22 C.C.R. § 85068.5(a).

[39] Interim Licensing Standards 86268.4(e).

[40] THPP-NMD Statement of Work, section 10.4.6.1.

complaint or grievance is pending. To the contrary, the short notice period, lack of adequate notice of procedures to file a complaint or grievance, and lack of any mechanism to ensure that foster youth remain housed during any proceedings, mean that in practice foster youth are denied any pre-deprivation process for the loss of THPP-NMD placements.

264. Finally, once a transition age foster youth is discharged from a THPP-NMD, other THPP-NMD providers may rely on the prior discharge as a basis for denying the youth admission to their programs. Defendants do not afford youth any privacy regarding the circumstances of their discharge, and once a discharged youth applies to a new THPP-NMD program, the prospective program is able to obtain information from the previous provider and from the youth's own social worker about the reason for the discharge. For example, DCFS' decision to share information about the circumstances of Junior R.'s placement discharges with THPP-NMD providers when Junior R. was applying for THPP-NDM programs undoubtedly diminished his chances of being accepted into the programs and prolonged his period of homelessness. Thus, Defendants' denial of due process rights is compounded into loss of future placement benefits as well.

265. CDSS's Interim Licensing Standards provide that THPP-NMD programs may conduct a removal without *any* notice or opportunity for youth to be heard in "emergency" circumstances.[41] Such circumstances include when the youth must receive emergency medical or psychiatric care, or "when the health and safety of the nonminor dependent or others in the THPP is endangered by the continued presence of the nonminor dependent in the THPP."[42] Defendants have created a system that deprives transition age foster youth of any opportunity to contest whether the circumstances surrounding the discharge qualified as a true emergency or an

---

[41] Interim Licensing Standards 86268.4(b)(1).

[42] Interim Licensing Standards 86268.4(b)(2)(B).

otherwise valid basis for discharge. Foreseeably, the complete lack of due process associated with emergency discharges, combined with the fact that Defendants do not afford transition age foster youth the right to maintain their placement while DCFS attempts to locate an alternate placement for them, often results in homelessness for transition age foster youth.

266. In the absence of any meaningful procedural protections, many discharges are misclassified as "emergency" discharges in order to avoid even the minimal and inadequate notice and appeal procedures available for "ordinary" discharges. No accountability mechanism exists to prevent this abuse of "emergency" discharges. For example, the Plan of Operations for the licensed THPP-NMD provider Olive Crest states that the provider may discharge a resident through the "emergency removal" process and forego the seven days prior written notice requirement if the provider determines that they are no longer able to meet the needs of the resident. The Plan of Operations for the licensed THPP-NMD provider First Place for Youth states that youth discharged for violations of rules may be required to move within three days of the provider's discharge decision. Despite these violations of the meager protections set forth in the Interim Licensing Standards, CDSS renews the providers licenses annually and DCFS likewise renews their contracts annually. The policies and procedures for the licensed THPP-NMD provider St. Anne's Maternity Home states that a residents' "emergency medical or psychiatric care" may be grounds for an emergency removal. These "emergency" discharge decisions are inextricably intertwined with actions of Defendants. For example, each "Plan of Operations" under which these emergency discharges take place is submitted to Defendants and, on information and belief, Defendants can and do reverse the discharge decisions of their contracted THPP-NMD providers when they disagree with those decisions.

267. To remedy these constitutional deficiencies, Defendants must implement adequate pre-deprivation processes, including an adequate notice period (which may

be shortened but not eliminated in "emergency" circumstances), where the notice includes a meaningful explanation of how to contest the deprivation, and a fair pre-deprivation hearing before a neutral arbiter that includes a determination of whether the deprivation is warranted, as well as whether it in fact constitutes an "emergency" justifying a shortened notice period.

268. The balance of interests weighs in favor of requiring these changes to the notice process because it would require minimal administrative burden on Defendants. For example, CDSS already has administrative hearings available, to challenge SILP denials, as well as, in theory, post-deprivation denials of THPP-NMD benefits. It would not be unduly burdensome to use the same administrative resources to afford fair pre-deprivation hearings to transition-aged youth being pushed out of THPP-NMD placements, particularly if the THPP-NMD were required to provide a sufficient notice period. Any additional administrative burden would be greatly outweighed by the reduced risk of housing instability and homelessness that these notice process changes would provide to the putative class of disabled foster youth.

## IX. DEFENDANTS DISCRIMINATE AGAINST TRANSITION AGE FOSTER YOUTH WITH MENTAL HEALTH DISABILITIES.

269. Defendants are well aware that many transition age foster youth have mental health disabilities, including impairments associated with complex trauma that substantially limit one or more major life activity. The ADA and Section 504 impose affirmative duties on Defendants to provide meaningful access to their services and programs to transition age foster youth with mental health disabilities. Defendants have gone in the opposite direction: they have erected burdensome, arbitrary, and discriminatory barriers for transition age foster youth with mental health disabilities.

270. All transition age foster youth with mental health disabilities, including complex trauma, are otherwise qualified to participate in California's foster care

system[43] and Medicaid program. Defendants' programs receive financial assistance, including federal funds, and are public entities. Members of the General Class have been subjected to unlawful disability discrimination.

**A. Youth with Mental Health Conditions Which Substantially Limit One or More Major Life Activity are Protected from Discrimination on the Basis of Disability.**

271. Many transition age foster youth experience complex trauma that is related to their exposure to traumatic events; complex trauma that substantially limits one or more major life activities is a protected disability. It is all too common for transition age foster youth to have experienced and continue to experience traumatic events that profoundly affect their psychological, emotional, and physical well-being. Before and after placement in foster care, they may have experienced physical, emotional, or sexual abuse; emotional or physical neglect; homelessness; the death, incarceration, or deportation of a parent; domestic violence; parental substance abuse or mental illness; and/or maltreatment while in foster care. The trauma of abuse, abandonment, neglect, and instability is often compounded by unfair treatment and discrimination due to their race or ethnicity, sexual orientation, or gender identity, as well as extreme poverty and other socioeconomic hardship.

272. Although even a single traumatic event can impair a young person's mental health, for transition age foster youth these events often do not take place in isolation. Too often, transition age youth in foster care are subjected to multiple, repeated, and sustained traumatic experiences. The trauma they experienced with their families, including the harm of being separated from their families, is compounded by their experiences in foster care, which consists of unstable and unsafe

[43] Transition age foster youth whose verified medical conditions prevent them from being able to work, participate in secondary education, or participate in a program designed to remove employment barriers are nonetheless eligible for extended foster care. Cal. Welf. & Inst. Code § 11403(b).

placements, separation from their siblings or their own children, and lack of appropriate treatment and services.

273. Many transition age foster youth experience complex trauma, a term that describes children's exposure to multiple traumatic events, often interpersonal in nature, as well as the wide-ranging and long-term impacts of this exposure. The effects of complex trauma cause impairment that limits an individual's ability to perform major life activities, including without limitation sleeping, concentrating, long-term planning, and emotional self-regulation. Not only can complex trauma induce changes in the brain and impair cognition, learning, and social skills, it can manifest in diagnoses like PTSD, depression, anxiety, and bipolar disorder.

274. The definition of "an individual with a disability" under the ADA and Section 504 includes someone who has "a physical or mental impairment that substantially limits one or more major life activities."[44] Under federal regulations, certain psychiatric diagnoses presumptively substantially limit major life activities.[45] Plaintiffs with mental health conditions which substantially limit one or more major life activities, including those with complex trauma, have mental impairments that also meet the definition of "individuals with disabilities" under federal anti-discrimination laws. Over sixty percent (60%) of transition age youth in foster care meet the criteria for at least one mental health disorder, and studies have observed PTSD in transition age foster youth at over twice the rate of transition age youth in the general population. The ADA and Section 504 protect transition age foster youth with mental health disabilities from discrimination on the basis of disability.

---

[44] 42 U.S.C. §§ 12102(1)(A), (2)(A).

[45] 29 C.F.R. § 1630.2(j)(3)(iii); *see* 42 U.S.C. § 12102(2)(B).

**B. DCFS's Placement Application Process Discriminates Based on Disability.**

275. Class members struggle to navigate DCFS's byzantine application processes for gaining access to least restrictive placements available to their non-disabled peers such as THPP-NMDs and SILPs. Already challenging for any youth, deciphering the intricacies of transition age foster youth placement options is particularly arduous for youth with mental health disabilities. Defendants' application process erects barriers for transition age foster youth with mental health disabilities to even apply to community-based placements that would allow them to live with their non-disabled peers.

276. Instead of giving transition age foster youth with mental health disabilities the program-wide supports and trauma-responsive accommodations they require to complete transitional placement applications, Defendants leave class members to navigate the process on their own, whether that requires decoding the alphabet soup of placement programs and application procedures or accomplishing predicate steps for program participation, like obtaining a state-issued ID and other vital documents. For any eighteen-year-old, this would be a tall order, but for one with a mental health disability, it may be insurmountable. The result is that transition age foster youth with mental health disabilities are systemically excluded from even applying to less restrictive programs like SILPs and THPP-NMD.

277. Defendants also fail to ensure that transition age foster youth with mental health disabilities can successfully transition to placements after their applications are submitted. For example, DCFS was late in submitting Rosie S.'s THPP-NMD applications. Even when applications are submitted, as in the case of Ocean S., at least one THPP-NMD required three denial letters from other transitional housing programs before accepting her and another THPP-NMD rejected Ocean S. because of lack of space for her and her daughter. Even after being accepted into the THPP-

NMD, Ocean S.'s DCFS case worker did not properly provide her with documentation to leave her STRTP placement.

278. In addition, youth with mental health disabilities are often excluded from accessing THPP-NMD because intake policies adopted by Defendants allow, and even encourage, THPP-NMD programs to refuse to serve foster youth based on their disabilities.

279. First, DCFS train their staff considering eligibility for THPP-NMD programs to screen out transition age foster youth with mental health disabilities who report mental health diagnoses or display behaviors consistent with trauma. As a result, evidence of a mental health disability is functionally a basis for denial of less restrictive placement.

280. Second, Defendants have established policies that encourage disability discrimination by transitional placement providers. CDSS's THPP-NMD Interim Licensing Standards allow THPP-NMD programs substantial access to youth's medical and mental health history for use in a "Pre-Placement Appraisal." Yet, after DCFS social workers have supplied THPP-NMD providers with medical information regarding the NMD applicant, Defendants place no legally-required guard rails on how the disability can be used to assess suitability for THPP-NMD. For example, based on CDSS's THPP-NMD Interim Licensing Standards, Defendants' providers are not prohibited from denying an application based on the fact that the youth has been prescribed psychotropic medication. Defendants all but encourage THPP-NMD providers to identify class members with actual or perceived disabilities and thereby exclude them from a less restrictive placement option.

281. For example, Onyx G. is at serious risk of being excluded from less restrictive placement options due to her mental health disability. Onyx G. has been diagnosed with anxiety, Major Depressive Disorder, and Disruptive Mood Dysregulation Disorder, and she has struggled with self-harming behavior. While in DCFS custody, Onyx G. bounced through several STRTPs that did not meet her

needs, including a lack of intensive, trauma-responsive behavioral health services. Under DCFS's current procedures, Onyx G.'s history of mental and behavioral health needs will be disclosed to prospective providers. Providers have denied applications because the transition age foster youth disclosed a history of suicidal ideation, no matter how far in the distant past, which providers presume creates a per se safety risk for the applicant and other program residents, again in lieu of required assessment of reasonable accommodation. She will likely be labeled "higher need," and risks being denied participation in a THPP-NMD program, rather than being provided with the legally-required, individualized assessment of whether she can participate with reasonable accommodations.

282. Additionally, Defendants' procedures do not allow transition age foster youth with mental health disabilities the opportunity to dispute a provider's interpretation of their needs and are not designed to allow youth to request a reasonable accommodation to enable them to fully access and benefit from the placements available to their non-disabled peers despite their disability. Jackson K., for instance, learned of several denials by THPP-NMD programs but had no opportunity to present his application or respond, let alone discuss reasonable accommodations that would allow him to succeed in the placement programs.

283. DCFS does not have a reliable system to provide, or require THPP-NMD programs to provide, reasonable accommodations or help the transition age foster youth with mental health disabilities access individualized and developmentally appropriate behavioral health services that would allow the youth to participate in THPP-NMD programs. For instance, when Junior R.'s THPP-NMD provider discharged him, DCFS did not have a process in place to ensure that Junior R. received appropriate services that could have stabilized the placement and allowed him to remain in the program.

284. Additionally, Defendants' design and administration of the SILP program discriminates against transition age foster youth with mental health

disabilities in much the same way. For example, due to Defendants' failure to assist with identifying and arranging SILPs, many class members are functionally foreclosed from SILPs because their mental health disabilities make it difficult to independently identify a potential SILP placement, let alone one that would meet DCFS and CDSS requirements. DMH does not have a functional process to provide needed Medicaid services that would help youth access the SILP program.

285. Moreover, even if a transition age foster youth with mental health disabilities is able to take the great initiative of identifying a SILP, those youth are at risk of significant placement instability because the SILP option does not include any supportive services. According to DCFS policy, a SILP is not appropriate for youth requiring "significant supportive services," or youth with high-risk mental/physical health needs. Yet, nearly half of transition age foster youth ages 18-21 reside in SILPs. On information and belief, many of the youth residing in SILP experience severe placement instability that could be mitigated if DMH provided needed Medicaid services to help youth maintain placement.

### C. Defendants Fail to Accommodate Youth with Mental Health Disabilities in Placements.

286. Even if transition age foster youth with mental health disabilities successfully obtain a THPP-NMD placement, Defendants' policies and practices prevent them from meaningfully accessing the benefits of Defendants' programs. Youth may be discharged for failure to maintain school enrollment, employment, or to meet other program participation requirements, regardless of how their disabilities impact their ability to meet this criteria.[46]

---

[46] Defendants' failure to ensure that transition age youth with disabilities are reasonably accommodated so they can meaningfully access the benefits of extended foster care not only violates the ADA and section 504, but it is contrary to the Housing First approach required under Cal. Welf. & Inst. Code §§ 8255; 8256, which mandates that all state funded or administered programs that provide housing or housing-related

287. Accommodating youth impacted by trauma requires trauma-responsive practice, including centering the youth's perspective and experiences, providing individualized treatment through a culturally-sensitive lens, and ensuring that program staff are trained in trauma-responsive care. Defendants' county-certified, State-licensed THPP-NMD providers routinely fail to accommodate the needs of youth impacted by trauma by putting youth in situations that exacerbate their trauma, establishing policies that frustrate recovery, and punishing manifestations of mental health impairments.

288. Transition age youth impacted by trauma need systems of support to develop positive relationships and support, yet most THPP-NMD programs certified by DCFS have restrictions that undermine youth's ability to develop and maintain connections to their support systems. Even though THPP-NMD programs are designed for young adults, they often have restrictive visitor policies that interfere with their ability to socialize with friends and peers and to arrange frequent visitation with their co-parent. And there is not a single licensed transitional housing program that contracts with Los Angeles County that allows a foster youth's non-participant partner or co-parent to reside in the placement.

289. Rather than requiring THPP-NMD programs to have an individualized planning process to determine how to support positive relationships for transition age youth with mental health disabilities and modifying visitor policies and other program rules as appropriate, DCFS allows programs to have blanket rules that preclude transition age youth from having normative relationship experiences available to other young adults. For many transition age youth with mental health disabilities, these

---

services adopt the core components of Housing First no later than 7/1/2019. Housing First is an evidence-based approach to addressing homelessness that provides or connects homeless individuals and families to permanent housing as quickly as possible without preconditions. In All County Letter No. 19-114 (12/13/19), CDSS advised all county welfare departments of their obligations to offer a Housing First model.

rules, applied without consideration of individualized need, negatively impair their ability to gain the skills they need to develop healthy relationships.

290. For transition age foster youth with mental health disabilities, including those impacted by complex trauma, it may often be difficult to plan their activities and socialization in a way that comports with program rules, or they may impulsively decide to engage in social activity that providers prohibit. A placement system that fails to encourage relationships but promotes unjustified isolation, actively punishing youth when they take steps to meet their needs for connection, and fails to offer them reasonable accommodations as needed, does not provide transition age youth with mental health disabilities equal access to DCFS's foster care placements.

291. In another example, most THPP-NMD programs house youth with roommates. DCFS is fully aware that roommate conflict is a primary reason for placement disruption for transition age foster youth with mental health disabilities. DCFS also knows that, for many transition age foster youth with mental health disabilities, their disabilities impair their ability to manage relationships with others and their trauma histories may include being harmed by people with whom they have lived. Because so many youth with mental health disabilities have been unsafe in prior placements, they have good reason to fear that any roommate conflict can escalate. Many transition age foster youth with mental health disabilities do not have the skills they need to navigate roommate conflict and need supportive services to be able to navigate issues with peers, including roommates. Without trauma responsive supports, they are often unable to meet program expectations, or may feel they need to leave their placements in order to be safe.

292. Additionally, youth, like Ocean S. and Erykah B. describe how program staff often enter their private spaces without notice. For most transition age foster youth with mental health disabilities, intrusion into their private space, especially an unannounced and unwanted entry, is an unsafe experience and underscores ways in which they lack control over their own environment. It would not fundamentally alter

the Defendants' programs to modify methods of monitoring youth or entering youth's private spaces and to require that these activities be done in a trauma-responsive, developmentally appropriate manner that protects the safety, privacy and independent needs of transition age foster youth with mental health disabilities.

293. When transition age foster youth with mental health disabilities are not able to obtain a placement in a THPP-NMD program, their other practical alternative is often to apply for a SILP, often with people they are related to or otherwise know. SILPs with family are often fragile because these relationships may be impacted not only by the needs of the transition age foster youth but also by intergenerational trauma impacting the entire family. SILPs with others may demand that youth with mental health disabilities interact regularly with persons who do not know or understand their individual needs. Transition age foster youth with mental health disabilities predictably need supports and services to manage these relationships. Yet, DMH does not make available trauma treatments that would help them develop strategies to be successful in SILP placements. DCFS routinely places youth in SILP placements without regard to the relationships in the living space and without implementing appropriate supports and services to stabilize the placement. For example, Junior R. specifically asked for help setting up expectations with his grandmother, which DCFS and DMH never provided. As Junior R. predicted, the result was conflict and threats of physical harm that forced Junior R. to leave the placement.

294. Defendants' policies and practices have excluded class members from participating in or retaining placements.

295. Defendants' policies and practices have excluded class members from participation in or retaining safe and appropriate placements. There are effective and reasonable modifications to Defendants' policies and practices that could be made to ensure that transition age foster youth with mental health disabilities are offered and provided trauma-responsive approaches and other related services needed to stabilize

their placements. These modifications would not fundamentally alter Defendants' programs.

**D. Youth with Mental Health Disabilities Are Pushed Out of DCFS Placement Because of Disability.**

296. When transition age youth with mental health disabilities do not receive or are excluded from placements, services, and supports based on their disability-related needs, their placements are predictably unstable. In transitional placement settings, for example, Defendants fail to ensure that THPP-NMD staff are able to properly respond to the disability-related needs of transition age foster youth with mental health disabilities.

297. Because THPP-NMD staff often lack training in trauma-responsive techniques or de-escalation tactics, they are not well-equipped to mediate disputes between youth with mental health disabilities living in group settings. These "roommate disputes" can lead to unlawful and involuntary exits.

298. Staff are ill-equipped to manage and ameliorate behavioral issues that stem from the compounded trauma so many transition age foster youth with mental health disabilities have experienced. Any behavior that providers deem to be a violation of the program's rules may lead to an involuntary exit. For example, a DCFS social worker threatened Jackson K. with eviction from his apartment and with homelessness for alleged noise complaints.

299. Relatedly, THPP-NMDs are often not equipped to properly manage the symptoms of mental health crises. Upon information and belief, rather than working with mobile crisis response services to help stabilize a dysregulated young person, THPP-NMD staff instead often call police unnecessarily to address mental health issues, resulting in youth with mental health disabilities being re-traumatized, involuntarily committed and/or incarcerated.

300. Youth with mental health disabilities who successfully obtain a THPP-NMD placement are often evicted or "pushed out" of these programs for behaviors related to their disabilities, a practice which State policies explicitly allow.[47]

301. CDSS policy enumerates grounds for removal and discharge that discriminate against individuals with disabilities. For example, CDSS's Interim Licensing Standards for THPP-NMDs provide a "health and safety" basis for "emergency" removal when a youth participant is experiencing a behavioral or psychiatric crisis.

302. Moreover, CDSS's Interim Licensing Standards for THPP-NMDs allows programs to push out youth if the provider "is no longer able to meet the needs of the nonminor dependent, youth" when the youth's disabilities require accommodations that do not align with the THPP-NMD's programming and staffing. Defendants' policies jeopardize any sense of safety or stability for youth with mental health disabilities in foster care and instead encourage disability-based discrimination. Behavior that results from impaired emotional self-regulation and heightened sensitivities to stressors in the foster care environment—both symptoms of trauma—does not lead to trauma-responsive interventions or provision of needed Medicaid services, but rather involuntary and unlawful discharges from the placements that took the youth so long to obtain. For example, Onyx G. and Junior R. were both denied placements because of perceptions of their behavioral records. Erykah B. and Jackson K. have both been villainized as poorly behaved, with no recognition of the ways their behavioral problems are naturally emergent responses to the trauma and instability they've experienced.

303. There are effective and reasonable modifications the Defendants could implement that would create appropriate supports for transition age foster youth with mental health disabilities across the foster care placement continuum and allow class

[47] Interim Licensing Standards 86268.4(b)(2), (c)(1)(B).

members to enjoy the benefits of Defendants' placements and services. Examples include trauma-responsive training for Defendants' and their contractors' staff; trauma-responsive interventions and dispute resolution processes to enable youth with mental health disabilities to remain in placements at all times; individualized planning; mandatory convening of a CFT meeting prior to any discharge; and trauma-responsive methods of connecting youth to services; and provision of needed Medicaid services.

### E. Defendants Unlawfully Institutionalize and Segregate Youth with Mental Health Disabilities by Warehousing Them in STRTPs.

304. Defendants route many transition age foster youth with mental health disabilities into segregated, overly-restrictive institutional settings even though they are eligible for less-restrictive and more integrated placement options, they could be better served in these less restrictive and more integrated placement options, and they do not oppose being served in these community-based non-institutional settings.

305. Government agencies, including the Department of Justice and Health and Human Services agency, have distinguished integrated settings from segregated settings that have qualities of an institutional nature, and found that congregate care is virtually never the most appropriate long-term setting for children.[48] [49] By contrast,

---

[48] *See* U.S. Dep't of Justice Civil Rights Division, *Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C.* (June 22, 2011), http://www.ada.gov/olmstead/q&a_olmstead.htm (explaining segregated settings include (1) congregate settings populated exclusively or primarily with individuals with disabilities; (2) congregate settings characterized by regimentation in daily activities, lack of privacy or autonomy, policies limiting visitors, or limits on individuals' ability to engage freely in community activities and to manage their own activities of daily living; or (3) settings that provide for daytime activities primarily with other individuals with disabilities.)

[49] Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 40066, 40106 (May 9, 2024) ("[A]ll

the most integrated setting appropriate for children with disabilities is almost always the family home, family foster care, or other community-based settings.

306. Segregated settings such as congregate care have the highest rates of re-entry into institutions when compared to less restrictive placements.[50] Congregate care does not generally enhance or improve child development, stability, and long-term outcomes.[51] Instead, segregated settings negatively impact youths' social development by reducing their ability to navigate essential aspects of adolescence and increasing their likelihood of experiencing harm.[52]

307. Upon information and belief, DCFS places transition age foster youth with mental health disabilities eligible for SILP and THPP-NMD into STRTPs, which evolved from what formerly were known as "group homes." These programs are far more restrictive environments than the apartments or other homes in which transition age foster youth with mental health disabilities could otherwise live. STRTPs impose strict rules on their residents, including 24/7 supervision; exclusion in an unlocked living, sleeping, or recreation area as a form of discipline; curfews; locked doors that prevent youth from leaving; visitor rules; and restrictions on telephone and internet-enabled device usage.

---

children with disabilities in foster care are entitled to receive services in the most integrated settings appropriate to their needs, and congregate care is virtually never the most appropriate long-term setting for children.")

[50] Richard P. Barth, *Institutions vs. Foster Homes: The Empirical Base for a Century of Action*, Jordan Inst. For Fams., Sch. Soc. Work, Univ. N.C. Chapel Hill 16 (June 17, 2002), https://ahum.assembly.ca.gov/sites/ahum.assembly.ca.gov/files/hearings/062811-BarthInstitutionsvFosterHomes.pdf.

[51] *Id.* at 25.

[52] Mary Dozier et al., *Consensus Statement on Group Care for Children and Adolescents: A Statement of Policy of the American Orthopsychiatric Association*, 84 A.M. J. of Orthopsychiatry 219, 223 (2014).

308. Although youth are only supposed to stay in STRTPs for a limited period until they can be transitioned to a less restrictive environment, DCFS' denial of SILP and THPP-NMD placements to youth on the basis of their mental health disabilities forces transition age foster youth with mental health disabilities to stay far longer in these institutional and congregate care settings than they want or than is appropriate based on their needs.

309. As a result, DCFS cycles youth with mental health disabilities through restrictive placements for unnecessarily long periods of time, leading to segregation from their community. For example, Onyx G. moved from one STRTP to a homeless shelter to another STRTP, Ocean S. was moved through multiple STRTPs with occasional placement in emergency shelters, and Junior R. moved between five different residential STRTP facilities.

310. In addition, DMH's failure to provide community-based behavioral health services through Medicaid is a major contributor to institutionalization. *See* Section VII, *infra*. In particular, DMH's untimely and inadequate provision of intensive behavioral health services unique to the needs of the individual youth with mental health disabilities and complex trauma harms youth like Onyx G. and Junior R., who were subjected to psychiatric hospitalization rather than trauma-informed crisis response.

311. DMH and DCFS also fail to ensure continuity of behavioral health care upon discharge from STRTPs, setting youth up for failures to reintegrate into the community and high risk of return to institutionalization. For example, Monaie T. was not connected with needed intensive behavioral health services, resulting in her entry into an STRTP in order to finally receive any mental health support. Similarly, DMH failed to ensure that Junior R. remain connected to behavioral health services upon his exit from an STRTP, leading to mental health crises that resulted in psychiatric hospitalizations.

312. DMH's failure to provide appropriate case planning such as Intensive Care Coordination, further prevents youth with mental health disabilities from receiving the care they need to succeed in foster care, subjecting them to serious risk of segregation and often even effectively pushing them into more restrictive placement than necessary. For example, Onyx G. was cycled through multiple STRTPs and approximately 20 hospitalizations, but each time she was discharged from an institution, DMH failed to provide her with consistent case management such as Intensive Care Coordination.

313. Defendants' unlawful policies result in the institutionalization and confinement of transition age foster youth with mental health disabilities in overly-restrictive settings in another way: by pushing them to homelessness. For example, Defendants discharged Monaie T. from her STRTP without adequate supports or placements, leading her to become homeless in 2021.

314. Transition age youth who are homeless too often cycle between homelessness and incarceration. Incarceration in the County's jails and juvenile halls, notorious for their deplorable treatment of the mentally ill, is a particularly pernicious form of institutionalization that retraumatizes those already suffering from complex trauma; blocks their integration into the County's economic, social, civic, political, educational, employment, and familial communities; and perpetuates unwarranted assumptions that disabled individuals are unable to and should not be permitted to participate in these essential aspects of community life.

315. Once released from incarceration and cycled back out onto the County's sidewalks and into homeless encampments, transition age foster youth with mental health disabilities experience segregation and isolation, risking yet further trauma, amplified impairment, and a heightened risk of further institutionalization in the County's jails. With the heightened stressors inherent in being unhoused, it is even more challenging for transition age foster youth with mental health disabilities to restart the obstacle-filled process of applying for a placement.

316. Transition age foster youth with mental health disabilities who experience homelessness are also subjected to isolation from mainstream society. On information and belief, class members experiencing homelessness would accept safe and appropriate placements in the most integrated, least restrictive environment based on their needs if Defendants offered them.

## X. TRANSITION AGE FOSTER YOUTH WITH MENTAL HEALTH DISABILITIES ARE BEING DENIED NECESSARY BEHAVIORAL HEALTH SERVICES.

317. Developing a minimally adequate array of safe and appropriate placements for transition age foster youth is impossible without the benefits of California's Medicaid program. Transition age foster youth desperately need—and are legally entitled to—necessary behavioral health services. Such services enable them to maintain stable housing, accommodate for disabilities, and reduce their risk of institutionalization.

318. The majority of foster youth will require behavioral health services at some point in their life as a result of the trauma they have experienced both before and during their time in care. The National Foster Youth Institute (NFYI), launched by City of Los Angeles Mayor Karen Bass, has indicated that 80% of children and youth that enter foster care have a serious mental health need.

319. When these behavioral health needs are not met, it also prevents youth from receiving and maintaining needed housing. LA County's Board of Supervisors has noted that "[b]oth the unhoused and housed foster youth population may have mental health needs that could contribute to difficulty in finding stable housing."[53]

320. Yet, just as transition age foster youth are transitioning to adulthood and need increased support, they face tremendous obstacles accessing needed behavioral

[53] Kathryn Barger and Lindsey P. Horvath, "Stabilization Supports for Foster Youth" (May 21, 2024), https://file.lacounty.gov/SDSInter/bos/supdocs/191563.pdf.

health services and navigating the complex Medicaid system. Director Baas and DMH share responsibility for the failure to provide necessary Medicaid services to transition age foster youth with mental health disabilities.

### A. Transition Age Foster Youth with Mental Health Disabilities Are Entitled to Necessary EPSDT Services, Including Behavioral Health Services.

321. Virtually all transition age foster youth receive their health services, including behavioral health services, through Medi-Cal, California's Medicaid program. Medicaid is a cooperative federal and state funded program designed to provide medical and remedial services to low-income people under Title XIX of the Social Security Act.[54] States that choose to participate in the Medicaid program and receive federal funding must adhere to the minimum federal requirements set forth in the Social Security Act and its implementing regulations.

322. Federal law requires California, as a state participating in Medicaid, to cover certain mandatory services, including Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") services for Medicaid-eligible youth participants under the age of 21.[55] Under the EPSDT provisions, states are required to provide screenings to identify transition age foster youth's mental and physical health needs, as well as arrange for treatment services necessary to correct or ameliorate a youth's mental or physical health conditions.[56]

323. Medicaid-eligible children are entitled to a broader set of services than Medicaid-eligible adults. A state that participates in Medicaid must submit and have approved by the Secretary of Health and Human Services a state plan for medical assistance, that describes what medical services it intends to provide. 42 U.S.C.

---

[54] 42 U.S.C. § 1396.

[55] 42 U.S.C. § 1396a(a).

[56] 42 U.S.C. §§ 1396a(a)(10)(A); 1396a(a)(43)(C); 1396d(a)(4)(B); 1396d(r)(1); 1396d(r)(5).

§ 1396a. However, when services are necessary to correct or ameliorate a child's mental or physical health condition, the state must provide them, *even if* they are not otherwise included in the state plan, as long as they fall within service categories listed in 1396d(a). 42 U.S.C. § 1396d(r)(5); 42 C.F.R. § 441.56(c). Specialty Mental Health Services all fall within 1396d(a) categories, specifically case management services, 42 U.S.C. §§ 1396d(a)(19), 1396n(g), and rehabilitative services, 42 U.S.C. § 1396d(a)(13), 42 U.S.C. § 1396d(a)(13)(C).

324. A state participating in Medicaid must designate a single state agency that is responsible for ensuring that the state's Medicaid program complies with all federal requirements. *See* 42 U.S.C. § 1396(a)(5); 42 C.F.R. § 431.10.

325. DHCS is California's single state Medicaid agency and is responsible for administering Medicaid in California.[57] DHCS administers the EPSDT behavioral health services entitlement to youth primarily through two complicated parallel systems. County Mental Health Plans are responsible for providing a set of more intensive behavioral health services called Specialty Mental Health Services ("SMHS") under the authority of a section 1915(b) waiver approved by the Centers for Medicare & Medicaid Services. Medi-Cal Managed Care Plans, or fee for service providers for youth not enrolled in managed care, are responsible for providing so-called non-Specialty Mental Health Services. Although states may contract out the delivery of services, the single state agency retains responsibility for ensuring compliance with Medicaid requirements, including the EPSDT mandates.[58]

326. DMH is the Los Angeles County agency responsible for providing or arranging for the provision of Specialty Mental Health Services for Medi-Cal beneficiaries, including transition age foster youth. These services are "carved out"

[57] *See* 42 U.S.C. § 1396(a)(5); 42 C.F.R. § 431.10.

[58] 42 U.S.C. §§ 1396a(a)(5); 1396a(a)(43); 1396u-2.

of the Medicaid services otherwise provided by DHCS, and are provided through the Los Angeles County Mental Health Plan.

327. Transition age foster youth are eligible for a variety of necessary Specialty Mental Health Services, including Intensive Care Coordination, therapeutic foster care, Intensive Home-Based Services ("IHBS"), peer support specialists, and crisis services.

328. Effective January 1, 2022, all foster youth under age 21 are automatically entitled to necessary SMHS, because California's access criteria assumes they are at "high risk for a mental health disorder due to trauma evidenced by [among other things] involvement in the child welfare system, juvenile justice involvement, or experiencing homelessness." Cal. Welf. & Inst. Code § 14184.402(c).[59]

329. Two Specialty Mental Health Services are particularly critical, and particularly lacking, in ensuring foster youth achieve and maintain safe and appropriate housing – Intensive Care Coordination and Mobile Crisis Response.

330. Intensive Care Coordination is a targeted and intensive case management service that facilitates the assessment of, care planning for, and coordination of behavioral health services, and includes formal and informal supports and team planning. As described by the Center for Medicaid Services ("CMS"), the federal agency that oversees the Medicaid program, Intensive Care Coordination is a "team-based, collaborative process" that helps to coordinate services across a variety of providers and systems, including behavioral health, but also the disability, education, juvenile justice, or other supportive systems. For this reason, Intensive Care Coordination is particularly necessary to meet the needs of youth with complex behavioral health needs – such as Plaintiffs here. Intensive care coordination is a

---

[59] *See also* Cal. Dep't of Health Care Servs., Behavioral Health Information Notice No. 21-073 (Dec. 10, 2021), https://www.dhcs.ca.gov/ Documents/BHIN-21-073-Criteria-for-Benefciary-to-Specialty-MHS-MedicalNecessity-and-Other-Coverage-Req.pdf [hereinafter BHIN 21-073].

covered service under Medicaid, which uses the terms "case management" and "targeted case management" to refer to care coordination services. *See* 42 U.S.C. §§ 1396d(a)(19), 1396n(g)(2); 42 C.F.R. §§ 440.169, 441.18.

331. Mobile Crisis Response services provide community-based rapid response, individual assessment and community-based stabilization. These services are intended to reduce the immediate risk of danger and avoid unnecessary psychiatric hospitalization or law enforcement involvement. Mobile Crisis Response services should be available twenty-four hours a day and provided in any setting where a crisis may be occurring, including the child's home or in the community. The Center for Medicaid Services has indicated that, "[m]obile crisis response and stabilization services are instrumental in defusing and de-escalating difficult mental health situations and preventing unnecessary out-of-home placements." CMCS Bulletin. Mobile Crisis Response services are covered under Medicaid as rehabilitative services. *See* 42 U.S.C. § 1396d(a)(13); 42 C.F.R. § 440.130(d).

### B. Defendants Fail to Provide Transition Age Foster Youth with Mental Health Disabilities with Necessary Behavioral Health Services.[60]

332. Defendants fail to provide necessary behavioral health services to transition age foster youth who require them. This failure is reflected in both data and the Plaintiffs' lived experiences. Access to Medicaid behavioral health services is poor for all Los Angeles County foster youth, but especially dire for transition age foster youth over the age of eighteen. As recently as May 2024, the Los Angeles County Board of Supervisors indicated that foster youth in LA face significant challenges in accessing appropriate behavioral health services, and that "[c]urrent wait times [for behavioral health services]…can reach up to three months for [foster]

[60] 42 U.S.C. § 622; *see also* 42 U.S.C. § 675(1)(C).

youth who have already been traumatized."[61] These metrics are even worse for foster youth after they turn eighteen. DHCS' own data indicates that in Fiscal Year 2022 in Los Angeles County, while 65.3% of eligible foster children between the ages of 12-17 received Specialty Mental Health Services, only 40.66% of eligible foster youth between the ages of 18-20 received Specialty Mental Health Services.[62]

333. DHCS and DMH have particularly failed to provide transition age foster youth with mental health disabilities with Intensive Care Coordination services and Mobile Crisis Response services. For example, DHCS's own quality assurance review process revealed that DMH has systematically failed to provide Intensive Care Coordination services to youth who need such services. This quality assurance mechanism, called the "Triennial Review," is the process by which DHCS reviews and oversees each county Mental Health Plan (MHP) to determine compliance with federal and state regulations as well as the terms of the MHP contract. The review, conducted in September 2022, found that around a fifth of children whose files were reviewed were not even assessed as to whether or not they needed Intensive Care Coordination services.[63] Yet many of these youth, about half, "appear[ed] to have necessitated an individualized [Intensive Care Coordination] determination." Despite these concerning performance metrics, there is no indication that either DHCS or

---

[61] Kathryn Barger and Lindsey P. Horvath, "Stabilization Supports for Foster Youth" (May 21, 2024), https://file.lacounty.gov/SDSInter/bos/supdocs/191563.pdf.

[62] DHCS, Children And Youth In Foster Care Specialty Mental Health Services (SMHS) Performance Dashboard, https://behavioralhealth-data.dhcs.ca.gov/pages/f953faa802cf40d5b4d9b5780183fca4 (last accessed 7/31/2024)

[63] CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES, FISCAL YEAR 2021/2022 MEDI-CAL SPECIALTY MENTAL HEALTH SERVICES TRIENNIAL REVIEW OF THE LOS ANGELES COUNTY MENTAL HEALTH PLAN – CHART REVIEW FINDINGS REPORT 21-23 (2022), https://www.dhcs.ca.gov/Documents/Los-Angeles-System-Review-Findings-Report-FY-21-22.pdf.

DMH have improved the poor delivery of Intensive Care Coordination services in response to the 2022 Triennial Review.

334. Defendants' public data indicates that only 23.9% of Medi-Cal eligible children in Los Angeles County foster care received any Intensive Care Coordination services in fiscal year 2022.[64]

335. Likewise, Defendants' data indicates that there is a severe shortage of Mobile Crisis Response services in Los Angeles County. An April 2023 analysis of DMH data on the utilization of mobile crisis services, conducted by the LA Times, found that in more than 90% of cases, it took more than an hour for DMH's mobile crisis teams to respond to callers in need of emergency services.[65] In about half of cases, the Mobile Crisis Response team took more than four hours. In some cases, the team took days to respond. DMH officials themselves claimed they had insufficient staff to appropriately respond to the need for mobile crisis services.

336. Defendants' public data indicates only 6.4% of Medi-Cal eligible children in Los Angeles County foster care received any crisis intervention services in fiscal year 2022.[66]

337. Because of the failure by DMH to appropriately staff and build out the needed Mobile Crisis Response teams, a service DHCS and DMH are required to provide under their Medicaid obligations, other actors, including the City of Los Angeles and the LAPD have begun to build out their own crisis teams to try to fill the

---

[64] DHCS, Children And Youth In Foster Care Specialty Mental Health Services (SMHS) Performance Dashboard, https://behavioralhealth-data.dhcs.ca.gov/pages/f953faa802cf40d5b4d9b5780183fca4.

[65] Lila Seidman, "L.A. promised mental health crisis response without cops. Why isn't it happening?" (April 13, 2023), https://www.latimes.com/california/story/2023-04-13/988-hotline-mental-health-crisis-system-police#:~:text=On%20July%2015%2C%202022%2C%20one,day%2C%20the%20county%20statement%20said.&text=More%20than%20eight%20months%20later,hours%20for%20an%20emergency%20response.

[66] *Supra* at n. 64.

gap.[67] A Los Angeles City Council Member has indicated that "[w]hile it would be great for the county to step up and provide these roles and services in a comprehensive manner, we can no longer wait for [them to do so]."

338. DHCS and DMH's failures to provide necessary Intensive Care Coordination and Mobile Crisis Response services to transition age foster youth who require them is further reflected in the experiences of the Plaintiffs. Each member of the Medicaid subclass experienced crisis incidents that were not responded to by a mobile crisis team. For example, DMH failed to respond to Erykah B.'s self-harm and mental health crises, Jackson K.'s alleged threat of suicide, Junior R.'s panic attacks and subsequent suicidal ideation, or Monaie T.'s self-harm with appropriate mobile crisis services. Instead, in many instances Plaintiffs were responded to by the police or ended up hospitalized in the emergency room.

339. In addition, none of the Plaintiffs in the Medicaid subclass have consistently received Intensive Care Coordination, and some have never received it at all, despite the fact that the Plaintiffs' complex mental and behavioral health needs are exactly those for which Intensive Care Coordination is consistently found to be medically necessary. The delivery of Intensive Care Coordination services could have helped the Plaintiffs to access other needed behavioral health services, particularly as they bounced between unstable placements and homelessness, yet they were instead often left to navigate access to these services on their own, without support provided by DMH. For example, DMH never consistently provided Erykah B. with Intensive Care Coordination despite multiple recommendations by mental health professionals that she required such care coordination. Similarly, DMH never provided Onyx G. consistent Intensive Care Coordination, despite her continuous cycling between approximately 22 different psychiatric hospitalizations and multiple

---

[67] Robert Garrova, "What You Should Know About LA's New Unarmed Teams Responding To Mental Health Crises" (April 3, 2024), https://laist.com/news/health/la-unarmed-teams-mental-health-crises.

in-patient STRTP placements. This failure was particularly egregious on those occasions when Onyx G. was discharged to the community without Intensive Care Coordination in place to help connect her to community-based services, which could have helped her avoid re-entry into an institutional setting.

340. At a minimum, failure to provide these necessary behavioral health services resulted in worsening symptoms, harming youth who are entrusted to the County's care. But, over time, without access to these services, youth are cycled in and out of placements that do not meet their individual needs, funneled into overly restrictive settings, forced into dangerous situations while unhoused, and effectively abandoned by the system.

**C. Defendants Must Take Steps to Ensure Receipt of Behavioral Health Services.**

341. Despite the fact that Defendants have known for decades that foster youth with mental health disabilities, including transition age foster youth, need access to Medicaid behavioral health services, their efforts to provide such services have been woefully inadequate.

342. DMH has consistently failed to provide Plaintiffs with medically necessary Specialty Mental Health Services such as Intensive Care Coordination and Mobile Crisis Response services to which they are entitled, despite evidence demonstrating the deficiencies in DMH's provision of these services.

343. Director Baass has likewise failed to monitor and oversee DMH's provision of necessary Specialty Mental Health Services, including failing to conduct an adequate monitoring process, and failing to follow up on DHCS's limited monitoring processes when that review revealed failures and non-compliance on the part of DMH.

344. In addition, meeting the State's affirmative duty to provide timely Medicaid services to foster youth with mental health disabilities requires intra- and

inter-agency coordination, particularly for the provision of Intensive Care Coordination.

345. At present, insufficient coordination between all Defendants results in transition age foster youth with mental health disabilities falling through the cracks. Many transition age foster youth with mental health disabilities are still unable to access legally required and necessary Specialty Mental Health Services in the home and community.

## XI. THE INDIVIDUAL STATE DEFENDANTS HAVE PERSONAL KNOWLEDGE OF DEFENDANTS' FAILURE TO MEET THEIR LEGAL OBLIGATIONS TO TRANSITION AGE FOSTER YOUTH WITH MENTAL HEALTH DISABILITIES.

346. Defendants Johnson, Ghaly, and Baass are each personally aware of Defendants' failure to meet their legal obligations to TAY as evidenced by these individual State Defendants' publications and meeting transcripts which highlight the difficulties faced by TAY and the inadequacies of the support systems their agencies each provide to TAY.

347. For example, a January 2023 report entitled "AB 2083: Children and Youth System of CARE Legislative Report," which was co-authored by Defendant Ghaly, Defendant Baass, and Defendant Johnson, and Governor Newsom (among others), noted that "[g]aps exist in case coordination, preventative and upstream planning, transition planning, and cross-system competencies, which impact timely access to coordinated supports and services."

348. As council members and Council Co-Chair of the California Interagency Council on Homelessness, respectively, upon information and belief, Defendants Johnson, Baass, and Ghaly have extensively discussed the lack of permanent housing for TAY. The Council's 2022-2023 Action Plan—which was approved by all council members—highlights the need to "continue to offer Transition Housing Placements" for TAY who are 18-21 and to "continue to support THP-Plus" for TAY who are 18-

24, to assist in providing the “supports necessary to obtain more permanent housing.” Indeed, the Council identified the need for these “supports necessary to obtain more permanent housing for TAY” as one of the year’s “HIGHEST-PRIORITY ACTIVITIES FOR IMPLEMENTATION.”

349. Defendant Johnson has also attended numerous meetings with the California legislature in which Defendants’ failures to meet their legal obligations to TAY were briefed and/or discussed. For example, in advance of a legislative hearing in April 2024, upon information and belief, as a hearing attendee, Defendant Johnson received meeting materials that specifically noted that “1 in 5 youth in extended foster care experience homelessness,” and that “[s]ince 2012 when extended foster care was implemented, the cost of housing has increased 95% in these counties, while the SILP rate has increased 51%.”

350. In the same meeting, the Chief Deputy Director of CDSS—who upon information and belief is a direct report of Defendant Johnson—admitted that CDSS “does not track data in a way that allows us to know how frequently [foster] youth experience homelessness or housing insecurity.” Additionally, in this same meeting, Defendant Johnson heard firsthand testimony from a former TAY who explained that “[i]t has become commonplace for people to expect housing instability for [TAY] and SILPs.”

351. Moreover, Defendant Johnson has advised the California legislature that she regularly personally meets with current and former foster youth, including “quarterly check-ins with the California Youth Connection to hear directly from young people . . . giving us recommendations.” Publications by the California Youth Connection include a report titled: “Housing Stability for All: Findings and Recommendations from Current and Former Foster Youth,” which highlights the “disproportionate number of TAY [that] lose their housing as a result of aging out without adequate support” and the housing discrimination faced by pregnant and parenting youth.

## XII. THIS ACTION CANNOT BE BROUGHT IN THE DEPENDENCY COURT AND IT DOES NOT INTERFERE WITH THE DEPENDENCY COURT'S JURISDICTION.

352. Plaintiffs in this action do not challenge or seek to enjoin or otherwise interfere with the Dependency Court's determinations. Plaintiffs instead challenge the unlawful systemic practices of Defendants, practices that the Dependency Court is incapable of remedying.

353. The systemic issues alleged in this complaint are ones that cannot be remedied in the Dependency Court, because State law bars the interposition of Plaintiffs' claims in Dependency Court and/or because the systemic nature of the claims and remedies renders the Dependency Court an inadequate forum.

354. The Dependency Court does not have authority to:

a. correct systemic failures to ensure Defendants make reasonable modifications necessary to avoid discrimination against Class members on the basis of disability, maintain an adequate reliable system to provide accommodations to transition age youth with mental health disabilities, and ensure equal access to integrated, least-restrictive, safe and appropriate foster care placement and services based on their needs;

b. correct systemic failures to ensure that Class members receive adequate notice of placement decisions and sufficient notice apprising them of their right to appeal a denial of placement and the process for doing so;

c. correct systemic failures to ensure that THPP-NMD Subclass members receive adequate notice and opportunity to be heard upon being pushed out of placement;

d. correct systemic failures to ensure that Unsheltered Subclass members, at a minimum, are not without shelter (including emergency housing), reasonable safety, and medical care;

e. correct systemic failures that cause STRTP Subclass members to be unnecessarily placed in STRTPs or at serious risk of institutionalization;

f. correct systemic failures to ensure that Medicaid Subclass members have access to and receive Intensive Care Coordination and Mobile Crisis Response services to which they are entitled.

355. The remedies asserted herein will promote, not interfere with, the Dependency Court's ability to exercise its jurisdiction and ensure the safety and well-being of transition age foster youth with mental health disabilities.

## XIII. CLASS ACTION ALLEGATIONS

356. This action is properly maintained as a class action under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

357. This action consists of the General Class and four Subclasses:

a. The General Class includes all transition age foster youth who are now, or in the future will be, in extended foster care in Los Angeles County and who now, or in the future will, have mental impairments due to mental health conditions that substantially limit a major life activity.

b. The Medicaid Subclass includes all members of the General Class who are Medicaid-eligible and for whom Intensive Care Coordination or Mobile Crisis Response services are needed to correct or ameliorate their mental health condition.

c. The THP-NMD Subclass includes all members of the General Class who have been, or are at risk of being, pushed out from THPP-NMD placements without adequate notice and an opportunity to be heard.

d. The STRTP Subclass includes all members of the General Class who currently are, or are at risk of being, unnecessarily placed in STRTPs.

e. The Unsheltered Subclass includes all members of the General Class who have been, are, or in the future will be without shelter (including emergency housing), reasonable safety, and medical care.

358. Each Class is sufficiently numerous to make joinder impracticable:

a. Upon information and belief, the General Class includes more than 2,500 transition age foster youth. There are at least four thousand two hundred (4,200) transition age foster youth, ages sixteen to twenty-one, who are or will be in extended foster care in Los Angeles County. Over sixty percent (60%) of foster youth, ages seventeen to eighteen, have a mental health disability. Using sixty percent (60%) as the baseline, over two thousand five hundred (2,500) transition age foster youth in Los Angeles County have mental health disabilities, and those disabilities substantially limit one or more major life activities. Moreover, youth who have not yet been identified with a DSM-V diagnosis may still be members of the General Class as they have been subjected to the known trauma associated with removal from their home and communities, along with other trauma and instability they have experienced. This complex trauma substantially limits their functioning. Joinder of thousands of these youth would be unduly burdensome and impractical in these circumstances.

b. The Medicaid Subclass is sufficiently numerous to make joinder impracticable. Based on the most recent publicly available data, over 1,200 young people ages eighteen to twenty in Los Angeles received at least one Specialty Mental Health Service in 2022. This number does not include subclass members ages sixteen to seventeen because their Specialty Mental Health Services usage is not disaggregated by age in publicly available data. This number includes all such services because data disaggregated by age and type of service (e.g., Intensive Care Coordination and Mobile Crisis Response) is also not publicly available.

c. The THP-NMD Subclass is sufficiently numerous to make joinder impracticable. As of January 1, 2023, there were 375 nonminor dependents residing in THPP-NMD programs, which was approximately 16% of the nonminor dependents in care in Los Angeles county. As of January 1, 2024, there were 364 nonminor dependents residing in THPP-NMD programs, which was 15.7% of all nonminor

dependents in care in Los Angeles county. Nonminor dependents residing in THPP-NMD are at constant risk of push-out, including for minor program violations.

d. The STRTP Subclass is sufficiently numerous to make joinder impracticable. Although not disaggregated by age in publicly available data, at least 2,397 children and youth in California were placed in an STRTP in 2023. The most recent publicly available data indicate that over 80 young people between ages 16 and 21 in Los Angeles County were placed in an STRTP as of July 2024.

e. The Unsheltered Subclass is sufficiently numerous to make joinder impracticable. Roughly one in every five transition age foster youth in California reports experiencing homelessness while in extended foster care. In 2022, more than 4,200 youth aged sixteen to twenty-one years old were in foster care in Los Angeles County. Based on the best available data, more than 1,000 of these young people will become unhoused at least once while in Defendants' care.

359. The questions of fact and law raised by Named Plaintiffs' claims are common to and typical of those of the putative General Class and each Subclass.

360. Each General Class and Subclass member relies on Defendants for their safety and well-being, both for necessities such as food and a safe and appropriate placement, but also for mental health, permanency, and other supportive services. Defendants' longstanding failures to oversee and support transition-related services and to ensure a minimally adequate array of safe and appropriate extended foster care placements harm and/or place the entire General Class and each Subclass at risk of harm.

361. Defendants' systemic failures arise from action and inaction taken by Defendants. The policies and practices raised by the Named Plaintiffs' claims, and their consequences, have been so widespread that Defendants should be deemed to have acquiesced to them.

362. Questions of fact common to the Classes include:

a. Whether Defendants have a policy, pattern, and/or practice of failing to ensure that the General Class is not unlawfully denied the right to a placement;

b. Whether Defendants fail to make reasonable modifications to their policies, practices, and procedures that are necessary to avoid discrimination on the basis of mental health disabilities, including depriving the General Class of necessary and appropriate placement and services in the most integrated, least restrictive setting, and failing to maintain an adequate reliable system to provide accommodations to transition age youth with mental health disabilities;

c. Whether Defendants utilize criteria or methods of administration in placements and services in a manner that discriminates against the General Class, including the failure to develop a minimally adequate array of safe and appropriate placements and supportive services tailored to their needs;

d. Whether Defendants DHCS and DMH have failed to provide necessary behavioral health services to the Medicaid Subclass, including through DMH's failure to provide Intensive Care Coordination and Mobile Crisis Response services, and DHCS's failure to monitor and oversee the provision of such services;

e. Whether Defendants have a policy, pattern, and/or practice of pushing out members of the THP-NMD Subclass from placements without adequate notice and an opportunity to be heard;

f. Whether Defendants have a policy, pattern and/or practice of unnecessarily placing members of the STRTP Subclass in STRTPs, or of placing them at serious risk of institutionalization.

g. Whether Defendants have a policy, pattern, and/or practice of failing to have a system that, at a minimum, ensures youth are not without shelter (including emergency housing), reasonable safety, and medical care, placing the Unsheltered Subclass at substantial risk of serious harm.

363. Questions of law common to the Classes include:

a. Whether Defendants' policies and practices violate the ADA and Section 504 with respect to the General Class;

b. Whether Defendants' policies and practices violate the General Class's procedural due process rights by failing to create adequate processes to notify transition age foster youth of placement decisions and the procedures to appeal the denial of a foster care placement benefit, as guaranteed by the Fourteenth Amendment to the United States Constitution;

c. Whether Defendants' policies and practices violate the Medicaid Act with respect to the Medicaid Subclass;

d. Whether Defendants' policies and practices violate the Unsheltered Subclass's substantive due process rights, thus exposing them to a substantial risk of serious harm while in State custody, as guaranteed by the Fourteenth Amendment to the United States Constitution;

e. Whether Defendants' policies and practices violate the procedural due process rights of the THP-NMD Subclass to be free from involuntary and unlawful pushouts without adequate notice and an opportunity to be heard, as guaranteed by the Fourteenth Amendment to the United States Constitution;

f. Whether Defendants' policies and practices violate the ADA and Section 504' "integration mandate" with respect to the STRTP Subclass; and

g. Whether the General Class and Subclass members are entitled to declaratory and injunctive relief to vindicate the rights they have been denied.

364. The violations of law and resulting harms suffered by the Named Plaintiffs are typical of the legal violations and harms (or substantial risk of serious harm) that all General Class members experience. Named Plaintiffs Erykah B., Onyx G., Jackson K., Ocean S., Junior R., and Monaie T. have claims that are typical of claims of the Medicaid Subclass. Named Plaintiffs Erykah B., Onyx G., Rosie S., Jackson K., Ocean S, and Junior R. have claims that are typical of claims of the THPP-NMD Subclass. Named Plaintiffs Onyx G., Ocean S., Junior R., and Monaie T. have

claims that are typical of claims of the STRTP Subclass. Named Plaintiffs Erykah B., Rosie S., Junior R., and Monaie T. have claims that are typical of claims of the Unsheltered Subclass.

365. The Named Plaintiffs will fairly and adequately represent and protect the interests of the General Class and each Subclass. There are no conflicts of interest between the Named Plaintiffs and the classes they seek to represent. The relief sought by the Named Plaintiffs will benefit all members of the classes.

366. Named Plaintiffs and the General Class are represented by attorneys with extensive experience in complex civil and public interest litigation. Plaintiffs' Counsel include attorneys from Public Counsel, the Alliance for Children's Rights, Children's Rights, and Munger, Tolles, & Olson LLP. Plaintiffs' counsel have committed sufficient resources to represent the classes.

## FIRST CAUSE OF ACTION

### (By All Plaintiffs Against All Defendants for Violation of Section 504 of the Rehabilitation Act: General Discrimination and Methods of Administration)

367. Plaintiffs hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

368. Defendants are prohibited under Section 504 of the Rehabilitation Act, 294 U.S.C. § 794, and its implementing regulations, 28 C.F.R. §41.51, from discriminating against individuals with disabilities.[68] Defendants are also prohibited from discriminating against individuals on the basis of disability through contractual, licensing or other arrangements.[69]

369. Plaintiffs have mental health disabilities that substantially limit one or more major life activities, or have a record of such disabilities, and therefore have a

[68] 29 U.S.C. § 794; 28 C.F.R. § 41.51; 45 C.F.R. § 84.1; 45 C.F.R. § 84.60.

[69] 28 C.F.R. §41.51(b)(1); 45 C.F.R. § 84.68; 45 C.F.R. § 84.60

disability as defined by Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 and its implementing regulations, 28 C.F.R. § 41.51; 45 C.F.R. 84.10.

370. Defendants conduct, operate, or administer the State foster care and Medicaid programs, which receive federal financial assistance and are therefore programs or activities within the meaning of the Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(b), and its implementing regulations, 28 C.F.R. § 41.51; 45 C.F.R. § 84.2.

371. Plaintiffs were at all relevant times under twenty-one years of age and otherwise eligible for the foster care placement and services for which Defendants receive federal funds at all times.

372. Plaintiffs are otherwise eligible for Medicaid.

**General Discrimination**

373. Defendants have denied transition age foster youth the benefits of the foster care system and Medicaid program solely on the basis of their disability. Defendants fail to have a reliable system to provide accommodations to transition age foster youth with mental health disabilities. Defendants and their contractors exclude and unjustifiably terminate transition age foster youth with mental health disabilities, solely on the basis of their disabilities, from foster care placements, including THPP-NMD and SILP, and other needed services. This discrimination impairs Plaintiffs' and class members' ability to meaningfully access the benefits of foster care, denies them equal access to placements available to non-disabled transition age foster youth, denies them placement in the most integrated, least restrictive setting appropriate to their needs, and denies other federally-funded Medicaid services to transition age foster youth with mental health disabilities, and substantially impairs accomplishment of these programs' objectives with respect to individuals with disabilities.

374. Plaintiffs and General Class members could be better served in less restrictive and more integrated placement options, and they do not oppose being served in these community-based non-institutional settings.

375. There are effective and reasonable modifications the Defendants could implement that would allow Plaintiffs and class members to enjoy the benefits of the foster care system and Medicaid programs. Providing these reasonable modifications would not fundamentally alter the nature of the placements and services that Defendants must provide at all times.

376. Plaintiffs have suffered irreparable injury because of Defendants' discrimination on the basis of disability. Plaintiffs are without adequate remedy at law.

**Methods of Administration**

377. Pursuant to the regulations implementing the Rehabilitation Act, Defendants are prohibited from utilizing criteria or other methods of administration "(i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of [disability]; [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program or activity with respect to handicapped."[70]

378. Plaintiffs and General Class members could be better served in less restrictive and more integrated placement options, and they do not oppose being served in these community-based non-institutional settings.

379. Defendants utilize methods of administration that subject Plaintiffs and General Class Members to discrimination solely on the basis of disability. Defendants fail to have a reliable system to provide accommodations to transition age foster youth with mental health disabilities. Defendants' policies exclude and unjustifiably terminate transition age foster youth with mental health disabilities, solely on the basis of their disabilities, from foster care placements, including THPP-NMDs and SILPs, and other needed services. This discrimination impairs Plaintiffs' and class members' ability to meaningfully access the benefits of foster care, denies equal access to

[70] 28 C.F.R. § 41.51(b)(3); 45 C.F.R. § 84.68(b)(3); 45 C.F.R. § 84.60.

placements available to transition age youth without disabilities, denies placement in the most integrated, least restrictive setting appropriate to their needs, and denies federally-funded Medicaid services to transition age foster youth with mental health disabilities, and substantially impairs accomplishment of these programs' objectives with respect to youth with mental health disabilities.

380. There are effective and reasonable modifications Defendants could implement that would create appropriate supports for placement and services and allow Plaintiffs and class members to enjoy the benefits of the foster care system and the Medicaid program. Providing these reasonable modifications would not fundamentally alter the nature of the placement and services that Defendants provide.

381. Plaintiffs have suffered irreparable injury because of Defendants' use of methods of administration that discriminate solely on the basis of disability. Plaintiffs are without adequate remedy at law.

Plaintiffs and members of the General Class are entitled to appropriate relief.

## SECOND CAUSE OF ACTION

**(By All Plaintiffs Against All Defendants for Violation of the Americans with Disabilities Act of 1990: General Discrimination And Methods Of Administration)**

382. Plaintiffs hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

383. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[71] Defendants are also prohibited under Title II of the ADA and its implementing regulations from discriminating

[71] 42 U.S.C. § 12132; 28 C.F.R. § 35.130.

against individuals with disabilities through contractual, licensing or other arrangements.[72]

384. Plaintiffs have mental health disabilities that substantially limit one or more major life activities, or have a record of such disabilities, and therefore have a disability as defined by the ADA, 42 U.S.C. §§ 12102 *et seq*., and its implementing regulations, 28 C.F.R. § 35.108.

385. Members of the General Class are "qualified individuals with disabilities" as defined by the ADA, 42 U.S.C. § 12131(2), and its implementing regulations, 28 C.F.R. § 35.104.

386. Defendants are public entities as defined by the ADA, 42 U.S.C. § 12131, and its implementing regulations, 28 C.F.R. § 35.104.

387. Plaintiffs were at all relevant times under twenty-one years of age and otherwise eligible for the foster care placement and services for which Defendants receive federal funds at all times.

388. Plaintiffs are otherwise eligible for Medicaid.

**General Discrimination**

389. Defendants have denied transition age foster youth the benefits of the foster care system and Medicaid program by reason of their disability. Defendants and their contractors exclude and unjustifiably terminate transition age foster youth with mental health disabilities, on the basis of their disabilities, from foster care placements, including THPP-NMD and SILP, and other needed services. Defendants fail to have a reliable system to provide accommodations to transition age foster youth with mental health disabilities. This discrimination impairs Plaintiffs' and General Class members' ability to meaningfully access the benefits of foster care, denies them equal access to placements available to non-disabled transition age foster youth, denies them placement in the most integrated, least restrictive setting appropriate to

[72] 28 C.F.R. § 35.130(b)(1).

their needs, and denies other federally-funded Medicaid services to transition age foster youth with mental health disabilities, and substantially impairs accomplishment of these programs' objectives with respect to individuals with disabilities.

390. Plaintiffs and General Class members could be better served in less restrictive and more integrated placement options, and they do not oppose being served in these community-based non-institutional settings.

391. There are effective and reasonable modifications the Defendants could implement that would allow Plaintiffs and members of the General Class to enjoy the benefits of Defendants' foster care system and Medicaid programs. Providing these reasonable modifications would not fundamentally alter the nature of the placement, social services, and health services that Defendants provide.

392. Plaintiffs have suffered irreparable injury because of Defendants' discrimination on the basis of disability. Plaintiffs are without adequate remedy at law.

**Methods of Administration**

393. Pursuant to the regulations implementing Title II of the ADA, Defendants are prohibited from utilizing criteria or other methods of administration: "(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities . . . ."[73]

394. Defendants utilize methods of administration that subject Plaintiffs and General Class Members to discrimination by reason of disability. Defendants' policies exclude and unjustifiably terminate transition age foster youth with mental health disabilities, on the basis of their disabilities, from foster care placements, including THPP-NMDs and SILPs, and other needed services. Defendants fail to

[73] 28 C.F.R. § 35.130(b)(3).

have a reliable system to provide accommodations to transition age foster youth with mental health disabilities. This discrimination impairs Plaintiffs' and General Class members' ability to meaningfully access the benefits of foster care; denies placement and federally funded Medicaid services to transition age foster youth with mental health disabilities; and substantially impairs accomplishment of these programs' objectives with respect to youth with mental health disabilities.

395. Plaintiffs and General Class members could be better served in less restrictive and more integrated placement options, and they do not oppose being served in these community-based non-institutional settings.

396. There are effective and reasonable modifications Defendants could implement that would create appropriate supports for placement and allow Plaintiffs and members of the General Class to enjoy the benefits of Defendants' foster care system and Medicaid program. Providing these reasonable modifications would not fundamentally alter the nature of the placements and social services that Defendants provide.

397. Plaintiffs have suffered irreparable injury because of Defendants' use of methods of administration that discriminate on the basis of disability. Plaintiffs are without adequate remedy at law.

398. Plaintiffs and members of the General Class are entitled to appropriate relief.

## THIRD CAUSE OF ACTION

**(By All Plaintiffs Against the County, DCFS and CDSS for Violation of Procedural Due Process under the Fourteenth Amendment to the United States Constitution With Respect To Obtaining A Foster Care Placement)**

399. Plaintiffs hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

400. Plaintiffs have a right to a foster care placement while in foster care, which Defendants have no discretion to deny. As dependents of the Juvenile Court,

they are members of the class of people meant to benefit from the statutes requiring Defendants to provide them with foster care placement.

401. Defendants, while acting under color of law, have deprived Plaintiffs of their property without providing adequate procedural safeguards by failing to create adequate processes to notify foster youth of placement decisions or the procedures to appeal the denial of a foster care placement benefit. Defendants' actions, inactions, customs, policies, and practices deprive Plaintiffs of their property interest in extended foster care placement and services without due process, in violation of 42 U.S.C. § 1983.

402. Defendants' procedural shortcomings for providing notice of placement decisions and the right to appeal the denial of placement are deliberate policy choices and a repeated pattern of violations that amount to official policy. These policies are the cause of Plaintiffs' injuries and threatened injuries.

403. Defendants' actions have resulted in a grievous loss to Plaintiffs. When they are denied or lose their placement without adequate procedural safeguards, Plaintiffs lose not only a place to sleep, but other DCFS resources that are linked to Plaintiffs' placement status, including monthly stipends to help cover the cost of food and basic living expenses, clothing allowances and, for parenting youth, infant supplements.

404. The balance of interests weighs in favor of requiring the changes that Plaintiffs propose to Defendants' procedures because it would require minimal administrative burden on Defendants. Defendants already are required to maintain information regarding the placements that they provide to transition age foster youth and changes to such placements. Any additional administrative burden would be greatly outweighed by the risk of housing instability and homelessness faced by the putative class of disabled foster youth.

405. Plaintiffs and members of the General Class are entitled to appropriate relief.

**FOURTH CAUSE OF ACTION**

**(On Behalf of the Unsheltered Subclass Against the County, DCFS, CDSS, Johnson, CalHHS, and Ghaly for Violation of Substantive Due Process under the Fourteenth Amendment to the United States Constitution)**

406. Plaintiffs hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

407. Foster youth, including transition age foster youth, have a federal constitutional right to State protection while they remain in the care of the State. Because Defendants have restrained Plaintiffs' personal liberty by taking them into State custody and extending their foster care past age eighteen by operation of law, Defendants owe Plaintiffs reasonable safety, shelter, and minimally adequate care and treatment appropriate to the Plaintiffs' age and circumstances. Due to Defendants' special relationship with Plaintiffs, Defendants assumed an affirmative duty under the Fourteenth Amendment to the United States Constitution to protect Plaintiffs from harm, including but not limited to the harm caused by extreme housing instability and homelessness.

408. Defendants, while acting under color of law, have developed and maintained customs, policies and practices that deprive Plaintiffs of their constitutional rights, in violation of 42 U.S.C. § 1983. These practices include, but are not limited to, failing to provide shelter; failing to identify sufficient emergency housing options for youth transitioning between placements or re-entering care; affirmatively issuing standards and policies that undermine shelter for transition age foster youth; and deliberately ignoring the need to evaluate and expand the number of safe and appropriate placements and the emergency housing capacity for transition age foster youth.

409. Defendants' practices have caused Plaintiffs' conditions to deteriorate and have subjected them to unsafe conditions and physical harm, in violation of the Fourteenth Amendment to the United States Constitution.

410. Defendants have failed to provide for Plaintiffs' basic needs, including, without limitation, reasonable safety; shelter; medical care; and freedom from substantial risk of serious harm.

411. Defendants have acted under color of law with deliberate indifference towards Plaintiffs. Defendants are aware that their failure to provide transition age foster youth with safe and appropriate placement and required services causes youth to experience homelessness and its attendant health and safety risks. In denying Plaintiffs access to shelter, including emergency housing, reasonable safety, and medical treatment, Defendants abdicated their duty to provide for Plaintiffs' basic needs and have thereby caused Plaintiffs' injuries, including without limitation a substantial risk of serious harm.

412. The foregoing actions and omissions of Defendants constitute a policy, pattern, practice, and/or custom that is inconsistent with the exercise of any accepted professional judgment and amounts to deliberate inference to the constitutionally protected liberty and privacy interests of Plaintiffs.

413. Plaintiffs and members of the Unsheltered Subclass are entitled to appropriate relief.

## <u>FIFTH CAUSE OF ACTION</u>

**(On behalf of the THPP-NMD Subclass Against the County, DCFS, and CDSS for Violation of Procedural Due Process under the Fourteenth Amendment to the United States Constitution With Respect To Push-Out From Existing THPP-NMD Placements)**

414. Plaintiffs hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

415. Plaintiffs have a right to a foster care placement while in foster care, which Defendants have no discretion to deny. As dependents of the Juvenile Court, they are members of the class of people meant to benefit from the statutes requiring Defendants to provide them with foster care placement. When Plaintiffs reside in

THPP-NMD programs, the foster care placement benefit in which they have a protected property interest is their THPP-NMD placement.

416. Defendants, while acting under color of law, have deprived Plaintiffs of their property without providing adequate procedural safeguards by failing to provide for sufficient notice or hearing before a neutral arbiter before a youth is pushed out of a THPP-NMD placement. Due to DCFS and CDSS' close coordination with and oversight of THPP-NMD providers, there is a sufficiently close nexus between the Defendants and their providers such that the decision to push transition age foster youth out of their THPP-NMD placement may be fairly treated as that of Defendants themselves.

417. Defendants further allow THPP-NMD programs to misclassify as "emergencies" behaviors that could be addressed through trauma-responsive approaches; by misclassifying this conduct, programs may, under Defendants' policies, unlawfully and involuntarily exit Plaintiffs from their placements without any notice at all.

418. Defendants' actions, inactions, customs, policies, and practices deprive Plaintiffs of their property interest in THPP-NMD foster care placement and services without due process, in violation of 42 U.S.C. § 1983.

419. Defendants' procedural shortcomings for push-outs from THPP-placements are deliberate policy choices and a repeated pattern of violations that amount to official policy. These policies are the cause of Plaintiffs' injuries and threatened injuries.

420. Defendants have denied Plaintiffs foster care placement and services, resulting in a grievous loss for Plaintiffs, without providing timely notice, a pre-termination hearing, and an impartial decision-maker as required by the Fourteenth Amendment. When they lose their placement without adequate procedural safeguards, Plaintiffs lose not only a place to sleep, but other DCFS resources that are linked to Plaintiffs' placement status, including monthly stipends to help cover the

cost of food and basic living expenses, clothing allowances and, for parenting youth, infant supplements.

421. The balance of interests weighs in favor of requiring the changes that Plaintiffs propose to Defendants' procedures because it would require minimal administrative burden on Defendants. Defendants already implemented an administrative hearing process to handle appeals of other types of foster care benefits such as foster care funding. Any additional administrative burden would be greatly outweighed by the risk of housing instability and homelessness faced by the putative class of disabled foster youth.

422. Plaintiffs and members of the THPP-NMD Subclass are entitled to appropriate relief.

## SIXTH CAUSE OF ACTION

**(On Behalf of the Medicaid Subclass**
**Against DMH and Baass for Violation of the Medicaid Act, Early and Periodic Screening, Diagnostic and Treatment (EPSDT) Services, 42 U.S.C. §§ 1396a(43), 1396d(a)(4)(B) and 1396d(r))**

423. Plaintiffs hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

424. Defendants, DMH and Director Baass, while acting under color of law, have violated the EPSDT provisions of the Medicaid Act, by failing to provide or arrange for behavioral health services for the Medicaid Subclass that are necessary to correct or ameliorate their mental health conditions in violation of 42 U.S.C. §§ 1396a(a)(10)(A), 42 U.S.C. §§ 1396a(43)(C), 1396d(a)(4)(B) and 1396d(r). Specifically, Defendants fail to provide or arrange for medically necessary Intensive Care Coordination and mobile crisis services to which Plaintiffs are entitled.

425. Plaintiffs in the Medicaid Subclass are otherwise eligible for Medicaid.

426. Defendants' acts and omissions described above violate 42 U.S.C. § 1983 by depriving Plaintiffs and members of the Medicaid Subclass of their

statutory rights. Plaintiffs and members of the Medicaid Subclass are entitled to appropriate relief.

**SEVENTH CAUSE OF ACTION**

**(On Behalf of the STRTP Subclass Against All Defendants for Violation of Section 504 of the Rehabilitation Act: Integration Mandate)**

427. Plaintiffs hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

428. Plaintiffs with mental health disabilities meet the definition of "individuals with disabilities" within the meaning of Section 504 of the Rehabilitation Act, 42 U.S.C. § 794 and its implementing regulations, 28 C.F.R. §41.51;45 C.F.R. § 84.10.

429. Defendants conduct, operate, or administer the State foster care and Medicaid programs, which receive federal financial assistance and are therefore programs or activities within the meaning of the Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(b), and its implementing regulations, 28 C.F.R. § 41.51; 45 C.F.R. § 84.2.

430. Plaintiffs were at all relevant times under twenty-one years of age and otherwise eligible for the foster care placement and services for which Defendants receive federal funds at all times.

431. Plaintiffs are otherwise eligible for Medicaid.

432. Section 504 mandates that qualified individuals with disabilities are entitled to receive services in the most integrated setting appropriate to their needs.[74]

433. Plaintiffs and STRTP Subclass Members are capable of living in integrated settings, and they wish to receive services in the most integrated community-based settings that meet their needs, including their mental and behavioral health needs.

---

[74] 28 C.F.R. 41.51(d); 45 C.F.R. 84.60; 45 C.F.R. § 84.68.

434. Defendants' fail to provide a minimally adequate array of placements and needed services to meet the needs of transition age foster youth with mental health disabilities, depriving Plaintiffs and STRTP Subclass members of their right to receive placement and services in the most integrated, least restrictive setting appropriate to their needs. Defendants have placed Plaintiffs and STRTP Subclass Members in unduly restrictive and segregated settings despite their ability to benefit from placements and services in a less restrictive setting.

435. Defendants fail to provide intensive home and community-based services and fail to adequately implement and administer the mental health service system. Defendants discriminate against Plaintiffs and STRTP Subclass members by denying them the opportunity to receive necessary services in integrated settings, thus causing them to be unnecessarily segregated or placed at serious risk of institutionalization and lack of community integration in violation of the Rehabilitation Act. 28 C.F.R. § 41.51(d); 45 C.F.R. § 84(d).

436. As a result of Defendants' acts and omissions, Plaintiffs and STRTP Subclass Members are unnecessarily segregated or placed at serious risk of institutionalization and lack of community integration in violation of the Rehabilitation Act.

437. Providing these services to the Plaintiffs and the members of the STRTP Subclass in the most integrated settings appropriate to their needs would not fundamentally alter the nature of the Defendants' services, programs, or activities.[75]

438. Plaintiffs have suffered irreparable injury because of Defendants' failure to facilitate the receipt of services and least restrictive placement in the most integrated settings appropriate to their needs. Plaintiffs are without adequate remedy at law.

---

[75] 28 C.F.R. § 35.130(b)(7).

439. Plaintiffs and members of the STRTP Subclass are entitled to appropriate relief.

## EIGHTH CAUSE OF ACTION

**(On Behalf of the STRTP Subclass Against All Defendants for Violation of the Americans with Disabilities Act of 1990: Integration Mandate)**

440. Plaintiffs hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

441. Plaintiffs and members of the STRTP Subclass have mental health disabilities that substantially limit one or more major life activities, or have a record of such disabilities, and therefore have a disability as defined by the ADA, 42 U.S.C. §§ 12102 *et seq*., and its implementing regulations, 28 C.F.R. § 35.108.

442. Members of the STRTP Subclass are "qualified individuals with disabilities" as defined by the ADA, 42 U.S.C. § 12131(2), and its implementing regulations, 28 C.F.R. § 35.104.

443. Defendants are public entities as defined by the ADA, 42 U.S.C. § 12131, and its implementing regulations, 28 C.F.R. § 35.104.

444. Plaintiffs were at all relevant times under twenty-one years of age and otherwise eligible for the foster care placement and services for which Defendants receive federal funds at all times.

445. Plaintiffs are otherwise eligible for Medicaid.

### Integration Mandate

446. Title II of the ADA requires that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

447. Plaintiffs and STRTP Subclass members are capable of living in integrated settings, and they wish to receive services in the most integrated

community-based settings that meet their needs, including their mental and behavioral health needs.

448. Defendants fail to provide intensive home and community-based services and fail to adequately implement and administer the mental health service system. Defendants discriminate against Plaintiffs and STRTP Subclass members by denying them the opportunity to receive necessary services in integrated settings, thus causing them to be unnecessarily segregated or placed at serious risk of institutionalization and lack of community integration in violation of Title II of the ADA. 28 C.F.R. 35.130(d).

449. Defendants' administrative policies, practices, and procedures have the effects of: (1) impermissibly segregating transition age foster youth in STRTPs, hospitals, institutions, and other segregated settings; and (2) placing them at a serious risk of institutionalization. 28 C.F.R. § 35.130(b)(3), (d).

450. Defendants have utilized criteria and methods of administration that subject transition age foster youth to discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(3).

451. Defendants fail to provide a minimally adequate array of placements and services to meet the needs of transition age foster youth with mental health disabilities, depriving Plaintiffs and STRTP Subclass members of their right to receive placement and services in the most integrated, least restrictive setting appropriate to their needs.

452. Providing these services to the Plaintiffs and the members of the STRTP Subclass in the most integrated settings appropriate to their needs would not fundamentally alter the nature of the Defendants' services, programs, or activities.[76] Plaintiffs and members of the STRTP Subclass have suffered irreparable injury because of Defendants' failure to facilitate the receipt of services and safe and

[76] 28 C.F.R. § 35.130(b)(7).

appropriate placement at all times in the most integrated settings appropriate to their needs. Plaintiffs are without adequate remedy at law.

453. Plaintiffs and members of the STRTP Subclass are entitled to appropriate relief.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1. Assert subject matter jurisdiction over this action;
2. Order that this action may be maintained as a class action pursuant to Fed. R. Civ. P. §§ 23(a) and 23(b)(2);
3. Declare unlawful, pursuant to Fed. R. Civ. P. § 57, Defendants' conduct, as described above, in violation of: (i) Plaintiffs' substantive due process rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution; (ii) Plaintiffs' procedural due process rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution; (iii) Title II of the ADA; (iv) Section 504 of the Rehabilitation Act; and (v) the EPSDT provisions of the Medicaid Act;
4. Grant preliminary and permanent injunctive relief, pursuant to Fed. R. Civ. P § 65, requiring Defendants to correct systemic failures to ensure that:

(a) Class members receive reasonable modifications necessary to avoid discrimination on the basis of disability, an adequate reliable system to provide accommodations, and equal access to integrated, least-restrictive, safe and appropriate foster care placement and services based on their needs;

(b) Class members receive adequate notice of placement decisions and sufficient notice apprising them of their right to appeal a denial of placement and the process for doing so;

(c) THPP-NMD Subclass members receive adequate notice and opportunity to be heard prior to being pushed out of placement;

(d) Unsheltered Subclass members, at a minimum, are not without shelter (including emergency housing), reasonable safety, and medical care;

(e) STRTP Subclass members are not unnecessarily placed in STRTPs or face serious risk of institutionalization;

(f) Medicaid Subclass members have access to and receive Intensive Care Coordination and Mobile Crisis Response services to which they are entitled.

5. Retain jurisdiction over Defendants until such time as the Court is satisfied that Defendants have implemented and sustained this injunctive relief;
6. Award reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1920, 42 U.S.C. § 12205, 42 U.S.C. § 1988, and Fed. R. Civ. P. § 23(e); and
7. Grant such further relief as this Court may deem just, necessary, and proper.

DATED: August 12, 2024

Respectfully submitted,

By: */s/ Grant A. Davis-Denny*

Grant A. Davis-Denny
*Attorney for Plaintiffs*

## *ADDITIONAL ATTORNEYS OF RECORD

Kathryn Eidmann (State Bar No. 268053)
keidmann@publiccounsel.org
Mark R. Rosenbaum (State Bar No. 59940)
mrosenbaum@publiccounsel.org
Amanda Mangaser Savage (State Bar No. 325996)
asavage@publiccounsel.org
Rachel Stein (State Bar No. 257411)
rstein@publicounsel.org
Molly Mauck (State Bar No. 344278)
mmauck@publiccounsel.org
Natalie Garnica (State Bar No. 320230)
ngarnica@publiccounsel.org
Alero Egbe (State Bar No. 349753)
aegbe@publiccounsel.org
Amelia Piazza (State Bar No. 342473)
apiazza@publiccounsel.org
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, California 90071-3426
Telephone: (213) 385-2977
Facsimile: (213) 385-9089

Jessica Zou (New York Bar No. 5922091)
(Pro hac vice)
jzou@childrenrights.org
Stephanie Persson (New York Bar No. 5469648)
(Pro hac vice)
spersson@childrensrights.org
Rebecca Ritchin (New York Bar No. 6015069)
(Pro hac vice)
rritchin@childrensrights.org
CHILDREN'S RIGHTS
88 Pine Street, Suite 800
New York City, New York 10005
Telephone: (212) 683-2210

William D. Temko (State Bar No. 98858)
william.temko@mto.com
Peter Gratzinger (State Bar No. 228763)
peter.gratzinger@mto.com
Jimmy P. Biblarz (State Bar No. 341874)
jimmy.biblarz@mto.com
Carl Jiang (State Bar No. 355258)
carl.jiang@mto.com
Priscila Coronado (State Bar No. 355195)
priscila.coronado@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

# GLOSSARY OF TERMS[77]

## I. Named Defendants Defined in the Complaint

**CalHHS** .......... California Health and Human Services Agency

**CDSS** .......... California Department of Social Services

**County** .......... Los Angeles County

**DCFS** .......... Los Angeles County Department of Children and Family Services

**DHCS** .......... California Department of Health Care Services

**DMH** .......... Los Angeles County Department of Mental Health

## II. Terms Defined in the Complaint

**AACWA** .......... Adoption Assistance and Child Welfare Act of 1980

**ADA** .......... Americans with Disabilities Act

**ASL** .......... American Sign Language

**A.W.O.L.** .......... Absent Without Leave

**CCLD** .......... Defendant CDSS Community Care Licensing Division

**CFT** .......... Child and Family Team meeting

**EPSDT** .......... Early and Periodic Screening, Diagnostic and Treatment

**IEP** .......... Individualized Education Plan

**IHBS** .......... Intensive Home-Based Services

**ISFC** .......... Intensive Service Foster Care Program

**LAHSA** .......... Los Angeles Homeless Services Authority

**Medi-Cal** .......... California's Medicaid Program

**NMD** .......... Nonminor Dependent

**PTSD** .......... Post-Traumatic Stress Disorder

**Section 504** .......... Rehabilitation Act of 1973

**SILP** .......... Supervised Independent Living Placement

**SMHS** .......... Specialty Mental Health Services

---

[77] The defined terms are in alphabetical order in each section of this Glossary.

**STRTP** .......................................... Short-Term Residential Therapeutic Program
**TFC** ........................................................................ Therapeutic Foster Care
**THPP** .................................................. Transitional Housing Placement Program
**THPP-NMD** .. Transitional Housing Placement Program for Non-Minor Dependents
**TILP** ....................................................... Transitional Independent Living Plan
**TLS** ........................................................................ Transitional Living Setting