UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-06921-JAK-E | Date | September 18, 2026 |
| Title | Ocean S., et al. v. Los Angeles County, et al. | | |

| | |
|---|---|
| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |

| | |
|---|---|
| M. Lindaya | Not Reported |
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** **(IN CHAMBERS) ORDER RE MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT (DKTS. 137, 138)**

## I. Introduction

On August 22, 2023, six persons, on behalf of themselves and others similarly situated ("Plaintiffs"), brought this action against Los Angeles County and certain government entities and officials responsible for administering and supervising the County's child welfare system and Medicaid program ("Defendants"). Dkt. 1. On September 21, 2023, Plaintiffs filed a First Amended Complaint ("FAC"). Dkt. 21. The FAC added a seventh plaintiff. *Id.* at 40. Thereafter, Defendants filed several motions to dismiss the FAC ("MTDs FAC"). *See* Dkts. 48, 49, 50, 51, 52, 53, 54. On June 11, 2024, an order issued granting in part and denying in part the MTDs FAC ("Order re MTDs FAC"). Dkt. 120.

On August 12, 2024, a Second Amended Complaint was filed. Dkt. 129. On August 16, 2024, a corrected Second Amended Complaint was filed ("SAC"), which is the operative one. Dkt. 130-1. The named plaintiffs in the SAC are Erykah B., Onyx G., Rosie S., Jackson K., Ocean S., Junior R. and Monaie T (collectively, "Named Plaintiffs"). *Id.* at 20–21. The SAC names certain defendants associated with Los Angeles County ("County Defendants"): Los Angeles County ("County"); the County Department of Children and Family Services ("DCFS"); and the Department of Mental Health ("DMH"). *Id.* at 21–22. The SAC also names certain defendants associated with the State of California ("State Defendants"): the California Department of Social Services ("CDSS") and Kim Johnson, who was the Director of CDSS at the time the Complaint was filed, but has since been replaced by Jennifer Troia ("Director Troia")[1]; the California Department of Health Care Services ("DHCS") and Michelle Baass, the Director of DHCS ("Director Baass"); and the California Health and Human Services Agency ("CalHHS") and Mark Ghaly, who was the Secretary of CalHHS at the time the Complaint was filed, but has since been replaced by Kim Johnson ("Secretary Johnson"). *Id.* at 22–24.

The SAC advances eight causes of action: (1) violation of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, with respect to general discrimination and methods of administration ("Section 504

[1] On October 9, 2024, Governor Gavin Newsom announced that Jennifer Troia was appointed as Director of CDSS. Former CDSS Director Kim Johnson replaced Secretary Ghaly as Secretary of CalHHS. Because the individual State Defendants are sued solely in their official capacities, Director Troia and Secretary Johnson are substituted as State Defendants in their respective new official capacities. *See* Fed. R. Civ. P. 25(d).

Discrimination Claim"); (2) violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12102 *et seq.* ("ADA Discrimination Claim"); (3) violation of procedural due process under the Fourteenth Amendment to the U.S. Constitution, with respect to obtaining a foster care placement ("Placement PDP Claim"); (4) violation of substantive due process under the Fourteenth Amendment to the U.S. Constitution ("Substantive Due Process Claim"); (5) violation of procedural due process under the Fourteenth Amendment to the U.S. Constitution, with respect to push-out from existing THPP-NMD placements ("Push-Out PDP Claim," or, collectively with the Placement PDP Claim, the "Procedural Due Process Claims"); (6) violation of the Early and Periodic Screening, Diagnostic and Treatment ("EPSDT") provisions of the Medicaid Act, 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(43)(C), 1396d(a)(4)(B), 1396d(r) ("Medicaid Act Claim"); (7) violation of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504 Integration Mandate Claim"); (8) violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12102 *et seq.* ("ADA Integration Mandate Claim" (collectively, with the Section 504 Integration Mandate Claim, the "Integration Mandate Claims")). Dkt. 130-1 ¶¶ 367–453.

On September 23, 2024, Defendants filed two motions to dismiss ("MTDs SAC"). The State Defendants filed a motion to dismiss the SAC ("State MTD SAC" (Dkt. 137)), and a request for judicial notice in support of the State MTD SAC ("State RJN" (Dkt. 137-1)), and the County Defendants filed a motion to dismiss the SAC for failure to state a claim ("County MTD SAC" (Dkt. 138-1)), and a request for judicial notice in support of the County MTD SAC ("County RJN" (Dkt. 138-2)). On October 7, 2024, the State Defendants filed a joinder to the County MTD SAC ("State Joinder"). Dkt. 147. On November 4, 2024, Plaintiffs filed an opposition to the State MTD SAC ("State MTD SAC Opposition" (Dkt. 157)), and an opposition to the County MTD SAC ("County MTD SAC Opposition" (158)), and an appendix in support of the oppositions ("Plaintiffs' Appendix" (Dkt. 159)). On November 27, 2024, the State Defendants filed a reply in support of the State MTD SAC ("State Reply" (Dkt. 176)), and the County Defendants filed a reply in support of the County MTD SAC ("County Reply" (Dkt. 177)). On December 3, 2024, the State Defendants filed an errata to the State Reply ("State Reply Errata"). Dkt. 180.

On November 8, 2024, the Department of Justice ("DOJ"), filed a statement of interest regarding the MTDs SAC ("DOJ Statement"). Dkt. 166. On November 27, 2024, the County Defendants filed a response to the DOJ Statement ("DOJ Statement Response"). Dkt. 178.

A hearing on the MTDs SAC was held on March 3, 2025, and the MTDs SAC were taken under submission pursuant to Local Rule 7-15.[2]

On July 21, 2026, the County Defendants filed an ex parte application for leave to file supplemental briefing in support of the County MTD SAC ("Application"). Dkt 238. On July 22, 2026, Plaintiffs filed an opposition to the Application. Dkt. 239. On August 11, 2026, an order denying the Application issued. Dkt. 243.

For the reasons stated in this Order, the MTDs SAC are **GRANTED IN PART** and **DENIED IN PART**.

[2] All proceedings in this action were subsequently stayed pending the completion of an interlocutory appeal of the Order denying the Motions to Dismiss (Dkt. 120). *See* Dkts. 182, 204. The interlocutory appeal process concluded with the issuance of the Ninth Circuit mandate on July 2, 2026. Dkt. 236.

## II. Background

### A. The Parties

#### 1. Plaintiffs

It is alleged Plaintiffs are foster youth between the ages of 16 and 21 (“transition age foster youth”), with mental health disabilities, who have been deprived of meaningful access to housing, behavioral health and other necessary services. Dkt. 130-1 ¶ 1. It is further alleged that Plaintiffs and other transition age foster youth have experienced significant trauma in connection with the foster care system, including separation from their families, loss of community and physical, emotional and sexual abuse. *Id.* ¶ 3.

It is alleged that a majority of these youth have mental health disabilities related to chronic, ongoing interpersonal trauma; it is also alleged that some are now young parents who seek health, stability and safety for themselves and their families. *Id.* ¶ 4. It is alleged that the Named Plaintiffs as well as the vast majority of the County’s foster youth come from low-income communities of color. *Id.* ¶¶ 4, 15–21, 31, 55, 79, 97, 121, 143, 166.

The SAC seeks certification of the following class and four subclasses: (1) a “General Class” including all transition age foster youth who are now, or in the future will be, in extended foster care in the County, and who now, or in the future will, have mental impairments due to mental health conditions that substantially limit a major life activity; (2) a “Medicaid Subclass” including all members of the General Class who are Medicaid-eligible and for whom Intensive Care Coordination or Mobile Crisis Response services are needed to correct or ameliorate their mental health condition; (3) a “THP[P]-NMD Subclass” including all members of the General Class who have been, or are at risk of being, pushed out from Transitional Housing Placement Program for Non-Minor Dependents (“THPP-NMD”) placements without adequate notice and an opportunity to be heard; (4) a “STRTP Subclass” including all members of the General Class who currently are, or are at risk of being, unnecessarily placed in Short-Term Residential Therapeutic Programs (“STRTPs”); and (5) an “Unsheltered Subclass” including all members of the General Class who have been, are, or in the future will be without shelter (including emergency housing), reasonable safety, and medical care. *Id.* ¶ 357.

The SAC alleges that all of the Named Plaintiffs have suffered harm caused by violations of law, and that these are the same as those experienced by the putative General Class. *Id.* ¶ 364. It is alleged that Plaintiffs Erykah B., Onyx G., Jackson K., Ocean S., Junior R. and Monaie T. have claims that are typical of claims of the Medicaid Subclass. *Id.* It is alleged that Plaintiffs Erykah B., Onyx G.[3], Rosie S., Jackson K., Ocean S. and Junior R. have claims that are typical of claims of the THPP-NMD Subclass. *Id.* It is alleged that Plaintiffs Onyx G., Ocean S., Junior R. and Monaie T. have claims that are typical of claims of the STRTP Subclass. *Id.* It is alleged that Plaintiffs Erykah B., Rosie S., Junior R. and Monaie T. have claims that are typical of claims of the Unsheltered Subclass. *Id.*

[3] Although the SAC alleges that Onyx G. is a part of the THPP-NMD Subclass, Plaintiffs’ Appendix, filed in support of the County MTD SAC Opposition, states that Onyx G. is not a member of the THPP-NMD Subclass. *See* Dkt. 159 at 8. The allegations of the SAC on this issue are operative for purposes of this Order.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-06921-JAK-E | Date | September 18, 2026 |
| Title | Ocean S., et al. v. Los Angeles County, et al. | | |

2. Defendants

It is alleged that Defendants are responsible for providing foster care and Medicaid services to foster youth, including behavioral health services. *Id.* ¶ 2. In fulfilling these responsibilities, it is alleged that Defendants must provide foster youth with safe and appropriate placements that are free from physical, psychological and emotional harm. *Id.* It is alleged that Defendants' failures to meet these legal duties have created a pipeline for those in the foster care system to those who live on the margins of society. *Id.* ¶ 5.

With respect to the County Defendants, it is alleged that the County is a local government entity that oversees and monitors DCFS and DMH. *Id.* ¶ 22. It is alleged that DCFS is responsible for administering foster care services in the County, providing placements for youth in the foster care system and ensuring the safety and wellbeing of children under court supervision. *Id.* ¶ 23. It is alleged that DMH is responsible for providing behavioral health services to transition age foster youth in Los Angeles, including necessary specialty mental health services. *Id.* ¶ 24.

With respect to the State Defendants, it is alleged that CalHHS, which was led by Mark Ghaly (and is now led by Secretary Johnson), is responsible for overseeing and monitoring CDSS and DHCS. *Id.* ¶¶ 25–26. It is alleged that CDSS, which was led by Kim Johnson (and is now led by Director Troia), is the "single state agency" responsible for supervising and monitoring California's foster care system. *Id.* ¶¶ 27–28. It is alleged that DHCS, which is led by Director Baass, is the "single state agency" responsible for administering California's Medicaid program. *Id.* ¶¶ 29–30.

B. The Allegations

It is alleged that Erykah B. first entered foster care in June 2004 when she was an infant and was placed in at least five different foster homes in the eight years that followed. *Id.* ¶ 38. It is alleged that, in 2012, she was removed from her mother for the final time and placed with the person who would become her legal guardian. *Id.* It is alleged that, although Erykah B. told DCFS she did not want to be placed in that home, DCFS failed to listen, and the placement resulted in abuse and neglect. *Id.* It is alleged that Erykah B. was not removed from the 2012 placement until January 2022. *Id.* ¶ 39. It is alleged that in July 2022, Erykah B. survived one attempted sexual assault in her new foster home, causing her to flee, and another while she was unhoused. *Id.* ¶ 41. It is alleged that DCFS did not provide any placement or emergency housing from July 2022 to January 2024. *Id.* ¶¶ 36, 41–43. It is further alleged that Erykah B. has been diagnosed with post-traumatic stress disorder ("PTSD") and disruptive mood regulation, and her symptoms have substantially limited one or more major life activities. *Id.* ¶¶ 32–33. It is alleged that DMH has failed to provide Erykah B. with the behavioral health services that she needs despite her treating providers' recommendations. *Id.* ¶¶ 35, 48. It is alleged that as a result, Erykah B. has experienced several mental health crises and hospitalizations. *Id.* ¶ 49.

It is alleged that Onyx G. experienced abuse and neglect while being cycled by DCFS between family member placements when she was between ages two and seven. *Id.* ¶ 62. It is alleged that Onyx G. returned to her parents' care in 2013 but was removed by DCFS in March 2020. *Id.* It is alleged that between 2020 and 2024, Onyx G. was placed in four different STRTP facilities, and experienced periods of homelessness. *Id.* ¶¶ 63–69, 72. It is alleged that while at the STRTP placements, Onyx G. experienced abuse from peers, staff and due to significant restrictions. *Id.* ¶¶ 67, 69, 70. It is also

alleged that Onyx G. has been diagnosed with anxiety, major depressive disorder and disruptive mood dysregulation disorder. *Id.* ¶ 56. It is alleged that, since the age of five, Onyx G. has been hospitalized approximately 20 times for suicidal ideation. *Id.* ¶ 75. It is alleged that in all but one incident, a mobile crisis team did not respond to Onyx G. *Id.* It is further alleged that, despite being recommended for certain behavioral health services by a mental health professional while at her first STRTP, Onyx G. has received inconsistent services due to the changes in her placements. *Id.* ¶¶ 74–75.

It is alleged that Rosie S. is the parent of a young child, and that she has been in the foster care system since 2011. *Id.* ¶¶ 79, 85, 86. It is alleged that Rosie S. contacted DCFS to reenter extended foster care in 2022, but DCFS failed to offer her a foster care placement and only referred her to homeless shelters. *Id.* ¶¶ 87, 88. The SAC alleges that after Rosie S. ultimately found herself a placement in Nevada, DCFS delayed her approval for, and receipt of SILP benefits. *Id.* ¶ 89. It is alleged that for six months, including time while she was pregnant, Rosie was uninsured due to the failure of DCFS and DMH to transfer her Medicaid coverage to her Supervised Independent Living Placement ("SILP") in Nevada. *Id.* ¶ 82. It is also alleged that Rosie S. was initially denied acceptance into a THPP-NMD due to DCFS's failure to submit her applications on time. *Id.* ¶ 90. It is alleged that, after Rosie S. was ultimately accepted into a THPP-NMD program in Los Angeles in the summer of 2023, she went into labor while packing her belongings to prepare to move from Nevada. *Id.* ¶ 92. It is alleged that because she had to remain in Nevada for a recovery period after giving birth, the THPP-NMD provider gave her spot away to another applicant. *Id.* It is alleged that DCFS failed to provide Rosie S. with an alternate placement in Los Angeles, and she had to remain in Nevada until after she left foster care at age 21. *Id.* ¶ 93. It is further alleged that Rosie S. has been diagnosed with major depressive disorder, anxiety, trichotillomania and mood disorders. *Id.* ¶ 80. It is alleged that the failure to provide Rosie S. with a safe and appropriate placement in Los Angeles aggravated her existing trauma and prolonged her isolation and instability. *Id.* ¶ 95.

It is alleged that Jackson K. entered foster care in 2007 and was adopted in 2009. *Id.* ¶ 105. It is also alleged that American Sign Language ("ASL") is his primary language. *Id.* ¶ 97. It is alleged that after Jackson K. was forced to leave home by his adoptive father in January 2022, he reentered foster care in March 2022. *Id.* ¶¶ 97, 107, 108. It is alleged that between March and May 2022, DCFS placed Jackson K. in a shelter for unhoused adults, where he experienced threats from other residents. *Id.* ¶ 108. It is alleged that because of Jackson K.'s concerns regarding his physical safety, DCFS moved Jackson K. to a DCFS-contracted hotel and failed to provide him with an appropriate placement. *Id.* ¶ 109. It is alleged that Jackson K. was forced to complete THPP-NMD applications without an ASL interpreter and was repeatedly denied acceptance by THPP-NMDs because of a lack of appropriate placements for him and DCFS's alleged undermining of Jackson K.'s efforts. *Id.* ¶ 110. The SAC alleges that in August 2022, Jackson K. was ultimately accepted into a THPP-NMD program, but he was subsequently threatened with eviction in September 2022 and May 2023. *Id.* ¶¶ 111–13. It is further alleged that Jackson K. has been diagnosed with depression, anxiety and obsessive-compulsive disorder. *Id.* ¶ 98. The SAC alleges that in May and September of 2022, police responded to his mental health crises, but no mobile crisis response team was called, and Jackson K. was then placed on a 5150 psychiatric hold. *Id.* ¶¶ 114, 115. It is alleged that, despite being recommended behavioral health services in May 2022, Jackson K. did not receive any such services until October 2022. *Id.* ¶¶ 114, 116. It is alleged that the therapy services ended upon his graduation from high school in June 2023, and he was not receiving any behavioral health services as of March 2024. *Id.* ¶¶ 97, 116, 117.

It is alleged that Ocean S. has experienced significant abuse over the course of her life, that she has a history of sexual trauma and has been diagnosed with a mood disorder, insomnia, dysthymic disorder, PTSD and major depression. *Id.* ¶¶ 121–22. It is alleged that Ocean S. entered foster care in May 2018 and was constantly moved to different placements by DCFS, including to STRTPs, shelters and motels. *Id.* ¶¶ 128, 129. It is alleged that, despite her requests to be placed in a less restrictive environment, Ocean S. was unable to move into a THPP-NMD program until December 2020. *Id.* ¶ 131. It is alleged that in early 2022, Ocean S. was physically assaulted by her-then partner while at THPP-NMD placement, and thereafter, her THPP-NMD placement was terminated and DCFS failed to offer her an alternative one. *Id.* ¶¶ 132–33. From early 2023 to May 2023, when she found and moved into a SILP-funded apartment, Ocean S. struggled to find a safe and appropriate placement for herself and her daughter. *Id.* ¶¶ 134–36. It is further alleged that, despite treating providers' determinations that Ocean S. needed a range of intensive behavioral health services, upon discharge from the STRTP in December 2020, DMH failed to ensure that Ocean S. received any continued services. *Id.* ¶ 138. It is alleged that when Ocean S. experienced a mental health crisis while at the STRTP, no mobile crisis team responded. *Id.* ¶ 139.

It is alleged that Junior R. was originally placed in foster care from January 2012 to May 2014, and has cycled through several STRTPs since reentering foster care in 2018. *Id.* ¶¶ 150–52. It is alleged that Junior R. was forced to leave a SLIP housing program in February 2023 without adequate notice or opportunity to contest his removal. *Id.* ¶ 153. It is alleged that DCFS failed to offer Junior R. an appropriate placement after learning he was unhoused, and threatened to close his dependency case if he did not resume work or school soon, despite his homelessness. *Id.* ¶¶ 154, 155. It is alleged that Junior R. was threatened with physical harm after he was forced to return to his grandmother's care in April 2023, notwithstanding that her legal guardianship had been terminated years earlier. *Id.* ¶ 156. It is further alleged that Junior R. has been diagnosed with depression, anxiety and attention deficit hyperactivity disorder. *Id.* ¶ 144. It is alleged that the instability of his placement has also caused him to experience panic attacks and suicidal ideation. *Id.* It is alleged that despite mental health professionals' determinations that Junior R. required behavioral health services, upon Junior R.'s discharge from his last STRTP, he stopped receiving services. *Id.* ¶ 161. It is alleged that Junior R. thereafter experienced repeated mental health crises, to which there were no responses by a mobile crisis team, and which led to his hospitalization. *Id.* ¶ 162.

It is alleged that Monaie T. reentered foster care in 2016 at the age of 13 due to physical abuse by both of her parents. *Id.* ¶ 173. It is alleged that Monaie T. struggled with homelessness after her infant son died in 2018 and her daughter was born in 2019. *Id.* ¶¶ 174–81. It is alleged that DCFS failed to provide Monaie T. with an appropriate placement at various times between 2018 and 2024, leaving her unhoused. *Id.* It is further alleged that Monaie T. has been diagnosed with PTSD and major depressive disorder. *Id.* ¶ 167. It is alleged that despite mental health professionals' recommendations that Monaie T. receive behavioral health services, she has only received services sporadically. *Id.* ¶¶ 177, 182. It is alleged that Monaie T. has been hospitalized twice for suicidal ideation and DMH failed to provide her with mobile crisis services both times. *Id.* ¶ 183.

C. Requested Relief

The SAC seeks declaratory relief, injunctive relief and an award of attorney's fees and costs. *Id.* at 134–35. The SAC seeks preliminary and permanent injunctive relief to address the aforementioned,

alleged systemic failures to ensure the following: (1) class members receive "reasonable modifications necessary to avoid discrimination on the basis of disability, an adequate reliable system to provide accommodations, and equal access to integrated, least-restrictive, safe and appropriate foster care placement and services based on their needs;" (2) class members receive "adequate notice of placement decisions and sufficient notice apprising them of their right to appeal a denial of placement and the process for doing so"; (3) the "THPP-NMD Subclass members receive adequate notice and opportunity to be heard prior to being pushed out of placement"; (4) the Unsheltered Subclass "at a minimum, are not without shelter (including emergency housing), reasonable safety, and medical care"; (5) the STRTP Subclass is "not unnecessarily placed in STRTPs" or does not "face serious risk of institutionalization"; and (6) the Medicaid Subclass has access to and receives "Intensive Care Coordination and Mobile Crisis Response services to which they are entitled." *Id.*

## III. <u>The Requests for Judicial Notice</u>

In support of their respective MTDs SAC, both the County and the State Defendants seek judicial notice of certain documents. Dkt. 138-2 (County RJN); Dkt. 137-1 (State RJN).

### A. Legal Standards

Federal Rule of Evidence 201(b) provides that a court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Thus, a court "may . . . consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

District courts may take judicial notice of "records and reports of administrative bodies," *Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012) (citations omitted), as well as "undisputed matters of public record." *Harris v. County of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012). This includes "documents on file in federal or state courts." *Id.* (citing *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 803 n.2 (9th Cir. 2002)). Websites and their contents may also be subject to judicial notice. *See Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020).

While judicial notice is appropriate as to the fact that certain statements were made and certain information was accessible to the public, district courts "may not take judicial notice of the veracity of any arguments or facts presented in the documents subject to judicial notice." *Burnes v. Chavez*, No. 19-CV-03420-LHK, 2020 WL 2306488 at *1 (N.D. Cal. May 8, 2020) (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001)). The party "requesting judicial notice bears the burden of persuading the court that the particular fact is not reasonably subject to dispute and is capable of immediate and accurate determination by resort to a source whose accuracy cannot reasonably be questioned." *Newman v. San Joaquin Delta Cmty. Coll. Dist.*, 272 F.R.D. 505, 516 (E.D. Cal. 2011) (citation modified). Accordingly, even if judicial notice is taken of a record, a court must differentiate disputed and undisputed facts. *See Lee*, 250 F.3d at 689–90.

B. Analysis

The County seeks judicial notice of two documents. Dkt. 138-2 at 3. They are: (1) Plaintiff's Opposition to Defendants County of San Bernardino and Deborah Kay's Motion to Dismiss Pursuant to FRCP 12(b)(6), filed in *Mueller v. County of San Bernardino*, No. 5:18-cv-00151-DSF-SP (C.D. Cal. Apr. 9, 2018), Dkt. 25; and (2) California Department of Health Care Services Behavioral Information Notice No. 23-025 regarding Medi-Cal Mobile Crisis Services Benefit Implementation (https://www.dhcs.ca.gov/Documents/BHIN-23-025-Medi-Cal-Mobile-Crisis-Services-Benefit-Implementation.pdf), dated June 19, 2023. *Id.* The County RJN is unopposed.

The State Defendants seek judicial notice of four documents, which total more than 400 pages. Dkt. 137-1. They include: (1) AB 2083: Children and Youth Systems of Care, Legislative Report, January 2023 (https://www.chhs.ca.gov/wp-content/uploads/2023/02/AB-2083-Multiyear-Plan-for-Increasing-Capacity.pdf); (2) California Interagency Counsel on Homelessness's 2022-2023 Action Plan, November 2023 (https://www.bcsh.ca.gov/calich/documents/action_plan_2022-2023.pdf); (3) the April 3, 2024 Budget Agenda before the California State Assembly Budget Subcommittee No. 2 on Human Services on April 3, 2024 (https://abgt.assembly.ca.gov/system/files/2024-03/april-3-2024-asm-budget-sub-2-agenda-on-childrens-and-child-support-issues.pdf); and (4) the transcript from the California State Assembly Budget Subcommittee No. 2 on Human Services April 3, 2024 Hearing (https://calmatters.digitaldemocracy.org/hearings/257782?t=2098&f=1e0c2628270acd6c9d6dbd37045d6c8c). Dkt. 137-1 at 2–3. The State RJN is unopposed.

Because judicial notice is appropriate as to public records, government documents, and websites, "a court may take judicial notice of the existence" of these documents, although "the Court may not, however, accept as true the facts found or alleged in such documents." *Peel v. BrooksAmerica Mortg. Corp.*, 788 F. Supp. 2d 1149, 1158 (C.D. Cal. 2011). Accordingly, both the County RJN and the State RJN are **GRANTED**, in conformance with these limitations.

## IV. Motions to Dismiss

A. Legal Standards

Fed. R. Civ. P. 8(a)(2) provides that a "pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." The complaint must allege facts that, if established, would be sufficient to show that a claim for relief is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint need not include detailed factual allegations, but it must provide more than a "formulaic recitation of the elements of a cause of action." *Id.* at 555. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556–57).

Pursuant to Fed. R. Civ. P. 12(b)(6), a party may move to dismiss for failure to state a claim. Granting a motion to dismiss is appropriate only where the complaint lacks a cognizable legal theory or sufficient

facts to support one. *See Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). In considering a motion to dismiss, the allegations in the challenged complaint are deemed true and must be construed in the light most favorable to the non-moving party. *See Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). However, a court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

If a motion to dismiss is granted, the court should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). This policy is to be applied "with extreme liberality." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (quoting *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990)). However, allowing leave to amend is inappropriate in circumstances where litigants have failed to cure previously identified deficiencies, or where an amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Allen v. City of Beverly Hills*, 911 F.2d 367, 374 (9th Cir. 1990).

B. County MTD SAC

The County Defendants seek to dismiss the Third, Fourth, Fifth, Sixth, Seventh and Eighth Causes of Action in the SAC. Dkt. 138-1 at 9.

1. <u>Constitutional Claims (Third, Fourth and Fifth Causes of Action)</u>

(a) *Monell* Legal Standards

A plaintiff may pursue claims against a local government for constitutional injuries under 42 U.S.C. § 1983 when its officials implement a policy or custom of the local government that has that effect. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Counties are subject to *Monell* liability because they are not immune from suit under the Eleventh Amendment. *Eason v. Clark Cnty. Sch. Dist.*, 303 F.3d 1137, 1141 (9th Cir. 2002) (reviewing cases). To state a claim for *Monell* liability, a plaintiff must allege the following: "(1) he was deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to [plaintiff's] constitutional right; and (4) the policy was the moving force behind the constitutional violation." *Lockett v. County of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020).

"A plaintiff can satisfy *Monell*'s policy requirement in one of three ways." *Gordon v. County of Orange*, 6 F.4th 961, 973 (9th Cir. 2021). Thus, a local government may be liable: (1) if it acted "pursuant to an expressly adopted official policy"; (2) if it acted in conformance with a "longstanding policy or custom"; or (3) if "the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Id.* at 974 (citation modified).

(b) Procedural Due Process Claims (Third and Fifth Causes of Action)

In support of the County MTD, it is argued that Plaintiffs have not pleaded procedural due process claims because the SAC does not adequately allege the first element of a *Monell* claim -- a violation of their constitutional rights -- and as a result fails to plead the remaining elements of a *Monell* claim. Dkt. 138-1 at 12–23.

(i) Legal Standards

The Supreme Court has held that a person seeking a government benefit has a property interest protected by procedural due process only if the person has “a legitimate claim of entitlement to it.” *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Procedural due process claims are subject to a two-step inquiry: “the first asks whether there exists a liberty or property interest which has been interfered with by the State” while “the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.” *Kentucky Dep’t of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). A protected property interest “may arise from two sources-the Due Process Clause itself and the laws of the States.” *Kentucky Dep’t of Corr.*, 490 U.S. at 460 (citation omitted); *see also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982) (“The hallmark of property . . . is an individual entitlement grounded in state law, which cannot be removed except ‘for cause.’ ”). Although there is no property interest in a government benefit awarded under “unbridled discretion,” *City of Santa Clara v. Andrus*, 572 F.2d 660, 676 (9th Cir. 1978), if any discretion in the selection process is “closely circumscribe[d]” by “regulations and guidelines,” there is a protected claim of entitlement. *Ressler v. Pierce*, 692 F.2d 1212, 1215 (9th Cir. 1982).

(ii) Placement PDP Claim (Third Cause of Action)

The SAC alleges that, Plaintiffs “have a right to a foster care placement while in foster care, which Defendants have no discretion to deny.” Dkt. 130-1 ¶ 400. It is alleged that, “Defendants, while acting under color of law, have deprived Plaintiffs of their property without providing adequate procedural safeguards by failing to create adequate processes to notify foster youth of placement decisions or the procedures to appeal the denial of a foster care placement benefit.” *Id.* ¶ 401. It is alleged that Defendants’ failures to provide such notification processes are “deliberate policy choices and a repeated pattern of violations that amount to official policy.” *Id.* ¶ 402. It is also alleged that Defendants’ alleged policy choices result in a “grievous loss to Plaintiffs,” wherein Plaintiffs are denied or lose their placement without adequate procedural safeguards, causing Plaintiffs to “lose not only a place to sleep, but other DCFS resources that are linked to Plaintiffs’ placement status, including monthly stipends to help cover the cost of food and basic living expenses, clothing allowances and, for parenting youth, infant supplements.” *Id.* ¶ 403.

(1) Protected property interest

California law grants foster youth the “right” to “live in a safe, healthy, and comfortable home where they are treated with respect.” Cal. Welf. & Inst. Code §§ 16001.9(a)(1), 16001.9(a)(4). Plaintiffs argue that they have a protected property interest in the right to a placement that is consistent with this statute. Dkt. 158 at 13–14. The County Defendants argue that a “procedural due process claim that, like the SAC’s, demands process based on rights that may never be lawfully deprived fails as a matter

of law, for no amount of process could rise to the level of 'due' process." Dkt. 138-1 at 13–14 (citations omitted). The arguments of the County Defendants are unpersuasive.

As noted, to assert a protectable property interest in a benefit, a person must have a "legitimate claim of entitlement" to it. *Roth*, 408 U.S. at 577. "This typically requires an individual to demonstrate than an existing law, rule, or understanding makes the conferral of a benefit 'mandatory.' " *United States v. Guillen-Cervantes*, 748 F.3d 870, 872 (9th Cir. 2014) (quoting *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 760 (2005)).

The plain language of the statute shows that conferral of the benefit is mandatory for qualifying youth, which means it is something to which they are entitled. *See* Cal. Welf. & Inst. Code § 16001.9(a) ("All children placed in foster care . . . shall have the rights specified in this section. These rights also apply to nonminor dependents [("NMD")] in foster care, except when they conflict with NMDs' retention of all their legal decisionmaking authority as an adult."). CDSS guidance confirms the right of a transition age foster youth to receive such placement benefits. Dkt. 158 at 13–14 (citing Dkt. 130-1 ¶ 239) ("CDSS has instructed counties that 'the placing agency must offer the NMD a safe and suitable placement that is immediately available to the NMD. The placing agency remains responsible for ensuring that NMDs have access to a safe and suitable placement at all times.' "). The analysis of a protected property interest as alleged in the SAC is similar to that addressed in *Ressler v. Pierce*, which determined that the plaintiff had a "constitutionally protected 'property' interest in Section 8 benefits by virtue of her membership in a class of individuals whom the Section 8 program was intended to benefit." 692 F.2d 1212, 1215 (9th Cir. 1982). The SAC alleges that, "as dependents of the Juvenile Court, [Plaintiffs] are the members of the class of people meant to benefit from the statutes requiring Defendants to provide them with foster care placement." Dkt. 130-1 ¶ 400. Accordingly, the SAC sufficiently alleges a "constitutionally protected 'property' interest" in the right to a placement, by "virtue of [their] membership in a class of individuals whom the [placement scheme] was intended to benefit." *Ressler*, 692 F.2d at 1215.

The County Defendants also argue that, as a matter of law, Plaintiffs cannot state a protected property interest in the right to a placement because Plaintiffs have alleged that there is no discretion to deny the right. Dkt. 138 at 12–16. This position is also unpersuasive. The County Defendants have cited no binding authority in support of their position, and the cases on which they rely are distinguishable. For example, in *Mueller v. County of San Bernardino*, the plaintiffs alleged a procedural due process claim based on the defendants' alleged failure to document, report, and prevent, abuse experienced by the plaintiffs' foster child. No. 18-CV-151, 2018 WL 8130611, at *2 (C.D. Cal. May 9, 2018). *Mueller* concluded that the plaintiffs did not "adequately plead[] an entitlement giving rise to the alleged due process violation," because the "conclusory reference to the [plaintiffs'] constitutional liberty interest in the creation of their family through the adoption process,' is insufficient." *Id.* at *5. As noted, the SAC adequately alleges a protected property interest in the right to a placement. Further, *Mueller* determined that the plaintiffs' claim "muddle[d] the distinction between substantive and procedural due process" in part because plaintiffs did not "describe what process, such as predeprivation notice and a hearing, that, had it been followed, would have justified [d]efendants' turning a blind eye to [the foster child's] continued abuse at the hands of his brother." *Id.* at *4. Again, the claim alleged in the SAC is distinguishable. As Plaintiffs argue, they have "described additional processes to avoid erroneous deprivations, or alternatively, approve the County's actions (for example, if the applicant is determined not to qualify for placement, or if the applicant was already offered a placement)." Dkt. 158 at 16 (citing

Dkt. 130-1 ¶¶ 254–58).

For these reasons, the SAC adequately alleges a protected property interest of the Plaintiffs.

(2) Interfered with by the State

The County Defendants next argue that Plaintiffs have not alleged a "deprivation" that was caused "by the government." Dkt. 138-1 at 19. Specifically, they contend that "[e]very Plaintiff in this action had been offered a County-facilitated placement at the time this lawsuit was commenced," and to the extent Plaintiffs allege they were without placements for periods of time, "those instances were either caused by Plaintiffs' own decisions or decisions by private landlords—not 'by the government.' " *Id.* at 20. Plaintiffs respond that foster youth are entitled to a placement "at all times," and Plaintiffs have "alleged numerous instances in which Defendants have erroneously deprived them of their benefits by failing to offer any placement." Dkt. 158 at 16. Further, Plaintiffs argue that "notifying youth of placements is purely a government function that is currently carried out by County social workers." *Id.* at 17.

The SAC sufficiently states a claim for the deprivation of a protected property interest. It alleges that, as to each Plaintiff, DCFS failed to provide placements for various periods of time, emergency housing, adequate notice of placement decisions, or sufficient notice apprising Plaintiffs of their right to contest the decision or the process for doing so. Dkt. 130-1 ¶¶ 36, 60, 83, 102, 126, 148, 171. The SAC also makes more specific allegations. They include: (1) when Erykah B. was discharged from one placement due to DCFS's failure to provide on-time rent payment, DCFS moved her to a shelter; further, when Erykah B. was discharged from a THPP-NMD placement, DCFS failed to provide her with a new placement or emergency housing (*id.* ¶ 44–46); (2) when Onyx G. left a STRTP due to concerns for her safety, she became unhoused for a period without receiving a placement (*id.* ¶ 65); (3) in September 2022, when Rosie S. contacted DCFS in order to reenter foster care, DCFS referred Rosie S. to homeless shelters, not placements, and when Rosie S. reentered foster care in October 2022, DCFS failed to offer her a placement, which resulted in Rosie S. "couch-surfing" until she found a placement on her own (*id.* ¶¶ 87–89); (4) when Jackson K. reentered foster care, DCFS left him in a shelter for unhoused adults and moved him to a DCFS-contracted hotel without providing him a placement or notice of its determination (*id.* ¶¶ 108–09); (5) when Ocean S. was pushed out of a THPP-NMD program, the THPP-NMD provider paid for a one-month stay in a hotel for Ocean S., and by the time Ocean S. was required to leave, DCFS offered her only shelters or unlicensed living settings, not placements (*id.* ¶ 134); (6) when Junior R. was discharged from a SLIP program, he experienced homelessness and had to pay for a hotel with his own funds; further, when DCFS learned that Junior R. was unhoused, DCFS offered him only shelters and unlicensed settings, not placements (*id.* ¶¶ 153–54); (7) when Monaie T. entered extended foster care, she remained unhoused for months and DCFS did not provide her with emergency housing or any placement (*id.* ¶ 178).

As noted, the County Defendants also argue that the SAC fails to allege a deprivation "by the government." Dkt. 138-1 at 19. With respect to the Placement PDP Claim, the County Defendants argue that the SAC does not allege that Onyx G. was deprived of a placement by the government, because she left two of her placements of her own volition and one of them because it flooded. *Id.* at 20 (citing Dkt. 130-1 ¶¶ 66, 67, 72). This position is persuasive. The SAC does not include sufficiently specific allegations that a protected property interest of Onyx G. was "interfered with by the State." *See Kentucky Dep't of Corr.*, 490 U.S. at 460.

Based on the foregoing analysis, the allegations in the SAC as to all Named Plaintiffs except Onyx G. are sufficiently specific to allege a deprivation of a property interest by the government.

(3) Constitutionally deficient procedures

The final element to state a claim for procedural due process violation is "whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corr.*, 490 U.S. at 460. The County Defendants argue that the SAC does not state a claim for inadequate process because Plaintiffs have failed to avail themselves of protections already provided to them by the state through the juvenile court system, which was established to "ensure the needs of foster youth are met." Dkt. 138-1 at 21–22. Plaintiffs respond that the availability of the juvenile court system "does not relieve Defendants of their constitutional obligation to provide Plaintiffs with 'timely and adequate notice' of a placement decision so that Plaintiffs can have a determination that they can challenge before that decision-maker." Dkt. 158 at 17 (quoting *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970)).

"[I]n challenging a property deprivation, the claimant must either avail himself of the remedies guaranteed by state law or prove that the available remedies are inadequate." *Hudson v. Palmer*, 468 U.S. 517, 539 (1984) (O'Connor, J., concurring). However, the primary allegation in the SAC as to inadequate process for the Placement PDP Claim is that Defendants have "fail[ed] to create adequate processes to notify foster youth of placement decisions or the procedures to appeal the denial of a foster care placement benefit." Dkt. 130-1 ¶ 401; *see also id.* ¶¶ 248–52 (specific to each Named Plaintiff). The allegations challenge notification processes, not the existence of any available forum to challenge a placement decision. Plaintiffs do not contest that the juvenile court may be an appropriate forum for a foster youth to contest a placement decision. *See* Dkt. 158 at 17. Rather, Plaintiffs argue that Defendants have failed to provide notice to Plaintiffs of a forum and procedures for contesting or appealing a placement decision. *Id.* Thus, Plaintiffs' argument that "foster youth 'must receive notice of the availability of a procedure' in order to access it," is persuasive. *See* Dkt. 158 at 17 (quoting *Jordan v. Dir., Off. Of Workers' Comp. Programs*, 892 F.2d 482, 488 (6th Cir. 1989)).

The SAC sufficiently alleges that Defendants have failed to provide constitutionally sufficient procedures to Plaintiffs. *See* Dkt. 130-1 ¶ ¶¶ 248–52; *e.g.*, *id.* 108–09 (alleging that when Jackson K. reentered foster care, DCFS left him in a shelter for unhoused adults, then moved him to a hotel, during which time Jackson K. was not provided with a placement or with adequate written notice of the placement determination, his right to appeal that decision or the process for doing so).

* * *

For these reasons, the County MTD SAC is **DENIED IN PART** as to the Placement PDP Claim brought by the Named Plaintiffs other than Onyx G. The County MTD SAC is **GRANTED IN PART** with leave to amend as to the Placement PDP Claim brought by Onyx G.

(iii) <u>Push-Out PDP Claim (Fifth Cause of Action)</u>

The SAC alleges that "[w]hen Plaintiffs reside in THPP-NMD programs, the foster care placement benefit in which they have a protected property interest is their THPP-NMD placement." Dkt. 130-1 ¶ 415. It also alleges that, "Defendants, while acting under color of law, have deprived Plaintiffs of their

property without providing adequate procedural safeguards by failing to provide for sufficient notice or hearing before a neutral arbiter before a youth is pushed out of a THPP-NMD placement." *Id.* ¶ 416. The SAC further alleges that, "[d]ue to DCFS and CDSS' close coordination with and oversight of THPP-NMD providers, there is a sufficiently close nexus between the Defendants and their providers such that the decision to push transition age foster youth out of their THPP-NMD placement may be fairly treated as that of Defendants themselves." *Id.*

It is then alleged that, "Defendants allow THPP-NMD programs to misclassify as 'emergencies' behaviors that could be addressed through trauma-responsive approaches; by misclassifying this conduct, programs may, under Defendants' policies, unlawfully and involuntarily exit Plaintiffs from their placements without any notice at all." *Id.* ¶ 417. It is also alleged that Defendants' "actions, inactions, customs, policies, and practices deprive Plaintiffs of their property interest in THPP-NMD foster care placement and services without due process, in violation of 42 U.S.C. § 1983." *Id.* ¶ 418. It is next alleged that, "Defendants' procedural shortcomings for push-outs from THPP-placements are deliberate policy choices and a repeated pattern of violations that amount to official policy," which is the "cause of Plaintiffs' injuries." *Id.* ¶ 419.

It is also alleged that, Defendants' denial of Plaintiffs' placement and services results in "a grievous loss for Plaintiffs, without providing timely notice, a pre-terminating hearing, and an impartial decision-maker as required by the Fourteenth Amendment." *Id.* ¶ 420. It is alleged that the changes Plaintiffs propose "would require minimal administrative burden on Defendants" and any burden "would be greatly outweighed by the risk of housing instability and homelessness faced by the putative subclass of disabled foster youth." *Id.* ¶ 421.

(1) Protected property interest

As noted, the SAC alleges that, "[w]hen Plaintiffs reside in THPP-NMD programs, the foster care placement benefit in which they have a protected property interest is their THPP-NMD placement." Dkt. 130-1 ¶ 415. The County Defendants have not expressly contested the alleged protected property in THPP-NMD placements when Plaintiffs already reside in a THPP-NMD program, but they argue generally that the SAC fails to allege a cognizable procedural due process right. *See* Dkt. 138-1 at 12–21.

Plaintiffs argue that the County Defendants have conceded in prior briefing that "[a] person receiving . . . benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process." *See* Dkt. 158 at 18–19 (citing Dkt. 52-1 at 22 (quoting *Nozzi v. Housing Auth. of Los Angeles*, 806 F.3d 1178, 1191 (9th Cir. 2015)). Also, for the reasons stated in connection with the Placement PDP Claim, the argument that procedural due process does not apply to this interest is unpersuasive.

Accordingly, the SAC sufficiently alleges a protected property interest for the Push-Out PDP Claim.

(2) Interfered with by the State

As they did with respect to the Placement PDP Claim, the County Defendants argue that the SAC does not allege a "deprivation" that was caused "by the government." Dkt. 138-1 at 20.

As to the issue of "deprivation," the SAC makes the following allegations as to each member of the THPP-NMD Subclass[4]: (1) when Erykah B. was discharged from a THPP-NMD placement for minor infractions, the provider did not provide her with adequate notice upon discharge of her right to contest the decision or the process for doing so (Dkt. 130-1 ¶ 45); (2) when Rosie S. was accepted in a THPP-NMD program in Los Angeles, she went into labor while packing her things in Nevada; it is then alleged that because she had to remain in Nevada for a recovery period after giving birth, the THPP-NMD provider gave her spot away to another applicant and failed to provide her with adequate notice of her right to contest the discharge decision or the process for making such a challenge (*id.* ¶ 92); (3) one month into Jackson K.'s stay at a THPP-NMD program, he was given a three-day notice to vacate due to purported program rule violations. Notwithstanding that the THPP-NMD provider knew that Jackson K. required ASL interpretation, the notice referred to verbal warnings without stating whether an interpreter was present or whether any communications about program rules were provided to Jackson K. in ASL. Further, the notice failed to inform Jackson K. of his right to contest the discharge or how to do so. It is also alleged that the THPP-NMD provider ultimately withdrew the notice, but later, upon learning of noise complaints against Jackson K., his DCFS social worker threatened him with eviction (*id.* ¶¶ 111–13); (4) after experiencing a domestic violence incident by her then-partner who visited her while living at a THPP-NMD placement and perceptions of her response, Ocean S. was discharged by the THPP-NMD provider, after close consultation with DCFS; further, the discharge notice did not inform Ocean S. of her right to contest the termination decision or the process for doing so (*id.* ¶¶ 132–33); (5) when Junior R. was pushed out of a THPP-NMD program, the discharge notice did not inform him of his right to appeal the decision or the process for doing so (*id.* ¶ 152).

The foregoing allegations as to deprivations of the alleged right -- continued THPP-NMD placement -- are sufficiently specific as to Erykah B., Rosie S. and Ocean S. However, the allegations as to Jackson K. are insufficient to state a claim for deprivation to the extent it is alleged that the notice to vacate was withdrawn, and it is not alleged that Jackson K. was ever discharged or evicted from his THPP-NMD placement. The allegations as to Junior R. are conclusory. To the extent it is alleged that Junior R. was "pushed out of the THPP-NMD program," this is imprecise. *See* Dkt. 130-1 ¶ 152. The SAC does not allege that Junior R. was discharged or evicted, nor does it state either the reason provided to justify that decision, or the identity of the person who allegedly caused the "push out." *See id.*

With respect to the state action component of this claim, the County Defendants argue that the SAC "does not allege that any County Defendant took any action that deprived Plaintiffs of any right to housing." Dkt. 138-1 at 20. Rather, the County Defendants argue that if Plaintiffs are evicted from their placements by private landlords, it does not constitute a deprivation "by the government." *Id.* Plaintiffs respond that the actions by the THPP-NMD providers constitute state action for the following reasons: (i) the challenged procedures carried out by THPP-NMD providers "directly implement Defendants' policies and regulations"; (ii) there is a sufficiently close nexus Defendants and their contracted THPP-NMD providers; and (iii) the THPP-NMD providers are joint participants with Defendants with respect to whether Defendants have the ability to meet their duty to provide out-of-home care to NMDs. Dkt. 158 at 19–22.

---

[4] As previously stated, *supra* note 3, the SAC alleges that Onyx G. is part of the THPP-NMD Subclass. *See* Dkt. 130-1 ¶ 364. However, in a later filing Plaintiffs represent that Onyx G. is not part of the THPP-NMD Subclass. *See* Dkt. 159 at 8. Further, a review of the specific allegations made as to Onyx G. shows that they are insufficient to allege a Push-Out PDP Claim. Thus, the County MTD SAC is **GRANTED** as to the Push-Out PDP Claim to the extent that it is brought on behalf of Onyx G.

When evaluating the conduct of a private entity, the Ninth Circuit has identified four tests that "may aid" in "identifying state action": "(1) public function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus." *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 747 (9th Cir. 2020) (quoting *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003)). "Satisfaction of any one test is sufficient to find state action, so long as no countervailing factor exists." *Id.*

In support of the state action requirement, the SAC includes the following allegations: (1) "DCFS has delegated the essential government function of providing safe and appropriate placements for many of the transition age foster youth under DCFS's care and supervision to DCFS's contracted THPP-NMD providers" (Dkt. 130-1 ¶ 205); (2) because THPP-NMDs are only one of two primary placement options for NMDs and because DCFS does not operate its own THPP-NMD programs, "the contracted providers' operation of the THPP-NMD programs is indispensable to DCFS's ability to meet its duty to provide out-of-home care to transition age foster youth" (*id.*); (3) THPP-NMD providers must be certified by the County and meet statutory requirements before being licensed by CDSS (*id.* ¶ 206); (4) DCFS must certify that a prospective provider would be able "effectively and efficiently" to operate a THPP-NMD program (*id.*); (5) "THPP-NMD providers' policies, procedures, and day-to-day operations are heavily regulated at the State and County level" (*id.* ¶ 207); (6) to obtain and maintain licensure, THPP-NMD providers must adhere to CDSS's Interim Licensing Standards, which govern all aspects of a provider's operations, including, removal and discharge of program participants (*id.*); (7) the operations of THPP-NMD providers are also regulated through both their contracts with the County and the DCFS certification process (*id.* ¶ 208); (8) DCFS and its providers have a deeply intertwined process of selecting youth whom DCFS and its providers deem appropriate for THPP-NMD placements, providing placement to those youth, refusing placements to unsuitable youth, and involuntarily discharging youth from their placements (*id.*); (9) DCFS pre-selects which transition age foster youth apply for a THPP-NMD program and helps them submit their applications to providers (*id.*); (10) DCFS convenes regular meetings with its contracted THPP-NMD providers to discuss operational issues and challenges with placement (*id.*); (11) prior to discharging a THPP-NMD participant, providers inform DCFS of the decision and DCFS and the provider work together to decide a discharge plan and timeline (*id.*); and (12) Defendants can reverse the discharge decisions of their contracted THPP-NMD providers when they disagree with the decisions, and have done so. *Id.* ¶ 266.

Plaintiffs' principal argument is that the SAC sufficiently alleges state action under the joint action and government nexus tests. *See* Dkt. 158 at 20–22. Plaintiffs cite *Gallman v. Pierce*, 639 F. Supp. 472 (N.D. Cal. 1986) in support of this position. There, the plaintiffs challenged a federal regulation that allowed private landlords to terminate plaintiffs' subsidized leases in accordance with California eviction procedures, because those state procedures did not require landlords to include a statement of reasons for eviction. *Id.* at 474–75. *Gallman* determined that the state action requirement was met in part because the federal regulation "at least significantly encouraged the conduct that plaintiffs contest," the plaintiffs "directly challenge[d] the government-mandated procedures or regulations," as opposed to the decision of a private actor itself, and the government regulation in some ways restricted the "landlord's ability to terminate a lease." *Id.* at 481–82.

*Gallman* is persuasive.[5] Plaintiffs specifically challenge government regulations and the allegations in

[5] To the extent the County Defendants seek to distinguish *Gallman* because the state standards for lease termination at issue "prohibited landlords from 'exercis[ing] their "independent, professional judgment," ' " this position is unpersuasive. *See* Dkt. 177 at 6. The argument that "[d]ecisions 'based on independent professional

the SAC are sufficient to state the basis for the position that such regulations “at least significantly encourage[]” the THPP-NMD providers’ conduct through oversight, regulation, certification, and joint decision-making. Accordingly, the allegations in the SAC are sufficient to assert that there has been state action.

For the foregoing reasons, the allegations as to the THPP-NMD Subclass, other than Jackson K. and Junior R., are sufficient to state deprivation by the government.

(3) Constitutionally deficient procedures

The arguments by the County Defendants that the SAC fails to allege inadequate process are the same for the Placement PDP Claim as the Push-Out PDP Claim. As noted, the County Defendants argue that Plaintiffs have not alleged inadequate process because Plaintiffs have failed to avail themselves of protections already provided to them by the state through the juvenile court system, which was set up to “ensure the needs of foster youth are met.” Dkt. 138-1 at 21–22.

Similar to the Placement PDP Claim, the SAC sufficiently alleges inadequate process for the Push-Out PDP Claim. Again, to the extent the County Defendants argue that Plaintiffs’ claims fail because they have not availed themselves of the juvenile court system, the argument is unpersuasive. With respect to the Push-Out PDP Claim, the SAC alleges that Defendants have “failed to provide for sufficient notice or hearing before neutral arbiter before a youth is pushed out of a THPP-NMD placement.” Dkt. 130-1 ¶ 416. Plaintiffs argue that Defendants’ policy is to “not provide Plaintiffs with adequate pre-deprivation notice, notice periods, or continued residence in placements pending a hearing.” Dkt. 158 at 19 (citing Dkt. 130-1 ¶¶ 260–66). As to specific Plaintiffs, the SAC alleges:

> In addition to receiving inadequate notice of the termination of their placement benefit, Junior R., Ocean S., Rosie S., and Erykah B. were not afforded an adequate pre-deprivation process to contest the termination decision. Neither the CCLD complaint process nor the grievance procedure provide an opportunity for transition age foster youth who are discharged from a THPP-NMD to present their complaint in person or to have a neutral arbiter consider the evidence. Nor is there any mechanism to ensure that transition age foster youth remain housed while the complaint or grievance is pending.

Dkt. 130-1 ¶ 263.

The County Defendants have not presented a basis to support the conclusion or inference that Plaintiffs could have availed themselves of protections through “pre-deprivation processes that do not exist.” *See* Dkt. 158 at 19.

For the foregoing reasons, the allegations as to constitutionally deficient procedures are sufficient for the Push-Out PDP Claim.

---

judgments’ are ‘not subject to state direction,’ ” does not accurately state the cited caselaw. *Id.* at 5 (quoting *West v. Akins*, 487 U.S. 42, 52 n.10 (1988)). Rather, *West* held that such a determination made in one case, “cannot be transformed into the proposition that no person acts under color of state law where he is exercising professional judgment,” because “[t]he exercise of . . . independent professional judgment,” is not “the primary test.” *West*, 487 U.S. at 52 n.10.

* * *

Based on the preceding discussion, the County MTD SAC is **DENIED IN PART** as to the Push-Out PDP Claim brought by Plaintiffs in the THPP-NMD Subclass other than Onyx G., Jackson K. and Junior R. The County MTD SAC is **GRANTED IN PART** with leave to amend as to the Push-Out PDP Claim brought by Jackson K. and Junior R., and without leave to amend as to the Push-Out PDP Claim brought by Onyx G., to the limited extent Onyx G. was alleged to have been part of the THPP-NMD Subclass.

(c) Substantive Due Process Claim (Fourth Cause of Action)

The SAC alleges that, "[b]ecause Defendants have restrained Plaintiffs' personal liberty by taking them into State custody and extending their foster care past age eighteen by operation of law, Defendants owe Plaintiffs reasonable safety, shelter, and minimally adequate care and treatment appropriate to the Plaintiffs' age and circumstances." Dkt. 130-1 ¶ 407. It is alleged that "[d]ue to Defendants' special relationship with Plaintiffs, Defendants assumed an affirmative duty under the Fourteenth Amendment to the United States Constitution to protect Plaintiffs from harm, including but not limited to the harm caused by extreme housing instability and homelessness." *Id.* It is alleged that Defendants have developed and maintained customs, policies and practices that deprive Plaintiffs of their constitutional rights. *Id.* ¶ 408.

The County Defendants respond with the same argument addressed in the Order re MTDs FAC. *See* Dkt. 120 at 17–18; Dkt. 138-1 at 23–25. Specifically, the County Defendants argue that the Substantive Due Process Claim fails because Plaintiffs are "all adults who exited traditional foster care (and thereby custody). "That Plaintiffs voluntarily opted into non-custodial adult foster services does not extend any prior relationship." Dkt. 138-1 at 23.

In the Order re MTDs FAC, the following determinations were made:

> As to whether Plaintiffs are owed an affirmative duty under the Fourteenth Amendment, the Due Process Clause does not generally "confer any affirmative right to governmental aid." *Henry A. v. Willden*, 678 F.3d 991, 998 (9th Cir. 2012) (cleaned up). However, the "special relationship" exception to this rule applies "when a custodial relationship exists between the plaintiff and the State such that the State assumes some responsibility for the plaintiff's safety and well-being." *Id.* The Ninth Circuit has held that the "special relationship doctrine applies to children in foster care." *Id.* at 1000; *see also Lipscomb by & through DeFehr v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992) ("Once the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child.").
>
> This special relationship does not automatically terminate when a foster youth becomes 18 years old. Although a person who is no longer a minor is not in the "legal custody" of the juvenile courts (Cal. Welf. & Inst. Code § 303), he or she may remain in a custodial relationship with the state. As the County Defendants stated in support of the County SMJ MTD, Plaintiffs entered the foster care system as a result of "*state*-initiated proceeding[s]."

> Dkt. 51-1 at 18 (emphasis added). Similarly, although nonminor dependents may have the legal ability to leave what they deem an unsuitable placement, they remain in extended foster care because "they require support and do not have family members able to care from them," in large part due to the "state's own action in removing these children from their families." Dkt. 67 at 14. Because the "the law does not impose the duty of guarding their own safety on wards of the state," *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 842 (9th Cir. 2010), the special relationship exception applies to all transition foster care youth, including nonminor dependents.

Dkt. 120 at 17–18.

The County Defendants rely on unpublished district court opinions to support their contrary position on this issue. *See* Dkt. 138-1 at 23; Dkt. 177 at 8. These decisions are not binding and are distinguishable. For example, in *Schwartz v. Booker*, it was determined that there was no special relationship between a minor and a county when the child was placed in the legal and physical custody of an individual who was not a foster parent. No. 09-CV-915, 2024 WL 3540355, at *7–8 (D. Colo. July 25, 2025). *Morse for S.S. v. Oregon by and through the Department of Human Services* held -- in the context of establishing the duty element of a negligence claim against Oregon Department of Human Services ("DHS") for the criminal conduct of a third party -- that no special relationship existed between Oregon DHS and the minor after the court granted guardianship to the foster parent. No. 19-CV-1320, 2024 WL 4008321, at *4–5 (D. Or. Aug. 29, 2024). Thus, the Oregon DHS retained neither legal nor physical custody of the minor, which is not what is alleged in the SAC.[6]

For these reasons, the County Defendants have not shown that a special relationship cannot exist for Plaintiffs as transition age foster youth as alleged in the SAC.

As to whether Plaintiffs have alleged cognizable rights, the SAC alleges that "Defendants, while acting under color of law, have developed and maintained customs, policies and practices that deprive Plaintiffs of their constitutional rights" as follows: (1) failing to provide shelter; (2) failing to identify sufficient emergency housing options for youth transitioning between placements or reentering care; (3) affirmatively issuing standards and policies that undermine shelter for transition age foster youth; and (4) deliberately ignoring the need to evaluate and expand the number of safe and appropriate placements and the emergency housing capacity for transition age foster youth. Dkt. 130-1 ¶ 408.

As noted in the Order re MTDs FAC, "[d]ue to their special relationship with the state, transition age foster youth have the right to the 'basic human needs--*e.g.*, food, clothing, shelter, medical care, and reasonable safety.' " Dkt. 120 at 18 (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989)). And, "because shelter presents a basic human need, transition age foster youth have a substantive due process right to 'emergency housing options.' " *Id.* at 19. In support of the claim that the County Defendants violated this right, the SAC alleges that the following occurred due to inadequate emergency housing placements: (1) Erykah B. was unhoused (Dkt. 130-1 ¶¶ 40, 41, 46); (2) Rosie S. became homeless for a period because of structural difficulties in navigating re-entry (*id.*

[6] For the reasons stated in the Order re County Defendants' Ex Parte Application for Leave to File Supplemental Brief in Support of Pending Motion to Dismiss the SAC ("Order re Application" (Dkt. 243)), *Wyatt B. v. Kotek*, 146 F.4th 1267 (9th Cir. 2025) does not change the analysis of substantive due process rights of transition age foster youth. Dkt. 243 at 3–5.

¶ 86); (3) Junior R. became homeless for a period (*id.* ¶¶ 154, 156); and (4) Monaie T. was unhoused for several time periods. *Id.* ¶¶ 175, 178, 180, 181.

The allegations in the SAC as to all the Named Plaintiffs in the Unsheltered Subclass are sufficiently specific. They are also supported by additional allegations that the County Defendants had a longstanding policy of deliberate indifference to the rights of Plaintiffs in the Unsheltered Subclass. As stated in the Order re MTDs FAC, "[a]s applied to foster children, the 'deliberate indifference standard . . . requires a showing of an objectively substantial risk of harm and a showing that the officials were subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and that either the official actually drew that inference or that a reasonable official would have been compelled to draw that inference.' " Dkt. 120 at 19 (quoting *Tamas*, 630 F.3d at 845). Like the FAC, the SAC alleges that, although the County Board of Supervisors recognized an "acute need for youth in extended foster care and youth exiting foster care to have access to housing programs," the County Defendants neither expanded capacity "despite the stated availability of both the funds and the contractor capacity to do so," nor collected data that might reveal the severity of the problem. Dkt. 130-1 ¶¶ 225, 229, 232–33. These allegations are sufficiently specific to state a claim under *Monell*.

For these reasons, the County MTD SAC is **DENIED** as to the Substantive Due Process Claim brought by the Named Plaintiffs in the Unsheltered Subclass to the extent it is premised on a right to shelter.

2. <u>Medicaid Act Claim (Sixth Cause of Action)</u>

The SAC alleges that "Defendants, DMH and Director Baass, while acting under color of law, have violated the EPSDT provisions of the Medicaid Act, by failing to provide or arrange for behavioral health services for the Medicaid Subclass that are necessary to correct or ameliorate their mental health conditions in violation of 42 U.S.C. §§ 1396a(a)(10)(A), 42 U.S.C. §§ 1396a(43)(C), 1396d(a)(4)(B) and 1396d(r)." Dkt. 130-1 ¶ 424. Specifically, it is alleged that Defendants "fail to provide or arrange for medically necessary Intensive Care Coordination [("ICC")] and mobile crisis services [("MCS")] to which Plaintiffs are entitled." *Id.* It is also alleged that "Defendants' acts and omissions described above violate 42 U.S.C. § 1983 by depriving Plaintiffs and members of the Medicaid Subclass of their statutory rights." *Id.* ¶ 426.

It is further alleged that, as a state participating in Medicaid, California is required to provide EPSDT services for Medicaid eligible youth participants under the age of 21, including "screenings to identify transition age foster youth's mental and physical health needs, as well as arrange for treatment services necessary to correct or ameliorate a youth's mental or physical health conditions." *Id.* ¶ 322. It is also alleged that "Medicaid-eligible children are entitled to a broader set of services than Medicaid-eligible adults," and "when services are necessary to correct or ameliorate a child's mental or physical health condition, the state must provide them, even if they are not otherwise included in the state plan, as long as they fall within service categories listed in 1396d(a)." *Id.* ¶ 323.

The County Defendants challenge the adequacy of these allegations on two grounds. *First*, the County Defendants argue that the SAC fails to state a Medicaid Act claim for failure to provide MCS because "[w]ithout pleading facts establishing that MCS was part of California's Medicaid plan at the time MCS allegedly was denied, Plaintiffs fail to state a claim." Dkt. 138-1 at 26. Plaintiffs respond that they do not

have to show that MCS was a service covered under California's plan, so long as they allege that MCS is "necessary health care" as identified in 42 U.S.C. § 1396d(r)(5). Dkt. 158 at 22–23.

Under 42 U.S.C. § 1369d(r)(5), EPSDT services are defined to include:

> Such other necessary health care, diagnostic services, treatment, and other measures described in subsection (a) to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan.

The terms of the statute support Plaintiffs' position that MCS need not be "covered under the State plan" in order to constitute an EPSDT service to which a Medicaid recipient may be entitled. 42 U.S.C. § 1369d(r)(5). However, the County Defendants argue that under Section 1369d(r), "[s]uch other necessary health care" must be "described in subsection (a)," and because Section 1396d(a) "makes no reference to MCS and the [County MTD SAC Opposition] does not argue any other provision covers MCS," Plaintiffs fail to state a claim. Dkt. 177 at 8–9. Although Plaintiffs did not identify the provision that covers MCS in their County MTD SAC Opposition, the allegations in the SAC are what is relevant to whether it adequately states a claim. The SAC alleges that MCS is covered as rehabilitative services under Section 1396d(a)(13). Dkt. 130-1 ¶ 331. Section 1396d(a)(13) is a broad provision which includes:

> [A]ny medical or remedial services (provided in a facility, a home, or other setting) recommended by a physician or other licensed practitioner of the healing arts within the scope of their practice under State law, for the maximum reduction of physical or mental disability and restoration of an individual to the best possible functional level.

Further, courts "construing EPSDT requirements" have concluded that "so long as a competent medical provider finds specific care to be 'medically necessary' to improve or ameliorate a child's condition, the 1989 amendments to the Medicaid statute require a participating state to cover it." *Rosie D. v. Romney*, 410 F. Supp. 2d 18, 26 (D. Mass. 2006) (citing *Collins v. Hamilton*, 349 F.3d 371, 375 (7th Cir. 2003)). Thus, the argument that the SAC fails to assert a violation of the Medicaid Act with respect to MCS because the SAC does not allege that MCS is covered under the statute, is unpersuasive.

*Second*, the County Defendants argue that the SAC fails to establish the last three prongs of *Monell* liability with respect to both MCS and ICC under the Medicaid Act Claim. Dkt. 138-1 at 26–27. As noted, to state a claim under *Monell*, a plaintiff must allege the following: "(1) he was deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to [plaintiff's] constitutional right; and (4) the policy was the moving force behind the constitutional violation." *Lockett*, 977 F.3d at 741.

Also as noted, the policy requirement can be satisfied by a showing that the governmental entity acted in conformance with a "longstanding policy or custom." *Gordon*, 6 F.4th at 973. Such a policy may be one of inaction "based on the government body's 'failure to implement procedural safeguards to prevent constitutional violations.' " *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014) (quoting *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012)). When that is alleged,

> the plaintiff must show, first, that the policy amounts to deliberate indifference to the plaintiff's constitutional right. This requires showing that the defendant was on actual or constructive notice that its omission would likely result in a constitutional violation. Second, the plaintiff must show that the policy caused the violation in the sense that the municipality could have prevented the violation with an appropriate policy.

*Id.* (citation modified).

The County Defendants argue that, because the SAC does not allege violations that are "widespread" and "pervasive," it does not sufficiently allege a policy or custom under *Monell*. Dkt. 138-1 at 26 (quoting *Hunter v. County of Sacramento*, 622 F.3d 1225, 1233 (9th Cir. 2011)). Further, the County Defendants argue that the SAC neither identifies a deliberate choice not to provide ICC or MCS, nor connects the alleged policy to the particular injury. *Id.* at 27.

The SAC alleges that DMH has "consistently failed" to provide Plaintiffs with MCS and ICC services "to which they are entitled, despite evidence demonstrating the deficiencies in DMH's provisions of these services." Dkt. 130-1 ¶ 342. With respect to ICC, the SAC alleges that the DMH's quality assurance mechanism, the "Triennial Review," demonstrates that in 2022, around one-fifth of children whose files were reviewed were not assessed as to whether they needed ICC services and about half of those youth "appear[ed] to have necessitated an individualized [ICC] determination." *Id.* ¶ 333. It is also alleged that despite the metrics in the 2022 Triennial Review, neither DCHS nor DMH have responded with an improvement in the delivery of ICC. *Id.*

With respect to MCS, the SAC alleges that an April 2023 analysis of DMH data found that "in more than 90% of cases, it took more than an hour for DMH's mobile crisis teams to respond to callers in need of emergency services," and in half of those cases, it took the Mobile Crisis Response team more than four hours, while in some cases it took days. *Id.* ¶ 335. The SAC also alleges that each member of the Medicaid Subclass experienced crisis incidents to which there was no response by a mobile crisis team, and that no member of the Medicaid Subclass has consistently received ICC despite the medical necessity of such services. *Id.* ¶¶ 338–39; *e.g.*, *id.* ¶ 75 (alleging that Onyx G. has experienced approximately 20 hospitalizations due to suicidal ideation since the age of five, and only once had a response by a mobile crisis team), *id.* ¶ 161 (alleging that despite a mental health professional's determination that Jackson K. needed behavioral health services, including case management, upon his discharge from an STRTP, Jackson K. stopped receiving intensive behavioral health services and never received ICC from DMH).

The aforementioned allegations in the SAC sufficiently allege pervasive violations -- of which the County Defendants were aware yet they took no action -- and the corresponding harm to Plaintiffs. Accordingly, the SAC alleges a policy of inaction that is sufficient to support a *Monell* claim.

Accordingly, the County MTD SAC is **DENIED** with respect to the Medicaid Act Claim.

3. The Integration Mandate Claims (Seventh and Eighth Causes of Action)

(a) Legal Standards

Title II of the ADA prohibits public entities from discriminating on the basis of disability, *see* 42 U.S.C. § 12132, and section 504 imposes a similar bar against those who receive federal funding. *See* 29 U.S.C. § 794. "The two laws are interpreted coextensively because there is no significant difference in the analysis of rights and obligations created by the two Acts." *Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729, 737 (9th Cir. 2021) (citation modified). To state a claim under Title II of the ADA, a plaintiff must allege the following: (1) he or she is a qualified individual with a disability; (2) he or she was excluded from participation in or denied the benefits of a public entity's services, programs or activities; and (3) such discrimination was by reason of their disability. *See Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001).

Further, the implementing regulations of the ADA require a public entity to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). "Under this mandate, states are required to provide care in integrated environments for as many disabled persons as is reasonably feasible, so long as such an environment is appropriate to their mental-health needs." *Arc of Wash. State Inc. v. Braddock*, 427 F.3d 615, 618 (9th Cir. 2005). The Supreme Court has thus held that the "[u]njustified isolation" of persons with disabilities constitutes "discrimination based on disability." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999).

(b) Application

The SAC alleges that, under the terms of section 504 and the ADA, Defendants are prohibited "from discriminating against individuals with disabilities," including "through contractual, licensing or other arrangements." Dkt. 130-1 ¶ 368. It is alleged that Plaintiffs and members of the STRTP Subclass have mental health disabilities that are protected under section 504 and the ADA, and by the corresponding, implementation regulations of each statute. *Id.* ¶¶ 428, 441–42. With respect to the Integration Mandate Claims, it is alleged that Plaintiffs and STRTP Subclass members are capable of living in integrated settings, and they wish to receive services in the most integrated community-based settings that meet their needs. *Id.* ¶¶ 433, 447. It is alleged that Defendants violate both statutes for failing to provide a minimally adequate group of placements and services to meet the needs of transition age foster youth with mental health disabilities. *Id.* ¶¶ 434, 451.

As a preliminary matter, the SAC alleges that "Plaintiffs and members of the STRTP Subclass have mental health disabilities that substantially limit one or more major life activities, or have a record of such disabilities, and therefore have a disability as defined by the ADA, 42 U.S.C. § 12102 *et seq.*, and its implementing regulations, 28 C.F.R. § 35.108." Dkt. 130-1 ¶ 441. These regulations provide that certain psychiatric diagnoses presumptively "substantially limit" major life activities, including "[m]ajor depressive disorder, bipolar disorder, post-traumatic stress disorder, obsessive compulsive disorder, and schizophrenia." 28 C.F.R. § 35.108(d)(2)(iii)(K). The SAC sufficiently alleges that each of the Plaintiffs in the STRTP Subclass is a qualified individual with disabilities. *See* Dkt. 130-1 ¶ 56 (Onyx G. has been diagnosed with anxiety, major depressive disorder and disruptive mood dysregulation disorder); *id.* ¶ 122 (Ocean S. has been diagnosed with a mood disorder, dysthymic disorder, insomnia,

PTSD and major depression); *id.* ¶ 144 (Junior R. has been diagnosed with depression, anxiety and attention deficit hyperactivity disorder); *id.* ¶ 167 (Monaie T. has been diagnosed with PTSD and major depressive disorder).

The County Defendants argue that Plaintiffs have failed to state a claim for violation of the integration mandate because the SAC does not allege that they are presently institutionalized. They also contend that the determination in *M.R. v. Dreyfus* that "serious risk of institutionalization" is sufficient to state a claim under the integration mandate, has since been abrogated. Dkt. 138-1 at 29–31 (quoting *M.R. v. Dreyfus*, 663 F.3d 1100 (9th Cir. 2011), *opinion amended and superseded on denial of reh'g*, 697 F.3d 706 (9th Cir. 2012)). Specifically, the County Defendants contend that the holding in *Dreyfus* has been abrogated because it was based on *Auer* deference to a statement filed by the DOJ, and the Supreme Court has since determined that *Auer* deference can be exercised only where a regulation is genuinely ambiguous. *Id.* at 29–31 (citing *Kisor v. Wilkie*, 588 U.S. 558 (2019)). Further, the County Defendants argue that no determination was made in *Dreyfus* that the regulation was "genuinely ambiguous." *Id.* at 30. Thus, the County Defendants argue that the "better and more recent view" is that stated in *United States v. Mississippi*, 82 F.4th 387, 392 (5th Cir. 2023) (finding that "[n]othing in the text of Title II, its implementing regulations, or *Olmstead* suggests that a *risk of institutionalization*, without actual institutionalization, constitutes actionable discrimination."). *Id.* at 31.

Viewed collectively, these arguments by the County Defendants are unpersuasive. *First*, as stated in the Order re MTDs FAC, the Ninth Circuit has held that a plaintiff alleging an integration mandate claim must "show that the challenged state action creates a serious risk of institutionalization." *Dreyfus*, 697 F.3d at 734. Neither the Ninth Circuit nor the Supreme Court has reconsidered that ruling. Accordingly, "[a] district court bound by circuit authority . . . has no choice but to follow it." *Hart v. Massanari*, 266 F.3d 1155, 1175 (9th Cir. 2001); *see also Jeremiah M. v. Crum*, 695 F. Supp. 3d 1060, 1107 n.318 (D. Alaska 2023) (acknowledging the Fifth Circuit's decision in *Mississippi* and declining to deviate from Ninth Circuit precedent). *Second*, to the extent the County Defendants argue *Dreyfus* has been abrogated by *Kisor*, that position lacks force. *Kisor* determined that "a court should not afford *Auer* deference unless the regulation is genuinely ambiguous." 588 U.S. at 574. Although the Ninth Circuit engaged in some *Auer* deference in *Dreyfus*, it also independently concluded as follows:

> DOJ's interpretation is not only reasonable; it also better effectuates the purpose of the ADA "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(2). Institutionalization sometimes proves irreversible. Dr. Gardner, Plaintiffs' expert on habilitative mental health care, declared that "[i]nstitutionalization ... creates an unnecessary clinical risk that the individual will become so habituated to, and so reliant upon, the programmatic and treatment structures that are found in an inpatient setting that his or her ability to function in less structured, less restrictive, environments may become severely compromised." In recognition of this clinical reality, the cases accord with DOJ's interpretation. *See, e.g., V.L.,* 669 F.Supp.2d at 1119 ("[P]laintiffs who currently reside in community settings may assert ADA integration claims to challenge state actions that give rise to a risk of unnecessary institutionalization."); *Brantley,* 656 F.Supp.2d at 1170–71 ("[T]he *risk* of institutionalization is sufficient to demonstrate a violation of [the ADA]."); *see also, e.g., Fisher v. Okla. Health Care Auth.,* 335 F.3d 1175, 1182 (10th Cir.2003) ("*Olmstead* does not imply that disabled persons who, by reason of a change in state policy, stand imperiled with segregation, may not bring a challenge to that state policy under the ADA's

integration regulation without first submitting to institutionalization.").

697 F.3d at 735–36.[7]

For these reasons, *Kisor* is not "clearly irreconcilable" with *Dreyfus*. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003). Plaintiffs may state a claim for violation of the integration mandate where it is pleaded that "the challenged state action creates a serious risk of institutionalization." *Dreyfus*, 697 F.3d at 734.

The County Defendants argue in the alternative that, even if a "risk of institutionalization," theory is operative, Plaintiffs have failed to plead a serious risk of institutionalization. Dkt. 138-1 at 32. The Ninth Circuit has explained that such a risk of institutionalization arises when "[t]he elimination of services that have enabled Plaintiffs to remain in the community violates the ADA, regardless of whether it causes them to enter an institution immediately, or whether it causes them to decline in health over time and eventually enter an institution in order to seek necessary care." *Dreyfus*, 697 F.3d at 734–35.

The SAC alleges that each Plaintiff in the STRTP Subclass is at serious risk of future institutionalization in light of his or her past STRTP institutionalizations. Dkt. 130-1 ¶ 61 (Onyx G.); *id.* ¶ 127 (Ocean S.); *id.* ¶ 149 (Junior R.); *id.* ¶ 172 (Monaie T.). It is specifically alleged that: (1) Onyx G. has been cycled through at least four STRTPs within a period of four years, and 20 hospitalizations since the age of five (*id.* ¶¶ 64, 75); it is further alleged that each time Onyx G. was discharged from a STRTP, she stopped receiving behavioral health services or received them inconsistently (*id.* ¶ 74); (2) Ocean S. was placed in various STRTPs beginning in May 2018, and due to a lack of placements and despite an expressed desire to be in a less restrictive environment, she was not able to move into a THPP-NMD program until December 2020 (*id.* ¶¶ 129–31); it is further alleged that when Ocean S. was discharged from an STRTP, DMH failed to ensure that Ocean S. continued to receive behavioral health services (*id.* ¶ 138); (3) Junior R. was moved to six different STRTPs between December 2018 and July 2021 and was hospitalized twice in November 2021 (*id.* ¶¶ 151, 162); it is further alleged that upon discharge from his last STRTP, Junior R. stopped receiving intensive behavioral health services, and within months he experienced mental health crises that led to his hospitalization (id. ¶¶ 161–62); and (4) Monaie T. was hospitalized twice and institutionalized for several months in 2020 at a STRTP rather than at a community-based placement (*id.* ¶¶ 177, 183–84); it is further alleged that it was only after Monaie T. entered the STRTP that she was connected with the intensive behavioral health services she needed to avoid such institutionalization, and since she was discharged, she has only sporadically received behavioral health services. *Id.* ¶¶ 182, 184–85.

In addition to the Plaintiff-specific averments, the SAC alleges that "[s]egregated settings such as congregate care have the highest rates of re-entry into institutions when compared to less restrictive placements," because congregate care "does not generally enhance or improve child development, stability, and long-term outcomes." *Id.* ¶ 306. It is also alleged that Defendants' failure to provide these "necessary behavioral health services resulted in worsening symptoms, harming youth who are entrusted to the County's care," and "over time, without access to these services, youth are cycled in and out of placements that do not meet their individual needs, funneled into overly restrictive settings,

[7] For similar reasons and as stated in the Order re Application, the Department of Justice Office of Legal Counsel opinion, "Application of the Rehabilitation Act and Americans with Disabilities Act to State Institutionalization of Patients with Severe Mental Illness or Disabilities" does not change this analysis. Dkt. 243 at 5.

forced into dangerous situations while unhoused, and effectively abandoned by the system." *Id.* ¶ 340.

The SAC sufficiently alleges a serious risk of institutionalization caused by Defendants' actions and inactions. The alleged cycle of Defendants placing Plaintiffs in restrictive institutionalized settings, where Plaintiffs allegedly receive behavioral health services and then lose them, either entirely or in part, upon discharge, thereby leaving Plaintiffs without the services needed to stay out of such institutionalized settings, is sufficient to state a claim for a violation of the integration mandate. *See also Jeremiah M.*, 695 F. Supp. 3d at 1108 ("The persistent cycle of a lack of appropriate placements followed by institutionalizations plausibly alleges that Defendants' practices have placed Plaintiffs in this cycle at a serious risk of being forced from an integrated environment into an institutional or segregated setting."). The SAC presents sufficient, non-conclusory allegations as to these issues.

For these reasons, the County MTD SAC is **DENIED** with respect to the Integration Mandate Claims brought by the STRTP Subclass.

C. State MTD SAC

The State Defendants seek to dismiss the Integration Mandate Claims against all State Defendants, the Procedural Due Process Claims against Director Troia, the Substantive Due Process Claims against Director Troia and Secretary Johnson, and the Medicaid Act Claim against Director Baass. Dkt. 137.

1. <u>The § 1983 Claims</u>

Each of the § 1983 claims is brought against certain State Defendants in their official capacities. *See* Dkt. 130-1 ¶¶ 26, 28, 30. With respect to the § 1983 claims, the State Defendants argue that Plaintiffs may not "improper[ly] attempt to amend the SAC through their opposition," and that Plaintiffs are judicially estopped from arguing that the SAC sufficiently pleads liability of the State Defendants under *Hartmann v. California Department of Corrections and Rehabilitation*, 707 F.3d. 1114 (9th Cir. 2013) because, in their opposition to the State Defendants' motions to dismiss the FAC, Plaintiffs advocated for the "supervisory liability" standard that was included in the Order re MTDs FAC. Dkt. 176 at 8–9; *see also* Dkt. 137 at 22–23. Further, the State Defendants argue that even if Plaintiffs are not estopped from making the argument, the allegations in the SAC are insufficient to state a claim under *Hartmann*. Dkt. 176 at 10–12; Dkt. 137 at 24–25.

(a) Judicial estoppel

The doctrine of judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)). The Supreme Court has held that in determining whether to apply judicial estoppel, the following factors are relevant: *First*, "a party's later position must be 'clearly inconsistent' with its earlier position." *Id.* at 750 (citations omitted). *Second*, "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled.' " *Id.* (citations omitted). *Third*, "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 751 (citations omitted).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-06921-JAK-E | Date | September 18, 2026 |
| Title | Ocean S., et al. v. Los Angeles County, et al. | | |

Regarding the first element, the State Defendants argue that in opposing the State Defendants' motions to dismiss the FAC, "Plaintiffs argued for supervisory liability against the State Officials," but Plaintiffs' new position in the State MTD SAC Opposition, is that supervisory liability standard "is not applicable in this case." Dkt. 176 at 9 (citing Dkts. 68, 71, 72, 157). An evaluation of Plaintiffs' oppositions to the State Defendants' motions to dismiss the FAC (*see* Dkts. 68, 71, 72), shows that Plaintiffs' position is not clearly inconsistent with its current position in the State MTD SAC Opposition. In the State MTD SAC Opposition, Plaintiffs argue that the standard stated in *Hartmann* is appropriate when evaluating a plaintiff's § 1983 claims against a state official sued solely in his or her official capacity. Dkt. 157 at 11–12. The *Hartmann* standard is as follows:

> An official-capacity suit "represent[s] only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (quoting *Monell v. Dep't of Soc. Servs. of N.Y.C.,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); *see Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). "Suits against state officials in their official capacity therefore should be treated as suits against the State." *Hafer,* 502 U.S. at 25, 112 S.Ct. 358. A plaintiff seeking injunctive relief against the State is not required to allege a named official's personal involvement in the acts or omissions constituting the alleged constitutional violation. *See id.; Graham,* 473 U.S. at 166, 105 S.Ct. 3099. Rather, a plaintiff need only identify the law or policy challenged as a constitutional violation and name the official within the entity who can appropriately respond to injunctive relief. *See L.A. Cnty. v. Humphries,* ––– U.S. ––––, 131 S.Ct. 447, 452, 454, 178 L.Ed.2d 460 (2010); *Hafer,* 502 U.S. at 25, 112 S.Ct. 358.

*Hartmann*, 707 F.3d at 1127.

In Plaintiffs' opposition to the CDSS MTD FAC, they argued that "Director Johnson is responsible for ensuring adequate placements for transition age foster youth in her capacity as the head of CDSS (*See id.* ¶¶ 30-31, 129 (describing CDSS' supervisory responsibility over county administration of foster systems).)." Dkt. 68 at 17. To the extent Plaintiffs used the term "supervisory," it is appropriately seen as a reference to the relationship between CDSS and the County system, not Director Johnson. Further, although *Hartmann* is not expressly cited, Plaintiffs' argument appears to address the prong of the *Hartmann* analysis that requires a plaintiff to identify an official "who can appropriately respond to injunctive relief." *Hartmann*, 707 F.3d at 1127.

In Plaintiffs' opposition to the DHCS MTD FAC, they argued that the FAC "adequately demonstrates failures in oversight and administration of Medicaid services by Defendant Baass, and seeks remedies which only Defendant Baass could provide." Dkt. 71 at 11. Again, although *Hartmann* is not expressly cited, this argument aligns with the element of *Hartmann* that requires a showing that the official can respond to the injunctive relief sought. *See Hartmann*, 707 F.3d at 1127.

In Plaintiffs' opposition to the CalHHS MTD FAC, they argued that the FAC describes "supervisory deficiencies by Secretary Ghaly and CalHHS." Dkt. 72 at 7. However, the argument was made in the context of Plaintiffs' position that "CalHHS Defendants, as the agency and secretary ultimately responsible for CDSS and DHCS, have violated Plaintiffs' constitutional and statutory rights." *Id.* at 5. Again, Plaintiffs' position appears to be directed toward the responsibility of Ghaly and CalHHS for the

actions of a sub-agency, and as to the "ability to respond" under *Hartmann*, not necessarily supervisory liability in the context of *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011).

For these reasons, Plaintiffs' arguments in opposition to the State Defendants' motions to dismiss the FAC, are not "clearly inconsistent" with their arguments in the State MTD SAC Opposition. Plaintiffs did not cite the *Starr* "supervisor liability" standard in their oppositions to the State Defendants' motions to dismiss the FAC. Rather, the State Defendants' citations to Plaintiffs' prior positions were taken out of context. Given that Plaintiffs' positions have not been clearly inconsistent, Plaintiffs are not judicially estopped from arguing that *Hartmann* is the appropriate standard for liability in the State MTD SAC Opposition.

(b) Legal Standard for § 1983 Claim Against a State Official in Their Official Capacity

In the Order re MTDs FAC, an incorrect legal standard was included in the evaluation of whether the FAC had sufficient allegations to state a § 1983 claim against Director Johnson. *See* Dkt. 120 at 26–27 (identifying the "supervisory liability for deliberate indifference" standard under *Starr* and *Henry A. v. Willden*, 678 F.3d 991, 1003–04 (9th Cir. 2012)). The standard identified in *Starr* and again *Henry A*. is appropriate in an evaluation of § 1983 claims against state actors sued in their individual capacities, not in their official capacities.

As noted, because the State Defendants here are sued solely in their official capacities, the appropriate standard is *Hartmann*. Accordingly, to state a § 1983 claim against the individual State Defendants, Plaintiffs "need only identify the law or policy challenged as a constitutional violation and name the official within the entity who can appropriately respond to injunctive relief." *Hartmann*, 707 F.3d at 1127.

(c) Procedural Due Process Claims (Third and Fifth Causes of Action)

The Procedural Due Process Claims are brought against Director Troia solely in her official capacity as Director of CDSS. Dkt. 130-1 ¶ 28.

(i) Placement PDP Claim

With respect to the Placement PDP Claim, the SAC adequately alleges the "policy" challenged as a constitutional violation. Thus, it is alleged that Defendants have deprived Plaintiffs of their property without due process "by failing to create adequate processes to notify foster youth of placement decisions or the procedures to appeal the denial of a foster care placement." Dkt. 130-1 ¶ 401. It is further alleged that, "Defendants' procedural shortcomings for providing notice of placement decisions and the right to appeal the denial of placement are deliberate policy choices and a repeated pattern of violations that amount to official policy." Dkt. *Id.* ¶ 402.

As to identifying the official within the entity with the authority to respond to any such injunctive relief, it is alleged that CDSS is the "single state agency responsible for supervising and monitoring the administration of foster care services in California." Dkt. 130-1 ¶ 27. It is alleged that, as "Director of CDSS," Defendant Johnson, who has been replaced by Director Troia, "is responsible for administering laws relating to foster care services; promulgating regulations and standards; supervising the

administration of public social services, including foster care services; and investigating, examining and making reports on public offices responsible for the administration of social services." *Id.* ¶ 28. It is also alleged that "under California Welfare and Institutions Code § 10605," the director of CDSS, "has the authority to enforce state and federal law." *Id.* Further, it is alleged that "Defendants have failed to create adequate procedures to notify foster youth with mental health disabilities of DCFS' placement decisions or procedures to appeal a denial or delay of placement." In addition to those allegations, Plaintiffs argue that the allegation regarding CDSS's "Notice of Operation in Violation of Law" -- in which it is alleged that CDSS sent notice to the Director of DCFS of DCFS's "violation of the law through use of hotels to house foster youth" (*id.* ¶ 236) -- demonstrates "CDSS's specific responsibility to oversee DCFS' administration of foster care placements and to take corrective action when DCFS violates the law." Dkt. 157 at 20.

Considered collectively, the allegations in the SAC are sufficient to state a claim against Director Troia in her official capacity as Director of CDSS, under *Hartmann*. The allegations sufficiently identify the policy challenged, the name of the individual within the entity that has authority to respond, and CDSS's capacity to respond.

Accordingly, the State MTD SAC is **DENIED** as to the contention that the SAC fails to state a Placement PDP Claim against Director Troia in her official capacity.

(ii) Push-Out PDP Claim

With respect to the Push-Out PDP Claim, the SAC adequately alleges the "policy" challenged as a constitutional violation. It is alleged that Defendants have deprived Plaintiffs of their foster care placement benefit by "failing to provide for sufficient notice or hearing before a neutral arbiter before a youth is pushed out of THPP-NMD placement." Dkt. 130-1 ¶ 416. It is also alleged that "Defendants' procedural shortcomings for push-outs from THPP-placements are deliberate policy choices and a repeated pattern of violations that amount to official policy." *Id.* ¶ 419.

The SAC also sufficiently identifies "the official within the entity who can appropriately respond to injunctive relief." *Hartmann*, 707 F.3d at 1127. In addition to the allegations cited above regarding the authority of Director Troia, her role within CDSS, and the authority of CDSS (*see* Dkt. 130-1 ¶¶ 27–28), it is alleged that CDSS's Interim Licensing Standards "govern all aspects of [THPP-NMD] providers' operations, including record maintenance; procedures for assessment, selection, removal and discharge of program participants; safeguarding program participants' valuables' transportation of program participants; food services; occupancy limits for bedrooms; and even the provision of bed linens to program participants." *Id.* ¶ 207. Further, the SAC includes specific allegations regarding why CDSS's policy and Interim Licensing Standards "do not provide youth with sufficient notice when a transition age foster youth is facing 'push-out' from a THPP-NMD program." *Id.* ¶ 260; *see also id.* ¶¶ 261, 262, 265.

Based on the foregoing, the State MTD SAC is **DENIED** with respect to the argument that the SAC fails to state a Push-Out PDP Claim against Director Troia in her official capacity.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:23-cv-06921-JAK-E | Date | September 18, 2026 |
|---|---|---|---|
| Title | Ocean S., et al. v. Los Angeles County, et al. | | |

(d) Substantive Due Process Claim (Fourth Cause of Action)

The Substantive Due Process Claim is brought against both Director Troia and Secretary Johnson solely in their official capacities. Dkt. 130-1 ¶¶ 26, 28. With respect to the "law or policy challenged" through the Substantive Due Process Claim, the SAC alleges that Defendants have deprived Plaintiffs of their right to shelter by maintaining practices that include "failing to provide shelter, failing to identify sufficient emergency housing options for youth transitioning between placements or reentering care; affirmatively issuing standards and policies that undermine shelter for transition age foster youth; and deliberately ignoring the need to evaluate and expand the number of safe and appropriate placements and the emergency housing capacity for transition age foster youth." Dkt. 130-1 ¶ 408. Accordingly, the remaining issue is whether the SAC includes sufficient allegations that Director Troia and Secretary Johnson can appropriately respond to the injunctive relief in light of the above "law or policy challenged."[8]

(i) <u>Director Troia</u>

The same allegations that have been evaluated in concluding that Plaintiffs have stated a Placement PDP Claim against Director Troia, are also sufficient to state a Substantive Due Process Claim against Director Troia. As director of the "single state agency responsible for supervising and monitoring the administration of foster care services in California," Director Troia is "responsible for administering laws relating to foster care services," "supervising the administration of public social services, including foster care services; and investigating, examining and making reports on public offices responsible for the administration of social services." *Id.* ¶¶ 27–28. Further, the SAC includes allegations that would support CDSS's claimed ability to respond to DCFS's alleged violations of the law regarding the housing of foster children. *See id.* ¶¶ 236, 239.

For the foregoing reasons, the State MTD SAC is **DENIED** based on the argument that the SAC fails to state a Substantive Due Process Claim against Director Troia in her official capacity.

(ii) <u>Secretary Johnson</u>

The SAC alleges that CalHHS is a state agency that "oversees departments and offices that provide a wide range of services in the areas of health care, mental health, public health, alcohol and drug treatment, income assistance, social services, and assistance to people with disabilities." *Id.* ¶ 25. It also alleges that CalHHS "oversees and monitors [CDSS] and [DHCS]." *Id.* Further, it alleges that, as the "Secretary of CalHHS," Mark Ghaly, who has been replaced by Secretary Johnson, "is responsible for the administration and oversight of CalHHS and its departments and offices that provide a wide range of services in the areas of health care, mental health, public health, alcohol and drug treatment,

[8] Plaintiffs argue that several new allegations in the SAC (Dkt. 130-1 ¶¶ 346–51), demonstrate that "Defendants Johnson and Troia, and the agencies they represent, knew or should have known of the substantial risk that Plaintiffs would become unhoused or live in otherwise unsafe conditions." Dkt. 157. As the State Defendants note, "deliberate indifference is not relevant to the *Hartmann* standard." Accordingly, the State Defendants' argument that the allegations in paragraphs 346–51 of the SAC are "protected petitioning activity" under the *Noerr-Pennington* doctrine and should be disregarded, is moot, because paragraphs 346–51, to the extent they concern alleged "deliberate indifference," are not relevant in an evaluation of whether the SAC has stated a claim against the State Defendants in their official capacities.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-06921-JAK-E | Date | September 18, 2026 |
| Title | Ocean S., et al. v. Los Angeles County, et al. | | |

income assistance, social services, and assistance to people with disabilities." *Id.* ¶ 26.

A review of the SAC shows that other than the allegation that CalHHS "oversees and monitors" CDSS, there are no allegations specific to the ability of CalHHS or Secretary Johnson to respond to injunctive relief regarding the policy violation alleged.[9]

For these reasons, the State MTD SAC is **GRANTED** with leave to amend as to seeking to state a Substantive Due Process Claim against Secretary Johnson in her official capacity.

(e) The Medicaid Act Claim (Sixth Cause of Action)

The Medicaid Act Claim is brought against Director Baass solely in her official capacity. Dkt. 130-1 ¶ 30. The SAC alleges that Defendants, including Director Baass, have "violated the EPSDT provisions of the Medicaid Act by failing to provide or arrange for behavioral health services for the Medicaid Subclass that are necessary to correct or ameliorate their mental health conditions in violation of 42 U.S.C. §§ 1396a(a)(10)(A), 42 U.S.C. §§ 1396a(43)(C), 1396d(a)(4)(B) and 1396d(r)." Dkt. 130-1 ¶ 424.

Further it is alleged that DHCS is "the single state agency responsible under federal law for the administration of California's Medicaid program ('Medi-Cal')," and as "the Director of DHCS," Director Baass's "duties include supervision and control of the Medi-Cal program to secure full compliance with governing law." *Id.* ¶¶ 29, 30. It is specifically alleged that "Director Baass has . . . failed to monitor and oversee DMH's provision of necessary Specialty Mental Health Services, including failing to conduct an adequate monitoring process, and failing to follow up on DHCS's limited monitoring processes when that review revealed failures and non-compliance on the part of DMH." *Id.* ¶ 343. It is also alleged that "meeting the State's affirmative duty to provide timely Medicaid services to foster youth with mental health disabilities requires intra- and inter-agency coordination, particularly for the provision of Intensive Care Coordination." *Id.* ¶ 344.

The allegations in the SAC, which allege that Director Baas, as director of DHCS, is responsible for ensuring compliance with the Medi-Cal program, and has an "affirmative duty" to provide timely Medicaid services, which has allegedly not been met, are sufficient to state Medicaid Act Claim under *Hartmann*. *See Katie A. ex rel. Ludin v. Los Angeles County*, 481 F.3d 1150, 1159 (9th Cir. 2007) ("Even if a state delegates the responsibility to provide treatment to other entities such as local agencies or managed care organizations, the ultimate responsibility to ensure treatment remains with the state.")

For these reasons, the State MTD SAC is **DENIED** with respect to the argument that the SAC fails to state a Medicaid Act Claim against Director Baass in her official capacity.

2. <u>The Integration Mandate Claims (Seventh and Eighth Causes of Action)</u>

The Integration Mandate Claims are brought against all State Defendants. Because it has been

[9] As stated earlier, *supra* note 8, paragraphs 346–51 of the SAC are not relevant to whether Plaintiffs have stated a claim against Secretary Johnson under the *Hartmann* standard, to the extent they show "deliberate indifference" and/or specific Defendants' alleged "personal[] aware[ness]" of alleged failures to meet legal obligations.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-06921-JAK-E | Date | September 18, 2026 |
| Title | Ocean S., et al. v. Los Angeles County, et al. | | |

determined that Plaintiffs in the STRTP Subclass have made allegations sufficient to state a claim for violation of the integration mandate, the only remaining issue is whether the claim can be brought against the State Defendants. The State Defendants argue that SAC has failed to state an integration mandate claim against them because the claim is based "on placements the State Defendants did not make and on the alleged failure of the other defendants to provide community-based and continuity of 'behavioral health' care and services." Dkt. 137 at 25 (citing Dkt. 130-1 ¶¶ 307–11).

The SAC alleges: DHCS is "the single state agency responsible under federal law for the administration of California's Medicaid program ('Medi-Cal')," (Dkt. 130-1 ¶ 29); CDSS is the "single state agency responsible for supervising and monitoring the administration of foster care services in California" (*id.* ¶ 27); and that CalHHS is the state agency which "oversees and monitors [CDSS] and [DHCS]" (*id.* ¶ 25). It is also alleged that "CDSS and DCFS, together with DCHS and DMH, are public agencies that accept federal dollars and are responsible for ensuring that youth in the foster care system with mental health disabilities are served in accordance with federal law, including the ADA and Section 504." *Id.* ¶ 190. Further, it is alleged that "meeting the State's affirmative duty to provide timely Medicaid services to foster youth with mental health disabilities requires intra- and inter-agency coordination," and present "insufficient coordination between all Defendants results in transition age foster youth with mental health disabilities falling through the cracks," with many "still unable to access legally required and necessary Specialty Mental Health Services in the home and community." *Id.* ¶¶ 344–45.

As noted in the Order re MTDs FAC, "the Ninth Circuit has held that 'even in the absence of a regulation explicitly saying so, a State cannot avoid its obligations under federal law by contracting with a third party to perform its functions.' " Dkt. 120 at 28 (quoting *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1074 (9th Cir. 2010)). Further, courts have held that to state a claim under the ADA or section 504, "it is sufficient to allege" that the defendant "provides, administers and/or funds the existing service system," and/or that the defendant "has utilized criteria or methods of administration that" have led to unnecessary segregation to obtain services." *Day v. District of Columbia*, 894 F. Supp. 2d 1, 23–24 (D.D.C. 2012); *see also Timothy B. v. Kinsley*, 2024 WL 1350071, at *6 (M.D.N.C. Mar. 29, 2024) (finding that the plaintiffs were not required to allege that the state defendant made the "individual placement decisions" where the plaintiffs' claims were based on the state defendant's "administrative and supervisory role overseeing North Carolina's child welfare system"). Accordingly, the allegations in the SAC are sufficient to state a claim for violation of the integration mandate claim against each of the State Defendants.

The State Defendants argue in the alternative that the Integration Mandate Claims should be dismissed against the Individual State Defendants because "naming the individual State employees as Defendants in their official capacities is redundant" to naming the state agencies. Dkt. 137 at 26 (quoting *Enos v. Arizona*, No. 16-CV-384, 2017 WL 553039, at *6 (D. Ariz. Feb. 10, 2017)). This argument is persuasive. The Ninth Circuit has held that, "[w]hen both a municipal officer and a local government entity are named, and the officer is named only in an official capacity, the court may dismiss the officer as redundant." *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008). Thus, Director Troia, Director Baass and Secretary Johnson are dismissed from the Integration Mandate Claim as redundant defendants.

For these reasons, the State MTD SAC is **DENIED IN PART** on the ground that the SAC fails to state an Integration Mandate Claim against CDSS, DHCS and CalHHS, and **GRANTED IN PART** with

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-06921-JAK-E | Date | September 18, 2026 |
| Title | Ocean S., et al. v. Los Angeles County, et al. | | |

respect to Director Troia, Director Baass and Secretary Johnson to the extent they are redundant defendants.

## V. Conclusion

For the foregoing reasons, the MTDs SAC are **GRANTED IN PART** and **DENIED IN PART**.

The County MTD SAC is (1) **DENIED IN PART** as to the Placement PDP Claim brought by the Named Plaintiffs other than Onyx G., but **GRANTED IN PART** with leave to amend as to the Placement PDP Claim brought by Onyx G.; (2) **DENIED IN PART** as to the Push-Out PDP Claim brought by Plaintiffs in the THPP-NMD Subclass other than Onyx G., Jackson K. and Junior R., but **GRANTED IN PART** with leave to amend as to the Push-Out PDP Claim brought by Jackson K. and Junior R., and without leave to amend as to the Push-Out PDP Claim brought by Onyx G.; **DENIED** as to the Substantive Due Process Claim brought by the Named Plaintiffs in the Unsheltered Subclass to the extent it is premised on a right to shelter; (4) **DENIED** with respect to the Medicaid Act Claim; and (5) **DENIED** with respect to the Integration Mandate Claims brought by the STRTP Subclass.

The State MTD SAC is (1) **DENIED** on the ground that the SAC fails to state a Placement PDP Claim of Push-Out PDP Claim against Director Troia in her official capacity; (2) **DENIED** on the ground that the SAC fails to state a Substantive Due Process Claim against Director Troia; (3) **GRANTED** with leave to amend to the extent the SAC fails to state a Substantive Due Process Claim against Secretary Johnson; (4) **DENIED** on the ground that the SAC fails to state a Medicaid Act Claim against Director Baass; and (5) **DENIED IN PART** on the ground that the SAC fails to state an Integration Mandate Claim against CDSS, DHCS and CalHHS, and **GRANTED IN PART** without leave to amend with respect to Director Troia, Director Baass and Secretary Johnson on that claim.

Any Third Amended Complaint shall be filed within 30 days of the issuance of this Order; it shall include factual allegations to support each individual claim each Named Plaintiff seeks to bring against each individual Defendant. If any claim asserted by/against a specific party is then challenged, the parties shall include in the corresponding briefing citations to the relevant portions of the Third Amended Complaint. Further, any opposition briefing shall include a chart with citations to the relevant portions of the Third Amended Complaint on a claim-by-claim as well as a party-by-party basis. The reply shall include the same chart with any disputes and/or revisions.

**IT IS SO ORDERED.**

___ : ___

Initials of Preparer LC2